IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SONOS, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>D&M HOLDINGS INC. d/b/a THE D+M GROUP, D&M HOLDINGS U.S. INC., and DENON ELECTRONICS (USA), LLC,<br><br>　　　　Defendants. | Civil Action No. 14-1330-RGA |

MEMORANDUM OPINION

Phillip A. Rovner, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, DE; Jonathan A. Choa, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, DE; George I. Lee, Esq., LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL; Sean M. Sullivan, Esq., LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL; Rory P. Shea, Esq. (argued), LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL; J. Dan Smith, Esq., LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL; Michael P. Boyea, Esq., LEE SULLIVAN SHEA & SMITH, LLP, Chicago, IL.

Attorneys for Plaintiff

Jack B. Blumenfeld, Esq., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; Michael J. Flynn, Esq., MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; John M. Jackson, Esq. (argued), JACKSON WALKER LLP, Dallas, TX; Nathaniel (Nate) S. Clair II, Esq., JACKSON WALKER LLP, Dallas, TX; Matthew C. Acosta, Esq., JACKSON WALKER LLP, Dallas, TX; Blake T. Dietrich, Esq., JACKSON WALKER LLP, Dallas, TX; David Folsom, Esq., JACKSON WALKER LLP, Texarkana, TX.

Attorneys for Defendant

March 13, 2017

*[signature]*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is Defendants' Partial Motion for Judgment on the Pleadings for Lack of Patent-Eligible Subject Matter. (D.I. 116). The issues have been fully briefed. (D.I. 117, 119, 124). The Court held oral argument on November 14, 2016. (D.I. 206) ("Hr'g Tr."). For the reasons that follow, the Court will deny Defendants' motion.

## I. BACKGROUND

Plaintiff filed this patent infringement lawsuit against Defendant on October 14, 2014. (D.I. 1). Plaintiff has asserted a total of twelve patents in this suit. (D.I. 102). Defendants have moved for partial judgment on the pleadings with respect to four of the asserted patents, alleging that the patents are directed to ineligible subject matter. (D.I. 117). The patents at issue in this motion are U.S. Patent Nos. 8,588,949 ("the '949 patent"), 7,571,014 ("the '014 patent"), 9,202,509 ("the '509 patent"), and 9,219,959 ("the '959 patent").

The parties refer to the '949 and '014 patents collectively as the Volume patents. The '949 patent is directed to a multimedia controller and method for adjusting volume levels in a multi-zone system through the use of a user interface. The summary of the invention section of the specification describes the invention as follows:

> In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups. According to one aspect of the present invention, a mechanism is provided to allow a user to group some of the players according to a theme or scene, where each of the players is located in a zone. When the scene is activated, the players in the scene react in a synchronized manner.

('949 patent at 2:28-34). The '014 patent is similarly directed to a method and apparatus for controlling multimedia players in a multi-zone system. The invention is described in the specification as follows:

> In general, the present invention pertains to control of audio characteristics of a plurality of multimedia players, or simply players, from a controller. The

2

characteristics include, but are not limited to, an audio source and an audio volume being played in each of the players. In particular, the present invention enables the user to remotely control the audio characteristics of the players either as a group or as an individual player.

('014 patent at 2:24-31).

The parties refer to the '509 and '959 patents collectively as the Pairing patents. The '509 patent is directed to methods for grouping and pairing networked audio players. The specification describes the invention as follows:

In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups. . . . [I]ndividual players may be paired or grouped to stimulate [sic] a multi-channel listening environment. In [sic] instead of grouping selected players to play back an audio item, a user is allowed to activate one of the players to process the data of the audio item, essentially separating the data into individual streams, each of the streams representing a single-sound track and being played back in one of the players, thus creating a multi-channel listening environment with the selected players.

('509 patent at 2:26-27, 2:59-67). The '959 patent is similarly directed to devices and methods for grouping, consolidating, and pairing networked audio players. The invention is described in the specification as follows:

In brief summary, the embodiments described herein provide technology for grouping, consolidating, and pairing individual playback devices to create or enhance a multi-channel listening environment. Particularly, the embodiments described herein enable two or more playback devices to be paired, such that multi-channel audio is achieved or enhanced. Such embodiments may be used to produce stereo sound or other audio environments suitable for audio content encoded with more than two channels, such as for certain kinds of television, movies, and music.

('959 patent at 2:54-63).

## II. LEGAL STANDARD

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor,

3

subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized an implicit exception for three categories of subject matter not eligible for patentability—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," as "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 1293-94 (internal quotation marks and emphasis omitted). In order "to transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 1294 (emphasis omitted).

The Supreme Court recently reaffirmed the framework laid out in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must determine whether the claims are drawn to a patent-ineligible concept. *Id.* If the answer is yes, the court must look to "the elements of the claim both individually and as an 'ordered combination'" to see if there is an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357 (alterations in original) (quoting *Mayo*, 132 S. Ct. at 1297). "[S]imply appending conventional

4

steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable." *Mayo*, 132 S. Ct. at 1300. Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* For this second step, the machine-or-transformation test can be a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion for judgment on the pleadings. *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1293 (Fed. Cir. 2016). The Federal Circuit follows regional circuit law for motions for judgment on the pleadings. *Id.* Under Third Circuit law, a Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss when the Rule 12(c) motion alleges that the plaintiff failed to state a claim upon which relief can be granted. *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010); *Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). The court must accept the factual allegations in the complaint and take them in the light most favorable to the non-moving party. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002).

The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, so long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal quotation marks omitted).

5

## III. DISCUSSION

### A. The Volume Patents

The '949 patent contains three independent claims: claim 1, claim 8, and claim 15. In briefing Defendants argued, and, at oral argument Plaintiff agreed, that claim 1 is representative. (Hr'g Tr. at 61:6-9).[1] Claim 1 reads:

> 1. A multimedia controller including a processor, the controller configured to:
> provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;
> accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group for synchronized playback of a multimedia output from the same multimedia source;
> for any individual player in the player group, accept via the user interface a player-specific input to adjust a volume of that individual player, wherein the player-specific input to adjust the volume of that individual player causes that individual player to adjust its volume; and
> accept via the user interface a group-level input to adjust a volume associated with the player group, wherein the group-level input to adjust the volume associated with the player group causes each of the players in the player group to adjust its respective volume.

('949 patent, claim 1).

The '014 patent contains four independent claims, three of which have been asserted: claim 1, claim 16, and claim 38. In briefing Defendants argued, and, at oral argument Plaintiff agreed, that claim 1 is representative. (Hr'g Tr. at 61:6-9). Claim 1 reads:

> 1. A method for controlling a plurality of players, the method comprising:
> displaying on a screen a first list showing at least available players;

---

[1] At oral argument on November 14, 2016, the parties were directed to submit additional briefing to the extent that they felt claim 1 of each of these patents was not representative of any of the asserted dependent claims. (Hr'g Tr. at 62:5-8). The parties waited until February 1, 2017 to propose substantial additional briefing on this issue in a Joint Stipulation. (D.I. 224). On February 2, I denied the parties' Joint Stipulation, finding that the parties had waived any argument that claim 1 of each patent is not representative. (D.I. 225).

6

>displaying, when at least one of the players is selected as a zone group head, on the screen a second list showing at least some of the players that are eligible to be grouped with the zone group head;
>
>forming a zone group started with the zone group head, after one or more players from the at least some of the players are selected to join the zone group; and
>
>synchronizing all players in the zone group;
>
>adjusting a volume meter represented by an averaged value of audio volumes of the players in the group, wherein said adjusting of the volume meter includes changing a volume of each of the group of players synchronously in accordance with an adjustment made by a user.

('014 patent, claim 1).

"First, we determine whether the claims at issue are directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. "The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* (internal quotation marks omitted) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). "The Supreme Court has not established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). The Supreme Court has recognized, however, that "fundamental economic practice[s]," *Bilski*, 561 U.S. at 611, "method[s] of organizing human activity," *Alice*, 134 S. Ct. at 2356, and mathematical algorithms, *Benson*, 409 U.S. at 64, are abstract ideas. In navigating the parameters of such categories, courts have generally sought to "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish*, 822 F.3d at 1334. "But in determining whether the claims are directed to an abstract idea, we must be careful to avoid oversimplifying the claims because '[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) (alterations in original) (quoting *Alice*, 134 S. Ct. at 2354).

7

Defendants assert that the "Volume patents are directed to the abstract idea of 'controlling audio settings for multiple audio devices.'" (D.I. 117 at 13). Defendants contend that, like the concept of collecting and storing data in *Content Extraction*, the Volume patents seek to claim a concept that is "very basic" and "fundamental to the entire technological field described in the Asserted Patents." (*Id.* at 14). According to Defendants, the claimed method "can be manually performed by a human." (*Id.*). Defendants also argue that the asserted claims of the '014 patent encompass prior art devices because the claims are not limited to wirelessly networked audio players. (*Id.* at 15).

Plaintiff counters that Defendants are oversimplifying in characterizing the invention. (D.I. 126 at 12). Plaintiff asserts that the invention embodies "a concrete and tangible concept limited to a specific technological field and it is tethered to specific devices." (*Id.* at 13). Plaintiff further asserts that the invention discloses new functionality and is not simply an automation of steps previously performed by humans. (*Id.*) Finally, Plaintiff objects to Defendants' characterization of the "network" as encompassing prior art hardwired audio systems. (*Id.* at 10). Plaintiff contends, rather, that the claims are limited to audio players on a data network. (*Id.*).

I agree with Plaintiff that Defendants have advanced an oversimplified characterization of the allegedly abstract idea. "Under step one of *Mayo/Alice*, the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents*, 790 F.3d at 1346. As the Federal Circuit has cautioned, "courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games America Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (quoting *TLI Commc'ns*, 823 F.3d at 611).

8

As support for their proposed characterization, Defendants cite to several cases they claim are similar to this one. Many of these cases are inapplicable, however, as they are directed to the abstract idea of collecting, organizing, and storing data. *See TLI Commc'ns*, 823 F.3d at 613 (claims directed to abstract idea of classifying, organizing, and storing digital images"); *Content Extraction*, 776 F.3d at 1347 (claims drawn to abstract idea of collecting, recognizing, and storing data); *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (claims drawn to abstract idea of "organizing information through mathematical correlations" where claims "not tied to a specific structure or machine"); *Visual Memory LLC v. NVIDIA Corp.*, 2016 WL 3041847, at *4 (D. Del. May 27, 2016), *appeal docketed*, No. 16-2254 (Fed. Cir. June 28, 2016) (claims drawn to "abstract idea of categorical data storage"). In order to make the argument that these cases are similar to this one, Defendants offer additional alternative characterizations of the alleged abstract idea, arguing the Volume patents are directed to "organizing and manipulating electronic information" (D.I. 117 at 15) or, alternatively, "organizing and distributing information." (*Id.* at 16). These alternative characterizations are a far cry from, and oversimplified to a greater degree than, "controlling audio settings for multiple audio devices." (*Id.* at 13).

I think these claims are far more specific and limited than Defendants argue. For example, claim 1 of the '014 patent could only be considered to encompass collecting and organizing information if I were to restrict my analysis to the first two limitations involving displaying lists of available players. This is inappropriate. Considering the claim in its entirety reveals that there is more to the claim than organizing information. Rather, the third limitation calls for "forming a zone group," an action that involves controlling actual devices and effecting a fundamental alteration in how the plurality of zone players are networked together. The

9

remaining limitations involve controlling the zone players that have been grouped together, also actions that are not accurately characterized as organizing information. Similarly, claim 1 of the '949 patent claims a controller that provides a user interface allowing for the formation of groups of zone players and control of these players. To characterize this claim as being drawn to "organizing and distributing information" is a gross oversimplification. Defendants' arguments ignore tangible limitations that are tied to specific devices. I am not persuaded.

For similar reasons, I reject Defendants' argument that the concept claimed is fundamental to the entire field. The claims of both Volume patents relate not to the field of audio devices generally, but only to methods and devices for controlling the specific "players" referenced in the claims. I have already construed the term "player" to mean "data network device configured to process and output audio." (D.I. 219 at 9). Claim 1 of each of the Volume Patents, therefore, requires concrete, tangible components, specifically a "plurality of players," where the players are the specific devices described in the patents. Only under Defendants' oversimplified characterization of these patents could the claimed concept be considered fundamental to the technological field.

Defendants further argue that these patents are similar to those invalidated in *TLI Commc'ns*. (Hr'g Tr. at 5:21-6:10). In *TLI*, the claims were found to be abstract at step one because they were "directed to the use of conventional or generic technology in a nascent but well-known environment, without any claim that the invention reflects an inventive solution to any problem presented by combining the two" rather than being directed to "a specific improvement to computer functionality." *TLI Commc'ns*, 823 F.3d at 612. Importantly, however, the specification of the patent at issue in *TLI* did not "provide any technical details for the tangible components." *Id.* In contrast, the claims of the Volume patents are not directed to

10

"generic technology." They are directed to controllers and networked audio players that are described in detail in the specifications. ('014 patent at 6:18-8:49; '959 patent at 7:8-13:10). Furthermore, the specifications of both Volume patents describe the problems presented and solved by these inventions as "dynamically managing the ad hoc creation and deletion of groups" of audio players and "control of the audio players as a group." ('014 patent at 2:3-6; '949 patent at 2:10-13). Although Defendants attempt to argue that this is a "manufactured problem," I do not think *TLI* is analogous to this case both because the Volume patents are directed to specific rather than generic technology and present a specific improvement to the existing technology.

Defendants next argue that "each of the recited steps can be manually performed by a human." (D.I. 117 at 14). However, Defendants do not explain how a human could manually accomplish this feat. Nor could they. Performing the method of claim 1 of the '014 patent requires the following steps: 1) displaying a list of available players on a screen; 2) if one of the players is a zone head, displaying on the screen a second list of players that could be grouped with the zone head; 3) forming a group by selecting some of the players to group with the zone head; 4) synchronizing the players in the group; and 5) using the controller to synchronously adjust the volume of all of the grouped players. Even setting aside the steps involving displaying lists on a screen, it seems clear that in order to form a group in step 3 in a hard wired system contemplated by Defendants, a user would need to re-wire the audio system each time a new group is formed. Forming and changing the composition of player groups in real time simply by making a few selections on the screen of a device is not something a human could do manually in a hard wired system.

Similarly, claim 1 of the '949 patent is a device claim for a controller used to form and control groups of audio players. Defendants' arguments that a human could perform the actions

11

the device is said to perform is at best illogical. Defendants "provided no evidence that the process previously used [to group audio speakers] is the same as the process required by the claims." *McRO, Inc.*, 837 F.3d at 1314. As in *McRO*, the prior art method of grouping and controlling audio devices (*i.e.* by hardwiring them into the desired configuration) "would not be within the scope of the claims" because it does not involving using a controller with a user interface to view lists of available devices on the data network that are then grouped and controlled synchronously. Furthermore, unlike in *McRO*, the method is not implemented on a general purpose computer. Rather, as discussed above, the method is directed to specific devices that are described and claimed in the patents.

It seems to me that the invention as claimed in each of the Volume patents represents a substantial improvement over the existing technology – the invention described in the patents allows for the audio devices to be grouped and regrouped in real time simply using a user interface to select the desired members of the groups without the need for altering any hard wiring in the physical system. This is not simply a "more efficient" method of doing something already done by humans. It is a method that provides for capabilities far beyond what a traditional hardwired system offers. Plaintiff does not contend that audio speakers are a new technology. What is claimed, however, is not a traditional speaker; rather, the claims are directed to an improvement to the existing technology for grouping and controlling audio speakers. Furthermore, the claims are grounded in a specific device – the player/zone player/playback device that is described in the patent and that I previously construed to mean "data network device configured to process and output audio." (D.I. 219 at 9).

Finally, Defendants argue that the claims of the '014 patent "encompass the admitted prior art of hard-wired traditional multi-zone systems." (D.I. 117 at 15). I am not persuaded that

12

this is true for many of the same reasons I have already explained above. Whether it is true or not, however, is irrelevant in the context of this motion because "section 101 eligibility should not become a substitute for a patentability analysis related to prior art, adequate disclosure, or the other conditions and requirements of Title 35." *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868 (Fed. Cir. 2010).

For the reasons given above, I find that the Volume patents claim patent-eligible subject matter under § 101. Having found that the claims are not drawn to an abstract idea under step one, it is unnecessary for me to proceed to step two.

## B.   The Pairing Patents

The '509 patent contains three independent claims: claim 1, claim 11, and claim 23. In briefing Defendants argued, and at oral argument Plaintiff agreed, that claim 1 is representative. (Hr'g Tr. at 61:6-9).[2] Claim 1 reads:

> 1.   A method comprising:
> identifying, via a controller, a plurality of playback devices on a local area network (LAN), wherein at least one of the plurality of playback devices is configured to request an audio data stream from a source device in response to receipt of a command via the controller over the LAN;
> instructing, via the controller over the LAN, at least one of the plurality of playback devices to process the requested audio data stream into at least one of a first and a second channel of the requested audio data stream and to reproduce a respective one of the first and the second channel, wherein the plurality of playback devices, when grouped, provide multi-channel sound, such that a first playback device in the group of the plurality of playback devices is configured as part of the group to reproduce the first channel of the requested audio data stream for the group and a second playback device in the group of the plurality of playback devices is configured as part of the group to reproduce the second channel of the requested audio data stream for the group; and
> displaying, via the controller, an indication that each of the plurality of playback devices is configured to reproduce a respective channel.

---

[2] At oral argument, the parties were directed to submit additional briefing to the extent that they felt claim 1 of the '509 patent and claim 14 of the '959 patent were not representative of any of the asserted dependent claims. (Hr'g Tr. at 62:5-8). The parties waited until February 1, 2017 to propose substantial additional briefing on this issue in a Joint Stipulation. (D.I. 224). On February 2, I denied the parties' Joint Stipulation, finding that the parties had waived any argument that these claims are not representative. (D.I. 225).

13

('509 patent, claim 1). The '959 patent contains two independent claims. In briefing Defendants argued, and at oral argument Plaintiff agreed, that claim 14 is representative. (Hr'g Tr. at 61:6-9). Claim 14 reads:

> 14. A method for outputting audio in a multi-channel listening environment, wherein the method is performed by a playback device, the method comprising:
> receiving audio data over a network;
> processing the audio data before the playback device outputs audio from a plurality of speaker drivers based on the audio data;
> when the playback device is configured for a first type of pairing, performing a first equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers;
> when the playback device is configured for a second type of pairing, performing a second equalization of the audio data before outputting audio based on the audio data from the plurality of speaker drivers.

('959 patent, claim 14).

Defendants argue that the claims of the '509 patent are directed to the abstract idea of "grouping and controlling audio players." (D.I. 117 at 19). According to Defendants, the method described in claim 1 forms "the very foundation of any audio system with more than one speaker." (*Id.*). As to the '959 patent, Defendants argue that the claims are directed to the abstract idea of "changing audio settings based on programmed instructions." (*Id.* at 23). Defendants further allege that the claims of this patent "are so broad and abstract as to encompass the same general idea and practice identified in the '509 patent." (*Id.*). As with the other patents at issue in this motion, Defendants argue that the claimed methods from both of the Pairing patents "can be performed entirely by humans." (*Id.*).

Plaintiff respond that the claims of both of the Pairing patents "are directed to several specific improvements in existing audio system technology." (D.I. 126 at 17, 21). Plaintiff also takes issue with Defendants' contention that the claimed methods can be performed by humans.

14

(*Id.* at 19, 22). Plaintiff further argues, as with the Volume patents, that Defendants have advanced an oversimplified characterization of the claims. (*Id.* at 19).

Defendants make the same arguments here as they did for the Volume patents. I again reject those arguments. As with the Volume patents, I agree with Plaintiff that Defendants' characterization of the purportedly abstract idea is oversimplified. Just as with the Volume patents, the Pairing patents claim methods that involve specific devices (playback devices and controllers) that are described in detail in the specifications. ('509 patent at 5:63-8:50; '959 patent at 7:8-13:10). Furthermore, as with the Volume patents, the claimed methods do not represent simply an automation of something done manually. Rather, the method of claim 1 the '509 patent requires using a controller to identify the playback devices on a local area network, instruct some of the devices to each output different channels of audio data, and display on the controller's screen which device is outputting which channel. In order to perform this method manually, leaving aside the steps involving using a controller or displaying on the screen of the controller, a person would have to manually rewire the devices each time a new selection is made for which devices are to output which channels. Similarly, the method of claim 14 of the '959 patent is performed by the playback device and involves receiving and then processing audio data, recognizing the type of pairing that has been selected for that playback devices, performing an equalization previously specified for that type of pairing, and then outputting audio. This simply is not the kind of method that could be performed manually and, even if it were, automating the method as claimed represents a substantial improvement to the functionality of a specific device. I also reject Defendants' argument that the claims of the '959 patent "are so broad and abstract as to encompass the same general idea and practice identified in

15

the '509 patent." (D.I. 117 at 23). It seems clear to me that the two patents claim substantially different methods even if it could also be said they address "the same general idea."

At oral argument, Defendants drew an analogy between this case and the claims at issue in *Personalized Media*. (Hr'g Tr. at 12:16-13:2). *Personalized Media* involved a claim "directed to the abstract idea of using personal information to create a customized presentation." *Personalized Media Commc'ns, LLC v. Amazon.com, Inc.*, 161 F. Supp. 3d 325, 330 (D. Del. 2015), *aff'd*, 2016 WL 7118532 (Fed. Cir. Dec. 7, 2016). The claim in *Personalized Media*, however, is not analogous to the claims of the Pairing patents. These patents, like the Volume patents, are not about organizing, manipulating, or distributing information. Rather, these patents claim improvements to specific devices, not generic technology, and the methods involve controlling the devices to effect tangible changes in their configurations. For these reasons, I find that the Pairing patents claim patent-eligible subject matter under § 101.

Having found that the claims are not drawn to an abstract idea under step one, it is unnecessary for me to proceed to step two.

## IV. CONCLUSION

For the reasons set forth above, the motion for judgment on the pleadings for lack of patentable subject matter (D.I. 116) will be denied. An appropriate order will be entered.