IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SONOS, INC.,                                          )
                                                      )
                    Plaintiff,                        )
                                                      )
            v.                                        )   C.A. No. 14-1330 (RGA)
                                                      )
D&M HOLDINGS INC. d/b/a THE D+M                       )   REDACTED - PUBLIC VERSION
GROUP, D&M HOLDINGS U.S. INC., and                    )
DENON ELECTRONICS (USA), LLC,                         )
                                                      )
                    Defendants.                       )

**DEFENDANTS' MOTION FOR SUMMARY
<u>JUDGMENT OF NO DIRECT INFRINGEMENT</u>**

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                        Jack B. Blumenfeld (#1014)
OF COUNSEL:                             Michael J. Flynn (#5333)
                                        1201 N. Market Street
John M. Jackson                         P.O. Box 1347
Matthew C. Acosta                       Wilmington, DE  19899-1347
Blake T. Dietrich                       (302) 658-9200
Christopher J. Rourk                    jblumenfeld@mnat.com
JACKSON WALKER L.L.P.                   mflynn@mnat.com
2323 Ross Avenue, Suite 600
Dallas, TX 75201                        *Attorneys for D&M Holdings Inc. d/b/a The D+M*
(214) 953-6000                          *Group, D&M Holdings U.S. Inc. and Denon*
                                        *Electronics (USA), LLC*
David Folsom
JACKSON WALKER L.L.P.
6002 Summerfield, Suite B
Texarkana, TX 75503
(903) 255-3250

Wasif Qureshi
JACKSON WALKER LLP
1401 McKinney, Ste. 1900
Houston, Texas 77010
(713) 752-4521
wqureshi@jw.com

Originally Filed:  June 2, 2017
Redacted Version Filed:  June 9, 2017

## TABLE OF CONTENTS

Page

1. Nature & Stage of Proceedings.................................................................................1

2. Summary of the Argument.......................................................................................1

3. Statement of Facts.....................................................................................................3

    i.    Technology of Asserted Patents.....................................................................3

    ii.   Claim Construction.........................................................................................4

    iii.  Defendants' Accused Products.......................................................................5

    iv.   Representative Claims and Infringement Theories.........................................6

4. Statement of Law.....................................................................................................10

5. Argument..................................................................................................................10

    a.    D&M's Accused Products Do Not Directly Infringe the Asserted Patents "As Sold" or "As Imported"................................................................10

    i.    The Accused Products Are Not "Capable Of" Infringing "As Sold" or "Imported"..12

    ii.   The Asserted Claims Do Not Claim "Capability".......................................14

6. Conclusion................................................................................................................17

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
    672 F.3d 1335 (Fed. Cir. 2012)...............................................................................15

*Ball Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*,
    555 F.3d 984 (Fed. Cir. 2009)................................................................................15

*Bayer AG v. Elan Pharm. Research Corp.*,
    212 F.3d 1241 (Fed. Cir. 2000)...............................................................................11

*Boston Scientific Corp. v. Cordis Corp.*,
    No. C 02-01474 JW, 2006 WL 3782840 (N.D. Cal. Dec. 20, 2006)......................15

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)...............................................................................11

*Finjan, Inc. v. Secure Computing, Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010)...............................................................................12

*Fujitsu Ltd. v. Netgear Inc.*,
    620 F.3d 1321 (Fed. Cir. 2010)...............................................................................15

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
    739 F.3d 1339 (Fed. Cir. 2014).........................................................................12, 14

*Sta–Rite Indus., LLC v. ITT Corp.*,
    682 F.Supp.2d 738 (E.D. Tex. 2010) .....................................................................15

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
    247 F.3d 1316 (Fed. Cir. 2001)...............................................................................10

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011).....................................................................12, 15, 16

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. June 16, 2015), *aff'd*, __ Fed. Appx. __, 2017 WL
    1291313 (Fed. Cir. Apr. 7, 2017).............................................................................7

**Statutes**

35 U.S.C. 112(6) ......................................................................................................7

**Other Authorities**

Fed. R. Civ. P. 56...................................................................................................................3, 10

1.      **Nature & Stage of Proceedings**

On October 21, 2014, Plaintiff Sonos, Inc. ("Sonos") sued Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "Defendants") for allegedly infringing four patents, including U.S. Patent Nos. 7,571,014 ("the '014 Patent") and 8,588,949 ("the '949 Patent") (collectively, "the Volume Patents."). Sonos subsequently filed three Amended Complaints adding and removing various different patents to this litigation. In particular, on March 9, 2015, Sonos filed a Second Amended Complaint adding a number of patents including U.S. Patent No. 8,938,637 ("the '637 Patent").[1] Finally, on March 7, 2016, Sonos filed a Third Amended Complaint substituting seven newly-issued patents. Having dismissed three of these patents from this litigation, Sonos currently asserts nine patents against Defendants: the Volume Patents, the '637 Patent, and U.S. Patent Nos. 9,219,959 ("the '959 Patent"), 8,938,312 ("the '312 Patent"), 9,213,357 ("the '357 Patent"), 9,195,258 ("the '258 Patent"), 9,202,509 ("the '509 Patent"), and 9,042,556 ("the '556 Patent") (collectively, "the Asserted Patents"). The Parties recently exchanged expert reports detailing the various allegations in this litigation. Discovery in this case is now closed and the Parties are in the dispositive and *Daubert* motion stage.

2.      **Summary of the Argument**

Sonos currently asserts 29 different claims from the nine Asserted Patents. These claims span various method, apparatus, system and computer-readable medium (CRM) claims, shown as follows:[2]

---

[1] Sonos's Second Amended Complaint brought the total number of Asserted Patents to twelve.
[2] Defendants have prepared the attached Ex. E-25 which recites the claim language of each Asserted Claim as well as the language of any independent claim from which asserted dependent claims depend.

1

| Patent | Asserted Claims |
|---|---|
| 9,195,258 | 11, 17, 18, 21, 24 |
| 9,213,357 | 9, 10, 12, 19 |
| 8,938,637 | 1, 9 |
| 7,571,014 | 8, 21, 25, 38 |
| 8,588,949 | 1, 16 |
| 9,202,509 | 6, 25, 28, 30 |
| 9,219,959 | 5, 9, 10 |
| 9,042,556 | 10, 12, 14, 28 |
| 8,938,312 | 1 |

\* No highlighting – Method Claims
\* Apparatus Claims
\* System Claim
\* Computer-readable medium (CRM) Claims

Across these asserted claims, Sonos, through its infringement expert Dr. Kevin Almeroth, sets forth a number of plainly incompatible direct infringement positions.[3]  For example, for nearly every asserted method claim, Sonos concedes that direct infringement requires acts involving a number of different components within the omnibus "HEOS System," at least including (1) a HEOS Controller Application ("HEOS Controller App") operating on a third-party device such as a smart phone[4] and (2) at least one HEOS speaker device (the "HEOS Players") connected to a wireless network.  Thus Defendants could only directly infringe the asserted method claims by "using" the HEOS System during internal testing and demonstration.

Moreover, Sonos alleges direct infringement of nearly all the asserted non-method claims based on Defendants' "sale" or "importation" of the various HEOS Players or HEOS Controller App alone – without any additional configuration, assembly, or interaction with a wireless

---

[3]  Defendants have prepared the attached Exhibit 24 which includes direct citations to Dr. Almeroth's Reply Expert Report regarding infringement which provide the basis for Dr. Almeroth – and Sonos's – direct infringement theories.

[4]  It is undisputed that Defendants do not offer – and have never offered –any physical hardware device capable of operating the HEOS Controller App.  As such, any allegations related to the HEOS Controller App are necessarily rooted on the end-user installing the HEOS Controller App on their third-party device.

network, other HEOS Players or the HEOS Controller App.  However, D&M's HEOS Players do not infringe at least because they need to be modified by user assembly and programming before they have the functionality Sonos alleges as infringing the Asserted Patents.  Indeed, Sonos and Dr. Almeroth have explicitly recognized that in order to operate as accused, the HEOS Players must **necessarily** be controlled by the HEOS Controller App, which is never sold or imported in conjunction with the HEOS Players.  Because the HEOS Players require this additional assembly and control, the HEOS Players do not and cannot directly infringe the Asserted Patents "as sold" or "as imported" as Sonos and Dr. Almeroth allege.  Instead, any allegations of direct infringement against Defendants must also be limited to internal testing and demonstrations wherein D&M is "using" all the required components of the accused HEOS System.

Accordingly, Defendants request summary judgment under Fed. R. Civ. P. 56 that there is no direct infringement of the asserted claims of the Asserted Patents based on "sale" or "importation" of the accused products.

## 3.     Statement of Facts

### i.     Technology of Asserted Patents

Sonos admits in its Third Amended Complaint that the Asserted Patents all involve the same general technology relating to wireless audio systems.  *See* D.I. 93 at 5. As described in the specification of the '949 Patent, the Asserted Patents are directed to "the area of consumer electronics and human-computer interaction."  *See* '949 Patent at Col. 1, ll. 26-27.  More particularly, the Asserted Patents state that although multi-zone audio systems including a number of audio players were "conventional" around 2003, there was a demand for "dynamic control of the audio players as a group [with] minimal manipulation."  *See id.* at Col. 1, ll. 41-43 and Col. 2, ll. 12-15.  To address this purported need, the Asserted Patents describe methods of controlling and managing the various operations of the networked audio environment, including:

3

- Synchronizing playback of various playback devices in a networked environment – '258, '357 and '637 Patents (the "Synchronization Patents");

- Adjusting volume and other audio settings of various playback devices from a centralized control device – '014 and '949 Patent (the aforementioned "Volume Patents");

- Establishing various configurations including pairings of audio playback devices in the networked environment – '509 Patent;

- Adjusting the equalization settings of audio playback devices in the networked environment based on the established configurations or pairings – '959 Patent;

- Adjusting audio settings based on orientation of audio playback devices in the networked environment – '556 Patent; and

- Automatically adjusting playback of audio streams based on the detection of a new audio signal – '312 Patent.

In short, the Asserted Patents are directed to human-computer interaction and centrally controlling networked audio components. This is supported by the specifications of the Asserted Patents as well as Sonos's allegations in its Third Amended Complaint. *See id.* at Col. 1, ll. 26-27; *see also, e.g.*, D.I. 102, ¶ 54 ("The '949 patent is directed to devices and methods for controlling a plurality of players in a local area network.").

### ii.   Claim Construction

The Court construed the claim terms relevant to this motion as follows:

| Claim Term(s) | Asserted Patents | Construction (D.I. 221) |
|---|---|---|
| "zone player" / "playback device" / "player" | 7,571,014<br>8,588,949<br>8,938,312<br>8,938,637<br>9,042,556<br>9,195,258<br>9,202,509<br>9,213,357<br>9,219,959 | "data network device configured to process and output audio" |
| "paired" / "pairing" | 9,042,556<br>9,219,959 | "configuration involving two or more playback devices that have different playback roles" |

| Claim Term(s) | Asserted Patents | Construction (D.I. 221) |
|---|---|---|
| "independently clocked" | 9,195,258<br>9,213,357 | "operating in accordance with their own respective clocks during synchronous playback" |

### iii.    Defendants' Accused Products

Defendants manufacture and sell a number of wireless audio products as part of the accused HEOS System.  *See* D.I. 102 at ¶ 15 ("This HEOS system is made up of a line of HEOS wireless audio products, including the 'HEOS 7' speaker, the 'HEOS 5' speaker, the 'HEOS 3' speaker, 'HEOS 1' speaker, the 'HEOS LINK' pre-amplifier, the 'HEOS AMP' amplifier, the 'HEOS Drive' multi-room amplifier, and the 'HEOS HomeCinema' TV sound system (collectively, 'HEOS players'), all of which are controlled by the HEOS Controller App (for iOS, Android, or Kindle).").

But Defendants do not manufacture – and have never manufactured – any physical "controller" device for the identified HEOS Players.  Further, Defendants do not offer any networking equipment for enabling communication between the various HEOS Players and/or the HEOS Controller App.  Importantly, the HEOS Players have a number of features and functionalities that support and enable audio playback locally or via a Bluetooth link without any wireless network configuration or additional programming by the user via the HEOS Controller App.  Such functionality has not been accused of infringement in this case.

Sonos admits that in order to operate in the accused manner – i.e., to allow the various functionalities outlined above – the HEOS Players must be operated in conjunction with the HEOS Controller App.  *See, e.g.*, D.I. 102 at ¶43 ("Defendants' HEOS controller app—which is configured to group HEOS speakers, synchronize grouped HEOS speakers, and adjust a "Master" volume for grouped HEOS speakers—embodies one or more of the methods and/or

devices claimed in the '014 patent").  On this point, Sonos's expert Dr. Almeroth could not be clearer:



*See* Jackson Dec. at E-3 (Expert Report of Dr. Kevin C. Almeroth served on February 20, 2017) ("Almeroth Opening Report") at ¶ 267 (emphasis added).

Thus, Sonos admits that to operate as accused, the HEOS Players must be: (1) manufactured/purchased; (2) then connected to a third-party device operating the HEOS Controller App via an internal wireless network or a connector cable; (3) then connected to an external wireless network using the HEOS Controller App; (4) then updated and installed with the requisite version of firmware using the HEOS Controller App; and (5) then configured or programmed by the user operating the HEOS Controller App in the allegedly infringing manner, to create the instructions needed using the firmware that has been installed on the HEOS Player.

### iv.    Representative Claims and Infringement Theories

Sonos currently asserts eight method claims from the Asserted Patents.  *See* Exs. E-24 and E-25.

*See, e.g.*, Ex. E-12 (Reply Expert Report of Dr. Kevin C. Almeroth dated May 9, 2017) ("Almeroth Reply Report") at ¶¶ 237, 267, 322.

████████████████████████████████████████████████   *See, e.g.,*

E-12 (Almeroth Reply Report) at ¶¶ 226, 298.

As such, it is clear that Sonos's allegations related to all asserted method claims require at least two HEOS Players operating in conjunction with, or based on programming or other instructions delivered by, the HEOS Controller App.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████   Ex. 24 (Almeroth Allegations Chart).   For example, apparatus claim 25 of the '014 Patent recites:

| '014 Patent, Claim 25 |
|---|
| Claim 25 | An apparatus for controlling a plurality of players, the apparatus comprising:<br><br>a screen;<br><br>a screen driver commanding the screen;<br><br>an input interface;<br><br>a network interface;<br><br>a memory for storing code for an application module;[5]<br><br>a processor coupled to the memory, the input interface, the screen driver and the network interface, the processor executing the code in the memory to cause the application module and the screen driver to perform operations of:<br><br>displaying on a screen a first list showing at least available players;<br><br>displaying a zone group including players from the available players |

[5] It is noted that the term module "is a well-known nonce word that can operate as a substitute for 'means' in the context of § 112, para. 6." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. June 16, 2015), *aff'd*, __ Fed. Appx. __, 2017 WL 1291313 (Fed. Cir. Apr. 7, 2017).   As such, if Sonos is correct and this claim is functionally claimed, then it must be construed under 35 U.S.C. 112(6), which Sonos did not request during claim construction and has subsequently opposed.   *See* Ex E- 15 (Expert Report of Dr. Wolfe), Appendix A (Indefiniteness).

| '014 Patent, Claim 25 |
| --- |

|  |  | when at least two of the available players are selected to form the zone group, wherein any one of the players in the group serves as a zone group head; |
|  |  | synchronizing all players in the zone group in accordance with the zone group head; and |
|  |  | adjusting a volume meter represented by an averaged value of audio volumes of the slayers in the group, wherein said adjusting of the volume meter includes changing a volume of each of the group of players synchronously in accordance with an adjustment made by a user. |

██████████████████████████████████████████████

████████████████████████████████████████████.

*See, e.g.*, Ex. E-12 (Almeroth Reply Report) at ¶¶ 237, 267. Thus, according to Sonos, for Defendants to directly infringe the Volume Patents, end-users would not even need to purchase any HEOS Players – users would simply need to download the HEOS Controller App on their separately and independently purchased smart phone. That argument clearly cannot stand as claim 25 of the '014 Patent requires that the apparatus be configured to function in a specific way. In particular, Dr. Almeroth has not provided any evidence that the HEOS Controller App can operate with any player regardless of its configuration, and the only evidence is that the HEOS Controller App can only operate as claimed when two HEOS Players, each with a compatible version of the firmware, are present on the network and fully operational.

As another example of a representative apparatus claim, claim 9 of the '357 Patent recites:

| '357 Patent, Claim 9 | |
| --- | --- |
| Claim 9 | A first playback device comprising: |
|  | one or more processors; |

| '357 Patent, Claim 9 |
|---|
| a network interface; and<br><br>tangible, non-transitory computer-readable memory comprising program instructions that, when executed by the one or more processors, cause the first playback device to:<br><br>    receive, via the network interface from a network device configured to control the first playback device and communicatively coupled to the first playback device over a local area network (LAN), control information comprising an address identifying a network location of audio information available at an audio information source, wherein the audio information source is outside of the LAN; and<br><br>    after receiving the control information, (i) obtain, via the network interface from the audio information source outside of the LAN, the audio information; (ii) transmit, via the network interface of the first playback device to a second playback device, the audio information, playback timing information associated with the audio information, and device clock information of the first playback device; and (iii) play back the audio information in synchrony with the second playback device by using the playback timing information associated with the audio information and the device clock information of the first playback device to play back the audio information, wherein the first and second playback devices remain independently clocked during synchronous playback of the audio information. |

██████████████████████████████████████████████████

███████████████████████████████████████████. *See, e.g.,*
Ex. E-12 (Almeroth Reply Report) at ¶¶ 132, 198, 226. Thus, according to Sonos, for Defendants to directly infringe the Synchronization Patents under this theory, end-users would not even need to configure the HEOS Players or download the HEOS Controller App on their smart phone. Instead, Sonos insufficiently argues that all that is needed is the sale or importation of a HEOS Player.[6]

---

[6] These allegations are nearly identical to the direct infringement allegations of the apparatus claims of the '556 and '959 Patents although Sonos's allegations for those Asserted Patents are limited to sales and importation of the HEOS 3 products. Similarly, Sonos's allegations regarding the '312 Patent are limited to sales and importation of the HomeCinema products.

Sonos's allegations regarding the CRM claims of the '509 Patent are nearly identical to Sonos's allegations of direct infringement of the apparatus claims of the Volume Patents discussed above. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████ Ex. E-12 (Almeroth Reply Report) at ¶ 322.

████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ Ex. E-12 (Almeroth Reply Report) at ¶ 198.  This is similar to Sonos's allegations regarding the asserted method claims, which require a combination of the HEOS Players <u>and</u> the HEOS Controller App in order to directly infringe.

**4.     Statement of Law**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Broad conclusory statements offered by [ ] experts are not evidence and are not sufficient to establish a genuine issue of material fact."  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) (citations omitted).

**5.     Argument**

**a.     D&M's Accused Products Do Not Directly Infringe the Asserted Patents "As Sold" or "As Imported"**

For direct infringement, a device must meet all limitations of a claim.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311-12 (Fed. Cir. 2005).  If a

10

claim element is missing, there is no direct infringement.  *See, e.g.*, *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).



. *See* Ex. E-24 (Almeroth Allegations Chart).

. *See* Ex. E-24 (Almeroth Allegations Chart).

.” *See, e.g.,* Ex. E-12 (Almeroth Reply Report) at ¶ 105.  In view of that position, Dr. Almeroth suggests that Sonos need not show that users (i) purchase HEOS Players, (ii) install the HEOS Controller App on their third-party device, (iii) connect the HEOS Players and HEOS Controller App to a wireless network, (iv) use the HEOS Controller App to configure the HEOS Players to operate on an external wireless network, and (v) use the HEOS Controller App to configure the HEOS Players to operate in the specifically claimed manner.  Instead, Dr. Almeroth mistakenly finds it sufficient that either step (i) or (ii) alone results in Defendants' direct infringement of the

---

[7] To the extent Sonos disputes this position, Defendants reserve the right to address these newly-added allegations which would deviate from the explicit positions taken in Dr. Almeroth's expert reports.  *See* Ex. E-24 (chart of Almeroth's arguments).

apparatus claims of the Asserted Patents. The law requires that for direct infringement under a "capability of infringement" allegation it must be true that (a) the product provide that capability without further modification or programming, and (b) that the claims properly recite a capability (rather than covering explicit functions or configurations). *Finjan, Inc. v. Secure Computing, Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010).

> **i.   The Accused Products Are Not "Capable Of" Infringing "As Sold" or "Imported"**

The Federal Circuit has rejected the argument that "devices infringe if they 'have the capability of being configured or programmed to perform the stated function,' even though the accused devices were not structured to perform that stated function as sold." *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (quoting *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011)).  In *Nazomi*, the Federal Circuit held that the purchase and installation of separate software that would allow the accused hardware to function as accused was a modification of the accused product and therefore sale of the hardware alone did not constitute direct infringement.  *See* 739 F.3d at 1345-46.  In other words, because the underlying hardware **required software** to operate as accused, the product as sold was not capable of infringing the asserted patent without modification.  *Id.*

██████████████████████████████████████████████████████████

████████████████████████████████████████████   *See* Ex. E-

3 (Almeroth Opening Report) at ¶ 267 ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██   Therefore, neither the HEOS Players nor the HEOS Controller App is capable of infringing as "sold" or "imported."

███████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████.   *See, e.g.*, Ex. C (Rebuttal Expert Report of Dr. Harry Bims)  ("Bims Report") on April 17, 2017 at ¶ 330.  However, that capability is not the accused functionality claimed in the Asserted Patents.  Instead, the Asserted Patents are directed to devices providing centralized control of networked audio devices using a controller device.  *See, e.g.,* '949 Patent at Col. 1, ll. 26-30 ("The invention is generally related to the area of consumer electronics and human-computer interaction.  In particular, the invention is related to user interfaces for controlling or manipulating a plurality of multimedia players in a multi-zone system.").  In order to accomplish centralized control, the Asserted Patents describe the relationship between a dedicated control device that allows the user to select and control the operations of the various playback devices in the networked system.  *See id.* at Col. 2:55-64; Fig. 2B.

Faced with the undisputed fact that Defendants do not make or sell these types of dedicated control devices – or any physical "control" device for that matter – Sonos must resort to the strained argument that sale of HEOS Controller App alone infringes the apparatus and CRM claims.  ███████████████████████████████████████████

████████████████████████████████████████  *See* Almeroth

Opening Report at ¶ 267.  ████████████████████████████████████



*See* Ex. E-24 (Almeroth Allegations Chart).

. *See* Ex. E-3 (Almeroth Opening Report) at ¶ 267 ([a number of the listed steps necessarily] "require[ ] the use of a HEOS Controller"). As such, Sonos has presented no evidence that the HEOS Players alone are "capable" of infringing the asserted apparatus claims of the '258, '357, '637, '959 and '312 Patents. *See* Ex. E-24 (Almeroth Allegations Chart).

Because the accused HEOS Players and HEOS Controller App are <u>both</u> required to practice the claimed functionality, neither alone is "capable" of performing the claimed functionality without modification. *See Nazomi,* 739 F.3d at 1345-46. For this reason, Sonos has failed to provide any evidence to support its allegations of direct infringement based on "sale" or "importation."

### ii.    The Asserted Claims Do Not Claim "Capability"

The Federal Circuit has repeatedly held that "[u]nless the claim language only requires the capacity to perform a particular claim element, we have held that it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) (citations omitted). Where claims are not expressly directed to capability, "infringement is not proven *per se* by a finding that an accused product is merely capable of infringing." *Ball*

*Aerosol and Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 994-5 (Fed. Cir. 2009) (citations and quotations omitted) (emphasis in original).  Thus, even if the accused HEOS Players and HEOS Controller App were "capable" of infringement as "sold" or "imported" – which they are not – infringement would lie only if the asserted claims recite "capability" as opposed to reciting certain required functionality.

Courts have generally interpreted "configured to" more narrowly than simply "capable of."  *See Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1380 (Fed. Cir. 2011) (construing "memory ... configured to" as "memory that must perform the recited function"); *see also Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335 (Fed. Cir. 2012) (interpreting "adapted to" and construing it in the "narrow" sense of "configured to" in contrast to the "broader" sense as "capable of"); *Sta–Rite Indus., LLC v. ITT Corp.*, 682 F.Supp.2d 738, 753 (E.D. Tex. 2010) (construing "adapted to," in context, to mean "designed or configured to," not "having the capacity to"); *Boston Scientific Corp. v. Cordis Corp.*, No. C 02-01474 JW, 2006 WL 3782840 (N.D. Cal. Dec. 20, 2006) (construing "adapted to," in light of patent as a whole, to mean "configured to," not "capable of").

Importantly, the phrase "configured to" appears 24 times in the 29 asserted claims.  *See* Ex. E-25 (Almeroth Claim Language Chart).  The phrase appears in every asserted independent claim – and therefore all dependent claims – for six of the nine Asserted Patents.[8]  The most common use of this phrase is a "playback device *configured to*" perform certain functionalities such as receiving and outputting audio data.  *Id.*  This phrase is also commonly used to describe "controllers *configured to*" perform certain functions in conjunction with the playback devices.  *Id.*  In either instance, having the mere "capability" to eventually perform some functionality

---

[8] In particular, the '949, '258, '357, '556, '509 and '959 Patents.

under user customized circumstances, programming and configurations would not constitute infringement.  *Typhoon*, 659 F.3d at 1380.

This Court has previously construed a number of claims terms in the Asserted Patents that also inform this analysis.  *See* D.I. 221.  In particular, the Court determined that the terms "zone player," "playback device," and "player" – which appear in every asserted claim of every Asserted Patent – constitutes a "data network device *configured to* process and output audio.". *Id.* (emphasis added).  Notably, this was the exact construction proposed by Sonos in this matter. D.I. 219 at 8.  In light of the Court's construction – and Sonos's arguments during the *Markman* proceedings – it is clear that the accused HEOS Player must actually be (i) a data network device and (ii) configured to process and output audio.  Sonos has failed to provide any evidence that the accused HEOS Players (or HEOS Controller App for that matter) are a "data network device" before these devices are actually connected to a data network which is clearly accomplished only *after* the sale or importation of the accused products.[9]  Further, Sonos waived any argument that the mere "capability" of processing and outputting audio is sufficient for direct infringement when it sought a construction that the HEOS Players must actually be "*configured to* output and receive audio."

The claim construction positions also apply to at least the terms "paired" / "pairing" and "independently clocked" which require certain functionality in the accused products as opposed to merely the capability of operating in the infringing manner.  In particular, the terms "paired" / "pairing" describe a specific "configuration involving two or more playback device" that can *only* be accomplished based on user programming from the HEOS Controller App.  *See* Ex. E-3

---

[9] The internal network of a HEOS Player is not used for processing and outputting audio data, and is only used to configure the HEOS Player to operate on the user's external network.  While the HEOS Players can function as speakers without being configured to operate on the external network, that mode of operation does not include a network.

(Almeroth Opening Report) at ¶ 345 ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████[10]

Furthermore, the term "independently clocked" was construed to convey a specific mode of "operating in accordance with their own respective clocks during synchronous playback." None of these terms permit mere "capability" and instead recite concrete structural configurations and/or functionalities which must be achieved in order for any infringement to exist.

As detailed above, it is clear that merely installing the HEOS Controller App or purchasing a HEOS Player does not result in a controller *or* playback device that is "configured to" perform *any* of the claimed functionality of the Asserted Patents. ████████████████ ██████████████████████████████████████████████ *See* Ex. E-3 (Almeroth Opening Report) at ¶ 267. Thus, while the accused products may be programmable and/or configurable to allegedly perform the accused functionalities, the players and mobile application are certainly not "configured to" do so without substantive additional steps and/or components provided by an end-user. Thus the accused products are not "configured to" infringe "as sold" or "as imported" as required by the Federal Circuit's precedents, and thus cannot directly infringe without user configuration.

6.    **Conclusion**

Accordingly, Defendants respectfully request that the Court grant summary judgment of no direct infringement based on the sale and importation of the Asserted Patents.

---

[10] This statement is further evidence that both the HEOS Players and HEOS Controller App are required to operate in the accused fashion and that "sale" or "importation" of either component alone cannot constitute direct infringement.

17

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Michael J. Flynn*

John M. Jackson
Matthew C. Acosta
Blake T. Dietrich
Christopher J. Rourk
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000

David Folsom
JACKSON WALKER L.L.P.
6002 Summerfield, Suite B
Texarkana, TX 75503
(903) 255-3250

Wasif Qureshi
JACKSON WALKER LLP
1401 McKinney, Ste. 1900
Houston, Texas 77010
(713) 752-4521
wqureshi@jw.com

June 2, 2017

_____
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for D&M Holdings Inc. d/b/a The D+M*
*Group, D&M Holdings U.S. Inc. and Denon*
*Electronics (USA), LLC*

18

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on June 9, 2017, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan A. Choa, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza
Wilmington, DE  19801
*Attorneys for Plaintiff*

George I. Lee, Esquire                                       *VIA ELECTRONIC MAIL*
Sean M. Sullivan, Esquire
Rory P. Shea, Esquire
John Dan Smith III, Esquire
Michael P. Boyea, Esquire
LEE SULLIVAN SHEA & SMITH LLP
224 North Desplaines Street, Suite 250
Chicago, IL  60661
*Attorneys for Plaintiff*

*/s/ Michael J. Flynn*
_____
Michael J. Flynn (#5333)