# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SONOS, INC., § <br> § <br> *Plaintiff*, § <br> § <br> v. § <br> § <br> D&M HOLDINGS INC. d/b/a THE D+M § <br> GROUP, D&M HOLDINGS U.S. INC., and § <br> DENON ELECTRONICS (USA), LLC, § <br> § <br> *Defendants*. § | Civil Action No. 14-1330-WCB |

## MEMORANDUM OPINION AND ORDER

Before the Court are two motions brought by plaintiff Sonos, Inc., that seek summary judgment on five of the affirmative defenses asserted by defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M"). Specifically, Sonos moves for summary judgment on D&M's affirmative defenses of patent exhaustion, patent misuse, prosecution laches, intervening rights, and two of D&M's theories of invalidity. Dkt. Nos. 289, 295. On October 30, 2017, the Court held a hearing on the motions, at which the Court ruled on some of the issues and took some under submission. This order addresses all of the issues raised by the parties in the two motions. Sonos's motions are GRANTED as to patent exhaustion, patent misuse, prosecution laches, and invalidity; and GRANTED in part and DENIED in part as to intervening rights.

## BACKGROUND

Sonos is a manufacturer of wireless audio devices. On October 21, 2014, Sonos brought suit against D&M, a direct competitor that had launched its own wireless audio system called

"HEOS by Denon." Sonos initially alleged that D&M had infringed 12 of Sonos's patents. Dkt. No. 263 ¶¶ 12, 15-16, 25-167. At present, Sonos is asserting eight of those patents against D&M: U.S. Patent Nos. 7,571,014 ("the '014 patent"), 8,588,949 ("the '949 patent"), 8,938,312 ("the '312 patent"), 9,042,556 ("the '556 patent"), 9,195,258 ("the '258 patent"), 9,202,509 ("the '509 patent"), 9,213,357 ("the '357 patent"), and 9,219,959 ("the '959 patent"). See Dkt. No. 350, at 1 n.1. Those patents cover five features offered in both Sonos's and D&M's products. First, the synchronization patents (the '258 and '357 patents) allow for synchronized audio playback between two or more speakers. Second, the group volume control patents (the '014 and '949 patents) allow for the volume of two or more speakers or speaker groups to be adjusted simultaneously. Third, the pairing patents (the '959 and '509 patents) allow for two or more separate speakers to be paired to provide multi-channel sound. Fourth, the orientation patent (the '556 patent) shapes the audio output based on the orientation—e.g., horizontal or vertical—of the speaker. Finally, the autoplay patent (the '312 patent) allows a speaker to monitor for audio signals from an external audio source, such as the speaker's line-in input connector, and select that source for playback when that external source begins outputting audio signals. The two group volume control patents and one of the synchronization patents (the '258 patent) are scheduled to be tried in a bellwether trial beginning December 11, 2017.

## DISCUSSION

### I. Patent Exhaustion

Sonos moved for summary judgment on D&M's affirmative defense of patent exhaustion. In its responsive brief, D&M stated that it has abandoned the affirmative defense of patent exhaustion. Dkt. No. 343, at 1 n.1. The Court therefore grants summary judgment to Sonos on D&M's pleaded defense of patent exhaustion.

## II. Patent Misuse

Sonos moved for summary judgment on D&M's affirmative defense of patent misuse. At the October 30, 2017, hearing, D&M announced that it was not pursuing the defense of patent misuse. The Court therefore grants summary judgment to Sonos on D&M's pleaded defense of patent misuse.

## III. Prosecution Laches

Sonos moved for summary judgment on D&M affirmative defense of prosecution laches. At the October 30, 2017, hearing, D&M announced that it was not pursuing the defense of prosecution laches. The Court therefore grants summary judgment to Sonos on D&M's pleaded defense of prosecution laches.

## IV. Intervening Rights

D&M asserts the affirmative defense of absolute intervening rights as to the '949 and '959 patents, both of which underwent reexamination. The defense of absolute intervening rights allows a party whose products infringe a reissued or reexamined patent to continue to use or sell specific products that were made, purchased, or used before the reissuance or reexamination, if the asserted claim was not in the original patent, so long as the accused infringer began its infringing activity before the patent was reissued or reexamined. 35 U.S.C. § 252 (second paragraph, first sentence); id. § 307(b) (section 252 applicable to reexamined claims); see also Marine Polymer Techs., Inc. v. HemCon, Inc., 672 F.3d 1350, 1361-62 (Fed. Cir. 2012) (en banc).[1]

---

[1] D&M has not asserted the defense of equitable intervening rights, which is embodied in the second sentence of the second paragraph of section 252 of the Patent Act, 35 U.S.C. § 252. See Dkt. No. 343, at 4-5. The statutory provision establishing equitable intervening rights authorizes the court to allow the continued manufacture, use or sale of additional products covered by the reissued or reexamined patent when the accused infringer made, purchased, or

The owner of a patent that survives reexamination "is only entitled to infringement damages for the time period between the date of issuance of the original claims and the date of the reexamined claims if the original and the reexamined claims are substantially identical." Convolve, Inc. v. Compaq Comput. Corp., 812 F.3d 1313, 1322-23 (Fed. Cir. 2016) (quoting R & L Carriers, Inc. v. Qualcomm, Inc., 801 F.3d 1346, 1351 (Fed. Cir. 2015)). "[I]t is the scope of the claim that must be identical, not that identical words must be used." Id. (alteration in original) (quoting Slimfold Mfg. Co. v. Kinkead Indus., Inc., 810 F.2d 1113, 1116 (Fed. Cir. 1987)). Amendments made during reexamination, even those made after a rejection based on prior art, "do not necessarily compel a conclusion that the scope of the claims has been substantively changed." Id. Rather, "[t]o determine whether a claim change is substantive it is necessary to analyze the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information." Id. (alteration in original) (quoting Laitram Corp. v. NEC Corp., 952 F.2d 1357, 1362-63 (Fed. Cir. 1991)). The court applies traditional claim construction principles and pays "particular attention to the 'examiner's focus in allowing the claims' after amendment." Id. at 1322-23 (quoting R & L Carriers, Inc., 801 F.3d at 1351).

Sonos argues that D&M should not be allowed to rely on the rebuttal report of its expert, Dr. Harry Bims, to support its position on intervening rights, because D&M did not address the issue of intervening rights prior to the filing of that report, and thus Dr. Bims's opinions on intervening rights were not timely disclosed. Sonos points to the Court's scheduling order, which provided that the party with the burden of proof on an issue was required to file an

---

used identical products, or made substantial preparations to make, use, or sell identical products, before the reissue or reexamination date, "under such terms as the court deems equitable for the protection of investments made or business commenced." 35 U.S.C. § 252 (second paragraph, second sentence); see Shockley v. Arcan, Inc., 248 F.3d 1349, 1360-61 (Fed. Cir. 2001).

opening expert report by February 20, 2017, long before Dr. Bims's rebuttal expert report was filed. See, e.g., Dkt. No. 231. The burden of proof on the issue of intervening rights, an affirmative defense, rests on the defendant. BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1221 (Fed. Cir. 1993); Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1388 (Fed. Cir. 1983). Therefore, according to Sonos, D&M has forfeited its right to present a defense of intervening rights.

The Court disagrees. D&M pleaded the defense of intervening rights and raised the issue of the improper broadening of the claims of the '949 and '959 patents in the February 20, 2017, report of its expert, Dr. Jay P. Kesan, although Dr. Kesan did not specifically tie his discussion of improper broadening to the legal issue of intervening rights. Dkt. No. 307, Ex. A, at 42-54 (¶¶ 133-151). Sonos's expert, Dr. Kevin C. Almeroth, stated in his expert report that the changes made to the claims of the '949 patent following reexamination did not substantively change the scope of the claims of that patent. See Dkt. No. 311, Ex. E-3, at 75 (¶ 205). D&M was entitled to rebut that evidence, which it did through Dr. Bims's expert rebuttal report. Dkt. No. 309, Ex. C, at 76-80 (¶¶ 243-54). Dr. Bims's rebuttal report also contended that the '959 patent had been substantively changed during reexamination in light of prior art. Id. at 82-86 (¶¶ 261-265). At the same time, another Sonos expert, Dr. Andrew Wolfe, submitted a report stating that neither the '949 patent nor the '959 patent was broadened during reexamination. Dkt. No. 315, Ex. E-15, at 477-83 (¶¶ 1365-84). And Dr. Almeroth followed with a reply report on behalf of Sonos responding to Dr. Bims's report with respect to both patents. Dkt. No. 314, Ex. E-12, at 22-24 (¶¶ 70-76).

Although Dr. Kesan's report did not identify the intervening rights defense by name, his report set forth the factual basis for that claim, on which the parties engaged in the subsequent

5

expert witness reports. The issue of the change in the scope of the claims of the '949 and '959 patents was thus timely raised through the presentations of the various expert witnesses, including Dr. Bims. Moreover, Sonos was able to respond to Dr. Bims's report in Dr. Almeroth's subsequently filed reply report. Both parties thus had a full opportunity to address the intervening rights issue prior to Sonos's filing its summary judgment motion. Under these circumstances, the Court will not exclude the evidence in Dr. Bims's rebuttal report with respect to that issue.

    a. <u>The '949 Patent</u>

Sonos is asserting claims 1 and 16 of the '949 patent. Claim 16 is a method claim that depends from claim 15. Method claims have been held not to be subject to the defense of absolute intervening rights. <u>See</u> <u>NetAirus Techs., LLC v. Apple, Inc.</u>, No. LA CV10-03257, 2013 WL 3089061, at *4 (C.D. Cal. May 23, 2013) ("The language in 35 U.S.C. § 252 that gives rise to absolute intervening rights 'appears not to relate to a patented process,' because processes are only addressed in the statute's discussion of equitable intervening rights."); <u>Rohm & Haas Co. v. Chem. Insecticide Corp.</u>, 171 F. Supp. 426, 432 (D. Del. 1959) (same).

Although it appears that the Federal Circuit has not squarely addressed this issue, the plain language of section 252 supports drawing a distinction between process claims and product claims with regard to absolute intervening rights. The portion of section 252 that addresses absolute intervening rights refers to right to use, sell, offer to sell, etc., "the specific thing so made, purchased, offered for sale, or used or imported unless the making using, offering for sale or selling of such thing infringes a valid claim of the reissued patent which was in the original patent." By contrast, the portion of section 252 that addresses equitable intervening rights provides that the court may provide for "the continued manufacture, use, offer for sale, or sale of

the thing made," purchased, offered for sale, etc., before the grant of the reissue, "and the court may also provide for the continued practice of any process patented by the reissue" to the extent the court deems equitable for the protection of investments made or business commenced before the grant of the reissue. See generally BIC Leisure Prods., Inc., 1 F.3d at 1220-21 (noting the narrow statutory language applicable to absolute intervening rights as compared to the broader language applicable to equitable intervening rights).[2]

As counsel for D&M points out, however, drawing a sharp line between product claims and method claims in determining eligibility for absolute intervening rights could result in defeating the purpose of the statute to provide intervening rights for particular goods made prior to the reissue or reexamination. Thus, if particular goods were made by a process that is separately covered by a process claim that was also changed upon reissuance or reexamination, absolute intervening rights would be no benefit to the accused infringer if the patentee could assert a parallel process claim against the process that was used to make the very same products that were intended to be protected by absolute intervening rights. Accordingly, in order to avoid undermining the statutory protection for particular products made prior to a reissuance or reexamination that entails a change in the scope of both product and process claims, the Court holds that intervening rights must extend not only to products that are asserted to infringe a modified product claim, but also to processes that were used to make those specific products, if those processes are asserted to infringe a modified process claim.

---

[2] P.J. Federico, one of the principal authors of the 1952 Patent Act that added section 252 explained that the protection of absolute intervening rights extended only to the things made before the reissue, whereas equitable intervening rights could extend to "the continued practice of a process patented by the reissue" if the court determined that it was equitable to so provide. See P.J. Federico, Commentary on the New Patent Act, 75 J. Pat. & Trademark Off. Soc'y 161, 207-08 (1975 reprint; original 1954); P.J. Federico, Intervening Rights in Patent Reissues, 30 Geo. Wash. L. Rev. 603, 632-33 (1962).

7

Language was added to both claims 1 and 16 (through claim 15) during reexamination. In the originally issued patent, the pertinent limitation of claim 1 provided that the multimedia controller including a processor was configured to perform various functions, including to

> accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;

'949 patent, col. 12, ll. 14-18. Likewise, claim 15, from which claim 16 depends, initially recited a method comprising, inter alia,

> receiving via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;

Id., col. 14, ll. 26-29.

Following the reexamination proceeding, the words "for synchronized playback of a multimedia output from the same multimedia source" were added to the end of that limitation in both claims before the semicolon. '949 Reexamination Certificate, col. 1, ll. 27-33, col. 3, ll. 10-16.

Sonos's expert, Dr. Almeroth, stated in his report that "[a]fter reviewing the differences between the original and amended claims of the '949 patent, it is my opinion that the amendments made during prosecution of the '949 patent did not substantively change the scope of the claims." Dkt. No. 311, Ex. E-3, at 75 (¶ 205). Instead, he stated, "it is my opinion that these amendments merely clarified the claim language by making explicit what was always implicit in the original claims when such claims were viewed in the context of the intrinsic evidence." Id. He added that in his view it was "clear that 'synchronized playback of a

multimedia output from the same multimedia source' was an implicit aspect of a 'player group' as recited in the original claims." Id.

D&M's expert Dr. Bims disagreed. He pointed out that in the course of the reexamination, all claims of the original patent were rejected as anticipated by U.S. Patent No. 5,761,320 to Farinelli. Dkt. No. 309, Ex. C, at 77 (¶ 246). Sonos did not at that point amend its claims, but argued that Farinelli was not an anticipating reference. Id. at 77-79 (¶¶ 247-49). After the examiner issued a final rejection, however, Sonos amended claims 1 and 15 to add the language "synchronized playback of a multimedia output from the same multimedia source" that has given rise to D&M's claim of intervening rights. Id. at 79-80 (¶¶ 250-54).

As D&M points out, amendments made to overcome a prior art rejection during reexamination are "a highly influential piece of prosecution history," and it is "difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1348 (Fed. Cir. 1998). Because the evidence shows that the language added to claim 1 and 15 (and thus dependent claim 16) of the '949 patent was added to overcome a prior art rejection, the Court concludes that Sonos is not entitled to summary judgment on its defense of absolute intervening rights with respect to the '949 patent. However, because D&M has made clear that its defense of intervening rights is limited to absolute intervening rights, Sonos is granted summary judgment as to any claim of equitable intervening rights.

b. The '959 Patent

In his initial report, Dr. Almeroth did not offer an opinion as to whether the claims of the '959 patent were changed after reexamination. However, Sonos's expert Dr. Wolfe stated in his rebuttal expert report that in his opinion the amendments to the '959 patent did not substantively

9

change the scope of the claims. Dkt. No. 315, Ex. E-15, at 481-83 (¶¶ 1378-84). And Dr. Almeroth's reply report asserted that the '959 patent had not been substantively changed as a result of the reexaminations. Dkt. No. 314, Ex. E-12, at 22-24 (¶¶ 70-76).

When the '959 patent emerged from reexamination, claim 1 was cancelled and the claims that depended from claim 1—including asserted claims 5, 9, and 10—were rewritten as independent claims. D&M argues that the rewording removed limitations and broadened the scope of the claims, entitling D&M to intervening rights.

The Court disagrees. Rearranging the limitations to rewrite dependent claims as independent claims neither broadened nor narrowed the scope of the '959 patent. As amended, newly independent claims 5, 9, and 10 each contain both the entirety of former claim 1 and the limitations originally contained in each of the dependent claims. See Dkt. No. 369-1, Ex. 25 (showing amendments to claims 5, 9, and 10 compared to original claim 1). The incorporation of the additional limitation into claim 1's language was a cosmetic change, not a substantive one, and it does not give rise to intervening rights for D&M. Because the scope of the claims at issue in the '959 patent was not substantively changed during reexamination, Sonos's motion for summary judgment as to the defense of intervening rights with regard to the '959 patent is granted.

## V. Invalidity

Sonos has moved for summary judgment on two of the theories of invalidity raised by D&M. Sonos argues that, in response to its summary judgment motion, D&M has not pointed to evidence that would raise a disputed issue of material fact as to those theories.

Under the Supreme Court's decision in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Sonos was not required to produce affirmative evidence of patent validity in order to establish its

right to summary judgment. Instead, as the moving party that would not have the burden of proof on that issue at trial, Sonos needed only to point out to the district court "the absence of evidence to support the nonmoving party's case." Id. at 325. Once that occurred, the burden shifted to D&M, the nonmoving party with the burden of proof, to "designate specific facts showing that there is a genuine issue for trial." Id. at 324; see also, e.g., DiCuio v. Brother Int'l Corp., 653 F. App'x 109, 112 (3d Cir. 2016). After a close review of the evidence offered by D&M in its responsive brief as to the two contested issues of validity, the Court concludes that Sonos has pointed out the absence of evidence to support D&M's case, and D&M has not met its burden under Celotex as to these two theories of invalidity.

a. The Rietschel Patent

Sonos moved for summary judgment that U.S. Patent No. 7,710,941 ("the Rietschel patent") does not invalidate the '258 or '357 patents under 35 U.S.C. §§ 102(a), (b), (e), and (g).[3] Dkt. No. 296, at 5-10. In response, D&M withdrew its allegations regarding the Rietschel patent as prior art under sections 102(a), 102(b), and 102(e). D&M continues to maintain, however, that the Rietschel patent is prior art to Sonos's '258 and '357 patents under section 102(g)(2). Dkt. No. 346, at 4-5.

Section 102(g)(2) provides that a person is entitled to a patent unless, "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." A patent is invalid under that provision if the invalidating prior art was conceived and reduced to practice in this country prior to the patent's priority date. See Solvay S.A. v. Honeywell Int'l Inc., 742 F.3d 998, 1000 (Fed. Cir. 2014).

---

[3] The version of section 102 that applies to this case is the version that pre-dated the America Invents Act of 2011 ("AIA"), because both the '258 and '357 patents have an effective filing date in 2011, which is before the effective date of the AIA amendments to section 102.

"While conception is the 'formation, in the mind of the inventor, of a definite and permanent idea of a complete and operative invention,' reduction to practice 'requires that the claimed invention work for its intended purpose.'" Id. (quoting Solvay S.A. v. Honeywell Int'l, Inc., 622 F.3d 1367, 1376 (Fed. Cir. 2010)). "Although the inventors may reside in a foreign country and conceive the invention abroad, a reduction to practice made outside the United States is beyond the scope of § 102(g)(2) prior art." Id. Either the inventor, or someone acting on the inventor's behalf, must have reduced the invention to practice in the United States to gain the benefit of section 102(g)(2). Id.

At the outset, Sonos argues that the Rietschel patent cannot serve as prior art, because the effective date of the Rietschel patent as a prior art reference is May 4, 2005, which is the filing date of the U.S. national stage application for Rietschel's international application. See 35 U.S.C. § 102(e).[4] The effective date of a patent as prior art, Sonos argues, is not the date of conception or actual reduction to practice of the invention claimed in that patent. Dkt. No. 296, at 8. In so arguing, Sonos relies on Sun Studs, Inc. v. ATA Equipment Leasing, Inc., 872 F.2d 978, 983 (Fed. Cir. 1989), overruled on other grounds, A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1038-39 (Fed. Cir. 1992). In that case, the Federal Circuit stated that under the pre-1999 version of section 102(g), "[w]hen patents are not in interference, the effective date of a reference United States patent as prior art is its filing date in the United States, as stated in § 102(e), not the date of conception or actual reduction not practice of the invention claimed or the subject matter disclosed in the reference patent." Id.

In response, D&M argues that the decision in Sun Studs does not apply to this case because in 1999 section 102(g) was amended by dividing subsection (g) into two paragraphs,

---

[4] For that reason, D&M does not dispute Sonos's assertion that the Rietschel patent itself is not prior art to the Sonos synchronization patents under section 102(e).

creating sections 102(g)(1) and 102(g)(2). Section 102(g)(1) was directed to interference practice, and section 102(g)(2) was not so limited. Thus, section 102(g)(2), prior to the enactment of the AIA and as applicable to this case, provides that a person shall be entitled to a patent unless

> [b]efore such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it. In determining priority of invention under this subsection, there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102(g)(2) (2006).

It is true, as D&M contends, that section 102(g) is not limited to interference practice, but can be asserted as the basis for invalidating a patent in an infringement action. Apotex USA, Inc. v. Merck & Co., 254 F.3d 1031, 1035 (Fed. Cir. 2001). However, it is also true, as the Federal Circuit explained in Sun Studs, that section 102(g) does not address the role of patents and patent applications as prior art: That task is assigned to section 102(e). Instead, section 102(g)(2) is directed to prior art in the form of an invention that was made in this country and not abandoned, suppressed, or concealed. Accordingly, for purposes of the section 102(g)(2) analysis, the parties' focus on the Rietschel patent is misplaced. What matters is whether the inventions claimed in Sonos's synchronization patents, and in particular in asserted claims 11, 17, 18, 21, and 24 of the '258 patent and asserted claims 9, 10, 12, and 19 of the '357 patent, were made in this country before the priority date for those patents of April 1, 2004.

To show prior invention that qualifies as prior art under section 102(g)(2), D&M relies on evidence relating to a device known as the Exstreamer, which was made by Barix AG, a company formed by Johannes Rietschel, the inventor of the Rietschel patent. In particular, D&M points to evidence that Mr. Rietschel's company demonstrated the Barix Exstreamer

product at the Electronic Home Expo ("the Expo") in Orlando, Florida, in March 2003, before the priority date of the '258 and '357 patents. Dkt. No. 346, at 8-12. D&M argues that the display of the Exstreamer device at the Expo constituted the required reduction to practice in this country of an invention that qualifies as prior art under section 102(g)(2) and thus invalidates the asserted claims of the '258 and '357 patents. See Dkt. No. 297-1, Ex. H, at 348-49 (¶ 618).

The problem with D&M's argument is that the evidence set forth in D&M's brief to show that the Exstreamer product, as displayed in this country in 2003, reads on the claims of the '258 and '357 patents is very thin. To begin with, there is very little information in the record as to the nature of the device that was displayed at the 2003 Expo other than that it was referred to as the Barix Exstreamer. There is no direct evidence that the Exstreamer practiced any of the claims of the '258 and '357 patents. D&M does not represent that it possesses a physical embodiment of the version of the Exstreamer that was allegedly displayed at the Expo. Nor has D&M offered any other persuasive evidence to support its assertions regarding what the Exstreamer device disclosed.

The evidence as to the device that was shown at the Expo consists mainly of notes from Sonos employees who attended the event. Those notes are very general in nature, and to the extent they refer to Barix products at all, they provide very little detail. One report cryptically lists Barix, among other manufacturers, as having "zone player with distributed amps" and "audio source." Dkt. No. 347-1, Ex. 37. Another report states that Barix "is moving towards distributed amplifier and wireless solutions, but they seem very confused." Id. at Ex. 34. That report adds that the Barix exhibitors "were showing the following: (1) Basic Exstreamer (nothing new here) (2) Wireless (802.11b) version of the Exstreamer (3) Prototype of new network audio player/converter with amplifier" and "(4) Security controller." Id. at Ex. 34. As

14

to prototype, which from the context appears to refer to a device other than the Exstreamer, the report adds that the prototype features:

> -2x10W speaker out
> -S/PDIF optical out
> -stereo RCA input
> -target price around $400
> -able to work with Latronix control systems

Dkt. No. 347-1, Ex. 34, at SONDM000138982. Nothing in that brief description supports D&M's contention that the Exstreamer or Exstreamers on display at the 2003 Expo reflected a reduction to practice of the inventions disclosed and claimed in '258 and '357 patents, much less clear and convincing proof of that fact.

D&M seeks to get around that problem by asserting that the Barix Exstreamer was an embodiment of the inventions disclosed and claimed in the Rietschel patent, and that the disclosures of the Rietschel patent can therefore be used, indirectly, as prior art against the asserted claims of the '258 and '357 patents. In support of that line of argument, D&M's expert Dr. Kesan stated in his report that "the Barix products satisfy the claim language of Rietschel." Dkt. No. 308, Ex. B, at 349-51 (¶ 619). But there are several problems with using Dr. Kesan's analysis in that manner.

First, as described above, equating the features of the Exstreamer with the disclosures of the Rietschel patent conflates the two in a way that distorts the proper analysis. The 2005 U.S. filing date and 2010 issuance date of the Rietschel patent makes clear that the Rietschel patent is not prior art to Sonos's synchronization patents. The relevant inquiry, therefore, is not whether the Exstreamer is an embodiment of the Rietschel patent, but whether the Exstreamer itself invalidates the '258 or '357 patents.

Dr. Kesan focuses entirely on claim 14, the most general claim of the Rietschel patent, in his effort to show that the Exstreamer is an embodiment of that patent. Even accepting Dr. Kesan's analysis at face value, however, there is nothing in Dr. Kesan's report to suggest that the Exstreamer embodies all of the claims and disclosures of the Rietschel patent. Therefore, even if Dr. Kesan is correct with respect to claim 14 of the Rietschel patent, the full contents of the Rietschel patent cannot be regarded as, in effect, prior art as embodied in the Exstreamer device.

Second, in his analysis of the relationship between the Exstreamer and the Rietschel patent, Dr. Kesan relies on a four-page advertising brochure for the Exstreamer device and a device known as the Instreamer, which was apparently related in some fashion to the Exstreamer. The brochure contains only the most general characterizations of the functions of the Instreamer and Exstreamer. None of the text of the brochure corresponds to the various specific limitations of the claims of the Rietschel patent. For example, the brochure describes the Exstreamer device as follows:

> The Exstreamer Digital is a versatile, network connected digital audio player for a variety of applications featuring a 10/100 M bit Ethernet connection, built in web server for control and management. Exstreamer plays MP3 music up to bitrate of 320 kbit/sec and can be controlled by IR Remote web pad, PDA and PC. The device features two RCA connectors for Stereo Line out, a RCA for coaxial and an optical digital S/PD IF output, two 3.5 mm Jack connectors for infrared receiver and transmitter and a 9 pin D-Sub serial interface (RS-232).

Dkt. No. 347-1, Ex. 32, at D&M_0400172. Nothing in that description, or elsewhere in the brochure, demonstrates with the requisite clarity that the Exstreamer device operated in a fashion that satisfied the limitations of the claims of the Rietschel patent, such as by performing the functions of "synchronizing reproduction using the at least two reproduction units, wherein the reproduction units are synchronized in a range below 100 ms," Rietschel patent, col. 13, ll. 30-32, or "by virtue of the internal clock of an external unit which is likewise available on the

16

network being used as the master and all reproduction units, as slaves, aligning their internal clock with that of the master via the network and reproducing data streams or data packets on the basis of this aligned clock," id., col. 15, ll. 10-15; id., col. 16, ll. 41-46; id., col. 17, ll. 23-29.

Dr. Kesan's analysis focuses principally on a single sentence from the four-page brochure, which states: "Exstreamer Digital can synchronize to other Exstreamers, so it plays the same music as other units." Dkt. No. 347-1, Ex. 32. But that single sentence, which Dr. Kesan cites four times in his comparison of the brochure and claim 14 of the Rietschel patent, says nothing more than that the Exstreamer is capable of synchronization. It does not sweep in the entire Rietschel patent as prior art, and it does not satisfy any specific limitations of the asserted claims of the '258 and '357 patents.

In support of its section 102(g)(2) argument, D&M also relies on a user's manual for the Instreamer device. Dkt. No. 347-1, Ex. 31. That manual, however, besides being directed to the Instreamer, not the Exstreamer, has a copyright date of 2004, which is after the 2003 critical date for the '258 and '357 patents under section 102(b). Moreover, the manual contains very little information relating to whether the Exstreamer device embodies the inventions disclosed and claimed in the Rietschel patent. Most of the manual, unsurprisingly, is directed to showing the customer how to use the device, and describing the various settings on the device. Even where the manual describes technical features of the device, such as in the section referred to as "Buffer Underrun Mode (TCP)," the manual is not informative regarding whether the device practices the Rietschel patent. Thus, the manual states:

> The Buffer Underrun Mode (TCP) defines the action if a TCP stream is slower than the real stream from the encoder. In this case the output streaming buffer underruns and cannot hold older data anymore. The device can then "*disconnect*" the TCP connection or it can "*skip*" the stream directly to the encoder stream without disconnecting TCP.

17

Dkt. No. 347-1, Ex. 31, at D&M_0400294. That text merely describes the way the device deals with a particular problem; it does not demonstrate that the Instreamer device that is the subject of the manual employs any of the technology disclosed and claimed in the Rietschel patent, much less that it reads on any of the limitations of the asserted claims of the '258 and '357 patents. Nor is there any evidence in the materials the parties have presented to the Court on summary judgment that would indicate that the information regarding the Instreamer is equally applicable to the Exstreamer, which is the device that D&M contends was on display at the Expo.

D&M's evidentiary showing in response to Sonos's summary judgment motion on this issue is insufficient to support a determination in its favor by a reasonable jury. The Court therefore grants Sonos's motion for summary judgment on D&M's contention that the '258 and '357 patents are invalid under section 102(g)(2) in light of the Rietschel patent.

      b. <u>Sonos's Prior Products</u>

D&M argues that two of Sonos's products—the Control (CR 200) and the PLAY:5 (gen 1)—are prior art products that invalidate the pairing patents (the '509 and '959 patents) under section 102(b) of the pre-AIA Patent Act. The pre-AIA version of section 102(b) provides that a person shall be entitled to a patent unless "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

D&M contends that the CR 200, which was released in July 2009, and the PLAY:5 (gen 1), which was released in November 2009, each embodied the claims of the '509 and '959 patents at least a year prior to the effective filing dates of those patents—January 25, 2011, and April 8, 2011, respectively. D&M's primary evidence in support of that contention is a document that Sonos published that describes "patent-to-product" information and pairs product

names with particular covered patents. See Dkt. No. 347-1, Ex. 42. In that document, the '509 patent is listed as one of the "covered patents" for the "Control (CR 200)," and the '959 patent is listed as one of the "covered patents" for the PLAY:5 (gen 1) device. Based on that document, D&M argues that those two devices embodied those patents at the time of their launch.

Sonos responds that both products received software updates on May 18, 2010, that enabled the "stereo pair" feature that embodies the inventions of the '509 and '959 patents. Sonos provides extensive evidence supporting its contention, including software change logs that describe the addition of that feature, website captures from May 2010 reflecting the newly available software, internal documents describing the development of that feature in early 2010, and contemporaneous news articles announcing the new feature. Dkt. No. 297, Exs. I, M, N, O, R, & T. That evidence demonstrates that the "stereo pair" feature was released in May 2010. Although D&M correctly notes that Sonos's patent-to-product information does not reflect that software update, the evidence offered by Sonos shows that the CR 200 and PLAY:5 (gen 1) devices did not embody the '509 and '959 patents until May 2010, less than one year before the patents' application dates in January and April 2011. D&M's evidence is not sufficient to create a triable issue of fact as to that question. The Court therefore grants Sonos's motion for summary judgment of no invalidity with respect to D&M's contention that the '509 and '959 patents are invalid under section 102(b) based on Sonos's prior products.

        IT IS SO ORDERED.

        SIGNED this 1st day of November, 2017.

        _____
        WILLIAM C. BRYSON
        UNITED STATES CIRCUIT JUDGE