# SCHEDULE A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**JOINT STATEMENT OF UNDISPUTED FACTS**

Plaintiff Sonos, Inc. ("Sonos") and Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M") respectfully submit this Joint Statement of Undisputed Facts.

## I.    THE PARTIES

1.    Plaintiff Sonos, Inc. is a Delaware corporation with its principal place of business at 614 Chapala St., Santa Barbara, California 93101.

2.    Sonos's current line of products includes the "PLAY:1," "PLAY:3," and "PLAY:5" speaker products, the "CONNECT" pre-amplifier product, and the "CONNECT:AMP" amplifier, all of which are controlled by the Sonos app available for iOS, Android, PC, or Mac.  Sonos also offers "PLAYBAR," "PLAYBASE," and "SUB" speaker products for wireless home theater.

3.    Defendant D&M Holdings Inc. d/b/a The D+M Group is a Japanese corporation with its principal place of business at 2-1 Nisshin-cho, Kawasaki-ku, Kawasaki-shi, Kanagawa 210-8569, Japan.

4.    Defendant D&M Holdings U.S. Inc. is a Delaware corporation with its principal place of business at 100 Corporate Drive, Mahwah, NJ 07430.

5.    Defendant Denon Electronics (USA), LLC is a Delaware limited liability company with its principal place of business at 100 Corporate Drive, Mahwah, NJ 07430. Denon Electronics (USA), LLC is a wholly-owned subsidiary of D&M Holdings U.S. Inc.

## II.    JURISDICTION AND VENUE

6.    This is a civil action for patent infringement arising under the patent laws of the United States, Title 35, United States Code, and this Court has subject matter jurisdiction over this action pursuant to 35 U.S.C. §§ 271, *et seq*., and 28 U.S.C. §§ 1331 and 1338.

7.      Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S.

Inc., and Denon Electronics (USA), LLC do not contest personal jurisdiction in this Court.

8.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. §

1400(b).

## III.   ASSERTED SONOS PATENTS

9.      The bellwether trial involves Sonos's claims accusing D&M of infringing certain

asserted claims of U.S. Pat. Nos. 7,571,014 ("'014 Patent"), 8,588,949 ("'949 Patent"), and

9,195,258 ("'258 Patent") (collectively, the "Asserted Sonos Patents").  The '258 Patent may be

referred to as the "Sync Patent," and the '014 and '949 Patents may be referred to as the "Group

Volume Patents."

### A.      The '258 Patent

10.      The '258 Patent is entitled "System and Method for Synchronizing Operations

Among a Plurality of Independently Clocked Digital Data Processing Devices."

11.      The '258 Patent was issued by the USPTO on November 24, 2015.

12.      Every Asserted Claim of the '258 Patent is entitled to a priority date of April 1,

2004.

13.      Sonos is the owner by assignment of the '258 Patent.

14.      D&M had actual knowledge of the '258 Patent by no later than November 26,

2015.

### B.      The '014 Patent

15.      The '014 Patent is entitled "Method and Apparatus for Controlling Multimedia

Players in a Multi-Zone system."

16.      The '014 Patent was issued by the USPTO on August 4, 2009.

17.     Every Asserted Claim of the '014 Patent is entitled to a priority date of June 5, 2004.

18.     Sonos is the owner by assignment of the '014 Patent.

19.     D&M had actual knowledge of the '014 Patent by no later than January 2012.

**C.     The '949 Patent**

20.     The '949 Patent is entitled "Method and Apparatus for Adjusting Volume Levels in a Multi-Zone System."

21.     The '949 Patent was originally issued by the USPTO on November 19, 2013.

22.     An *ex parte* reexamination of the '949 Patent was instituted on January 29, 2015.

23.     During the *ex parte* reexamination of the '949 Patent, amendments were made to certain claims of the '949 Patent.

24.     A reexamination certificate for the '949 Patent was issued by the USPTO on November 5, 2015.  The amended claims of the '949 Patent are set forth in the reexamination certificate.  Further, the reexamination certificate for the '949 Patent states that (a) claims 1, 3, 4, 6, 7 8, 10, 11, 13, 14, 15, and 17-20 are determined to be patentable as amended and (b) claims 2, 5, 9, 12, and 16, which depend on an amended claim, are determined to be patentable.

25.     Sonos is the owner by assignment of the '949 Patent.

**IV.     OVERVIEW OF ACCUSED PRODUCTS**

26.     In June 2014, D&M officially launched a new line of wireless multi-room home audio products under the name "HEOS by Denon."

27.     D&M's line of HEOS audio devices (or "HEOS devices" for short) includes, *inter alia*, the "HEOS 1," HEOS 3," "HEOS 5," and "HEOS 7" speaker products, the "HEOS LINK"

pre-amplifier product, the "HEOS AMP" amplifier product, the "HEOS Drive" multi-room

amplifier product, and the "HEOS HomeCinema" TV sound system product.

28.     D&M also provides a HEOS controller app for the HEOS system, which is

available for iOS, Android, and Kindle.

29.     D&M's HEOS devices and HEOS controller app can be set up by a user to work

together as part of D&M's HEOS wireless multi-room audio system (or the "HEOS system" for

short).

30.     D&M first began offering to sell and selling its HEOS device models in the

United States on the following dates:

| HEOS Device Model | Release Date |
| --- | --- |
| HEOS 1 | May 2015 |
| HEOS 3 | March 2014 |
| HEOS 5 | March 2014 |
| HEOS 7 | March 2014 |
| HEOS HomeCinema | June 2015 |
| HEOS Link | August 2014 |
| HEOS Amp | August 2014 |
| HEOS Drive | June 2015 |

31.     D&M first began importing its HEOS device models into the United States at

least as early as the dates set forth in Paragraph 33.

32.     D&M offers to sell and sells HEOS devices with firmware pre-installed, but

which firmware may be updated.

33.     D&M imports HEOS devices with firmware pre-installed, but which firmware

may be updated.

34.     D&M ships HEOS devices with firmware pre-installed, but which firmware may

be updated.

35.     The release date for each version of HEOS firmware is as follows:

| Firmware Version | Release Date |
|---|---|
| U0 | June 2014 |
| U1 | September 2014 |
| U1.1 | November 2014 |
| U2 | December 2014 |
| U2.1 | March 2015 |
| U3 | May 2015 |
| U4 | July 2015 |
| U4.1 | August 2015 |
| U5 | December 2015 |
| U5.1 | January 2016 |
| U6 | January 2016 |
| U7 | April 2016 |
| U8 | July 2016 |
| U9 | September 2016 |
| U9.1 | October 2016 |
| U10 | November 2016 |
| U11 | April 2017 |
| U12 | May 2017 |

36.     A third party can optionally receive firmware updates from D&M for HEOS devices in the United States.

37.     In December of 2014, D&M modified the group volume control functionality in the HEOS controller through the U2 software update.

38.     In April 2016, D&M began offering for sale and selling a second generation of each model of HEOS device, which are referred to as HEOS "HS2" players.

39.     The second generation of HEOS devices are downward compatible to the first generation of HEOS devices.  For example, a user can choose to control both generations of HEOS devices using the same HEOS controller app

40.     D&M has been offering to sell and selling each model of HEOS device within the United States since the dates set forth in Paragraph 33 above.

41.     D&M has been importing each model of HEOS device within the United States since the dates set forth in Paragraph 33 above.

42.     D&M from time-to-time develops updates to the HEOS controller app.

43.     The release date for each version of the HEOS controller app is as follows:

| App Version | Release Date |
|---|---|
| U0 | June 2014 |
| U1 | September 2014 |
| U1.1 | November 2014 |
| U2 | December 2014 |
| U2.1 | March 2015 |
| U3 | May 2015 |
| U4 | July 2015 |
| U4.1 | August 2015 |
| U5 | December 2015 |
| U5.1 | January 2016 |
| U6 | January 2016 |
| U7 | April 2016 |
| U8 | July 2016 |
| U9 | September 2016 |
| U9.1 | October 2016 |
| U10 | November 2016 |
| U11 | April 2017 |
| U12 | May 2017 |

44.     In order to run the HEOS controller app, a third-party device needs to have at least one processor.

45.     In order to run the HEOS controller app, a third-party device needs to have computer readable memory.

46.     The HEOS controller app is designed to run on a third-party device that has a display screen.

47.     The HEOS controller app is designed to run on a third-party device that has a network interface.

48.     D&M has provided User Guides and Installation Guides for each model of HEOS device through its website and periodically updates these User Guides and Installation Guides.

7

## IV.     FUNCTIONALITY OF ACCUSED HEOS PRODUCTS

49.     The HEOS controller apps can be used to identify HEOS devices that are within the same LAN as the HEOS controller apps.

50.     Each model of HEOS device is programmed with the capability to obtain audio available from a source outside of a LAN, such as an Internet audio source.

51.     Each model of HEOS device (other than the subwoofer device of the HEOS HomeCinema) is programmed with the capability to receive audio data and transmit audio data to other HEOS devices within the same LAN.

52.     The HEOS iOS, Android, and Kindle Controller applications provide a user interface for the HS1 and HS2 versions of the HEOS products.

53.     The HEOS iOS, Android, and Kindle Controller applications, in certain configurations, display individual volume controls for the HS1 and HS2 versions of certain HEOS products. In such cases, the volume controls may be adjusted by a user, which, in some circumstances, results in a corresponding volume adjustment.

54.     The HEOS iOS, Android, and Kindle applications can be used to create a group of any two of the HS1 and HS2 versions of the HEOS 3, HEOS 5, and HEOS 7 devices connected to the same local area network among themselves and the application.

## V.     THE ALLEGED PRIOR ART

55.     Microsoft Corporation introduced the Universal Plug and Play Standard (UPnP) initiative at the Consumer Electronics Show in January of 1999.

56.     The UPnP initiative was originally supported by companies such as Microsoft, Intel, Hewlett-Packard, Compaq, Dell, and many others.   To guide the creation of the standards, a cross-industry group, the UPnP Forum, was also created.

57.     The book entitled "UPnP Design by Example: A Software Developer's Guide to Universal Plug and Play" was published in the United States no later than April 2003.

58.     The "UPnP Design by Example" book had an accompanying CD-ROM that included Intel UPnP Media Renderer, UPnP Media Server, and UPnP Controller software.

59.     Escient was ultimately acquired by D&M in 2003.

60.     U.S. Patent No. 6,469,633 to Wachter (the "Wachter Patent") was filed on January 5, 1998 and issued on October 22, 2002.

61.     The Wachter Patent was assigned to Escient Technologies, LLC.  The Wachter Patent was also assigned to Escient Inc. The Wachter Patent was later assigned to D&M.

62.     U.S. Patent Application Publication No. US2002/0124097 to Isely ("Isely") was filed on December 29, 2000 and published on September 5, 2002.

63.     Isely was previously-assigned to Home Director Technologies, Inc. which is a wholly-owned subsidiary of Home Director, Inc.

64.     U.S. Patent Application Publication No. US20020072816A1 to Shdema ("Shdema") was filed on December 7, 2002 and published on June 13, 2002.

# SCHEDULE B1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SONOS'S STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED

Plaintiff Sonos, Inc. ("Sonos") respectfully submits this Statement of Issues of Fact that Remain to be Litigated, which is based on Sonos's current understanding of the defenses of Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M") and the proceedings in this action to date.

To the extent that Sonos's Statement of Issues of Law to be Litigated set forth in **Schedule C1** contains issues of fact, those issues are incorporated herein by reference. Likewise, should the Court determine that any issue identified below is more appropriately considered an issue of law, Sonos incorporates such issues by reference into **Schedule C1**.  By including a fact herein, Sonos does not assume the burden of proof or production with regard to that fact.  Sonos reserves the right to revise this statement in light of the Court's rulings.

## ISSUES ON WHICH SONOS BEARS THE BURDEN OF PROOF

### I.  DIRECT INFRINGEMENT

Below are the issues of fact related to whether D&M has directly infringed the Asserted Claims of the Asserted Sonos Patents.  For the Court's convenience, the following table shows the current list of Asserted Claims and Accused HEOS Instrumentalities[1] for each Asserted Sonos Patent:

---

[1] Sonos's infringement theories set forth herein apply equally to both the first generation of HEOS players (i.e., the "HS1" version of HEOS players) and the second generation of HEOS players (i.e., the "HS2" version of HEOS players).  Thus, any reference to a given model of HEOS player herein is intended to cover both generations of that HEOS player model (e.g., a reference to the HEOS 1 player model covers both the HS1 and HS2 versions of the HEOS 1 player model).  Likewise, Sonos's infringement theories set forth herein apply equally to the HEOS controller app for iOS, Android, and Kindle.  Thus, any reference to the HEOS controller app is intended to cover the HEOS iOS app, the HEOS Android app, and the HEOS Kindle app.

| Patent | Asserted Claims | Accused HEOS Instrumentalities |
|--------|----------------|-------------------------------|
| 9,195,258 | 11, 17, 18, 21, 24 | HEOS 1, HEOS 3, HEOS 5, HEOS 7, HEOS HomeCinema, HEOS Link, HEOS Amp, and HEOS Drive players installed with any version of the HEOS firmware (collectively, the "Accused HEOS Players") |
| 7,571,014 | 21, 25, 38 | Devices installed with any version of the HEOS controller app prior to Version "U2" |
| 8,588,949 | 1, 16 | Devices installed with any version of the HEOS controller app |

**A.    The '258 Patent**

1.    Whether D&M has directly infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent by making, using, offering to sell, selling, and/or importing Accused HEOS Players within the United States.

      a.    Whether the Accused HEOS Players infringe every limitation of Asserted Claims 17, 18, 21, and 24 of the '258 Patent, either literally or under the Doctrine of Equivalents.

2.    Whether D&M has directly infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent by virtue of the fact that Accused HEOS Players have automatically downloaded and installed updated versions of the HEOS firmware, which also constitutes "making" the invention claimed in Asserted Claims 17, 18, 21, and 24 of the '258 Patent.

      a.    Whether the Accused HEOS Players infringe every limitation of Asserted Claims 17, 18, 21, and 24 of the '258 Patent, either literally or under the Doctrine of Equivalents.

3.    Whether D&M has directly infringed Asserted Claim 11 of the '258 Patent by making, offering to sell, and/or using, within the United States, any HEOS system including at least two Accused HEOS Players and at least two devices installed with any version of the HEOS controller app that are within the same local area network (LAN).

      a.    Whether Accused HEOS Players are zone players programmed with the capability recited in Asserted Claim 11 of the '258 Patent, either literally or under the Doctrine of Equivalents.

      b.   Whether a device installed with any version of the HEOS controller app is a controller programmed with the capability recited in Asserted Claim 11 of the '258 Patent, either literally or under the Doctrine of Equivalents.

**B.      The '014 Patent**

4.      Whether D&M has directly infringed Asserted Claims 25 and 38 of the '014 Patent by installing any version of the HEOS controller app prior to Version "U2" onto a device (and thus "making" the claimed invention) within the United States and/or by using devices installed with any version of the HEOS controller app prior to Version "U2" within the United States.

      a.   Whether a device installed with any version of the HEOS controller app prior to Version "U2" infringes every limitation of Asserted Claims 25 and 38 of the '014 Patent, either literally or under the Doctrine of Equivalents.

5.      Whether D&M has directly infringed Asserted Claim 21 of the '014 Patent by using, within the United States, any HEOS system including a device installed with any version of the HEOS controller app prior to Version "U2" and at least two Accused HEOS Players in a manner that caused every limitation of these Asserted Claims to be performed, either literally or under the Doctrine of Equivalents.

**C.      The '949 Patent**

6.      Whether D&M has directly infringed Asserted Claim 1 of the '949 Patent by installing any version of the HEOS controller app prior to Version "U2" onto a device (and thus "making" the claimed invention) within the United States and/or by using devices installed with any version of the HEOS controller app within the United States.

      a.   Whether a device installed with any version of the HEOS controller app infringes every limitation of Asserted Claim 1 of the '949 Patent, either literally or under the Doctrine of Equivalents.

7.      Whether D&M has directly infringed Asserted Claim 16 of the '949 Patent by using, within the United States, any device installed with any version of the HEOS controller app in a

manner that caused the device to perform every limitation of this Asserted Claim, either literally or under the Doctrine of Equivalents.

## II.     INDIRECT INFRINGEMENT

Below are the issues of fact related to whether D&M has induced infringement of the Asserted Claims of the Asserted Patents.

### A.     The '258 Patent

8.     Whether D&M has induced infringement of Asserted Claims 17, 18, 21, and 24 of the '258 Patent under 35 U.S.C. § 271(b) by actively inducing others to install HEOS firmware updates into Accused HEOS Players (and thus "make" the claimed invention) within the United States and/or to use Accused HEOS Players within the United States.

    a.  Whether the Accused HEOS Players infringe every limitation of Asserted Claims 17, 18, 21, and 24 of the '258 Patent, either literally or under the Doctrine of Equivalents.

    b.  Whether D&M acted with a specific intent to induce others to infringe the '258 Patent.

9.     Whether D&M has induced infringement of Asserted Claim 11 of the '258 Patent under 35 U.S.C. § 271(b) by actively inducing others to make and/or use, within the United States, a HEOS system including at least two Accused HEOS Players and at least two devices installed with any version of the HEOS controller app that are within the same LAN.

    a.  Whether the Accused HEOS Players are zone players programmed with the capability recited in Asserted Claim 11 of the '258 Patent, either literally or under the Doctrine of Equivalents.

    b.  Whether a device installed with any version of the HEOS controller app is a controller programmed with the capability recited in Asserted Claim 11 of the '258 Patent, either literally or under the Doctrine of Equivalents.

    c.  Whether D&M acted with a specific intent to induce others to infringe the '258 Patent.

**B.      The '014 Patent**

10.     Whether D&M has induced infringement of Asserted Claims 25 and 38 of the '014

Patent under 35 U.S.C. § 271(b) by actively inducing others to install any version of the HEOS

controller app prior to Version "U2" onto a device (and thus "make" the claimed invention)

within the United States and/or to use devices installed with any version of the HEOS controller

app prior to Version "U2" within the United States.

      a.   Whether a device installed with any version of the HEOS controller app prior to
         Version "U2" infringes every limitation of Asserted Claims 25 and 38 of the '014
         Patent, either literally or under the Doctrine of Equivalents.

      b.   Whether D&M acted with a specific intent to induce others to infringe the '014
         Patent.

11.     Whether D&M has induced infringement of Asserted Claim 21 of the '014 Patent

under 35 U.S.C. § 271(b) by actively inducing others to use, within the United States, any HEOS

system including a device installed with any version of the HEOS controller app prior to Version

"U2" and at least two Accused HEOS Players in a manner that caused every limitation of these

Asserted Claims to be performed, either literally or under the Doctrine of Equivalents.

      a.   Whether at least one third party has used, within the United States, a HEOS
         system including a device installed with any version of the HEOS controller app
         prior to Version "U2" and at least two Accused HEOS Players in a manner that
         caused every limitation of these Asserted Claims to be performed, either literally
         or under the Doctrine of Equivalents.

      b.   Whether D&M acted with a specific intent to induce others to infringe the '014
         Patent.

**C.      The '949 Patent**

12.     Whether D&M has induced infringement of Asserted Claim 1 of the '949 Patent

under 35 U.S.C. § 271(b) by actively inducing others to others to install any version of the HEOS

controller app onto a device (and thus "make" the claimed invention) within the United States

and/or to use devices installed with any version of the HEOS controller app within the United

States.

     a.   Whether a device installed with any version of the HEOS controller app infringes every limitation of Asserted Claim 1 of the '949 Patent, either literally or under the Doctrine of Equivalents.

     b.   Whether D&M acted with a specific intent to induce others to infringe the '949 Patent.

13.   Whether D&M has induced infringement of Asserted Claim 16 of the '949 Patent

under 35 U.S.C. § 271(b) by actively inducing others to use, within the United States, any device

installed with any version of the HEOS controller app in a manner that caused the device to

perform every limitation of this Asserted Claim, either literally or under the Doctrine of

Equivalents.

     a.   Whether at least one third party has used, within the United States, any device installed with any version of the HEOS controller app in a manner that caused the device to perform every limitation of this Asserted Claim, either literally or under the Doctrine of Equivalents.

     b.   Whether D&M acted with a specific intent to induce others to infringe the '949 Patent.

## III.   CONTRIBUTORY INFRINGEMENT

Below are the issues of fact related to whether D&M has contributorily infringed the

Asserted Claims of the Asserted Patents.

### A.   The '258 Patent

14.   Whether D&M has contributorily infringed Asserted Claims 17, 18, 21, and 24 of

the '258 Patent under 35 U.S.C. § 271(c) by supplying HEOS firmware updates for the Accused

HEOS Players in the United States.

     a.   Whether the Accused HEOS Players infringe every limitation of Asserted Claims 17, 18, 21, and 24 of the '258 Patent, either literally or under the Doctrine of Equivalents.

      b.   Whether the accused software components have no substantial noninfringing use.

      c.   Whether D&M knew that the accused software components were being used in an infringement of the '258 Patent or was at least willfully blind to this fact.

15.   Whether D&M has contributorily infringed Asserted Claim 11 of the '258 Patent under 35 U.S.C. § 271(c) by supplying HEOS firmware updates for the Accused HEOS Players in the United States.

      a.   Whether the Accused HEOS Players are zone players programmed with the capability recited in Asserted Claim 11 of the '258 Patent, either literally or under the Doctrine of Equivalents.

      b.   Whether a device installed with any version of the HEOS controller app is a controller programmed with the capability recited in Asserted Claim 11 of the '258 Patent, either literally or under the Doctrine of Equivalents.

      c.   Whether the accused software components have no substantial noninfringing use.

      d.   Whether D&M knew that the accused software components were being used in an infringement of the '258 Patent or was at least willfully blind to this fact.

**B.    The '014 Patent**

16.   Whether D&M has contributorily infringed Asserted Claims 25 and 38 of the '014 Patent under 35 U.S.C. § 271(c) by supplying versions of the HEOS controller app prior to Version "U2" in the United States.

      a.   Whether a device installed with any version of the HEOS controller app prior to Version "U2" infringes every limitation of Asserted Claims 25 and 38 of the '014 Patent, either literally or under the Doctrine of Equivalents.

      b.   Whether the accused software components have no substantial noninfringing use.

      c.   Whether D&M knew that the accused software components were being used in an infringement of the '014 Patent or was at least willfully blind to this fact.

17.   Whether D&M has contributorily infringed Asserted Claim 21 of the '014 Patent

under 35 U.S.C. § 271(c) by supplying versions of the HEOS controller app prior to Version

"U2" in the United States.

    a.   Whether at least one third party has used, within the United States, any HEOS
system including a device installed with any version of the HEOS controller app
prior to Version "U2" and at least two Accused HEOS Players in a manner that
caused every limitation of these Asserted Claims to be performed, either literally
or under the Doctrine of Equivalents.

    b.   Whether the accused software components have no substantial noninfringing use.

    c.   Whether D&M knew that the accused software components were being used in an
infringement of the '014 Patent or was at least willfully blind to this fact.

**C.**    **The '949 Patent**

18.   Whether D&M has contributorily infringed Asserted Claim 1 of the '949 Patent

under 35 U.S.C. § 271(c) by supplying the HEOS controller app in the United States.

    a.   Whether a device installed with any version of the HEOS controller app infringes
every limitation of Asserted Claim 1 of the '949 Patent, either literally or under
the Doctrine of Equivalents.

    b.   Whether the accused software components have no substantial noninfringing use.

    c.   Whether D&M knew that the accused software components were being used in an
infringement of the '949 Patent or was at least willfully blind to this fact.

19.   Whether D&M has contributorily infringed Asserted Claim 16 of the '949 Patent

under 35 U.S.C. § 271(c) by supplying the HEOS controller app in the United States.

    a.   Whether at least one third party has used, within the United States, any device
installed with any version of the HEOS controller app in a manner that caused the
device to perform every limitation of this Asserted Claim, either literally or under
the Doctrine of Equivalents.

    b.   Whether the accused software components have no substantial noninfringing use.

    c.   Whether D&M knew that the accused software components were being used in an
infringement of the '949 Patent or was at least willfully blind to this fact.

IV.     **WILLFULLNESS**

20.   Whether D&M's infringement of any Asserted Claim was willful.

V.     **RELIEF AND DAMAGES**

21.   Whether Sonos is entitled to a judgment that D&M directly infringed each Asserted Claim.

22.   Whether Sonos is entitled to a judgment that D&M induced infringement of each Asserted Claim.

23.   Whether Sonos is entitled to a judgment that D&M contributorily infringed each Asserted Claim.

24.   Whether Sonos is entitled to a judgment that any infringement by D&M was willful.

25.   Whether Sonos is entitled to a permanent injunction enjoining D&M, their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with D&M, and their parents, subsidiaries, divisions, successors and assigns, from further infringement of the Asserted Claims.

26.    Whether Sonos is entitled to a judgment awarding lost profits for D&M's infringement of the Asserted Claims, and if so, the amount of such lost profits.

27.   Whether Sonos is entitled to a judgment awarding reasonable royalties for D&M's infringement of the Asserted Claims, and if so, the amount of such reasonable royalties.

28.   Whether Sonos is entitled to a judgment awarding enhanced damages for D&M's willful infringement of the Asserted Claims, and if so, the amount of such enhanced damages.

29.   Whether Sonos is entitled to a judgment awarding pre-judgment and post-judgment interest.

30.   Whether Sonos is entitled to a judgment awarding attorneys' fees and/or costs.

## ISSUES ON WHICH D&M BEARS THE BURDEN OF PROOF

**I.   NON-INFRINGING ALTERNATIVES**

31.   Whether D&M can prove that non-infringing alternatives exist to practicing claims 11, 17, 18, 21, and 24 of the '258 Patent.

32.   Whether D&M can prove that non-infringing alternatives exist to practicing claims 21, 25, and 38 of the '014 Patent.

33.   Whether D&M can prove that non-infringing alternatives exist to practicing claims 1 and 16 of the '949 Patent.

**II.   INVALIDITY OF THE ASSERTED PATENTS**

34.   Below are the issues of fact related to whether the Asserted Patents are invalid under 35 U.S.C. §§ 102, 103 and 112.[2]

**A.   The '258 Patent**

35.   Whether D&M can prove, by clear and convincing evidence, that any Asserted Claim of the '258 Patent is invalid under 35 U.S.C. § 102 as being anticipated by any of D&M's asserted prior art references.

---

[2] Sonos objects to the invalidity contentions set forth in D&M's pretrial exhibits for several reasons.  First, D&M's expansive list of asserted prior art references goes well beyond the limits set forth by the Court.  Second, D&M's contentions that the Asserted Claims are "invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of" D&M's asserted prior art references is vague, ambiguous, misleading, and confusing.  Third, D&M's inclusion of invalidity allegations under § 102 go beyond the scope of D&M's final invalidity contentions and its expert reports, and in many instances, violate the legal standards regarding what constitutes a single reference for purposes of § 102.  Fourth, D&M's contentions that the Asserted Claims are "invalid under 35 U.S.C. § 112" – without providing any specificity regarding the grounds for D&M's § 112 challenges – are vague, ambiguous, misleading, and confusing.  For at least these reasons, Sonos respectfully submits that D&M should be required to provided an updated statement of invalidity contentions that remedies these deficiencies.  Further, Sonos expressly reserves its right to update its statement of the issues of fact related to D&M's invalidity defenses once D&M provides its updated statement of invalidity contentions.

36.     Whether D&M can prove, by clear and convincing evidence, that any Asserted Claim of the '258 Patent is invalid under 35 U.S.C. § 103 as being rendered obvious by any of D&M's asserted prior art references, either alone or in combination.

37.     Even if D&M could establish a *prima facie* case of obviousness with respect to any Asserted Claim of the '258 Patent, whether there are secondary considerations of non-obviousness that overcome this *prima facie* case of obviousness.

38.     Whether D&M can prove, by clear and convincing evidence, that any of the Asserted Claims of the '258 Patent is invalid under 35 U.S.C. § 112.

**B.      The '014 Patent**

39.     Whether D&M can prove, by clear and convincing evidence, that any Asserted Claim of the '014 Patent is invalid under 35 U.S.C. § 102 as being anticipated by any of D&M's asserted prior art references.

40.     Whether D&M can prove, by clear and convincing evidence, that any Asserted Claim of the '014 Patent is invalid under 35 U.S.C. § 103 as being rendered obvious by any of D&M's asserted prior art references, either alone or in combination.

41.     Even if D&M could establish a *prima facie* case of obviousness with respect to any Asserted Claim of the '014 Patent, whether there are secondary considerations of non-obviousness that overcome this *prima facie* case of obviousness.

42.     Whether D&M can prove, by clear and convincing evidence, that any of the Asserted Claims of the '014 Patent is invalid under 35 U.S.C. § 112.

### C.   The '949 Patent

43.    Whether D&M can prove, by clear and convincing evidence, that any Asserted Claim of the '949 Patent is invalid under 35 U.S.C. § 102 as being anticipated by any of D&M's asserted prior art references.

44.    Whether D&M can prove, by clear and convincing evidence, that any Asserted Claim of the '949 Patent is invalid under 35 U.S.C. § 103 as being rendered obvious by any of D&M's asserted prior art references, either alone or in combination.

45.    Even if D&M could establish a *prima facie* case of obviousness with respect to any Asserted Claim of the '949 Patent, whether there are secondary considerations of non-obviousness that overcome this *prima facie* case of obviousness.

46.    Whether D&M can prove, by clear and convincing evidence, that any of the Asserted Claims of the '949 Patent is invalid under 35 U.S.C. § 112.

## III.   ABSOLUTE INTERVENING RIGHTS

47.    Whether D&M can prove, by a preponderance of evidence, that the claims of the '949 Patent were substantively changed during reexamination.

48.    Whether D&M can prove, by a preponderance of evidence, that absolute intervening rights apply to the Asserted Claims of the '949 Patent.

# SCHEDULE B2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC. | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 14-1330-RGA |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| D&M HOLDINGS INC. d/b/a THE | § | |
| D+M GROUP, D&M HOLDINGS U.S. | § | |
| INC., and DENON ELECTRONICS | § | |
| (USA), LLC, | § | |
| | § | |
| Defendants. | § | |

### DEFENDANTS' STATEMENT OF ISSUES OF FACT THAT REMAIN TO BE LITIGATED

Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "Defendants") submit this Statement of Issues of Fact that Remain to be Litigated, which is based on Defendants' current understanding of the claims asserted by Plaintiff Sonos, Inc. ("Sonos") and the proceedings in this action to date.

To the extent that Defendants' Statement of Issues of Law to be Litigated set forth in **Schedule C2** contains issues of fact, those issues are incorporated herein by reference. Likewise, should the Court determine that any issue identified below is more appropriately considered an issue of law, Defendants incorporate such issues by reference into **Schedule C2**. By including a fact herein, Defendants do not assume the burden of proof or production with regard to that fact. Defendants reserve the right to revise this statement in light of the Court's rulings or any amendments, modifications, or extensions to Sonos's positions.

1

## ISSUES ON WHICH DEFENDANTS BEAR THE BURDEN OF PROOF

I.   **NON-INFRINGING ALTERNATIVES**[1]

1.      Whether non-infringing alternatives exist to practicing claims 11, 17, 18, 21, and 24 of the '258 Patent.

2.      Whether non-infringing alternatives exist to practicing claims 21, 25, and 38 of the '014 Patent.

3.      Whether non-infringing alternatives exist to practicing claims 1 and 16 of the '949 Patent.

II.   **INVALIDITY OF THE ASSERTED PATENTS**

Below are the issues of fact related to whether the Asserted Patents are invalid under 35 U.S.C. §§ 102, 103 and 112.

A.   **The '258 Patent**

4.      Whether claim 11 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the UPnP Design by Example book, including the Intel UPnP Media Renderer, UPnP Media Server, UPnP Media Controller and Intel Device Spy software that was included in a CD with that book, and the documents specifically identified and incorporated by reference into that book (including UPnP Design by Example; Intel UPnP Software Suite (Renderer, Server, Controller, Device Spy); "RenderingControl:1 Service Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000115187-249); "AVTransport:1 Service Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000114882-947); "Connection Manager: 1 Service Template Version 1.01 For UPnP, Version 1.0" June 25, 2002

---

[1] As described in Defendants' Issues of Law to be Litigated, Sonos bears the burden of proof for the purposes of obtaining lost profits that there is an absence of non-infringing alternatives. Regardless of whether Sonos can meet its burden, Defendants intend to prove the existence of non-infringing alternatives.

(SONDM000114948-72); Windows Universal Plug and Play (UPnP) Client Support (D+M_0402007-24); Universal Plug and Play AV Architecture:1 For UPnP, Version 1.0, June 25, 2002 (D+M_0298151-172); "MediaRenderer:1 Device Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000115163-74); "MediaServer:1 Device Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000115175-86); "ContentDirectory:1 Service Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000114973-5061); Universal Plug and Play Device Architecture," Version 1.0, June 8, 2000 (SONDM000164289-0342); RTP (RFC 1889); IEEE 1394; NTP (RFC-1305); (RFC 2616); Microsoft, Universal Plug and Play (UPnP) Client Support, August 2001 ("Microsoft UPnP") (D+M_0402007-24)) (collectively, "UPnP").

5.      Whether claim 11 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the Home Director System as evidenced by U.S. Patent Application Publication No. US2002/124097 to Isely and D+M_0402137-140 (collectively, "Home Director").

6.      Whether claim 11 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

7.      Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 11 of the '258 Patent.

8.      Whether claim 11 of the '258 Patent is invalid under 35 U.S.C. § 112.

9.      Whether claim 17 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

10.     Whether claim 17 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

3

11.     Whether claim 17 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

12.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 17 of the '258 Patent.

13.     Whether claim 17 of the '258 Patent is invalid under 35 U.S.C. § 112.

14.     Whether claim 18 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

15.     Whether claim 18 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

16.     Whether claim 18 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

17.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 18 of the '258 Patent.

18.     Whether claim 18 of the '258 Patent is invalid under 35 U.S.C. § 112.

19.     Whether claim 21 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

20.     Whether claim 21 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

21.     Whether claim 21 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

22.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 21 of the '258 Patent.

23.     Whether claim 21 of the '258 Patent is invalid under 35 U.S.C. § 112.

24.     Whether claim 24 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

25.     Whether claim 24 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

26.     Whether claim 24 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

27.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 24 of the '258 Patent.

28.     Whether claim 24 of the '258 Patent is invalid under 35 U.S.C. § 112.

**B.      The '014 Patent**

29.     Whether claim 21 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

30.     Whether claim 21 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System which comprises of the Escient Fireball System (as evidenced by The Fireball Digital Music Manager E-40 AND E-120 Installation and User Guide, January 2003 (D+M_0297671-906); The FireBall remote control guide, December 23, 2003 (D+M_0296627-645); Meet the Fireball, August 26, 2003 (D+M_0298092-3); FireBall Digital Music Player MP-100, Installation and User's Guide, January 2003 (D+M_0318272-432)) in combination with Denon AVRs (as evidenced by "DVD and Music Manager DVDM-100 Installation and User's Guide" October 2003 (D+M_0323045-229); "AVR-5800 Operating Instructions" August 2000 (D+M_0295690-756); "AVR-1604/684 Operating Instructions" June 2003 (D+M_0000326-453)) and in further combination with U.S. Patent 6,469,633 to Wachter (collectively, the "D&M System").

31.     Whether claim 21 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of U.S. Patent Application Publication No. US20020072816A1 to Shdema ("Shdema").

32.     Whether claim 21 of the '014 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

33.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 21 of the '014 Patent.

34.     Whether claim 21 of the '014 Patent is invalid under 35 U.S.C. § 112.

35.     Whether claim 25 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

36.     Whether claim 25 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

37.     Whether claim 25 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

38.     Whether claim 25 of the '014 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

39.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 25 of the '014 Patent.

40.     Whether claim 25 of the '014 Patent is invalid under 35 U.S.C. § 112.

41.     Whether claim 38 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

42.     Whether claim 38 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

43.     Whether claim 38 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

44.     Whether claim 38 of the '014 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

45.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 38 of the '014 Patent.

46.     Whether claim 38 of the '014 Patent is invalid under 35 U.S.C. § 112.

**C.     The '949 Patent**

47.     Whether the '949 Patent is entitled to a priority date earlier than February 21, 2008.

48.     Whether claim 1 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

49.     Whether claim 1 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

50.     Whether claim 1 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

51.     Whether claim 1 of the '949 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

52.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 1 of the '949 Patent.

53.     Whether claim 1 of the '949 Patent is invalid under 35 U.S.C. § 112.

54.     Whether claim 16 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

55.     Whether claim 16 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

7

56.     Whether claim 16 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

57.     Whether claim 16 of the '949 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

58.     Whether there is evidence of any secondary considerations of nonobviousness which salvage an otherwise invalid claim 16 of the '949 Patent.

59.     Whether claim 16 of the '949 Patent is invalid under 35 U.S.C. § 112.

## III.     ADDITIONAL AFFIRMATIVE DEFENSES

Below are the issues of fact related to Defendants' additional affirmative defenses.

### A.     The '949 Patent

60.     Whether Sonos's claims for relief for the '949 Patent are limited and/or barred by the doctrine of absolute intervening rights.[2]

a.     Whether the claims of the '949 Patent were amended during reexamination.[3]

b.     Whether the amendments to the '949 Patent claims were substantive.[4]

---

[2] Although Defendants have identified the issue of absolute intervening rights as an issue of fact related to Defendants' affirmative defenses, there are no pending issues of fact which require the jury's attention. Instead, the issue of absolute intervening rights is a matter of law for the Court to decide for the reasons set forth below. Nevertheless, out of an abundance of caution, Defendants have identified these issues in this statement to avoid any claims of waiver or incompleteness.

[3] There is no dispute that claims 1 and 16 of the '949 Patent were amending during reexamination. *See* D.I. 428 at 8 ("Language was added to both claims 1 and 16 (through claim 15) during reexamination."). As such, there is no further need for the jury to consider this issue.

[4] The Court has determined – and the Parties are in agreement –  that the issue of whether amendments were substantive is a matter of law to be determined by the Court. *See* Hrg. Tr. p. 8, ll. 4-25, October 30, 2017. As such, there is no need for the jury to consider this issue either.

# SCHEDULE C1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SONOS'S STATEMENT OF ISSUES OF LAW THAT REMAIN TO BE LITIGATED

Plaintiff Sonos, Inc. ("Sonos") respectfully submits this Statement of Issues of Law that Remain to be Litigated, which is based on Sonos's current understanding of the defenses of Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M") and the proceedings in this action to date.

To the extent that Sonos's Statement of Issues of Fact to be Litigated set forth in **Schedule B1** contains issues of law, those issues are incorporated herein by reference. Likewise, should the Court determine that any issue identified below is more appropriately considered an issue of fact, Sonos incorporates such issues by reference into **Schedule B1**. By including a fact herein, Sonos does not assume the burden of proof or production with regard to that fact. Sonos reserves the right to revise this statement in light of the Court's rulings.

## ISSUES ON WHICH SONOS BEARS THE BURDEN OF PROOF

**I.   DIRECT INFRINGEMENT**

1.     The jury must decide whether Sonos can prove by a preponderance of evidence that D&M has directly infringed each of the Asserted Claims of the Asserted Sonos Patents, either literally or under the Doctrine of Equivalents, by making, using, offering to sell, selling, and/or importing the Accused HEOS Instrumentalities.

2.     Under 35 U.S.C. § 271(a), an accused infringer is liable for direct infringement if, without authorization from the patentee, the accused infringer "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

3.     The patentee has the burden to prove direct infringement, either literally or under the Doctrine of Equivalents, by a preponderance of evidence. *See, e.g., Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.5, 1342 (Fed. Cir. 2005).

4.     A determination of direct infringement under 35 U.S.C. § 271(a) requires a two-step analysis.  First, the Court construes the claims at issue to define their scope and meaning as a matter of law.  *See, e.g., Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc), *abrogated on other grounds*, *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, --- U.S. ----, 135 S. Ct. 831 (2015); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Second, the evidence is examined to determine whether the claims as construed by the Court are infringed by the accused

instrumentalities, which is a question of fact to be decided by the jury.  *See, e.g., Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 696 (Fed. Cir. 2008); *Warner-Lambert*, 418 F.3d at 1340; *Kegel Co. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1425 (Fed. Cir. 1997).

5. "[I]ntent is not an element of direct infringement. . . . Infringement is, and should remain, a strict liability offense." *Hilton Davis Chem. Co. v. Warner- Jenkinson Co.*, 62 F.3d 1512, 1527 (Fed. Cir. 1995) (en banc), *rev'd on other grounds by Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997).

6. Moreover, an accused product that allegedly adds unclaimed features, performs additional functions, or carries out claimed functions in a more efficient manner does not negate or avoid infringement.  *See, e.g.*, *Dow Chem. Co. v. Sumitomo Chem. Co.,* 257 F.3d 1364, 1380 (Fed. Cir. 2001); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984).

### A. Literal Infringement

7. For there to be literal infringement of a device or system claim[1], every limitation of the claim must be present in an accused device or system exactly as recited in the claim.  *See, e.g., Microsoft Corp. v. GeoTag, Inc.*, 817 F.3d 1305, 1313 (Fed. Cir. 2016); *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001). "If even one claim limitation is missing or not met, there is no literal infringement." *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1352 (Fed. Cir. 2005).

8. For there to be literal infringement of a claim directed to a device or system that is configured or programmed to perform recited functions, an accused device or system only needs to possess the functional capability to perform the recited functions.  *See, e.g.*, *Silicon Graphics, Inc. v. AT! Technologies, Inc.,* 607 F.3d 784, 794 (Fed. Cir. 2010); *Finjan, Inc. v. Secure*

---

[1] As used herein, the term "device claim" is intended to cover both apparatus claims and computer-readable medium (CRM) claims.

*Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010); *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1369-70 (Fed. Cir. 2009); *Microprocessor Enhancement Corp. v. Texas Instrum. Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008); *Intel Corp. v. U.S. Int 'l Trade Comm 'n*, 946 F.2d 821, 832 (Fed. Cir. 1991); D.I. 406 at 2-3 ("If the accused products ship with firmware pre-installed that enables the end user to utilize the functions described in the asserted claims, then that is all that is necessary for the sale or importation of the product to constitute infringement."); *M2M Sols. LLC v. Motorola Sols., Inc.*, No. 12-33-RGA, 2016 WL 70814, at *4 (D. Del. Jan. 6, 2016); *Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*, No. 11-484-RGA, 2013 WL 3830416, at *1-2 (D. Del. July 23, 2013).  Infringement of such a claim does not require the accused device or system to actually perform the recited functions, nor does it require the accused device or system to be set up or activated.  *See, e.g.*, *Finjan*, 626 F.3d at 1204-05.

9.    When applying this legal standard to claims reciting computing devices in functional terms, an accused computing device infringes as long as its software already contains program code that enables the accused device to perform the recited functions, without the need to modify the underlying code.  *See, e.g., Finjan*, 626 F.3d at 1204-05; *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002); *M2M,* 2016 WL 70814, at *7.  The fact that such program code may need to be "activated" is irrelevant to infringement, because it "does not detract from or somehow nullify the existence of the claimed structure in the accused software." *Finjan*, 626 F.3d at 1205.   Thus, a computing device with software that contains program code for performing the recited functions literally infringes as sold.  *Id*.

10.    For there to be literal infringement of a method claim, "the enumerated steps of [the] claim must . . . all be practiced as recited in the claim for a process to infringe." *Ricoh Co.*

*v. Quanta Computer Inc.*, 550 F.3d 1325, 1333 (Fed. Cir. 2008) (citing *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed.Cir.2007)).

11.     A patentee may prove infringement by "'any method of analysis that is probative of the fact of infringement,' and circumstantial evidence may be sufficient." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1372 (Fed. Cir. 2009); *see also Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) ("There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable per se.").

12.     Thus, for each Asserted Claim that Sonos contends to be literally infringed, the jury must decide whether Sonos can prove by a preponderance of evidence that every limitation of the claim is literally present in the Accused Instrumentalities.

### B.     Infringement Under Doctrine of Equivalents

13.     An accused device or process that does not literally infringe may still infringe under the Doctrine of Equivalents "if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)); *see also Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1568 (Fed. Cir. 1996) ("Infringement under the doctrine of equivalents may be found where those limitations of a claim not found exactly in the accused device are met equivalently."). Thus, under the Doctrine of Equivalents, a patentee must prove by a preponderance of the evidence that "the accused device contains an equivalent for each limitation not literally satisfied." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002).

14.     To prove such equivalence, a patentee generally must "show[] that the difference between the claimed invention and the accused product [is] insubstantial." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007).  "One way of doing so is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each limitation of the patented product." *Id.*  Further, when evaluating whether a feature of an accused device or process is equivalent to a limitation of a claim, one useful factor to consider is whether one of ordinary skill in the art would have known the feature to be interchangeable with the claim limitation.  *See Ring & Pinion Serv. Inc. v. ARB Corp.*, 743 F.3d 831, 834 (Fed. Cir. 2014) (collecting cases).

15.     Thus, for each Asserted Claim that Sonos contends to be infringed under the Doctrine of Equivalents, the jury must decide whether Sonos can prove by a preponderance of evidence that the Accused Instrumentalities contain an equivalent for each limitation of the claim that is not literally satisfied.

## II.     INDIRECT INFRINGEMENT

### A.     Induced Infringement

16.     The jury must decide whether Sonos can prove by a preponderance of evidence that D&M has induced infringement of the Asserted Claims under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors of the Accused Instrumentalities to take acts that result in direct infringement of the Asserted Claims.

17.     In general, an accused infringer "induces infringement under § 271(b) by actively and knowingly aiding and abetting another's direct infringement." *C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.*, 911 F.2d 670, 675 (Fed. Cir. 1990).  To prove inducement of infringement, a patentee must show by a preponderance of evidence that (1) a third party

engaged in acts that resulted in direct infringement and (2) the accused infringer acted with a specific intent to induce the direct infringement by the third party. *See, e.g., Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 697-700 (Fed. Cir. 2008); *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1304-06 (Fed. Cir. 2006). Both prongs of this standard are questions of fact to be decided by the jury. *See, e.g., Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 700 (Fed. Cir. 2008); *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1378 (Fed. Cir. 2004) ("Intent is a factual determination particularly within the province of the trier of fact and may be inferred from all of the circumstances.").

18.     Under the first prong of this standard, a finding of induced infringement "can rest on as little as one instance" of direct infringement by a third party. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009). In addition, a third party's direct infringement can be established either by direct evidence or by circumstantial evidence. *See, e.g., Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1365 (Fed. Cir. 2012). As examples, a third party's direct infringement can be established by:

- Evidence showing that an accused infringer instructs users to use a product in an infringing manner. *See, e.g., Convolve, Inc. v. Compaq Computer Corp.*, 527 F. App'x 910, 929 (Fed. Cir. 2013); *Toshiba*, 681 F.3d at 1365; *Lucent*, 580 F.3d at 1317-19.

- Evidence showing that an accused infringer designs a product having a "normal and intended use" that "involves an infringing use." *Cornell Univ. v. Hewlett-Packard Co.*, 654 F. Supp. 2d 119, 127 (N.D. N.Y. 2009) (citing *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1307, 1311-1312 (Fed. Cir. 1998)); *see also Lucent*, 580 F.3d at 1317-19, 21-23.

- Evidence showing that a defendant infringed while testing the accused product's intended operation in combination with evidence showing that a significant number of accused products were provided to third parties. *See, e.g., Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522 (Fed. Cir. 2016).

19.     Moreover, in line with the direct infringement standards set forth above, a patentee need not show that the specific functions recited in device claims have actually been used in order to prove a third party's direct infringement of such claims.  *Fantasy Sports*, 287 F.3d at 1118 (find that an accused device having program instructions for performing the recited functions infringes claims directed to devices having functional capability regardless of whether those functions are "activated or utilized in any way"); *Revolution*, 563 F.3d at 1369-70 (finding it "irrelevant" to infringement that an accused product was "not actually used" in the claimed configuration of an apparatus claim); *M2M Sols.*, 2016 WL 70814, at *12-14 (finding that the patentee need not show "evidence of any third party having operated the devices in an infringing matter" to establish direct infringement of apparatus claims).

20.     Rather, a device that possesses the functional capability to perform the recited functions of a device claim infringes that claim regardless of whether the recited functions are actually performed, and thus any use of the accused device by a third-party user is a direct infringement under 35 U.S.C. § 271(a).  *See, e.g., M2M,* 2016 WL 70814, at *12-14.  Likewise, any time that a third-party user installs software on such a device that includes program code for performing the recited functions of a device claim, the user "makes" a device that infringes the device claim, which is direct infringement under 35 U.S.C. § 271(a).  *Id.*; *see also Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1288 (Fed. Cir. 2011) (finding that a customer "makes" a claimed system under 35 U.S.C. § 271(a) by providing the personal computer and "installing the client software").

21.     Turning to the second prong of this standard, a patentee can satisfy the "intent" requirement of induced infringement by proving that (a) the accused infringer took affirmative acts to cause, urge, encourage, or aid the third party's acts, and (b) the accused infringer knew

that the induced acts of the third party would result in direct infringement or was at least

willfully blind to that fact—which necessarily requires proof that the accused infringer knew of,

or was at least willfully blind to, the existence of the patent being infringed.  *See, e.g., Power*

*Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir.

2016); *Suprema, Inc. v. International Trade Com'n*, 626 Fed.Appx. 273, 280-282 (Fed. Cir.

2015); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 764-771 (2011); *Broadcom*, 543

F.3d at 697-700; *DSU Medical*, 471 F.3d at 1304-06.

22.     Establishing that an accused infringer willfully blinded itself to the infringing

nature of a third party's acts requires a showing that (1) the accused infringer subjectively

believed there was a high probability that a patent was being infringed by the third party and (2)

the accused infringer took deliberate actions to avoid learning of this fact. *Global-Tech*, 563 U.S.

at 769-71; *see also Suprema*, 626 Fed.Appx. at 280-282.

23.     As with the direct infringement requirement, the intent requirement can be

established either by direct evidence or by circumstantial evidence, and "the requisite intent to

induce infringement may be inferred from all of the circumstances."  *See, e.g., Broadcom*, 543

F.3d at 699 (internal quotation omitted); *see Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325,

1341 (Fed. Cir. 2008) (finding that "liability for active inducement may be found where evidence

goes beyond a product's characteristics or the knowledge that it may be put to infringing uses,

and shows statements or actions directed to promoting infringement") (internal quotation

omitted).  These circumstances may take various forms.

24.     As one example, "[e]vidence of active steps taken to induce infringement, such as

advertising an infringing use, can support a finding of an intention for the product to be using in

an infringing manner." *Lucent*, 580 F.3d at 1322.  As another example, "providing instruction on

how to engage in an infringing use shows an affirmative intent that the product be used to infringe." *Ricoh*, 550 F.3d at 1338 (internal quotation omitted).  As yet another example, "a failure to remove or diminish infringing features of a distributed product is relevant to a party's intent that those features be used for direct infringement." *Ricoh*, 550 F.3d at 1338.[2]

25.     Moreover, the Federal Circuit has found that the specific intent to induce infringement "may be inferred from circumstantial evidence where [an accused infringer] has both knowledge of the patent and specific intent to cause the acts constituting infringement." *Id*. at 1342-43.  For example, a "specific intent to cause infringement" can be inferred from "[an accused infringer's knowledge of the patent and control over the design or manufacturing of the product used for direct infringement." *Id*.

26.     Notably, an accused infringer's belief that a patent is invalid also cannot negate a showing of intent to induce infringement.  *See Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926-30 (2015).

## B.     Contributory Infringement

27.     The jury must decide whether Sonos can prove by a preponderance of evidence that D&M has contributorily infringed the Asserted Claims under 35 U.S.C. § 271(c) by

---

[2] *See also, e.g.*, *Broadcom*, 543 F.3d at 701 (finding substantial evidence to support jury verdict of induced infringement where, after the lawsuit was filed, defendant continued developing and supporting the accused products and failed to make changes to the products or instruct customers on how to avoid infringement); *CreAgri, Inc. v. Pinnaclife Inc.*, No. 11-06635, 2013 WL 3958379, at *4 (N.D. Cal. July 29, 2013) (denying motion to dismiss induced infringement claim where, after learning that the patent had issued, defendant "made the ***choices*** to: (1) continue to advertise its [accused product]; (2) participate in the study with the University of Iowa; and (3) leave its YouTube video on the internet.") (emphasis original); *Fujitsu Ltd. v. Belkin Int'l, Inc.*, No. 10-3972, 2012 WL 4497966, at *40-41 (N.D. Cal. Sept. 28, 2012) (denying summary judgment of no indirect infringement where the accused infringer "distributed marketing materials and user manuals affirmatively instructing users to combine accused external devices with allegedly infringing cards and made no effort to delete these instructions after being contacted by [the patentee]").

supplying software components in the United States to be installed and/or used by third-party users of the Accused Instrumentalities with knowledge that installation and/or use of the software components would result in direct infringement.

28.     To prove contributory infringement of a patent, a patentee must show by a preponderance of evidence that (1) an accused infringer sold, offered to sell, or imported in the United States a material component of an infringing product that is not a staple article or commodity of commerce suitable for substantial noninfringing use, (2) a third party used the component in an infringing manner, and (3) the accused infringer knew that the component was especially made or adapted for use in the infringing manner or was at least willfully blind to this fact.  *See* 35 U.S.C. § 271(c); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010); *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 850–51 (Fed. Cir. 2010); *Philips Electronics N.A. Corp. v. Remote Solution Co., Ltd.*, 411 F.Supp.2d 479, 482-83 (D. Del. 2006). Each prong of this standard is a question of fact to be decided by the jury.  *See, e.g.*, *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 522-25 (Fed. Cir. 2016); *Cross Med. Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1314 (Fed. Cir. 2005).

29.     Under the first prong of this standard, a component has no "substantial noninfringing use" if the component has no meaningful use other than to infringe the claims of a patent.  *See, e.g., Golden Blount, Inc. v. Robert H. Peterson Co.,* 438 F.3d 1354, 1363 (Fed. Cir. 2006).  When applying this standard to a separate and distinct component that is embedded into a larger package, the analysis must remain focused only on whether the specific component – and not the entire package – is capable of substantial noninfringing uses.  *See Koninklijke*, 656 F. App'x at 524 (compiling cases); *see also, e.g., i4i Ltd.*, 598 F.3d at 849 (Fed. Cir. 2010); *Lucent*,

580 F.3d at 1320-21; *Ricoh*, 550 F.3d at 1339; *Skyhook Wireless, Inc. v. Google, Inc.*, No. 10-11571, 2015 WL 10012985, *11-12 (D. Mass. Feb. 18, 2015).

30.     Moreover, a use of the component that is not practical, not worthwhile, far-fetched, illusory, or hypothetical does not quality as "substantial noninfringing use" under 35 U.S.C. § 271(c). *See, e.g., i4i Ltd.*, 598 F.3d at 851; *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1379 (Fed. Cir. 2001).

31.     Turning to the second prong of this standard, as with induced infringement, a finding of contributory infringement can be based on as little as one instance of direct infringement by a third party and can be established by either direct or circumstantial evidence. *See, e.g., i4i Ltd.*, 598 F.3d at 850; *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1327-28 (Fed. Cir. 2004).

32.     Moreover, in line with the direct infringement standards set forth above, a patentee need not show that the specific functions recited in device claims have actually been used in order to prove a third party's direct infringement of such claims. *Fantasy Sports*, 287 F.3d at 1118; *Revolution*, 563 F.3d at 1369-70; *M2M Sols.,* 2016 WL 70814, at *12-14.  Rather, a device that possesses the functional capability to perform the recited functions of a device claim infringes that claim regardless of whether the recited functions are actually performed, and thus any use of the accused device by a third-party user is a direct infringement under 35 U.S.C. § 271(a). *See, e.g., M2M,* 2016 WL 70814, at *12-14.  Likewise, any time that a third-party user installs software on such a device that includes program code for performing the recited functions of a device claim, the user "makes" a device that infringes the device claim, which is direct infringement under 35 U.S.C. § 271(a). *Id*.; *see also Centillion* 631 F.3d at 1288.

33.     Lastly, as with induced infringement, the third prong of this standard requires proof that the accused infringer knew the component was being used in an infringing manner or was at least willfully blind to that fact—which necessarily requires proof that the accused infringer knew of, or was at least willfully blind to, the existence of the patent being infringed. *Commil*, 135 S. Ct. at 1926; *Global-Tech*, 563 U.S. at 761-71; *Philips Electronics N.A. Corp. v. Remote Solution Co., Ltd.*, 411 F.Supp.2d 479, 482 n.4 (D. Del. 2006) ("Even if actual, as opposed to constructive, knowledge were required, an instruction permitting Philips to argue that the Defendants must have known the truth would be appropriate, since willful blindness is a species of actual knowledge. . . . Thus, even an instruction that required Defendants to have had actual knowledge that infringement was occurring must include a situation where Defendants had particular information and turned a blind eye to it."). However, unlike for induced infringement, the standard for contributory infringement does not require proof of intent to cause infringement, because such intent is presumed when a component is not capable of any substantial noninfringing use. *See, e.g.*, *Ricoh*, 550 F.3d at 1338.

## III.   WILLFULNESS

34.     The jury must decide whether Sonos can prove by a preponderance of evidence that D&M's infringement was willful.

35.     The Supreme Court recently found that there is "no precise rule or formula" for determining whether an accused infringer's infringement was willful. *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1932 (2016). However, in general, an accused infringer is liable for willful infringement of a patent if the accused infringer knew or should have known of the patent and nevertheless engaged in conduct that infringed the patent without regard for the consequences. *See id.* at 1931-1934. For instance, "proof that [an accused infringer] acted

despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer'" is sufficient to establish willful infringement. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362-64 (Fed. Cir. 2016) (citing *Halo*, 136 S. Ct. at 1930).

36.    In general, the accused infringer's state of mind is to be evaluated at the time of the accused infringer's challenged conduct.  *See, e.g.*, *Halo,* 136 S. Ct. at 1933; *Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 12-630, 2017 WL 2720220, at *10 (N.D. Cal. June 23, 2017).  As such, pre-suit or post-suit conduct can independently serve as a basis for willful infringement. *See, e.g.*, *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295 (Fed. Cir. 2017); *Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-679-RGA, 2017 WL 3736750, at *2 (D. Del. Aug. 30, 2017) ("[A]llegations of post-filing conduct can support a finding of willfulness."); *Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 12-630, 2017 WL 2720220, at *11 (N.D. Cal. June 23, 2017) ("Samsung's post-filing conduct alone can serve as the basis of a jury's willfulness finding and an award of enhanced damages."); *DermaFocus LLC v. Ulthera, Inc.*, 201 F.Supp.3d 465, 473 (D. Del. 2016).

37.    Likewise, that an accused infringer's challenged conduct began prior to the issuance of a patent is no defense to willful infringement if the accused infringer continues to infringe post issuance.  *See, e.g.*, *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995) ("Whether Infanti was justified in producing the chairs prior to the issuance of Gasser's patent is irrelevant to whether it was justified in doing so after being made aware of it."); *Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992) ("[A]lthough willfulness is generally based on conduct that occurred after a patent issued, pre-patent conduct may also be used to support a finding of willfulness.");

*Pacific Furniture Mfg. Co. v. Preview Furniture Corp.*, 800 F.2d 1111, 1114 n.9 (Fed. Cir. 1986)

("The fact that Preview may have started its infringement before the patents issued (or before

appellants were aware of the patents) does not bar an award of increased damages or attorney

fees."); *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978-979 (Fed. Cir. 1986); *Idenix Pharms.*

*LLC v. Gilead Sciences, Inc.*, No. 13-1987, 2016 WL 7380530, at *1 (D. Del. Dec. 4, 2016)

("Nor is the Court persuaded that the law absolutely precludes pre-patent conduct from being

probative of willfulness"); *Andover Healthcare, Inc. v. 3M Co.*, No. 13-843, 2016 WL 6246360,

at *6 (D. Del. Oct. 18, 2016); *Chimie v. PPG Indus., Inc.*, 218 F.R.D. 416, 422 (D. Del. 2003)

("Where there is particularly egregious behavior showing a party intent on misappropriating a

competitor's proprietary technology, courts have been willing to consider that behavior as

evidence of willfulness, even if some of the offending acts occurred before a patent issued.").

38.     For example, evidence of pre-issuance copying of patented features coupled with

evidence of post-issuance continued sale of products embodying those copied features can

support willful infringement. *See, e.g., Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1259 (Fed.

Cir. 2000); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1127 (Fed. Cir. 1993)

("[C]ontinu[ing] the accused activities after patent issuance" can support a finding of willfulness

because "[t]he law imposes an affirmative duty of due care to avoid infringement of the known

patent rights of another."); *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978-979 (Fed. Cir.

1986); *Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 12-630, 2017 WL 2720220, at *12 (N.D.

Cal. June 23, 2017) ("The continued sale of a copied product supports an inference that

Samsung's infringement was willful."); *Sargent Mfg. Co. v. Cal-Royal Prod., Inc.*, No. 08-408,

2012 WL 603268, at *11 (D. Conn. Feb. 24, 2012) ("Cal–Royal has admitted that after Sargent

filed the current lawsuit . . . , Cal–Royal created a new design of its easily reversible mortise lock

to avoid infringement, and yet continued to sell the allegedly infringing design until at least 2009. This fact alone would allow a reasonably jury to find that Cal–Royal's willfully infringed Sargent's '870 patent in the post-filing period."); *cf K-TEC, Inc. v. Vita-Mix Corp.,* 696 F.3d 1364, 1378 (Fed. Cir. 2012). ("In addition, as recounted above, K–TEC presented evidence that, in designing the XP product, Vita–Mix started with the MP container—a direct copy of K–TEC's five-sided jar—and made only a trivial change. Specifically, K–TEC offered evidence that, rather than adopting one of numerous noninfringing designs, Vita–Mix opted for a design that allowed Vita–Mix to produce a container that performed in the same way as the MP container and employ a design that its customers would not be able to distinguish from the MP container. Indeed, Vita–Mix maintained the same product numbers for both the MP and XP containers.").

39.     As another example, evidence suggesting that (i) the accused infringer knew of the value of an invention, (ii) the accused infringer knew that the inventor intended to obtain a patent on the invention, and (iii) there was similarity between the accused infringer's product and the invention can support willful infringement. *See, e.g.*, *Tomita Techs. USA, LLC v. Nintendo Co.*, Ltd., No. 11-4256, 2012 WL 2524770, at *10 (S.D. N.Y. June 26, 2012).

40.     Willful infringement is a question of fact to be decided by the jury, and the patentee has the burden of proving willful infringement by a preponderance of evidence. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016); *Halo*, 136 S. Ct. at 1934.  Willful infringement can be established either by direct evidence or by circumstantial evidence. *See, e.g.*, *Georgetown Rail Equip. Co. v. Holland L.P.*, No. 2016-2297, 2017 WL 3499240, at *11 (Fed. Cir. Aug. 1, 2017); *Tristrata Tech., Inc. v. ICN Pharm., Inc.*, 313 F. Supp. 2d 405, 411-12 (D. Del. 2004); *cf. Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988)

("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

## IV.   REMEDIES

### A.   Injunction

41.     If it is determined that D&M infringes one or more of the Asserted Claims of the Asserted Sonos Patents, the Court will have to decide whether to issue an injunction against D&M.

42.     Under 35 U.S.C. § 283, the Court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

43.     To obtain an injunction under § 283, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay*, 547 U.S. at 391

44.     "Where two companies are in competition against one another, the patentee suffers the harm - often irreparable - of being forced to compete against products that incorporate and infringe its own patented inventions."  *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).  "The patentee's unwillingness to license the patented technology also weighs in favor of a finding of irreparable harm."  *Evonik Degussa GmbH v. Materia, Inc.*, Civ. No. 09-636 (NLH/JS), 2017 WL 3434156, at *1 (D. Del. Aug. 9, 2017)

(citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363-64 (Fed. Cir. 2012)).

45.     The nature of the competitive relationship between [the parties], as well as the patentee's unwillingness to license the patented technology, also weigh in favor of a conclusion that the patentee has no adequate remedy at law.  *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1327-28 (Fed. Cir. 2008); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1337 (Fed. Cir. 2012) ("As the district court correctly observed, the issues of irreparable harm and adequacy of remedies at law are inextricably intertwined."); *Evonik*, 2017 WL 3434156 at *2.  "Additionally, 'a patent holder's . . . engagement in lengthy litigation to protect [the] business decision,' [not to license the patented technology] as occurred here, also weighs in favor of finding the remedy at law inadequate." *Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA*, 821 F. Supp. 2d 681, 694 (D.N.J. 2011) (quoting Federal Judicial Center's Patent Case Management Judicial Guide Table 9.1).

46.     Balancing the hardships between the parties "assesses the relative effect of granting or denying an injunction on the parties."  *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 645 (Fed. Cir. 2015).  Factors that may be considered "include[ ] the parties' sizes, products, and revenue sources."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).  "A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011); *Evonik*, 2017 WL 3434156 at *3.  Furthermore, the balance of the hardships does not favor the defendant when "[a]ny harms Defendants may suffer as a result of an injunction 'were almost entirely preventable and were the result of its own calculated

risk.'" *Sanofi-Aventis Deutschland GmbH*, 821 F. Supp. 2d at 695 (quoting *Sanofi-Synthelabo v.*

*Apotex*, 470 F.3d 1368, 1383 (Fed. Cir. 2006))

47.     "[T]he public interest nearly always weighs in favor of protecting property rights

in the absence of countervailing factors, especially when the patentee practices his inventions.

'The encouragement of investment-based risk is the fundamental purpose of the patent grant, and

is based directly on the right to exclude.'" *Apple*, 809 F.3d at 647 (quoting *Sanofi-Synthelabo v.*

*Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006)); *see also Sanofi-Aventis Deutschland GmbH*,

821 F. Supp. 2d at 696 ("If generic pharmaceutical companies were free to disregard patent

rights and simply piggy back off the innovations of others, then the incentives the patent system

is designed to promote, namely those that encourage continued investment in costly drug

development, would disappear.").

### B.     Damages

48.     If it is determined that D&M infringes one or more of the Asserted Claims of the

Asserted Sonos Patents, the jury will be asked to determine the amount of damages that should

be awarded to Sonos.

49.     35 U.S.C § 284 states in relevant part:

> Upon finding for the claimant the court shall award the claimant damages
> adequate to compensate for the infringement, but in no event less than a
> reasonable royalty for the use made of the invention by the infringer . . . .
>
> . . .
>
> The court may receive expert testimony as an aid to the determination of damages
> or of what royalty would be reasonable under the circumstances.

50.     The purpose of compensatory damages is to make the patent owner "whole" or

"fully compensate" him for the infringement, such that the patent owner is restored to the

financial position he would have been in had the infringement not occurred. *Lucent*

*Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), *cert. denied*, 130 S.

Ct. 3324 (2010); *Rite- Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en

banc), *cert. denied*, 516 U.S. 867 (1995) ("[T]he Supreme Court has interpreted [Section 284] to

mean that 'adequate' damages should approximate those damages that will *fully compensate* the

patentee for infringement.") (emphasis in original).

51.     Depending on the circumstances of the case, compensatory damages may take the

form of (1) lost profits, (2) an established royalty, or (3) a reasonable royalty. *SmithKline*

*Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1167 & n.5 (Fed. Cir. 1991); *Hanson v.*

*Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). As a general matter, a

"patentee may seek to recover actual damages, usually, the amount of profits actually lost, or if

unable to prove actual damages, the patentee is entitled to a reasonable royalty." *Smithkline*, 926

F.2d at 1164. A reasonable royalty may take the form of a lump sum royalty, "where the

patentee receives an upfront payment," or a running royalty, "where the patentee collects

ongoing per-unit or percentage payments." *Wordtech Sys. Inc. v. Integrated Networks Solutions,*

*Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010).

52.     To recover lost profits, "a patent owner must prove a causal relation between the

infringement and its loss of profits." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l,*

*Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001) (internal quotation marks and citation omitted). "In

other words, the burden rests on the patentee to show a reasonable probability that but for the

infringing activity, the patentee would have made the infringer's sales." *Id*. (internal quotation

marks and citation omitted). "When a patentee proves it would have made additional sales but

for a defendant's infringement, the patentee is entitled to be made whole for the profits it proves

it lost." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1284 (Fed. Cir. 2017).

53.    "There is no particular required method to prove but for causation" in patent cases.  *Id*.  "One useful, but non-exclusive method to establish the patentee's entitlement to lost profits is the *Panduit* test first articulated by the Sixth Circuit" in *Panduit Corp. v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  *Mentor Graphics*, 851 F.3d at 1284 (internal quotation marks and citation omitted).  Under the *Panduit* test, a patentee is entitled to lost profits if it can establish: (1) "demand for the patented product"; (2) "absence of acceptable noninfringing substitutes"; (3) "manufacturing and marketing capability to exploit the demand"; and (4) "the amount of profit [the patentee] would have made."  575 F.2d at 1156.

54.    "The first factor—demand for the patented product—considers demand for the product as a whole."  *Mentor Graphics*, 851 F.3d at 1285 (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330-31 (Fed. Cir. 2009)).  "This factor does not require any allocation of consumer demand among the various limitations recited in a patent claim." *DePuy*, 567 F.3d at 1330.

55.    "The second factor—the absence of non-infringing alternatives —considers demand for particular limitations or features of the claimed invention."  *Mentor Graphics*, 851 F.3d at 1285 (citing *DePuy*, 567 F.3d at 1331).

56.    "[I]f purchasers are motivated to purchase because of particular features available only from the patented product, products without such features—even if otherwise competing in the marketplace—would not be acceptable noninfringing substitutes."  *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991).  Similarly, "products lacking the advantages of the patented invention 'can hardly be termed a substitute acceptable to the customer who wants those advantages.'"  *Presidio*, 702 F.3d at 1361 (quoting *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901-02 (Fed. Cir. 1986)); *see also Radio Steel & Mfg. Co. v. MTD*

*Prods., Inc.*, 788 F.2d 1554, 1556 (Fed. Cir. 1986) (affirming district court's finding of no acceptable, noninfringing alternatives where "[t]he various [proposed alternative] wheelbarrows to which [infringer] refers incorporate only some, but not all, of the elements of the patent."). This is especially true where the "proposed non-infringing substitutes are not adequate substitutes in the same market" and/or the market is moving away from the proposed non-infringing substitute to the infringing design. *Presidio*, 702 F.3d at 1361.

57.     "The patent holder does not need to negate *all* possibilities that a purchaser might have bought a different product or might have foregone the purchase altogether" in order to satisfy the second *Panduit* factor. *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989) (quoting *Paper Converting Mach. Co. v. Magna–Graphics Corp.*, 745 F.2d 11, 21 (Fed. Cir. 1984)) (emphasis in original); *see also Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F.Supp.2d 589, 613 (D. Del. 2004) ("A patentee need not negate every possibility that a purchaser might have bought a product other than its own.").

58.     As an alternative to demonstrating the absence of acceptable, noninfringing alternatives under the second *Panduit* element, a patentee can use a market share approach where the patentee recovers lost profits on the percentage of infringing sales equal to its market share. *See, e.g.*, *BIC Leisure Prods., Inc. v. Windsurfing Intern., Inc.*, 1 F.3d 1214, 1219 (Fed. Cir. 1993) ("This court has held that a patent owner may satisfy the second *Panduit* element by substituting proof of its market share for proof of the absence of acceptable substitutes. This market share approach allows a patentee to recover lost profits, despite the presence of acceptable, noninfringing substitutes, because it nevertheless can prove with reasonable probability sales it would have made 'but for' the infringement.") (internal citation omitted); *Oscar Mayer Foods Corp. v. ConAgra, Inc.*, Nos. 94-1247, 94-1248, 1994 WL 712488 at *8

(Fed. Cir. Dec. 22, 1994) ("[T]his court has previously approved proof of market share as a substitute for proving the absence of acceptable, noninfringing alternatives."); *Mor-Flo*, 883 F.2d at 1577-78 (When a market share approach is applied "the presence or absence of acceptable noninfringing alternatives does not matter.  The question then becomes whether an established market share combined with the other Panduit factors is sufficient to show [patentee's] loss to a reasonable probability."); *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F.Supp.2d 346, 362 (D. Del. 2006) ("[D]amages for lost profits may be awarded, even where there are non-infringing alternatives, based on a patentee's previous share of the market.  Thus, even if [a competitor] did produce a product that was a non-infringing alternative, it is possible for [the patentee] to be awarded lost profits damages based on the market share it held prior to [the infringer's] entrance into the market."); *Izumi*, 315 F.Supp.2d at 614 ("[A]warding lost profits based on market share is proper if the patentee shows an established market share in lieu of the absence of acceptable noninfringing alternatives and, at the same time, meets the three other *Panduit* factors."); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F.Supp. 547, 601 (D. Del. 1997) ("[A] patent owner may satisfy the second prong of the *Panduit* test by proving its share of the market in lieu of proof of the absence of acceptable substitutes.  Under this approach, a patentee recovers lost profits on the percentage of infringing sales equal to its market share.") (citations omitted); *see also Mentor Graphics*, 851 F.3d at 1286 n.5; *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1377 (Fed. Cir. 2003); *Crystal Semiconductor Corp.*, 246 F.3d at 1353-55; *TruePosition Inc. v. Andrew Corp.*, 568 F.Supp.2d 500, 524 n.31 (D. Del. 2008); *C.R. Bard, Inc. v. Boston Sci. Corp.*, C.A. No. 95-215-JJF, 1998 WL 34181945, at *2 (D. Del. Nov. 30, 1998).

59.     "For sales in which the patentee cannot prove the elements necessary to establish

entitlement to lost profits, the statute guarantees the patentee a reasonable royalty for those

sales." *Mentor Graphics*, 851 F.3d at 1286.  The common approach to determining a reasonable

royalty is to consider the outcome of a hypothetical arms-length negotiation between a willing

licensor and licensee just before infringement began.  *Lucent Technologies, Inc.*, 580 F.3d at

1324-25.  In other words, the reasonable royalty is "the royalty upon which the parties would

have agreed had they successfully negotiated an agreement" at that time.  *Id*.  "[P]arties in a

hypothetical negotiation are presumed to have perfect knowledge of all facts and circumstances,

some of which were unknown during the actual patent negotiations and acquisition." *Intellectual

Ventures I LLC v. Check Point Software, et al.*, C.A. Nos. 10-1067-LPS, 12-1581-LPS, at *11

(D. Del. Mar. 31, 2014) (Mem. Op.) (citing *Mobile Oil Corp. v. Amoco Chemicals Corp.*, 915 F.

Supp. 1333, 1353 (D. Del. 1994)).  In applying the construct of the hypothetical negotiation, the

fact-finder must assume that the patents-in-suit are valid, enforceable, and infringed.  *See Lucent

Technologies, Inc.*, 580 F.3d at 1324-25.

60.     As a general matter, the reasonable royalty analysis considers the relevant facts

and circumstances concerning the parties as of the time of the hypothetical negotiation, but the

analysis is flexible – the fact-finder may also look to "events and facts that occurred thereafter

and that could not have been known or predicted by the hypothesized negotiators" under the so

called "Book of Wisdom."  *See Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568,

1575-76 (Fed. Cir. 1988), *overruled on other grounds by, Knorr Bremse System Fuer

Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004).  Indeed, "the Supreme

Court recognized that factual developments occurring after the date of the hypothetical

negotiation can inform the damages calculation." *Lucent Technologies, Inc.*, 580 F.3d at 1333

25

(citing *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698, 53 S.Ct. 736,

(1933)).  And Federal Circuit "case law affirms the availability of post-infringement evidence as

probative in certain circumstances." *Id*.  "[P]arties in a hypothetical negotiation are presumed to

have perfect knowledge of all facts and circumstances, some of which were unknown during the

actual patent negotiations and acquisition." *Intellectual Ventures I LLC v. Check Point Software*,

C.A. Nos. 10-1067-LPS, 12-1581-LPS, D.I. 579 at *11 (D. Del. Mar. 31, 2014) (citing *Mobil Oil

Corp.*, 915 F. Supp. at 1353).

61.     Courts consider a variety of factors in determining the reasonable royalty that the

parties would have agreed to in the "hypothetical negotiation," outlined in *Georgia-Pacific Corp.

v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  These include:

> "1. The royalties received by the patentee for the licensing of the patent in suit,
> proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the
> patent in suit.
>
> 3. The nature and scope of the license, as exclusive or non-exclusive; or as
> restricted or non-restricted in terms of territory or with respect to whom the
> manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent
> monopoly by not licensing others to use the invention or by granting licenses
> under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as,
> whether they are competitors in the same territory in the same line of business; or
> whether they are inventor and promotor.
>
> 6. The effect of selling the patented specialty in promoting sales of other products
> of the licensee; the existing value of the invention to the licensor as a generator of
> sales of his non-patented items; and the extent of such derivative or convoyed
> sales.
>
> 7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."

*Georgia-Pacific*, 318 F. Supp. at 1120.

62.    While the Federal Circuit has approved the use of the *Georgia-Pacific* factors in

numerous decisions and district courts have repeatedly applied the analysis, the factors are not

exclusive, and some or all of the factors may be relevant to a particular case, depending on the

facts of the case.  *See, e.g.*, *Minks v. Polaris Industries, Inc.*, 546 F.3d 1364, 1372 (Fed. Cir.

2008); *Dow Chemical Co. v. Mee Industries, Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003); *Rite-*

*Hite Corp.*, 56 F.3d at 1555; *Energy Transp. Gp., Inc. v. Sonic Innovations, Inc.*, C.A. No. 05-422 (GMS), 2011 WL 2222066, at *21 n.29 (D. Del. June 7, 2011).

63.    As described in *Georgia-Pacific*, there is no mathematical formula to determining reasonable royalties:

> [A] multiplicity of inter-penetrating factors bear[s] upon the amount of a reasonable royalty. But there is no formula by which these factors can be rated precisely in the order of their relative importance or by which their economic significance can be automatically transduced into their pecuniary equivalent. . . . In discharging its responsibility as fact finder, the Court has attempted to exercise a discriminating judgment reflecting its ultimate appraisal of all pertinent factors in the context of the credible evidence.

*Georgia-Pacific*, 318 F. Supp. at 1120-21 (S.D.N.Y. 1970).  "Any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'"  *Lucent Technologies Inc.*, 580 F.3d at 1325 (citing *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)).

64.    Similarly, in *Summit 6*, the Federal Circuit held "[t]his court has recognized that estimating a reasonable royalty is not an exact science.  The record may support a range of reasonable royalties, rather than a single value.  Likewise, there may be more than one reliable method for estimating a reasonable royalty."  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015).  "All approaches have certain strengths and weaknesses, and, depending upon the facts, one or all may produce admissible testimony in a particular case. Because each case presents unique circumstances and facts, it is common for parties to choose different, reliable approaches in a single case and, when they do, the relative strengths and weaknesses of each approach may be exposed at trial or attacked during cross-examination.  That one approach may better account for one aspect of a royalty estimation does not make other approaches inadmissible."  *Id.*

65.     Fundamentally, a reasonable royalty must be tied to the particular facts of the case, including the claimed invention and the accused products. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) ("[A reasonable royalty] must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time.").

66.     As part of the analysis under *Georgia-Pacific* factors 1 and 2, the fact-finder may consider licenses for the use of the patent(s) in suit, or licenses for the use of "other patents comparable to the patent[(s)] in suit." *See Georgia-Pacific*, 318 F. Supp. At 1120; *ActiveVideo*, 694 F.3d at 1333 (rejecting infringer's argument that a license was not sufficiently comparable because it "did not involve the patents-in-suit and did not cover any of the technologies in the case"). The amount of weight given to any particular license depends on the degree of comparability with the terms of the hypothetical license. *See ResQNet.com, Inc. v. Lansa Inc.*, 594 F.3d 860, 869-70 (Fed. Cir. 2010); *Lucent Technologies, Inc.*, 1325-26. However, the Federal Circuit has stated that "we have never required identity of circumstances" for a license to be sufficiently comparable to the hypothetical license at issue in suit. *VirnetX*, 767 F.3d at 1330; *see also Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("Prior licenses . . . are almost never perfectly analogous to the infringement action" and "allegedly comparable licenses may cover more patents than are at issue in the action, include cross-licensing terms, cover foreign intellectual property rights, or, as here, be calculated as some percentage of the value of a multi-component product.").

67.     To calculate a reasonable royalty award, a royalty base to which the royalty rate will be applied must be selected. *See Ericsson*, 773 F.3d at 1226. "[W]here multi-component

products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Id.* However, even when multi-component products are at issue, the entire market value rule ("EMVR") "allows for recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is patented." *Fonar Corp. v. Gen. Elec.*, 107 F.3d 1543, 1552 (Fed. Cir. 1997) (quoting *Paper Converting Mach. Co.*, 745 F.2d at 22. In such a scenario, a patentee may use the EMVR to assess damages "where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013) (quoting *Uniloc*, 632 at 1318).

68.     Although a patented feature must drive demand for the EMVR to apply, the patented feature does not have to be the sole (or only) driver of demand for the accused product. *Intellectual Ventures I LLC v. Symantec Corp.*, C.A. No. 10–1067–LPS, 2016 WL 937220, at *4 (D. Del. Mar. 10, 2016) (rejecting argument that patentee could not use EMVR because the patented feature was not the only driver of demand and noting that "[e]ven [the infringer] concedes that of the numerous Federal Circuit cases on which it relies, none unambiguously state that, in order for EMVR to apply, it is necessary that only one component drive demand for a multi-component product."). Moreover, the EMVR can be applied in a case involving multiple asserted patents covering different patented features. *Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1375-76 (Fed. Cir. 2010) (affirming a damages award based on EMVR where evidence was presented showing "general industry demand" for different patented features of three different asserted patents).

69.     The types of evidence that a patentee may rely on to demonstrate that a patented feature creates the customer demand required to satisfy the EMVR include (i) a patentee's and/or an infringer's technical or marketing materials that emphasize or highlight/advertise the patented feature, (ii) a patentee's and/or an infringer's technical or marketing materials showing that the patented feature improves the performance of, and/or provides benefits to, the patented/infringing product, (iii) the patented feature was a prerequisite for the infringer's decision to launch the infringing product, and/or (iv) evidence showing that the patented feature contributed to an increase in sales of the infringing product. *See, e.g.*, *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001); *Fonar*, 107 F.3d at 1552-53; *Izumi*, 315 F.Supp.2d at 614; *see also NuVasive Inc. v. Globus Medical Inc.*, C.A. No. 10-849-LPS, D.I. 234 at *98:8-17 (D.Del. June 26, 2014).

70.     Courts have also found that asserted patent claims covering the entire accused product is a factor in favor of granting a patentee damages based on the value of the entire accused product. *See, e.g.*, *Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 561 F. App'x. 934, 947 (Fed. Cir. 2014) (finding that apportionment was not required "because claim 38 did not just claim [the allegedly novel] beam generators as an 'accessory used in conjunction with the RPM System,'" "it claims an apparatus where the beam generator and the RPM System operate via a gating signal where one actuates the other");

71.     "[T]he amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence." *SmithKline*, 926 F.2d at 1164.

31

## C.     Enhanced Damages

72.     If it is determined that D&M infringes one or more of the Asserted Claims of the

Asserted Sonos Patents, the Court will have to decide whether to enhance the damage award.

73.     Under 35 U.S.C. § 284, the "court may increase the damages up to three times the

amount found or assessed."  35 U.S.C. § 284.  "That language contains no explicit limit or

condition, and we have emphasized that the word 'may' clearly connotes discretion."  *Halo*

*Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931 (2016) (internal citations omitted).

74.     The Federal Circuit has set forth several factors that the Court may consider in

determining whether to award enhanced damages:

(1) whether the infringer deliberately copied the ideas or design of another;

(2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed;

(3) the infringer's behavior as a party to the litigation;

(4) defendant's size and financial condition;

(5) closeness of the case;

(6) duration of defendant's misconduct;

(7) remedial action by the defendant;

(8) defendant's motivation for harm; and

(9) whether defendant attempted to conceal its misconduct.

*Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (citing *Read*

*Corp. v. Portec. Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992), *superseded on other grounds as*

*recognized in Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996));

*see also Apple Inc. v. Samsung Electronics Co., Ltd.*, Case No. 12-CV-00630-LHK, 2017 WL

2720220, at *14 (2017) ("After *Halo*'s elimination of 'rigid formulas,' trial courts now look to the *Read* factors as 'useful guideposts' even though they 'are no longer the sole set of criteria' that can be considered.") (quoting *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2016 WL 3880774, at *16 (N.D. Cal. July 18, 2016)).

75.     A patentee may obtain enhanced damages under 35 U.S.C. § 284 where it establishes that the defendant's infringement was "willful." *Halo*, 136 S. Ct. at 1931; *In re Seagate Tech.*, LLC, 497 F.3d 1360, 1368 (Fed. Cir. 2007).  However, willfulness is not required for enhanced damages.  *Halo*, 136 S. Ct. at 1931-33 ("Section 284 allows district courts to punish the full range of culpable behavior.  Yet none of this is to say that enhanced damages must follow a finding of egregious misconduct.  As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount."); *Finjan, Inc. v. Blue Coat Systems, Inc.*, 2016 WL 3880774, *16 (N.D. Cal. 2016) ("'The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate.'  In other words, while willfulness may support a finding of enhancement, *Halo* does not hold that willfulness is necessary for enhanced damages.").  Moreover, "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." *Halo*, 136 S. Ct. at 1933.

76.     "[P]atent-infringement litigation has always been governed by a preponderance of the evidence standard.  Enhanced damages are no exception." *Halo*, 136 S. Ct. at 1931 (internal quotation marks and citation omitted).

### D.     Attorney Fees

77.     If it is determined that D&M infringes one or more of the Asserted Claims of the Asserted Sonos Patents, the Court will have to decide whether to award attorney fees.

78.     Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "This text is patently clear. It imposes one and only one constraint on district courts' discretion to award attorney's fees in patent litigation: The power is reserved for 'exceptional' cases." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1755-56, 188 L. Ed. 2d 816 (2014). "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id*. at 1756. District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances. *Id*.

79.     Attorney fees may be awarded for willful infringement, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed.R.Civ.P. 11, or like infractions. *Octane*, 134 S. Ct. at 1756. However, attorney fees are not limited independently sanctionable conduct. *Id*. at 1756-57. Moreover, a "district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Id*. at 1757. "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id*.

80.     A prevailing party must establish its entitlement to fees under Section 285 by a preponderance of the evidence. *Id*. at 1758.

E.      Pre-Judgment and Post-Judgment Interest

81.      "Prejudgment interest shall ordinarily be awarded absent some justification for

withholding such an award."  *Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 800 (Fed.

Cir. 1988) (citing *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983)).

"[P]rejudgment interest should be awarded from the date of infringement to the date of

judgment."  *Id.* (citing *General Motors*, 461 U.S. at 656).  28 U.S.C. § 1961(a) states that

"interest shall be allowed on any money judgment in a civil case recovered in a district court."

"Post-judgment interest is awarded on monetary judgments recovered in all civil cases,"

including ones for patent infringement.  *Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343,

1347 (Fed. Cir. 1999).  Post-judgment interest is governed by regional circuit law.  *Id.* at 1348.

Interest begins to accrue on the date of the entry of judgment.  *Loughman v. Consol-*

*Pennsylvania Coal Co.*, 6 F.3d 88, 97 (3d Cir. 1993).

82.      Courts in this district routinely award post-judgment interest in patent

infringement cases.  *See nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 392 (D.

Del. 2004), aff'd, 436 F.3d 1317 (Fed. Cir. 2006) (awarding post-judgment interest to patentee

for defendant's willful infringement); *TruePosition Inc. v. Andrew Corp.*, 611 F. Supp. 2d 400,

414 (D. Del. 2009), aff'd, 389 F. App'x 1000 (Fed. Cir. 2010) (awarding post-judgment interest

for patent infringement).

## ISSUES ON WHICH D&M BEARS THE BURDEN OF PROOF

### I.   INVALIDITY

83.   The jury must decide whether D&M can prove by clear and convincing evidence that each of the Asserted Claims of the Asserted Patents are invalid.

84.   All patents are presumed valid.  35 U.S.C. § 282; *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1352 (Fed. Cir. 2013) ("It is black-letter law that a patent is presumed valid.").  D&M bears the burden of proving its invalidity defenses by clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 131 S. Ct. 2238, 2242 (2011); *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).  D&M bears this burden throughout the entirety of the litigation.  *Novo Nordisk*, 719 F.3d at 1352 ("[B]ecause the presumption of validity remains intact . . . throughout the litigation, the burden of persuasion never shifts to the patentee . . . .").

85.   "[T]he burden of persuasion is and remains always upon the party asserting invalidity." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1358 (Fed. Cir. 1984) (citation and emphasis omitted).  "It is not necessary that the court hold a patent valid; it is only necessary that it hold that the patent challenger has failed to carry its burden." *Ajinomoto Co. v. Archer- Daniels-Midland Co.*, No. 95-218-SLR, 1996 U.S. Dist. LEXIS 15988, at *20 (D. Del. Oct. 21, 1996) (citing *Jones v. Hardy*, 727 F.2d 1524, 1529 n.3 (Fed. Cir. 1984)), *aff'd*, 228 F.3d 1338 (Fed. Cir. 2000).  "[W]here the challenger fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the validity issue." *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998).

A.      **What Constitutes Prior Art**

86.     Pre-AIA 35 U.S.C. §§ 102(a), (b), (e), (f), and (g)(2) define the scope of prior art

for the purposes of anticipation and obviousness in this case.  Pre-AIA § 102 states:

A person shall be entitled to a patent unless –

(a)     the invention was known or used by others in this country, or patented or
        described in a printed publication in this or a foreign country, before the
        invention thereof by the applicant for a patent, or

(b)     the invention was patented or described in a printed publication in this or a
        foreign country or in public use or on sale in this country, more than one
        year prior to the date of application for patent in the United States, or

                              * * * *
(e)     the invention was described in – (1) an application for patent, published
        under section 122(b), by another filed in the United States before the
        invention by the applicant for patent or (2) a patent granted on an
        application for patent by another filed in the United States before the
        invention by the applicant for patent, except that an international
        application filed under the treaty defined in section 351(a) shall have the
        effects for the purposes of this subsection of an application filed in the
        United States only if the international application designated the United
        States and was published under Article 21(2) of such treaty in the English
        language; or

(f)     he did not himself invent the subject matter sought to be patented, or

(g)(2)  before such person's invention thereof, the invention was made in this
        country by another inventor who had not abandoned, suppressed, or
        concealed it.  In determining priority of invention under this subsection,
        there shall be considered not only the respective dates of conception and
        reduction to practice of the invention, but also the reasonable diligence of
        one who was first to conceive and last to reduce to practice, from a time
        prior to conception by the other.

35 U.S.C. § 102.

87.     D&M has the burden under the Federal Rules of Evidence to show that the

documents or products it intends to assert as prior art are authentic, are not inadmissible hearsay,

and were publicly available or on sale before the relevant patent priority dates to qualify as prior

art under 35 U.S.C. § 102; Fed. R. Evid. 901 and 803; 35 U.S.C. § 102.  To establish that a

document is prior art, it is D&M's burden to present sufficient evidence to establish that the

document was publicly known or published by "a satisfactory showing that such document has

been disseminated or otherwise made available to the extent that persons interested and

ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it."

*Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008).

### *i.*      *Public Use*

88.      Under § 102(a), an invention is not new if "the invention was known or used by

others in this country . . . before the invention thereof by the applicant for a patent."  35 U.S.C. §

102(a).  Further, under § 102(b), an invention is not new if "the invention was . . . in public use .

. . in this country, more than one year prior to the date of the application for patent in the United

States."  35 U.S.C. § 102(b).

89.      An invention is in public use if it is used publicly by the inventor or by a person

who is not under any limitation, restriction, or obligation of secrecy.  *In re Smith,* 714 F.2d 1127,

1134 (Fed. Cir. 1983).  The absence of an express confidentiality agreement is not determinative.

*Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1266 (Fed. Cir. 1986).  An expectation

or understanding of confidentiality is sufficient.  *American Seating Co. v. USSC Group, Inc.*, 514

F.3d 1262, 1268 (Fed. Cir. 2008); *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d

1371, 1380-81 (Fed. Cir. 2004).  For example, a disclosure to those with "a professional ethical

obligation to treat the material as confidential" is not a public use.  *Xerox Corp. v. 3Com Corp.*,

26 F. Supp. 2d 492, 496 (W.D.N.Y. 1998).  Public knowledge is not "public use" under § 102(b).

*TP Labs., Inc. v, Prof'l Positioners, Inc.,* 724 F.2d 965, 970 (Fed. Cir. 1984).

90.     A secret commercial use by a third-party company is not a public use.  *Trading*

*Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1361-62 (Fed. Cir.  2010); *W.L. Gore & Assocs.,*

*Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1550 (Fed. Cir. 1983), *cert. denied,* 469 U.S. 851 (1984).

Thus, "when an asserted prior use is not that of the applicant, § 102(b) is not a bar when that

prior use or knowledge is not available to the public."  *Woodland Trust v. Flowertree Nursery,*

*Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998).

91.     Experimental use is not "public use" under § 102.  *Lough v. Brunswick Corp.*, 86

F.3d 1113, 1120 (Fed. Cir. 1996).  A use is experimental if it represents a *bona fide* effort to

perfect the invention or to ascertain whether it will answer for its intended purpose.  *LaBounty*

*Mfg. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1071 (Fed. Cir. 1992).  In addition,

the mere shipment of a product is insufficient to show "use" (or "sale") under § 102.  *Minn. Min.*

*& Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1307 (Fed. Cir. 2002).

92.     Oral testimony that an invention was in public use more than one year before the

filing of a patent must be sufficiently corroborated under a "rule of reason" standard.  *Lacks*

*Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003);

*Woodland Trust*, 148 F.3d at 1371.  Oral testimony by interested parties must be corroborated by

documentary evidence.  *Lacks*, 322 F.3d at 1350.

### ii.     On Sale

93.     Under § 102(b), an invention is also not new if "the invention was . . . on sale in

this country, more than one year prior to the date of the application for patent in the United

States."  35 U.S.C. § 102(b).  A two-prong test governs the application of the on-sale bar: "First,

the product must be the subject of a commercial offer for sale . . . Second, the invention must be

ready for patenting."  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).

94.     With respect to the first prong, an offer for sale under § 102(b) requires a commercial offer for sale under applicable contract law, *i.e.*, an offer for sale that the customer could make into a binding contract by simple acceptance (assuming consideration). *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1048 (Fed. Cir. 2002); *Group One Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001).

95.     With respect to the second prong, an invention is "ready for patenting" when it has been reduced to practice or when the inventor has prepared drawings or other descriptions of the invention that are sufficiently specific to enable persons skilled in the art to practice the invention. *Pfaff*, 525 U.S. at 61-63.

96.     The "on sale" bar does not generally apply where both manufacture and delivery occur in a foreign country. *Gandy v. Main Belting Co.*, 143 U.S. 587, 593 (1892). "For a prior sale to be invalidating under § 102(b), it must occur in the United States." *Baxa Corp. v. McGaw Inc.*, 996 F. Supp. 1044, 1053 (D. Colo. 1997) (citing *Gandy*, 143 U.S. at 592-93).

97.     Third-party secret commercial activity, more than one year before the patent application of another, is not a Section 102(b) bar. *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371 (Fed. Cir. 1998); *W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1550 (Fed. Cir. 1983). The "on sale" bar is measured by the time the public came into possession of the invention. *Continental Can Co. USA, Inc. v. Continental PET Tech., Inc.*, 948 F.2d 1264, 1270 (Fed. Cir. 1991).

98.     Sales that are primarily for experimentation rather than commercial gain do not trigger the "on sale" bar. *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1258 (Fed. Cir. 2001). In determining whether a transaction is primarily for experimentation, courts consider the following factors: (1) the necessity for public testing, (2) the amount of control over

40

the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, (9) the degree of commercial exploitation during testing, (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352-53 (Fed. Cir. 2002).

99.     Oral testimony that an invention was on sale more than one year before the filing of a patent must be sufficiently corroborated under a "rule of reason" standard. *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1349 (Fed. Cir. 2003); *Woodland Trust*, 148 F.3d at 1371. Oral testimony by interested parties must be corroborated by documentary evidence. *Lacks*, 322 F.3d at 1350.

### iii.     Prior Invention

100.     To qualify as prior art under pre-AIA 35 U.S.C. § 102(g)(2), a party must prove that "***before*** such person's invention thereof, the invention was made ***in this country*** by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2) (emphasis added). In determining priority of invention, "there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conceive and last to reduce to practice, from a time prior to conception by the other." *Id.*

101.     "While conception is the 'formation, in the mind of the inventor, of a definite and permanent idea of a complete and operative invention,' reduction to practice 'requires that the

claimed invention work for its intended purpose.'" *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 (Fed. Cir. 2014) (quoting *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F.3d 1367, 1376 (Fed. Cir. 2010)). "Although the inventors may reside in a foreign country and conceive the invention abroad, a reduction to practice made outside the United States is beyond the scope of § 102(g)(2) prior art." *Id*. Either the inventor, or someone acting on the inventor's behalf, must have reduced the invention to practice in the United States to gain the benefit of section 102(g)(2). *Id*.

102. To establish that the invention was "made in this country by another," the party must show that another inventor either (i) reduced the invention to practice in the U.S. before the date of invention of the challenged patent, or (ii) conceived of the invention in the U.S. before the date of invention of the challenged patent and exercised reasonable diligence in reducing the invention to practice after the date of invention of the challenged patent. *See Amkor Tech., Inc. v. Int'l Trade Comm'n*, 692 F.3d 1250, 1258 (Fed. Cir. 2012); *L-3 Commc'ns Corp. v. Sony Corp.*, C.A. No. 10-734-RGA, 2013 WL 5942521, at *1 (D. Del. Oct. 16, 2013).

103. A conception must encompass all limitations of the claimed invention, and "is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Singh v. Brake*, 222 F.3d 1362, 1367 (Fed. Cir. 2000). But, an inventor need not know that his invention will work for conception to be complete; the discovery that an invention actually works is part of its reduction to practice. *Burroughs Wellcome Co. v. Barr Lab., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

104. When a party seeks to prove conception via the oral testimony of a putative inventor, that party must proffer evidence corroborating that testimony. *Singh*, 222 F.3d at 1367.

There is no particular formula that an inventor must follow in providing corroboration of his testimony of conception. *Id*. Rather, whether a putative inventor's testimony has been sufficiently corroborated is determined by a "rule of reason" analysis, in which "an evaluation of *all* pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id*. The following factors may have a bearing on the inventor's credibility and on whether the inventor's testimony has been adequately corroborated in a rule of reason analysis: (1) delay between the event and the trial, (2) interest of corroborating witnesses, (3) contradiction or impeachment, (4) corroboration, (5) the corroborating witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user. *Price v. Symsek*, 988 F.2d 1187, 1195 n. 3 (Fed. Cir. 1993). The rule of reason, however, does not dispense with the requirement for some evidence of independent corroboration. *Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985).

105.    Reduction to practice can be shown by actual reduction to practice or constructive reduction to practice. To show actual reduction to practice, an inventor must demonstrate that the invention is suitable for its intended purpose. *Scott v. Finney,* 34 F.3d 1058, 1061 (Fed. Cir. 1994). Depending on the character of the invention and the problem it solves, this showing may require test results. *Id.* at 1062.

106.    Corroborating evidence of actual reduction to practice "may consist of testimony of a witness, other than an inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor." *Hahn v. Wong*, 892 F.2d 1028, 1032-33 (Fed. Cir. 1989). In order to establish an actual reduction to practice, the testimony of the inventor must be corroborated by independent

evidence. *Knorr v. Pearson*, 671 F.2d 1368, 1373 (C.C.P.A. 1982). But "[t]he law does not impose an impossible standard of 'independence' on corroborative evidence by requiring that every point of a reduction to practice be corroborated by evidence having a source totally independent of the inventor." *Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1171 (Fed. Cir. 2006). The standard of proof required to corroborate a reduction to practice is a more stringent standard than that required to corroborate a conception. *Singh*, 222 F.3d at 1369-70.

107.    Under § 102(g)(2), an invalidating prior invention by another inventor must be made ***in this country***. The conception date of an invention of foreign origin is the date the invention was first disclosed in the United States, and the reduction to practice is the date the invention was first embodied in a tangible form in the United States or successfully performed in the United States. *Scott v. Koyama*, 281 F.3d 1243, 1247 (Fed. Cir. 2002).

108.    In the U.S., priority of invention goes to the first party to reduce to practice, unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in reducing that invention to practice. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996). Where a party is first to conceive but second to reduce to practice, that party must demonstrate reasonable diligence toward reduction to practice from a date just prior to the other party's conception to its own reduction to practice. *Id.* at 1578. The critical period during which diligence is required must be accounted for by either affirmative acts or acceptable excuses. The work relied upon to show reasonable diligence must be directly related to the reduction to practice of the invention in issue. *Naber v. Cricchi*, 567 F.2d 382, 384 (C.C.P.A. 1977). There need not necessarily be evidence of activity on every single day if a satisfactory explanation of diligence is evidenced. *Monsanto Co. v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001).

109.    Under § 102(g)(2), to constitute abandonment, the inventor must intend a

dedication to the public. *Kendall v. Winsor,* 62 U.S. 322, 331 (1858).  The case law

distinguishes between two types of suppression or concealment.  The first is implicated in a

situation in which an inventor actively suppresses or conceals his invention from the public.

*Apotex USA, Inc., v. Merck & Co., Inc.*, 254 F.3d 1031, 1038 (Fed. Cir. 2001) (citing *Fujikawa v.*

*Wattanasin*, 93 F.3d 1559, 1567 (Fed. Cir. 1996)).  The second involves a legal inference of an

intent to suppress or conceal based upon an unreasonable delay in filing a patent application or

otherwise bringing the knowledge of the invention to the public.  *Id*.  The Federal Circuit has not

set strict time limits regarding the minimum and maximum periods necessary to establish an

inference of suppression or concealment.  *Fujikawa*, 93 F.3d at 1568 (citing *Correge v. Murphy*,

705 F.2d 1326, 1330 (Fed. Cir. 1983)).  Rather, the court has recognized that "it is not the time

elapsed that is the controlling factor but the total conduct of the first inventor." *Id*. (citing *Young*

*v. Dworkin*, 489 F.2d 1277, 1285 (C.C.P.A. 1974) (Rich, J., concurring)).

110.    A prior art United States patent reference "is ***not*** prior art under § 102(g), but

under § 102(e)," and the effective date of the alleged prior art patent reference is the "filing date

in the United States, as stated in § 102(e), not the date of conception or actual reduction to

practice of the invention claimed or the subject matter disclosed in the reference patent":

> When patents are not in interference, the effective date of a reference United
> States patent as prior art is its filing date in the United States, as stated in §
> 102(e), ***not*** the date of conception or actual reduction to practice of the invention
> claimed or the subject matter disclosed in the reference patent. . . .   Both sides
> appear to have confused interference practice under § 102(g) with prior art status
> under § 102(e). . . .   The Mouat [U.S. Patent] reference, as the district court held,
> does not describe or claim the identical invention to Mason.  It is ***not*** prior art
> under § 102(g), but under § 102(e). . . .  Under 35 U.S.C. § 102(e) the entire
> disclosure of Mouat's specification is effective as a reference, but only as of
> Mouat's filing date.

*Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 983-984 (Fed. Cir. 1989),

*overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d

1020 (Fed. Cir. 1992) (emphasis added); *see also In re Zletz*, 893 F.2d 319, 323 (Fed. Cir. 1989)

(concluding that "the disclosure in a reference United States patent does ***not*** fall under 35 U.S.C.

§ 102(g) but under 35 U.S.C. § 102(e) . . . .") (emphasis added).

### B.      Anticipation

111.    "Claimed subject matter is 'anticipated' when it is not new; that is, when it was

previously known." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1085 (Fed. Cir. 2008).

Anticipation requires that "every element and limitation of the claim was previously described in

a single prior art reference, either expressly or inherently, so as to place a person of ordinary skill

in possession of the invention." *Id*. at 1082.  "A patent claim is invalid due to anticipation if,

within 'the four corners of a single, prior art document . . . every element of the claimed

invention [is described], either expressly or inherently, such that a person of ordinary skill in the

art could practice the invention without undue experimentation.'" *Callaway Golf Co. v.*

*Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (citing *Advanced Display Sys., Inc. v. Kent*

*State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)).

112.    "Because the hallmark of anticipation is prior invention, the prior art reference . . .

must not only disclose all elements of the claim within the four corners of the document, but

must also disclose those elements 'arranged as in the claim.'" *NetMoneyIN, Inc. v. VeriSign,*

*Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008).  There also "must be no difference between the

claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the

field of the invention." *Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576

(Fed. Cir. 1991), *overruled in part on other grounds by Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1293 (Fed. Cir. 2009).

113.     In order to anticipate, a reference must disclose the claimed limitations either expressly or inherently.  *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 999 (Fed. Cir. 2006) (overturning district court finding of inherent anticipation).  Although a prior art reference may anticipate without explicitly disclosing a feature of the claimed invention, if that missing characteristic is inherently present in the single anticipating reference, that inherent limitation must be one that is "necessarily present" and not one that may be established by "probabilities or possibilities."  *See Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991); *see also Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1350 (Fed. Cir. 2013).  To establish inherency, extrinsic evidence "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill."  *Cont'l Can Co. USA,* 948 F.2d. at 1268.  That is, "[t]he mere fact that a certain thing *may* result from a given set of circumstances is not sufficient."  *Id.* at 1269 (emphasis in original) (citations omitted); *see also Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 639 (Fed. Cir. 2011).

114.     Similarly, anticipation requires that the reference must disclose the invention "without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference."  *In re Arkley*, 455 F.2d 586, 587-88 (C.C.P.A 1972) ("[The prior art] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference.  Such picking and choosing may be entirely proper in the making of a 103,

obviousness rejection, where the applicant must be afforded an opportunity to rebut with objective evidence any inference of obviousness which may arise from the *similarity* of the subject matter which he claims to the prior art, but it has no place in the making of a 102, anticipation rejection."); *see also Net MoneyIN*, 545 F.3d at 1371 ("Thus, it is not enough that the prior art reference discloses part of the claimed invention, which an ordinary artisan might supplement to make the whole, or that it includes multiple, distinct teachings that the artisan might somehow combine to achieve the claimed invention."); *Sanofi-Synthelabo v. Apotex, Inc*., 550 F.3d 1075, 89 (Fed. Cir. 2008) ("[The] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] without any need for picking, choosing, or combining various disclosures not directly related to each other by the teachings of the cited reference."); *Ecolochem, Inc. v. Southern California Edison Co*., 227 F.3d 1361 (Fed. Cir. 2000) (picking and choosing from disparate parts of a reference is not permitted in an anticipation analysis); *Air Prods. and Chems., Inc. v. Chas. S. Tanner Co.*, 1983 WL 51915, *8 (D.S.C. May 2, 1983) ("a prior art reference which contains a broad general disclosure requiring guessing, testing, speculation or 'picking and choosing' from an encyclopedic disclosure will not anticipate.").

115.    When determining the content of the prior art, patent drawings cannot be relied on for critical dimensions and relationships, absent confirmatory texts in the specification.  *See Nystrom v. TREX Co*., 424 F.3d 1136, 1149 (Fed. Cir. 2005) ("'Absent any written description in the specification of quantitative values, arguments based on measurements of a drawing are of little value.'") (quoting *In re Wright*, 569 F.2d 1124, 1127 (C.C.P.A. 1977)); *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l Inc*., 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may

not be relied on to show particular sizes if the specification is completely silent on the issue."); *Tenneco Auto. Operating Co. v. Visteon Corp.*, 375 F.Supp.2d 366, 374 n. 9 (D. Del. 2005) (rejecting defendant's argument that foreign patent drawing disclosed certain claim limitations, because to do so would "require making precise measurements without a special indication that such measurements were part of the invention").

116.    In addition to showing that a prior art reference meets all the limitations of a patent claim (identity requirement), to constitute an anticipation the reference must include a description that enables a person of ordinary skill to make the claimed invention without undue experimentation, *i.e.*, the reference must enable that which it is asserted to anticipate.  *See, e.g.*, *Elan Pharm., Inc. v. Mayo Found. for Med. Educ. And Research*, 346 F.3d 1051 (Fed. Cir. 2003); *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294 (Fed. Cir. 2002); *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001) ("To anticipate, the reference must also enable one of skill in the art to make and use the claimed invention.").  The disclosure in the reference must be adequate to enable possession of the desired subject matter.  *Elan Pharms.*, 346 F.3d at 1055.

117.    Enablement of a prior art reference is a question of fact and is determined as of the date of the allegedly anticipating reference.  *See, e.g.*, *Elan Pharms,* 346 F.3d at 1054; *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381 (S.D.N.Y. 2007) ("An invention is placed in the possession of the public only where 1) the reference meets the identity requirement such that 2) the person of ordinary skill in the art would have been able to make it *as of that* time based on his knowledge and the teaching of the publication.").  In *In re Wands*, the Federal Circuit set out eight factors for determining whether a disclosure requires undue experimentation: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance presented; (3) the

presence or absence of working examples; (4) the nature of the invention; (5) the state of the

prior art; (6) the relative skill of those in the art; (7) the predictability or unpredictability of the

art, and (8) the breadth of the claims.  858 F.2d 731 (Fed. Cir. 1988).

118.    An expert's conclusory testimony, if unsupported by the documentary evidence,

cannot replace the requirement that the prior art reference itself contain all of the elements of the

claim.  *See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F. Supp. 2d 362, 387

(S.D.N.Y. 2000) (finding that expert's testimony that values recited in the asserted claims were

inherently found in the prior art, without documentary evidence to support this assertion, was not

enough to prove inherent anticipation), *aff'd* 237 F.3d 1359 (Fed. Cir. 2001).

### C.    Incorporation by Reference

119.    In order to anticipate a claim, "a ***single*** prior art reference must expressly or

inherently disclose each claim limitation." *Finisar Corp. v. DirecTV Group, Inc.,* 523 F.3d 1323,

1334 (Fed. Cir. 2008) (emphasis added).  While material incorporated by reference into a prior

art document may be considered part of the prior art document for purposes of anticipation, the

incorporating document must identify the incorporated document with detailed particularity,

clearly indicating the specific material for incorporation.  *See Advanced Display Sys., Inc. v.*

*Kent State Univ.,* 212 F.3d 1272, 1282 (Fed. Cir. 2000).

120.    A prior art document's citations and cross-references to other prior art documents

is not a valid incorporation by reference for purposes of anticipation.  *See Commonwealth*

*Scientific & Indus. Research Org. v. BuffaloTech (USA), Inc.*, 542 F.3d 1363, 1372 (Fed. Cir.

2008) (holding that footnote citation to article did not constitute an incorporation by reference of

"any or all" of the material set forth in the article); *Kyocera Wireless Corp. v. Int'l Trade*

*Comm'n*, 545 F.3d 1340, 1351-52 (Fed. Cir. 2008) (holding that "cross-reference[s]" in GSM

specifications did not "meet this court's legal requirements for incorporation" and thus did not

"qualify the GSM standard as a single reference").  As explained by the Federal Circuit in

*Kyocera*:

> This court next turns to Qualcomm's contention that the ITC incorrectly found that Qualcomm's proffered collection of eleven separate GSM specifications does not anticipate the asserted '983 Patent claims because the specifications do not together constitute a single reference for § 102 purposes.  Qualcomm argues the different GSM specifications are like chapters of a book and function as a single, coherent reference that is simply too voluminous to bind into one volume.
>
> . . . The record evidence suggests that ***the GSM standard is not a single reference***.  The different specifications that comprise the GSM standard were authored by different subsets of authors at different times.  Indeed, the GSM standard includes hundreds of individual specifications drafted by approximately ten different subgroups, each with its own title and separate page numbering.  Each specification, though part of the greater GSM standard, stands as a separate document in its own right.  Even Qualcomm's witness—admittedly one of the most knowledgeable people in the world about the operation of GSM—testified that she had not read the entire standard and did not know of any person who had read the entire standard.  Open Session Tr. 1712, Mar. 15, 2006.  ***Under these circumstances, the GSM standard is actually several prior art references with separate dates of creation, rather than a single prior art reference***.
>
> Qualcomm asserts that each GSM specification incorporates the others by reference.  Even if true, this fact does not qualify the GSM standard as a single reference. . . .  At most, ***each relevant GSM specification identifies itself as a part of the greater GSM standard;*** specifications at times ***cross-reference*** other specifications***.  This vague referencing practice is hardly sufficient to meet this court's legal requirements for incorporation***.  In sum, the ***GSM standard is simply not a coherent whole document that can be assigned a single prior art date of creation***.
>
> For this reason, as opposed to the secrecy justification, this court affirms the ITC's determination that the GSM standard is not available for use as a single anticipating reference under § 102.

545 F.3d at 1351-52 (emphasis added).

121.    Whether and to what extent material is incorporated by reference is a question of

law.  *See Harari v. Lee*, 656 F.3d 1331, 1334 (Fed. Cir. 2011).

### D.     Obviousness

122.     A patent is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains."  35 U.S.C. § 103; *see also Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010).

123.     To perform this analysis under § 103, "the scope and content of the prior art are [to be] determined; differences between the prior art and the claims at issue are [to be] ascertained; and the level of ordinary skill in the pertinent art resolved."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 127 S. Ct. 1727, 1734 (2007) (quoting *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).  "Against this background, the obviousness or nonobviousness of the subject matter is determined."  *Id*.  "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented."  *Id*. Before finding a patent claim invalid for obviousness, a court must consider all of these factors. *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 663 (Fed. Cir. 2000).

124.     "[A] patent composed of several elements is not proved obvious merely by demonstrating that each element was, independently, known in the prior art."  *KSR Int'l Co.*, 550 U.S. at 418.  Rather, there must be some evidence of a motivation or reason to combine the references.  *Id.* at 415, 419.  "[O]bviousness is a matter of law based on findings of underlying fact."  *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1085 (Fed. Cir. 2008), *cert. denied*, 130 S. Ct. 493 (2009).

125.   D&M, as the patent challenger, must establish by clear and convincing evidence that the claimed invention would have been *prima facie* obvious.  *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 974-75 (Fed. Cir. 1986).  Failure to show *prima facie* obviousness means the claims are not invalid for obviousness, ending the inquiry.  *Yamanouchi Pharma. Co., Ltd. v. Danbury Pharma., Inc.*, 231 F.3d 1339, 1345 (Fed. Cir. 2000).

126.   "Although common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices according to their established functions, it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."  *KSR*, 550 U.S. at 418-19.  Further, a person of ordinary skill must have a reasonable expectation of success that making a modification to the prior art would successfully result in the claimed element. *Id.*

127.   "Obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention."  *Cheese Sys., Inc. v. Tetra Pak Cheese & Powder Sys., Inc.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013); *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) ("Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'").  "[W]hen the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious."  *KSR*, 550 U.S at 416.  "A reference may be said to teach away when a person of ordinary skill, upon reading the

reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.  The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant."  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1326 (Fed. Cir. 2009) ("An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements.").

128.    "What a prior art reference teaches and whether a skilled artisan would have been motivated to combine references are questions of fact."  *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 (Fed. Cir. 2016) (citing *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1196-97 (Fed. Cir. 2014)).

## E.    Secondary Considerations

129.    The patent holder "may rebut a *prima facie* showing of obviousness with objective indicia of nonobviousness."  *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) ("If all of the factual disputes regarding the objective evidence resolve in favor of [plaintiff], it has presented a strong basis for rebutting the prima facie case [of obviousness].").  The objective indicia of non-obviousness should be considered to guard against hindsight bias.  Such factors include: (i) copying; (ii) long felt but unresolved need; (iii) failure of others to develop the invention; (iv) licenses showing industry respect for the invention; (v) commercial success; (vi) unexpected results created by the claimed invention; (vii)

whether the claimed invention was praised by others in the field; and (viii) skepticism of skilled artisans before the invention. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013); *Cross Med. Prods.*, 424 F.3d at 1322-23; *Ormco*, 463 F.3d at 1311. This list is not exhaustive, however, and may also include additional factors related to obviousness or non-obviousness. *Graham*, 383 U.S. at 17-18. "Objective indicia of nonobviousness must be considered in every case where present." *Apple*, 839 F.3d at 1048 (citing *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012)).

### F.    35 U.S.C. § 112

130.    Section 112 of Title 35 of the United States Code provides, in relevant part, that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

35 U.S.C. § 112. This section provides three distinct standards: written description, enablement, and definiteness.

### i.    *Written Description*

131.    The Patent Statute requires a patent to contain a "written description of the invention." 35 U.S.C. § 112, ¶ 1. The "invention" refers to what is claimed in the issued patent. *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed. Cir. 1991). Thus, the written description requirement found in the first paragraph of 35 U.S.C. § 112 requires that the specification support the claims. *In re Hayes Microcomputer Products, Inc. Patent Litig.*, 982 F.2d 1527,

1533 (Fed. Cir. 1992).  Compliance with the written description requirement is a question of fact.

*Cordis Corp. v. Medtronic Ave., Inc.*, 339 F.3d 1352, 1364 (Fed. Cir. 2003).

132.    While the written description and enablement requirements "often rise and fall

together," they are separate requirements.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336,

1344 (Fed. Cir. 2010).

133.    The purpose of the written description requirement is to ensure that the inventor

had possession, as of the filing date of the application, of the subject matter claimed as the

invention.  *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir.

2012).

134.    In deciding whether Sonos's patents satisfy the written description requirement,

the jury must consider the description from the viewpoint of a person of ordinary skill in the field

of technology of the patent.  *Id.*; *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313,

1330 (Fed. Cir. 2003).  To satisfy the written description requirement, the inventor(s) must

provide a written description of the invention that describes in sufficient detail to those skilled in

the art what the inventor(s) have invented.  *See Energy Transp. Grp., Inc. v. William Demant

Holding A/S*, 697 F.3d 1342, 1350-51 (Fed. Cir. 2012).  In other words, the written description

requirement is satisfied if a person of ordinary skill reading the patent application as originally

filed would recognize that it describes the invention as it is finally claimed in the issued patent.

*Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998).

135.    The applicant is not required to use any precise form of disclosure to describe the

invention.  *See Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1365-68 (Fed. Cir. 2006) ("A

claim will not be invalidated on section 112 grounds simply because the embodiments of the

specification do not contain examples explicitly covering the full scope of the claim language."

(citations omitted)).  The written description requirement may be satisfied by the words,

structures, figures, diagrams, formulas, etc., in the patent application, and any combination of

them, as understood by one of ordinary skill in the field of technology of the invention.

*Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).  A requirement in a

claim also need not be expressly disclosed in the patent application as originally filed, provided

persons of ordinary skill in the field of technology of the invention would have understood that

the missing requirement is inherent in the written description in the patent application.  *All*

*Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779 (Fed. Cir. 2002).

Moreover, information that is already known by those of ordinary skill in the art need not be

included.  *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 405 F.3d 985, 987 (Fed. Cir. 2005).

### ii.    Enablement

136.    Enablement is a question of law.  *Transocean*, 617 F.3d at 1305.  To satisfy the

enablement requirement, the specification must provide a person of ordinary skill in the art with

a means of practicing the invention without undue experimentation.  *Id.*  "[A]n enablement

determination is made retrospectively, *i.e.*, by looking back to the filing date of the patent

application and determining whether undue experimentation would have been required to make

and use the claimed invention at that time."  *Elan Pharm., Inc.*, 346 F.3d at 1056-57.

137.    Enablement is required only for the invention as claimed, not for some other

unclaimed embodiment.  *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 730

F.2d 1452, 1463 (Fed. Cir. 1984).  The specification does not need to describe and make *every*

possible variant of the claimed invention; the knowledge of one of ordinary skill in the art and

routine experimentation can fill in the gaps.  *Pfizer Inc. v. Teva Pharm. U.S.A., Inc.*, 882 F. Supp.

2d 643, 682-83 (D. Del. 2012), *aff'd*, 555 F. App'x 961 (Fed. Cir. 2014).

138.    Objective enablement is all that is required; thus, the teaching can be provided through broad terminology or illustrative examples.  *In re Armbruster*, 512 F.2d 676, 677 (C.C.P.A. 1975); *Glaxo Grp. Ltd. v. Teva Pharm USA, Inc.*, No. C.A.02-219 GMS, 2004 WL 1875017, at *16 (D. Del. Aug. 20, 2004) (Sleet, J.) ("[T]he court does not find as a matter of law that the application must contain specific examples . . . to be enabled.").  Enablement does not require that the patent specification enable a person of ordinary skill in the art to make a commercially viable product.  *See Transocean*, 617 F.3d at 1306-07.

139.    While a patent does not need to teach what is already well known in the art, practice of the invention must not require undue experimentation.  *In re Wands*, 858 F.2d 731, 735 (Fed. Cir. 1988).  Factors to be considered in determining whether experimentation is "undue" include: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.  *Martek*, 579 F.3d at 1378; *In re Wands*, 858 F.2d at 737.  However, some "trial and error" is permissible.  *See W.L. Gore & Assoc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed. Cir. 1983); *see also Falko-Gunter Falkner*, 448 F.3d at 1365 ("The Board observed that the mere fact that the experimentation may have been difficult and time consuming does not mandate a conclusion that such experimentation would have been considered to be undue.") (internal quotation marks omitted).

### iii.    Definiteness

140.    Section 112 requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention."  35 U.S.C. § 112, ¶ 2.  This provision strikes a "delicate

balance" which recognizes that, although the definiteness requirement must tolerate "[s]ome modicum of uncertainty" as "the price of ensuring the appropriate incentives for innovation," *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2128, 189 L. Ed. 2d 37 (2014) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731-32 (2002)) (internal quotation marks omitted), a patent must nevertheless "be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus*, 134 S. Ct. at 2129 (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)) (internal quotation marks omitted).

141.    Accordingly, a party seeking to invalidate a patent claim based on indefiniteness under 35 U.S.C. § 112, ¶ 2 must prove by clear and convincing evidence that a patent's "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228-29 (Fed. Cir. 2016), *cert. denied*, 137 S. Ct. 2267 (2017) (quoting *Nautilus*, 134 S. Ct. at 2124). It is the "claims, not particular claim terms" that are pertinent to "the dispositive question in an indefiniteness inquiry." *Cox*, 838 F.3d at 1231-32.

142.    The non-conformity to an industry standard practice does not in itself result in a finding of indefiniteness. *Marley Mouldings Ltd. v. Mikron Indus., Inc.*, 417 F.3d 1356, 1360-61 (Fed. Cir. 2005).

143.    Whether a claim is indefinite is a question of law to be assessed as of the filing date. *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1370, 1372 (Fed. Cir. 2005).

### G.      Priority

144.     An application may claim the benefit of the filing date of an earlier application if the earlier application complies with the written description requirement of 35 U.S.C. § 112.  *See* 35 U.S.C. § 120; *Martek*, 579 F.3d at 1369.  "The test for sufficiency of support in a parent application is whether the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter."  *Id*. (internal quotation marks and citations omitted).

145.     "[I]t is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention."  *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Eiselstein v. Frank*, 52 F.3d 1035, 1038 (Fed. Cir. 1995) ("[T]he prior application need not describe the claimed subject matter in exactly the same terms as used in the claims; it must simply indicate to persons skilled in the art that as of the earlier date the applicant had invented what is now claimed.").

146.     In line with the discussion above, the disclosure requirement here may be satisfied by the words, structures, figures, diagrams, formulas, etc., in the patent application, and any combination of them, as understood by one of ordinary skill in the field of technology of the invention.  *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997).

## II.     ABSOLUTE INTERVENING RIGHTS

147.     The Court must decide whether D&M has proven that it is entitled to absolute intervening rights with respect to the Asserted Claims of the '949 Patent.[3]

---

[3] D&M has not asserted a defense of equitable intervening rights, and thus Sonos has already been granted summary judgment as to any claim of equitable intervening rights.  D.I. 427.

148.    D&M bears the burden of proving that it is entitled to absolute intervening rights with respect to the '949 Patent.  *See, e.g.*, *BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1220-21 (Fed. Cir. 1993); *Underwater Devices, Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380, 1388 (Fed. Cir. 1983); *Intest Corp. v. Reid-Ashman Mfg., Inc.*, 66 F. Supp. 2d 576, 582 (D. Del. 1999) ("[I]t is well established, that intervening rights is an affirmative defense, and as such, the burden of proof rests on the party raising the defense.").

149.    In general, the defense of intervening rights is embodied in 35 U.S.C. § 252.  The language of 35 U.S.C. § 252 is directed to reissued patents, but 35 U.S.C. § 307 specifies that the defense of intervening rights embodied in 35 U.S.C. § 252 applies to reexamined patents as well. In particular, 35 U.S.C. § 307(b) provides that:

> Any proposed amended or new claim determined to be patentable and incorporated into a patent following a reexamination proceeding will have the same effect as that specified in section 252 for reissued patents on the right of any person who made, purchased, or used within the United States, or imported into the United States, anything patented by such proposed amended or new claim, or who made substantial preparation for the same, prior to issuance of a certificate under the provisions of subsection (a) of this section.

150.    The defense of absolute intervening rights is embodied in the first sentence of 35 U.S.C. § 252, ¶ 2, which states as follows:

> A [reexamined] patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the [issuance of a reexamination certificate], made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the [reexamined] patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making, using, offering for sale, or selling of such thing infringes a valid claim of the [reexamined] patent which was in the original patent.

35 U.S.C. § 252; *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1361-62 (Fed. Cir. 2012) (en banc); *BIC Leisure*, 1 F.3d at 1220-21.

151.    "The defense of absolute intervening rights allows a party whose products infringe a reissued or reexamined patent to continue to use or sell specific products that were made, purchase, or used before the reissuance or reexamination, if the asserted claim was not in the original patent, so long as the accused infringer began its infringing activity before the patent was reissued or reexamined."  D.I. 427 at p. 3; *see also BIC Leisure*, 1 F.3d at 1220-21 (confirming that absolute intervening rights extend "only to anything made, purchased, or used before the grant of the [reexamined] patent").

152.    D&M is only entitled to absolute intervening rights if it can prove that the claims of the '949 Patent were "substantively changed" during reexamination.  *See Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1322 (Fed. Cir. 2016); *Marine Polymer*, 672 F.3d at 1362.  In this respect, "amendments made during reexamination do not necessarily compel a conclusion that the scope of the claims has been substantively changed," even if "the claims at issue were amended during reexamination after a rejection based on prior art." *Convolve*, 812 F.3d at 1322.  Rather, to determine whether an amendment is a substantive change, "it is necessary to analyze the claims of the original and the reexamined patents in light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information." *Id.* (quotations marks omitted).

153.    When performing the intervening rights analysis, a court's "task is to interpret the scope of the claims per the *Phillips* standard," which differs from the broadest reasonable interpretation standard applied during reexamination.  *Id.* at 1325.  Under the *Phillips* standard, "the specification 'is the single best guide to the meaning of the disputed term,' and is usually dispositive."  *Id*. (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)).

154.    Amendments during reexamination that merely make express what was already inherent in the claims, or otherwise simply clarify the language of the original claims, are not "substantive changes" that give rise to intervening rights.  *See, e.g., Convolve*, 812 F.3d 1322-25 (finding that "the language of the claims, read in light of the specification and prosecution history, especially the applicant's 2001 remarks and amendment, compel a conclusion that the claims as originally drafted were limited to seek acoustic noise despite the lack of an express recitation in the claims"); *Bloom Eng'ng Co., Inc. v. North America Mfg. Co., Inc.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997) ("[a]n amendment that clarifies the text of the claim or makes it more definite without affecting its scope" is considered an amendment "without substantive change" under § 252); *Tennant Co. v. Hako Minuteman, Inc.*, 878 F.2d 1413, 1417 (Fed. Cir. 1989) (finding that amending a claim limitation from "moveable first wall section" to "moveable first bottom wall section" did not substantively change the scope of the claim because the specification made clear that the claims already required the wall section to be a "bottom wall section"); *Kaufman Co., Inc. v. Lantech, Inc.*, 807 F.2d 970, 977 (Fed. Cir. 1986) (finding that "the amendments made during reexamination . . . were amended without substantive change" because they "did not expand, narrow or otherwise alter the meaning or scope of the [original] claims" and instead "were made, as stated by the examiner, simply to further clarify the completely sufficient language used in the original claims"); *Henrob Ltd. v. Bollhoff Systemtechnick GMBH & Co.*, No. 05- 73214, 2009 WL 3188572, at *13-15 (E.D. Mich. Sept. 29, 2009) (finding no substantive change where the amendments "made explicit what the court deems, based on the language and scope of the original patent itself, was inherent").

155.    As this Court recently recognized, the plain language of U.S.C. § 252 also

"supports drawing a distinction between process claims and product claims with regarding to

absolute intervening rights."  D.I. 427 at p. 6.  In particular:

> The portion of section 252 that addresses absolute intervening rights refers to
> right to use, sell, offer to sell, etc., "the specific thing so made, purchased, offered
> for sale, or used or imported unless the making using, offering for sale or selling
> of such thing infringes a valid claim of the reissued patent which was in the
> original patent." By contrast, the portion of section 252 that addresses equitable
> intervening rights provides that the court may provide for "the continued
> manufacture, use, offer for sale, or sale of the thing made," purchased, offered for
> sale, etc., before the grant of the reissue, "and the court may also provide for the
> continued practice of any process patented by the reissue" to the extent the court
> deems equitable for the protection of investments made or business commenced
> before the grant of the reissue.

Id. at p. 6-7 (citing *BIC Leisure*, 1 F.3d at 1220-21; P.J. Federico, Commentary on the New

Patent Act, 75 J. Pat. & Trademark Off. Soc'y 161, 207-08 (1975 reprint; original 1954); P.J.

Federico, Intervening Rights in Patent Reissues, 30 Geo. Wash. L. Rev. 603, 632-33 (1962)).

156.    In view of this distinction, the general rule is that absolute intervening rights do

***not*** apply to method claims.  *See*, *e.g.*, *NetAirus Techs., LLC v. Apple, Inc.*, No. 10-3257, 2013

WL 3089061, at *6 (C.D. Cal. May 23, 2013); *Rohm & Haas Co. v. Chem. Insecticide Corp.*,

171 F. Supp. 426, 432 (D. Del. 1959) (same).  The only exception to this general rule that, if a

claim is directed to a process that was used to make specific products, then absolute intervening

rights must extend to this particular type of process claims "in order to avoid undermining the

statutory protection for particular products made prior to a reissuance or reexamination."  D.I.

427 at p. 7.

# SCHEDULE C2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**D&M ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "Defendants") submit this Statement of Issues of Law that Remain to be Litigated, which is based on Defendants' current understanding of the claims asserted by Plaintiff Sonos, Inc. ("Sonos") and the proceedings in this action to date.

To the extent that Defendants' Statement of Issues of Fact to be Litigated set forth in Schedule B2 contains issues of law, those issues are fully incorporated herein by reference. Likewise, should the Court determine that any issue identified below is more appropriately considered an issue of fact, Defendants incorporate such issues by reference into Schedule B2. By including a fact or issue of law herein, Defendants do not assume the burden of proof or production with regard to that fact or issue. Defendants reserve the right to revise this statement in light of the Court's rulings or any amendments, modifications, or extensions to Sonos's positions.

## ISSUES OVER WHICH PLAINTIFF HAS THE BURDEN OF PROOF

## I. NON-INFRINGEMENT

### A. STATEMENT OF ISSUES

- Whether Defendants infringe claims 11, 17, 18, 21, and 24 of U.S. Patent No. 9,195,258?

- Whether Defendants infringe claims 21, 25, and 38 of U.S. Patent No. 7,517,014?

- Whether Defendants infringe claims 1 and 16 of U.S. Patent No. 8,588,949?

### B. BURDEN OF PROOF AND PROOF OF INFRINGEMENT

Sonos bears the burden of proving infringement, either direct or indirect, by a preponderance of the evidence. *InTouch Tech., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014); *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). A patent infringement analysis involves two steps: first, the court must construe the patent claims to determine their scope and meaning, and second, the claims as construed by the court

must be compared to the allegedly infringing device. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996); *see also Combined Sys., Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1210 (Fed. Cir. 2003).

### a) <u>Literal infringement</u>

To prove literal infringement, Sonos must prove by a preponderance of the evidence that the accused products either contain or perform every limitation in the asserted claims. *See Kao Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 972 (Fed. Cir. 2006). "Each element contained in a patent claim is deemed material to defining the scope of the patented invention." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). "[F]ailure to meet a single limitation is sufficient to negate infringement of the claim." *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed. Cir. 1991); *NOMOS Corp. v. BrainLAB USA, Inc.*, 357 F.3d 1364, 1367 n.1 (Fed. Cir. 2004). The absence of even one claim element of an asserted claim precludes literal infringement of that claim. *See Kahn v. GMC*, 135 F.3d 1472, 1477 (Fed. Cir. 1998). If an accused product does not infringe an independent claim, it also does not infringe any claim depending therefrom. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).

### b) <u>Direct Infringement</u>

Direct infringement is defined as the making, using, selling, offering to sell, or importing a patented invention in the United States without authorization from the patent owner. 35 U.S.C. § 271(a). Where an accused infringer manufactures only part of a claimed system or apparatus, or only performs part of a claimed method, it does not "make" a patented system under § 271(a) as a matter of law when its customer must complete the system by combining all of its parts. *Centillion Data Sys. LLC v. Qwest Commc'ns Int'l*, 631 F.3d 1279, 1288 (Fed. Cir. 2011); *see also Cross Med. Prods., Inc. v. Medtronic Sofamore Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir. 2005)

(finding manufacturer did not directly infringe by making a surgical apparatus when the claims required the apparatus to actually be in contact with the bone to infringe, not just the capability to do so). Unless the accused infringer is proven to be vicariously liable for the actions of its customers, the accused infringer cannot be liable for direct infringement by making components. *Centillion*, 631 F.3d at 1288 (noting that to be vicariously liable for the actions of its customers, the customers must either 1) act as agents of the accused infringer or 2) be contractually obligated by the accused infringer to act).

Apparatus claims fall into two categories: those that are "drawn to capability" and those that "specif[y] a particular configuration." *SRI Int'l. Inc. v. Internet Sec. Sys., Inc.*, 647 F. Supp. 2d 323, 337 (D. Del. 2009) (citing *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 994-95 (Fed. Cir. 2009)). The language of a particular claim determines which category it falls into. *See Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117-18 (Fed. Cir. 2002). When a claim is drawn to "a particular configuration," as opposed to capability, the fact that a device is "reasonably capable of being put into the claimed configuration is insufficient for a finding of infringement." *Ball Aerosol*, 555 F.3d at 994-95; *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 2017 U.S. Dist. LEXIS 59342 at *10-11 (D. Del. Apr. 10, 2017) ("'[I]t is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement.'") (citing *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010); s*ee also ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) ("Because the accused device can be used at any given time in a noninfringing manner, the accused device does not necessarily infringe the . . . patent.")..

While circumstantial evidence may be used to demonstrate direct infringement in "compelling circumstances," "the evidence must still indicate that infringement actually

occurred." *SRI Int'l.* 647 F. Supp. 2d at 336-37 (citing *ACCO Brands*, 501 F.3d at 1313 (patentee must "either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit")).

### c)   Infringement Under the Doctrine of Equivalents

A product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention. *Warner-Jenkinson*, 520 U.S. at 21. What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. *Id.* at 24, 117 S.Ct. 1040.

A party can show infringement under the doctrine of equivalents if every limitation of the asserted claim, including a limitation's "equivalent," is found in the accused product, where an 'equivalent' differs from the claimed limitation only insubstantially.  *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). Whether a component in the accused subject matter performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result may be relevant to this determination. *Id.*

But the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims. *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400 (Fed. Cir. 1994). The doctrine of equivalents also cannot render a claim limitation inconsequential or ineffective. *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016). If a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issue for the jury to resolve. *Warner-Jenkinson*, 520 U.S. at 39 n.8, 117 S.Ct. 1040.

### d)   Indirect infringement

To establish liability for indirect infringement, either inducement of infringement or contributory infringement, Sonos must first prove direct infringement. *See DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006) ("[T]he patentee always has the burden to show direct infringement for each instance of indirect infringement"); *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement."). "Hypothetical instances of direct infringement are insufficient to establish vicarious liability or indirect infringement." *ACCO Brands,* 501 F.3d at 1313. Sonos must prove that a user did or must infringe. *See, e.g., id.* at 1313-14.

To prove direct infringement, Sonos must prove that a "single actor can be held responsible for the performance of all steps of the patent," or that Defendants have control over or directs the parties performing or using the claimed method or apparatus so that all the steps are attributable to a single party. *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2118-19 (2014). *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015) ("*Akamai IV*"). An entity is responsible for another's infringing acts in two sets of circumstances: (1) where that entity directs or controls the others' performance, or (2) where the actors form a joint enterprise. *See Akamai Techs.,* 797 F.3d at 1020. To prove "direction and control" the patentee must prove that the accused infringer conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance. *Id.* at 1023.

### (i)  *Induced Infringement*

In order to succeed on a claim of induced infringement, Sonos must also prove that Defendants knew "that the induced acts constitute patent infringement." *Global-Tech Appliances,*

*Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). This requires Sonos to show more than just a defendant's knowledge of the patent and of the relevant acts; it must also show knowledge of whether the acts constituted infringement. *Fujitsu Ltd. v. Netgear Inc*., 620 F.3d 1321, 1329-30 (Fed. Cir. 2010) ("we disagree with Philips' claim that it need only show that Netgear knew of the patent and of the relevant acts, not whether these acts constituted infringement").

Finally, Sonos must prove that Defendants had actual intent to induce infringement. *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002) ("In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363–64 (Fed. Cir. 2003) ("[P]roof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement.").  "Knowledge of the acts alleged to constitute infringement is not enough." *DSU Med. Corp.*, 471 F.3d at 1305 (citing *Warner-Lambert*, 316 F.3d at 1363).  Evidence of affirmative actions taken to induce infringement, such as advertising, must be linked to intentionally inducing the allegedly infringing use.  *Lucent Techs., Inc.*, 580 F.3d at 1322; *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 234 (D. Del. 2012).  general advertising materials are insufficient to demonstrate more than speculation that the infringing activity has occurred or that defendants intended to induce infringement.  *See, e.g.*, *ACCO Brands,*501 F.3d at 1312-14; *see also E–Pass Techns., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222-23 (Fed. Cir. 2007); *MONEC Holding*, 897 F. Supp. 2d at 234.

Likewise, "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *DSU Med. Corp.*, 471 F.3d at 1305-06. Establishing "inducement requires evidence of culpable conduct, directed to

encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. Negligence or recklessness is also not enough to satisfy the knowledge requirement. *Global-Tech,* 131 S.Ct. at 2070.

"[A] willfully blind defendant is one who takes deliberate action to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts," which is a standard well beyond negligence or recklessness. *Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 817, 831 (D. Del. 2011) (Robinson, J.) (citing *Global-Tech*, 131 S.Ct. at 2070–71). Where no affirmative actions taken by the accused infringer to purposefully avoid gaining actual knowledge of the patent are provided, willful blindness cannot be found. *Monec Holding*, 897 F. Supp. 2d at 234.

"Knowledge after filing of the present action is not sufficient for pleading the requisite knowledge for indirect infringement." *Xpoint Techs., Inc. v. Microsoft Corp.*, 730 F. Supp. 2d 349, 357 (D. Del. 2010) (in the context of a motion to dismiss). "The court is not persuaded by plaintiff's contention that the requisite knowledge can be established by the filing of the plaintiff's complaint." *Id.* (quoting *Mallinckrodt Inc. v. E-Z-EM Inc.*, 670 F. Supp. 2d 349, 354 n.1 (D. Del. 2009))). The requisite intent for induced infringement can be negated by "evidence of an accused inducer's good-faith belief of invalidity." *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1368 (Fed. Cir. 2013).

### (ii) *Contributory Infringement*

"Contributory infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that 'material or apparatus' is material to practicing the invention, has no substantial non-infringing uses, and is known by the party 'to be especially made or especially adapted for use in an infringement of such patent.'" *In re Bill of Lading*

*Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012) (quoting 35 U.S.C. § 271 (c)).

To prove contributory infringement, Sonos must offer evidence: "1) that there is direct infringement, 2) that the accused infringer had knowledge of the patent, 3) that the component has no substantial noninfringing uses, and 4) that the component is a material part of the invention." *Fujitsu*, 620 F.3d at 1326; *see also Cross,* 424 F.3d at 1312 (quoting *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed. Cir. 2004)). "A violator of § 271(c) 'must know that the combination for which his component was especially designed was both patented and infringing.'" *Global–Tech,* 131 S.Ct. at 2068; *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 84 S.Ct. 1526, 1533 (1964).

The plaintiff has the burden of establishing that the component has no substantial noninfringing use. *See Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1362 (Fed. Cir. 2012) (holding that the plaintiff did not satisfy this burden where it "failed to provide any survey, expert, or other evidence showing how frequently users choose to use the accused DVDs in a non-infringing manner, and Toshiba did not offer any evidence that using the accused products in a non-infringing manner was "unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.").

"[A] substantial non-infringing use is any use that is 'not unusual, far-fetched, illusory, impractical, occasional, aberrant, or experimental.'" *In re Bill of Lading*, 681 F.3d at 1337 (quoting *Vita-Mix Corp. v. Basic Holdings, Inc.*, 581 F.3d 1317, 1327-29 (Fed. Cir. 2009)). "For purposes of contributory infringement, the inquiry focuses on whether the accused products can be used for purposes ***other than*** infringement." *Id.* at 1338 (emphasis in original); *see also Ricoh Co. v.*

*Quanta Comput. Inc.*, 550 F.3d 1325, 1339 (Fed. Cir. 2008) (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 104 S.Ct. 774 (1984)).

### (iii) *Willful Infringement*

Sonos must prove willful infringement by a preponderance of the evidence that infringing conduct was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016). Important to this determination proof that the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer. *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (citing *Halo*, 136 S.Ct. at 1930). Willful infringement is measured against the knowledge of the actor at the time of the challenged conduct. *Id.* at 1933. Defendants' awareness of an asserted patent, without more, cannot establish willful infringement. *See Vehicle IP, LLC v. AT&T Mobility LLC et al.*, 2016 WL 7647522, at *8 (D. Del. Dec. 30, 2016) ("Vehicle IP does not identify other evidence, beyond pre-suit knowledge of the patent, that could show that the TCS Defendants' infringement was 'egregious,' 'deliberate,' 'wanton,' or otherwise characteristic of the type of infringement that warrants the Court exercising its discretion to impose the 'punitive' sanction of enhanced damages."); *Greatbatch Ltd. v. AVX Corp.*, 2016 WL 7217625, at *3 (D. Del. Dec. 13, 2016) ("[A] party's pre-suit knowledge of a patent is not sufficient, by itself, to find 'willful misconduct' of the type that may warrant an award of enhanced damages."); *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332-33 (Fed. Cir. 2004) (affirming JMOL of no willfulness despite stipulation that defendant had knowledge of the asserted patents); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1351-52 (Fed. Cir. 2000) (affirming finding of no willfulness despite defendant's knowledge of asserted patent).

The failure if an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent.  35 U.S.C. § 289.

Evidence of willful infringement that predates the issuance of a patent is irrelevant.  *See, e.g., Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 13 USPQ2d 1972 (Fed. Cir. 1990)  ("It is obvious that a party cannot be held liable for 'infringement', and thus not for 'willful' infringement, of a nonexistent patent, i.e., no damages are payable on products manufactured and sold before the patent issued.");  *American Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459, 227 USPQ 299 (Fed. Cir. 1985) (there was no copying of the patent because the defendant began developing its process before issuance of the patent; possible knowledge of a pending patent application cannot provide a basis for willful infringement of a patent);  *W.S. Molnar Co. v. IKG Indus., a Div. of Harsco Corp.*, 82 F.3d 434 (Fed. Cir. 1996) (affirming district court's decision not to enhance damages, stating that "nearly all the activities supporting Molnar's assertion of copying occurred before the patents issued.").  *see also Emory Univ. v. Glaxo Wellcome Inc.*, 45 USPQ2d 1534, 1536 (N.D. Ga. 1997) ("In order to bring a claim for willful infringement, [the patentee] must prove that the patent exists and the alleged infringer had knowledge of it.");  *Smith & Nephew, Inc. v. Interlace Med., Inc.*, No. CIV.A. 10-10951-RWZ, 2012 WL 3560811, at *2 (D. Mass. Aug. 17, 2012) (in granting motions in limine, "conduct before the patent issues is not willfulness and copying plaintiff's product is not infringement unless that product reads on the patent claims.").

However, enhanced damages are only appropriate in egregious cases.  *Halo*, 136 S.Ct. at 1932.  And enhanced damages need not follow a finding of egregious misconduct.  *Id.* at 1933.  If

willfulness is established, the question of enhanced damages must be left to the district court's, and

not the jury's, discretion.  *WesternGeco*, 837 F.3d at 1362; 35 U.S.C. § 284.  The following factors

are typically relevant in the determination of whether to enhance damages:

> (1) whether the infringer deliberately copied the ideas or design of another
>
> (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; and
>
> (3) the infringer's behavior as a party to the litigation.
>
> (4) Defendant's size and financial condition.
>
> (5) Closeness of the case.
>
> (6) Duration of defendant's misconduct.
>
> (7) Remedial action by the defendant.
>
> (8) Defendant's motivation for harm.
>
> (9) Whether defendant attempted to conceal its misconduct.

The objective reasonableness of the accused infringer's positions can still be relevant for

the district court to consider when exercising its discretion.  *Id.* at 1363).

**ISSUES OVER WHICH DEFENDANTS BEAR THE BURDEN OF PROOF**

## II.  INVALIDITY

### A.  STATEMENT OF ISSUES

- Whether claims 11, 17, 18, 21, and 24 of U.S. Patent No. 9,195,258 (the '258 Patent) are invalid under 35 U.S.C. § 102 as anticipated by the prior art, , either expressly or inherently?

- Whether claims 11, 17, 18, 21, and 24 of the '258 Patent are invalid under 35 U.S.C. § 103 as obvious?

- Whether claims 11, 17, 18, 21, and 24 of the '258 Patent are invalid for failure to meet the requirements of 35 U.S.C. § 112?

- Whether claims 21, 25, and 38 of U.S. Patent No. 7,517,014 (the '014 Patent) are invalid under 35 U.S.C. § 102 as anticipated by the prior art, either expressly or inherently?

- Whether claims 21, 25, and 38 of the '014 Patent are invalid under 35 U.S.C. § 103 as obvious?

- Whether claims 21, 25, and 38 of the '014 Patent are invalid for failure to meet the requirements of 35 U.S.C. § 112?

- Whether claims 1 and 16 of U.S. Patent No. 8,588,949 (the '949 Patent) are invalid under 35 U.S.C. § 102 as anticipated by the prior art, either expressly or inherently?

- Whether claims 1 and 16 of the '949 Patent are invalid under 35 U.S.C. § 103 as obvious?

- Whether claims 1 and 16 of the '949 Patent are invalid for failure to meet the requirements of 35 U.S.C. § 112?

## B. BURDEN OF PROOF

An accused infringer has the burden to prove by clear and convincing evidence that a patent is invalid.  *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 111 (2011).  A patent claim is invalid if the claimed invention is anticipated by, or obvious in view of, the relevant prior art or otherwise fails to meet the requirements of 35 U.S.C. § 112. *See* 35 U.S.C. § 282; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007). When a prior art reference was not cited to the PTO during prosecution, that prior art carries "more weight" in overcoming the presumption of validity and "the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain." *Microsoft*, 131 S. Ct. at 2242.  The evidentiary standard of proof applies to questions of fact and not to questions of law. *See, e.g., Addington v. Texas*, 441 U.S. 418, 423 (1979).

## III. WHAT CONSTITUTES PRIOR ART

### A. PRIOR ART UNDER 35 U.S.C. § 102

A threshold question in any anticipation or obviousness analysis is whether the allegedly invalidating reference is prior art, which is a question of law for the Court. *See Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1376-77 (Fed. Cir. 2003). To qualify as a prior art reference under 35 U.S.C. § 102(b), a device must have been "in public use or on sale in this country[] more than one year prior to the date of the application for patent" and a patent or other printed publication must have "described" the invention "in this or a foreign country" before that time.  Section 102(a), on the other hand, does not limit invalidating public uses, offers for sale, or printed descriptions to one year before filing; those invalidating activities must simply occur "before the invention of the patent."

Public use and public knowledge are not demanding standards. *See Nat'l Research Dev. Corp. v. Varian Assocs., Inc.*, 822 F. Supp. 1121, 1129 (D.N.J. 1993) *aff'd in part, vacated in part*, 17 F.3d 1444 (Fed. Cir. 1994) ("It does not take much to trigger the 'public use' statutory bar to a patent."). Public use includes "any use" of a device "by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor*." Baxter Int'l, Inc. v. COBE Labs., Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996) (holding use of centrifuge in a laboratory where co-workers and visitors saw it in operation qualified as "public use"); *see also Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009) (holding public use requirement satisfied where "during the 1989 demonstration, all elements of the repair method in claim 1 of the [ ] Patent were performed"); *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1372 (Fed. Cir. 2007) (display of bracket at "1994 Florida trade show" is public use); *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1159-60 (Fed. Cir. 1994) (displaying an invention at a dinner party is public use). While § 102(b) uses slightly different language (i.e., "public use"), the same standard governs whether a reference is "known or used by others" under § 102(a). *See Ormco*

*Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305-06 (Fed. Cir. 2006) (reversing finding of no "use by others" under § 102(a) because "Dr. Truax promoted his system to other orthodontists through seminars and clinics and distributed his instruction sheet at those clinics"). In addition, a device known or used by others must be "ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998). That requirement is satisfied if the device is reduced to practice or the persons who conceived of the device have "prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.*

Slightly different standards govern whether a reference qualifies as a printed publication under §§ 102(a) and (b). Dissemination and public accessibility are the touchstones to the legal determination whether a prior art reference is a printed publication. *See Suffolk Techs., LLC v. AOL Inc*, 752 F.3d 1358, 1364 (Fed. Cir. 2014). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Id.* (quoting *SRI Int'l,* 511 F.3d at 1192).

Other provisions of § 102 recognize prior art that was not necessarily publicly known or used by others at the time of the alleged invention. *See, e.g.,* 35 U.S.C. §§ 102(e), (f), (g)(2). Section 102(e) invalidates claims "described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent." A patent or patent application can invalidate the claims, in other words, even if it was not prior art under §§ 102(a) or (b). *See In re Bayer*, 568 F.2d 1357, 1361 (CCPA 1978).  Prior art under § 102(f) can likewise invalidate even if it was not publicly known or used.  A patent may be invalid under that provision if it can be established that the

patentee derived its invention from the work of another. *See* 35 U.S.C. § 102(f) (stating a patent is invalid if the inventor "did not himself invent the subject matter sought to be patented"). Derivation under § 102(f) "requires a showing of both (1) prior conception of the invention by another and (2) communication of that conception to the patentee that is sufficient to enable him to construct and successfully operate the invention." *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1376 (Fed. Cir. 2004); *see also Brand v. Miller*, 487 F.3d 862, 869-70 (Fed. Cir. 2007).

Section 102(g)(2) invalidates a claim if "before [the alleged inventor's] invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." Under § 102(g), Bard can establish its own work or the work of another "was prior art by proving 'either that it reduced its invention to practice first or that it conceived of the invention first and was diligent in reducing it to practice.'" *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 974-75 (Fed. Cir. 2014) (quoting *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012)). The test for conception under § 102(g)(2), as under any other provision of § 102, is whether Bard or a third party "'had an idea that was definite and permanent enough that one skilled in the art could understand the invention.'" *Id.* at 975 (quoting *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)). In assessing diligence, the "basic inquiry is whether … there was reasonably continuing activity to reduce the invention to practice," *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006), and no effort to abandon, suppress, or conceal after reducing the invention to practice, *Dow Chem. Co. v. Astro-Valcour, Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001). An inventor who first conceives of his invention outside the United States "may rely on the date that the invention was disclosed in the United States[] as [the] conception date for" § 102(g) purposes. *Scott v. Koyama*, 281 F.3d 1243, 1247 (Fed. Cir. 2002); *see also Amkor Tech., Inc. v. ITC*, 692 F.3d 1250, 1255 (Fed. Cir. 2012).

Section 102(g)(2) and (f) prior art, like all other art, may be used to establish both anticipation and obviousness. *See Tyco Healthcare*, 774 F.3d at 976; *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1403-04 (Fed. Cir. 1997); *see also* 35 U.S.C. § 103(c).

An Examiner's decision is not binding on a court. *See, e.g., Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed. Cir. 1985) ("The Examiner's decision, on an original or reissue application, is never binding on a court."); *Tyler Refrigeration Corp. v. Kysor Indus. Corp.*, 777 F.2d 687, 690 (Fed. Cir. 1985) ("The judge took account of the presumption of validity but this is a case in which the court could, as it did, decide differently from the PTO examiner on the basis of the evidence before the court."); *Gen. Elec. Co. v. Hoechst Celanese Corp.*, 740 F. Supp. 305, 313 (D. Del. 1990) ("The Examiner's determination that the GE patent is valid is evidence of the claims' validity, but is not binding on the court."); *see also Belden Techs. v. Superior Essex Comms.*, 802 F.Supp. 2d 555, 569 (D. Del. 2011) ("Admitting evidence about the [patent-in-suit's] reexamination, the outcome of which is not binding on the Court, would have only served to confuse the jury and was ultimately far more prejudicial than probative.")

A prior art reference is not "cumulative" of references considered by the Examiner if it discloses an element the patentee used to distinguish the prior art before the Examiner from the patentee's claimed invention. *Belden Techs.*, 733 F. Supp. 2d at 544 (rejecting plaintiff's argument that a prior art reference was cumulative of prior art considered by the examiner).

## B. THE CORROBORATION REQUIREMENT

As a general rule, mere testimonial evidence concerning invalidating activities must be corroborated. *See Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354,1367- 68 (Fed. Cir. 1999). There is no single test for determining whether sufficient corroborative evidence has been identified. *See Woodland Trust*, 148 F.3d at 1371. Rather, corroborative evidence must satisfy a

"rule of reason analysis." *Id.*; *see also Finnigan*, 180 F.3d at 1368-69. Courts have indicated, however, that "[r]eliable evidence of corroboration preferably comes in the form of physical records that were made contemporaneously with the alleged prior invention." *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002); *see also Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351-52 (Fed. Cir. 2001) (testimony by inventor claiming priority was sufficiently corroborated by physical records made contemporaneously with the invention). Where the testifying inventor is a non-party and the testimony concerns an unpatented prior invention, the corroboration necessary to meet the clear and convincing standard is typically less than the corroboration needed to support the testimony of an interested inventor who stands to gain from a finding of invalidity. *Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1175-77 (Fed. Cir. 1999).

## C. ANTICIPATION

A patent claim is invalid as anticipated under 35 U.S.C. § 102 if "within the four corners of a single, prior art document every element of the claimed invention [is described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (quoting *Advanced Display Sys. Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000)).

An anticipatory prior art reference may disclose each limitation expressly or inherently. *In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009). A reference may "be anticipating if a person of ordinary skill in the art would understand [the reference] as disclosing [otherwise missing elements] and if such a person could have combined the [reference's] description of the invention with his own knowledge to make the claimed invention." *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d

1339, 1347 (Fed. Cir. 2000). "Simply put, the fact that a characteristic is a necessary feature or result of a prior-art embodiment (that is itself sufficiently described and enabled) is enough for inherent anticipation." *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004). A prior art reference need not use the exact same language as a patent claim to be anticipatory – anticipation need not be "*ipsissimis verbis.*" *See In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990).

"[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005); *see also Schering Corp. v. Geneva Pharms.*, Inc., 339 F.3d 1373, 1379 (Fed. Cir. 2003) ("Because inherency places subject matter in the public domain as well as an express disclosure, the inherent disclosure of the entire claimed subject matter anticipates as well as inherent disclosure of a single feature of the claimed subject matter. The extent of the inherent disclosure does not limit its anticipatory effect."); *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). As such, "anticipation does not require actual performance of suggestions in a disclosure. Rather, [it] only requires that those suggestions be enabling to one of skill in the art." *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1378-81 (Fed. Cir. 2001). Furthermore, there is no requirement that a person of ordinary skill in the art recognize that the inherent property would be present in the prior art reference, or that there be past recognition of the inherent feature. *Schering Corp.*, 339 F.3d at 1378. "Where...the result is a necessary consequence of what was deliberately intended, it is of no import that the article's authors did not appreciate the results." *MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1366 (Fed. Cir. 1999); *Atlas Powder Co. v. Ireco, Inc.*, 190 F.3d 1342, 1348-49 (Fed. Cir. 1999). In some cases, the inherent property corresponds to a claimed new benefit or characteristic of an invention otherwise in the prior art. In those cases, the

new realization alone does not render the old invention patentable. *See Id.* at 1347; *Johnson &*
*Johnson v. W.L. Gore & Assocs.*, 436 F. Supp. 704, 725 (D. Del. 1977) ("Recognition of the
inherent properties of a material does not constitute invention.").

A reference that discloses multiple options for a particular feature will anticipate a later
application that uses one of the disclosed options. "The anticipation analysis asks solely whether
the prior art reference discloses and enables the claimed invention, and not how the prior art
characterizes that disclosure or whether alternatives are also disclosed." *Perricone v. Medicis*
*Pharm. Corp.*, 432 F.3d 1368, 1376 (Fed. Cir. 2005) (quoting *Hewlett Packard Co. v. Mustek Sys.*,
340 F.3d 1314, 1324 n.6 (Fed. Cir. 2003)); *see also Leggett & Platt, Inc. v. Vutek, Inc.*, 537 F.3d
1349, 1356 (Fed. Cir. 2008) (rejecting "the erroneous assumption that the disclosure of multiple
examples renders one example less anticipatory"); *In re Gleave*, 560 F.3d at 1336-37 (rejecting
the argument that a prior art reference cannot anticipate by listing an element in a long list of
possibilities); *Application of Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962) (holding that it was
"immaterial that [the patent] did not expressly spell out the limited class as we have done here. It
is our opinion that one skilled in this art would, on reading the [] patent, at once envisage each
member of this limited class, even though this skilled person might not at once define in his mind
the formal boundaries of the class as we have done here."). Thus, when a list of options or
permutations is disclosed in the prior art, anticipation does not turn on the number of elements in
the list, but rather on whether the claimed subject matter is enabled by the prior art reference.
*Perricone*, 432 F.3d at 1377-78.

Material not explicitly contained in a single document may still be considered for
anticipation if that material is incorporated by reference into the document. "Incorporation by
reference provides a method for integrating material from various documents into a host

document—a patent or printed publication in an anticipation determination—by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein." *See Advanced Display*, 212 F.3d at 1282. A host document incorporates material by reference if it "identif[ies] with detailed particularity what specific material it incorporates and clearly indicate[s] where that material is found in the various documents." *Husky Injection Molding Sys. Ltd. v. Athena Automation Ltd.*, 838 F.3d 1236, 1248 (Fed. Cir. 2016) (citation omitted). The incorporation standard relies only on the reasonably skilled artisan and his or her ability to deduce from language, however imprecise, what a host document aims to incorporate. *Id.* Whether and to what extent material is incorporated by reference is a question of law. *See Harari v. Lee*, 656 F.3d 1331, 1334 (Fed. Cir. 2011).

Further, whatever infringes a claim if later in time anticipates if earlier in time. *Bristol-Myers Squibb Co.,* 246 F.3d at 1378. Thus, where a plaintiff for purposes of its infringement case alleges that a feature of an accused product meets a particular limitation recited in an asserted claim, then that feature should it be found in the prior art would also cause that limitation to be met for invalidity purposes. See id.

D. **OBVIOUSNESS**

A patent claim is invalid as obvious under 35 U.S.C. § 103 "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a); *see also KSR Int'l*, 550 U.S. at 406-407.

The person of ordinary skill in the art is "not an automaton," but rather has "ordinary creativity" to fit together his knowledge with the prior art. *Id.* at 421. "If a person of ordinary skill

can implement a predictable variation, § 103 likely bars patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 401. While a Court must guard against hindsight bias, such concerns should not deny the Court "recourse to common sense" as part of analyzing obviousness. *Id.*

"[A]dmitted prior art can be relied upon for both anticipation and obviousness determinations, regardless of whether the admitted prior art would otherwise qualify as prior art under the statutory categories of 35 U.S.C. 102." Manual of Patent Examining Procedures ("MPEP") § 2141.01; and MPEP § 2129 ("A statement by an applicant in the specification or made during prosecution identifying the work of another as 'prior art' is an admission which can be relied upon for both anticipation and obviousness determinations."). *See also Tokyo Keiso Co. Ltd. v. SMC Corp.*, 307 Fed. Appx. 446, 452-53 (Fed. Cir. 2009) (holding claimed invention obvious based on combination of prior art reference and admitted prior art described in the patent).

An "expansive and flexible approach" should be used in evaluating obviousness. *KSR*, 550 U.S. at 415, 419. The question of obviousness is a legal determination based on underlying facts, and the "ultimate judgment of obviousness is a legal determination." *KSR*, 550 U.S. at 426-27, *citing Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The underlying facts include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicators of non-obviousness, more commonly termed secondary considerations. *See Graham*, 383 U.S. at 17-18; *see also Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1348 (Fed. Cir. 2001); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1379 (Fed. Cir. 2000); *Ryko Mfg. Co. v. Nu*

*Star, Inc.*, 950 F.2d 714 (Fed. Cir. 1991); *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1353 (Fed. Cir. 1999).

A patent claim is invalid as obvious under 35 U.S.C. § 103 if the differences between the claim and the prior art are such that the claimed subject matter as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. *See Union Carbide Plastics & Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1187 (Fed. Cir. 2002). The hypothetical "person of ordinary skill in the art" is attributed "knowledge of all prior art in the field of the inventor's endeavor and of prior art solutions for a common problem even if outside that field." *In re Nilssen*, 851 F.2d 1401, 1403 (Fed. Cir. 1988).

Obviousness may be shown based on a combination of references, or based on a single reference even if the reference does not teach the particular claimed combination. *See, e.g., Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 989-990 (Fed. Cir. 2009) (reversing district court, finding asserted claim obvious based on single reference).  There is no absolute requirement that each claim limitation be disclosed in a prior art reference.  Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1377 (Fed. Cir. 2008); *Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*, 492 F.3d 1350, 1356 (Fed. Cir. 2007) ("We have held that structural similarity between claimed and prior art subject matter, proved by combining references or otherwise, where the prior art gives reason or motivation to make the claimed compositions, creates a prima facie case of obviousness." (emphasis added)); *Tegal Corp. v. Tokyo Electron Am., Inc.*, 257 F.3d 1331, 1349 (Fed.Cir.2001) (acknowledging that a claim could be obvious over a single prior art reference that does not disclose one of the limitations in the claim); *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016)("a patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention.").

The Supreme Court explained in *KSR Int'l Co. v. Teleflex Inc.* that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." 550 U.S. at 417. A teaching, motivation, or suggestion to combine references may be a "helpful insight," but it is not a requirement for demonstrating obviousness. *Id.* at 418. To teach away from a combination, a reference must expressly "criticize, discredit, or otherwise discourage the solution claimed." *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Further, "to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue," factors to consider include "interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art." *KSR*, 550 U.S. at 417.

One way to demonstrate that patented subject matter is obvious is to show that "there existed at the time of invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 420. Indeed, "[a]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id.* Also, "the fact that a combination was obvious to try might show that it was obvious under § 103," particularly where there was "a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *Id.* at 421; *see also Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 (Fed. Cir. 2008).

### a) **Secondary Considerations**

Secondary considerations that relate to obviousness or nonobviousness of the subject matter of the asserted claims of the patents include (i) whether products practicing those claims were commercially successful and whether there is a nexus between the invention and any commercial success, (ii) whether there was any long felt need for the claimed invention, and whether the claimed invention satisfied that long felt need, (iii) whether the claimed invention was or was not praised by others in the field and (iv) whether the accused products were developed independently. *See Cross*, 424 F.3d at 1322-23; *Ormco Corp.*, 463 F.3d at 1311. This list is not exhaustive, however, and may also include additional factors related to obviousness or nonobviousness. *See Graham*, 383 U.S. at 17- 18.

"The patentee bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness." *WMS Gaming, Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1359 (Fed. Cir. 1999). For example, to the extent Plaintiff claims "commercial success" or "licensing" of any product suggests non-obviousness, the Plaintiff must establish a nexus between the commercial success and the claimed invention. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1363 (Fed. Cir. 2012) ("for commercial success to be probative evidence of non-obviousness, a nexus must be shown between the claimed invention and the evidence of commercial success;" affirming district court that no sufficient nexus was shown where party did not show success of product "directly attributable" to claimed invention.). In determining whether licensure is actual evidence of secondary considerations of non-obviousness, the license rate is indicative of whether there was actual value to the licensee in taking the license. Thus, the rate paid is an important consideration in whether a license constitutes a secondary consideration of non-obviousness. *Transocean Offshore*

*Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1353 (Fed. Cir. 2012); *see also John E. Thropp's Sons Co. v. Seiberling*, 264 U.S. 320, 329-30 (1924) (noting that when a license has a low royalty rate, the "purchase of peace" may have been the motivation for license and thus evidence of licensing is of limited value to patentability).

It is well settled that evidence of secondary considerations directed to features already found in the prior art is not relevant to the obviousness inquiry. *See, e.g., Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1345 (Fed. Cir. 2007) (finding that where factors that led to commercial success of Dippin' Dots were present in the prior art, they could not overcome obviousness); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1365 (Fed. Cir. 2007) (recognition of patent inventors as "trail-blazers" — even by accused infringers — must be based upon the inventive contribution made in order to establish a nexus); *Ormco Corp.*, 463 F.3d at 1312 ("So too if the feature that creates the commercial success was known in the prior art, the success is not pertinent."); *J.T. Eaton & Co., Inc. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997) (citing *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983)) ("[T]he asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art."); *Cephalon Inc. v. Mylan Pharm. Inc.*, 962 F. Supp. 2d 688, 720-22 (D. Del. 2013) (Robinson, J.) (evidence of praise, failure of others, and commercial success must be sufficiently related to novel aspects of patent).

Where a patent claim recites a combination of multiple known components with new or modified components, even if commercial embodiments of the asserted patent have enjoyed commercial success, the patentee must "link that commercial success to the features of its invention that were not disclosed in the prior art" to establish nexus. *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008); *see also Sparton Corp. v. United States*, 89 Fed. Cl.

196, 239 (2009) (rejecting "presumption" of nexus argued by patentee, requiring patentee to demonstrate that the commercial success of a product embodying the claimed invention "must be due to the merits of the claimed invention beyond what was readily available in the prior art" (distinguishing *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387 (Fed. Cir. 1988))).

Moreover, even a defendant's "[choosing] the shortcut of copying one or more of the already well-known designs, now being used by [a competitor] does not indicate that [the patented] designs were innovative as compared to the prior art." *Bush Indus., Inc. v. O'Sullivan Indus., Inc.*, 772 F. Supp. 1442, 1458 (D. Del. 1991). Furthermore, a nexus between the copying and the novel aspects of the claimed invention must exist for evidence of copying to be given significant weight in an obviousness analysis." *Wm. Wrigley*, 683 F.3d at 1364 (affirming district court that even where Plaintiff showed Defendant sought to copy Plaintiff's invention, Plaintiff had no evidence suggesting that the "novel combination ... is what led [Defendant] to copy [Plaintiff's products].") Evidence of copying may in fact suggest that there is no nexus to the claimed invention where companies "market[] very similar products." *Id.* Even in such situations where copying exists, therefore, "evidence of copying" may be a "measure of the extent to which parties in the [particular] market typically copy any development by their competitors, whether patented or not." *Id.*

The existence of secondary considerations "does not control the obviousness determination." *Richardson-Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1483 (Fed. Cir. 1997). Where there is a strong case of obviousness, it cannot be overcome by secondary considerations. *See, e.g., Leapfrog Enters., Inc. v. Fisher-Price, Inc*., 485 F.3d 1157, 1162 (Fed. Cir. 2007);

*Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1344 (Fed. Cir. 2008); *Muniauction*, 532 F.3d at 1323.

### b) **Authenticity and Publication**

To the extent Sonos challenges the authenticity of Defendant's prior art references, Defendants are entitled to rely upon testimony, corroborating documentary evidence, and the appearance, contents and distinctive characteristics of references themselves taken in conjunction with the circumstances in order to meet Defendant's "slight" burden of producing evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994). The evidence used to authenticate a reference need not itself be admissible. Fed. R. Evid. 104(a) (in making a determination regarding preliminary questions concerning the admissibility of evidence, a court "is not bound by evidence rules, except those on privileges.").

To the extent Sonos challenges publication of Defendant's prior art references, whether there is sufficient evidence to conclude that each reference was publicly known or published, as those terms are used in the U.S. Patent Act, by "a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008).

### c) **Priority**

In response to Defendant's evidence of invalidity, Sonos bears the burden of proving that any patent claim is entitled to a priority date earlier than the filing date of the application that matured into the patent in which that claim can be found. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305-06 (Fed. Cir. 2008).

Conception must be proven by evidence showing conception of each element of the claimed invention to such an extent that all that remains is to undertake the mechanics of reducing the invention to practice. The uncorroborated testimony of the inventor cannot be used to support a date of conception. "An inventor is entitled to priority based on conception only as of a date when the complete conception has been manifested or disclosed in some fashion." Chisum on Patents, § 10.04[2]. "Conception requires an idea to be so "definite and permanent" that "all that remains to be accomplished ... belongs to the department of construction." *Dawson v. Dawson*, 710 F.3d 1347, 1355 (Fed. Cir. 2013) (quoting 1 *Robinson on Patents* 532 (1890)). "Conception exists when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known. Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." *Sewall v. Walters*, 21 F.3d 411, 415 (Fed. Cir. 1994); *see also Mergenthaler v. Scudder*, 11 App. D.C. 264, 1897 WL 17698, at *8 (App. D.C. 1897). "Conception must be proven by evidence showing what the inventor has disclosed to others and what that disclosure means to one of ordinary skill in the art." *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1334 (Fed. Cir. 2011) (internal quotes omitted). "Although the fundamental inquiry in conception is whether the inventor held the complete invention in his or her own mind, proof of conception requires objective evidence of what the inventor has disclosed to others, and what that disclosure would fairly suggest to one of ordinary skill in the art." *In re Jolley*, 308 F.3d 1317, 1323 (Fed. Cir. 2002). "[C]onception by an inventor, for the purpose of establishing priority, cannot be proved by his mere allegation nor by his unsupported testimony where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form . . ." *Price v. Symsek*, 988 F.2d 1187, 1194-95 (Fed. Cir. 1993) (quoting *Mergenthaler*); *see also Kardulas v. Florida Mach. Prods. Co.*,

438 F.2d 1118, 1121 (5th Cir. 1971) ("The date of invention cannot be carried back to that of the earliest mental conception. There must be a disclosure sufficient to enable one with ordinary skill in the art to reduce the invention to practice."), *Cislak v. Wagner*, 215 F.2d 275 (C.C.P.A. 1954).

To the extent that Plaintiffs challenge whether any of Defendant's prior art patents predate the relevant date of invention, a prior art patent will serve as prior art as of its earliest effective filing date, even if the application to which the later issued patent claimed priority is abandoned. *In re Wertheim*, 646 F.2d 527, 533-34 (C.C.P.A. 1981) (Rich J. writing for majority). The test for ensuring that the later issuing patent is entitled to its earliest effective application date for priority purposes is whether "the disclosure was contained in substance in the said earliest application." *Id*. (*quoting* 35 U.S.C. Sec. 102(e)). That level of disclosure references 35 U.S.C. Sec. 112, which the Patent Office reviews in reviewing the later, issuing application for patentability.

### E. INVALIDITY UNDER 35 U.S.C. §112

#### a) Written Description

"The federal patent system . . . embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989). This bargain requires that the patentee define precisely what he invented and describe that invention in the patent specification so the scope of the invention is clear to the public. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 731 (2002). This requirement is codified in the first paragraph of 35 U.S.C. § 112, which states "[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most clearly connected,

to make and use the same…." To fulfill the written description requirement, "the patent specification 'must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed. Cir. 1998) (citations omitted); *see also, e.g.*, *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343-47 (Fed. Cir. 2005); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). The written description test "requires an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art" to determine whether the specification "describe[s] an invention understandable to that skilled artisan and show[s] that the inventor actually invented the invention claimed" as of the filing date. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318-20 (Fed. Cir. 2011) (quoting *Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*)).

A patent fails the statutory written description requirement when the specification does not disclose what the claims are construed to cover. *Atl. Research Mktg. Sys., Inc. v. Troy*, 659 F.3d 1345, 1352-55 (Fed. Cir. 2011). "[T]he hallmark of written description is disclosure." *Ariad Pharms.,* 598 F.3d at 1351 (en banc). "[T]he written description requirement ensure[s] that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution . . . as described in the patent …." *In re Katz*, 639 F.3d at 1319 (internal quotation marks omitted).

### (i) Enablement

A patent must sufficiently enable one of skill in the art to practice the full scope of each of the asserted claims. "This important doctrine prevents both inadequate disclosure of an invention and overbroad claiming that might otherwise  attempt to cover more than was actually invented. Thus, a patentee chooses broad claim language at the peril of losing any claim that cannot be

enabled across its full scope of coverage." *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380-81 (Fed. Cir. 2012). The Federal Circuit has held various factors are relevant to whether a patent sufficiently enables one of skill in the art to practice the full scope including, for example, "the amount of direction or guidance presented," "the presence or absence of working examples," "the state of the prior art," and "the breadth of the claims." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009) (*quoting In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988)). Where the specification teaches away from what is sought to be claimed, claims are invalid for lack of enablement. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

### (ii) *Indefiniteness*

A claim is invalid as indefinite, pursuant to 35 U.S.C. § 112, when a person of ordinary skill in the art at the time of the invention would not understand what is claimed and what is not claimed in view of the specification. *Phillips*, 415 F.3d at 1313. Indefiniteness arises when one skilled in the art cannot determine whether a given product is within, or outside, the scope of the claims. *See Morton Int'l v. Cardinal Chem. Co*., 5 F.3d 1464, 1470 (Fed. Cir. 1993); *see also Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003). The Federal Circuit has made clear that, the issue of indefiniteness "is amenable to resolution by the jury where the issues are factual in nature." *BJ Servs. Co. v. Halliburton Energy Servs., Inc*., 338 F.3d 1368, 1371-72 (Fed. Cir. 2003).

## IV. ADDITIONAL AFFIRMATIVE DEFENSES

### A. STATEMENT OF ISSUES

- Whether Defendants obtained intervening rights as a result of the modifications made to the claims of the '949 Patent during reexamination?

### B. INTERVENING RIGHTS

"Intervening rights" is a statutory defense that is set forth in the second paragraph of 35 U.S.C.

§ 252, which provides in part:

> A reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such things infringes a valid claim of the reissued patent which was in the original patent.

Pursuant to 35 U.S.C. § 307(b), this defense also applies to reexamined patents.  D&M's

defenses are based on a theory of "absolute" intervening rights.  Absolute intervening rights protect

the right of an infringer of a reexamined patent to use or sell specific things which were made,

purchased or used before the grant of the reissue patent. *See Marine Polymer Techs., Inc. v.

HemCon, Inc.,* 672 F.3d 1350, 1362 (Fed. Cir. 2012).  These intervening rights must be recognized

where the accused product or activity infringes a claim that existed in the original patent and

remains "without substantive change" after reexamination. *Id.*

Whether the scope of a reissued claim is identical to the scope of the original claim is a

question of law. *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 741 (Fed. Cir. 1993).  "Without

substantive change" means that the scope of the claim, and not the words used, must be identical.

*Id.*  In determining whether the scope of the original and reexamined claims is identical, a court

must consider the particular facts, the prior art, the prosecution history, the references that

occasioned the reexamination and any other relevant information. *See Laitram Corp. v. NEC

Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998).

Both apparatus and method claims are subject to absolute intervening rights.  *See, e.g.*,

*MonoSol Rx, LLC v. Biodelivery Scis. Int'l, Inc.*, No. CIV. 10-5695 FLW/DEA, 2015 WL 5679891,

at *17 (D.N.J. Sept. 25, 2015).  Intervening rights must extend not only to products that are asserted

to infringe a modified product claim, but also to processes that were used to make those specific

products, if those processes are asserted to infringe a modified process claim. *See* D.I. 428 at 7.

This analysis may be conducted based on a plain reading of the claims. *Id. at* 1348. The Federal Circuit has further held that amendments made to overcome a prior art rejection during reexamination are "a highly influential piece of prosecution history," and that it "is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment . . . ." *Id.*

## V.  DAMAGES

### A.  STATEMENT OF ISSUES

- Assuming that the Asserted Patents are valid and infringed, whether Sonos is entitled to lost profits damages?

- Assuming that the Asserted Patents are valid and infringed, the appropriate calculation of reasonable royalty damages owed to Sonos?

- Assuming that the Asserted Patents are valid and infringed, the amount of damages owed to Sonos?

- Assuming that the Asserted Patents are valid, infringed, whether Sonos is entitled to prejudgment interest, postjudgment interest, or costs?

- Assuming that the Asserted Patents are valid, infringed, whether Sonos is entitled to attorneys' fees?

### B.  LOST PROFITS

To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits. *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999).  Simply because a patentee is entitled to "full compensation" for the alleged infringement does not entitle the patentee to lost profits in the absence of "but for" causation. *Id.* at 1352-53.  When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement. *Id.*  Once the patent owner establishes a reasonable

probability of "but for" causation, "the burden then shifts to the accused infringer to show that the patent owner's "but for" causation claim is unreasonable for some or all of the lost sales. *Id.*

Apportionment to the value of the patented feature is required even for non-royalty forms of damages. *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product. *Id.* "Under the entire market value rule applicable to lost profits awards, a patentee must prove the invention in suit created consumer demand for the patented and infringing products." *Rite-Hite Corp, Inc. v. Kelley Co.,* 56 F.3d 1538, 1557(Fed. Cir. 1995).

Under some circumstances, the following factors are relevant for assessing lost profits: (1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made. *Rite-Hite,* 56 F.3d at 1545  (en banc) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

The first factor—demand for the patented product—considers demand for the product as a whole. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330–31 (Fed. Cir. 2009).  The second factor—the absence of non-infringing alternatives—considers demand for particular limitations or features of the claimed invention. *Id.* at 1331. Together, these two factors requiring patentees to prove (a) demand for the product as a whole and (b) the absence of non-infringing alternatives, must tie lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012) ("[P]roducts lacking the

advantages of the patented invention can hardly be termed a substitute acceptable to the customer who wants those advantages." (quotations omitted)); *Grain Processing*, 185 F.3d at 1354), (holding that customers would have found a particular claim limitation "irrelevant," so the patentee could not rely on that limitation for the second *Panduit* factor).

Under the second factor, if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017) (emphasis added). For example, if the customer would have bought the infringing product without the patented feature or with a different, non-infringing alternative to the patented feature, then the patentee cannot establish entitlement to lost profits for that particular sale. *Id.* And this determination is made on a customer-by-customer basis. *Id.*

The availability of non-infringing alternatives affects the scope of the relevant market for which a lost profits analysis is based. *See Grain Processing.*, 185 F.3d at 1356. The patentee must present reliable economic proof of the market that establishes an accurate context to project the likely results "but for" infringement. *Id.* The availability of substitutes invariably will influence the market forces defining this "but for" marketplace. *Id.* A substitute need not be openly on sale to exert its influence. *Id.* An acceptable substitute not on the market during infringement may nonetheless become part of the lost profits calculus and therefore limit or preclude those damages. *Id.*

With multi-component products, it may often be the case that no one patentee can obtain lost profits on the overall product. *Id.* at 1289. A patentee cannot obtain lost profits unless it and only it could have made the sale—there are no non-infringing alternatives or, put differently, the customer would not have purchased the product without the infringing feature. *Id.*

### C.  REASONABLE ROYALTY

If a patent is proven infringed and valid, then a patentee is entitled to no less than a reasonable royalty.  35 U.S.C. § 284.  The patentee must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented features and the unpatented features or show that the entire  value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *see also Helios Software, LLC v. SpectorSoft Corp.*, No. CV 12-081-LPS, 2014 WL 4796111, at *5 (D. Del. Sept. 18, 2014), *modified in part on other grounds*, No. CV 12-081-LPS, 2015 WL 3622399, (D. Del. June 5, 2015).  Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product. *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

Generally, royalties must be based upon the "smallest salable unit."  The only exception to the apportionment requirement is evidence demonstrating that the entire market value of the accused product is properly and legally attributable to the patented feature.  *Helios Software,* 2014 WL 4796111, at *6 (citing *Uniloc*, 632 F.3d at 1318).  In other words, patentees must apportion the royalty down to a reasonable estimate of the value of its claimed technology, or else establish that its patented technology drove demand for the entire product.  *Virnetx, Inc. v. Cisco Sys., Inc.,* 767 F.3d 1308, 1329 (Fed. Cir. 2014).

The entire market value rule allows calculation of damages based on the value of an entire apparatus containing several features, when the patent-related feature is the basis for customer demand.  *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380

(Fed. Cir. 2005).  The "entire market value" rule requires a higher degree of proof that the presence of the patented functionality is what motivates consumers to buy the accused product in the first place." *Helios Software*, 2014 WL 4796111, at *6 (citing *LaserDynamics*, 694 F.3d at 68).  It is not enough to merely show that the patented feature is viewed as valuable, important, or even essential. Proof that consumers would not want the accused product as a whole without its many features is not tantamount to proof that any one of those features alone drives the market for the accused product.  *LaserDynamics*, 694 F.3d at 68.

### D.  PREJUDGMENT INTEREST, POSTJUDGMENT INTEREST, AND COSTS

"Prejudgment interest is awarded to compensate for the delay in payment of the damages, and not to punish the infringer." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed. Cir. 1983). Although prejudgment interested "should ordinarily be awarded," the Court has discretion to limit, or deny entirely, prejudgment interest where appropriate. *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-57 (1983). "For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Id.* at 657; *see also Crystal Semiconductor Corp. (need full cite here)*, 246 F.3d at 1362 ("[T]he district court acted within its discretion in denying Crystal prejudgment interest."). "[P]rejudgment interest cannot be awarded on the punitive or enhanced portion of a damages award." *Underwater Devices Inc. v. Morrison- Knudsen Co.*, 717 F.2d 1380, 1389 (Fed. Cir. 1983), *overruled on other grounds by In re Seagate Tech.*, LLC, 497 F.3d 1360 (Fed. Cir. 2007); *Lam*, 718 F.2d at 1066. The applicable interest rate is left to the discretion of the Court; however, in exercising its discretion, the Court "must be guided by the purpose of prejudgment interest, which is 'to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.'"

*Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986) (quoting *Gen. Motors*, 461 U.S. at 654). "Postjudgment interest is awarded on monetary judgments recovered in all civil cases." *Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1347 (Fed. Cir. 1999). Pursuant to 28 U.S.C. § 1961, interest shall be computed daily to the date of payment and shall be compounded annually.

Federal Rule of Civil Procedure 54(d) states that "costs should be allowed to the prevailing party." Under 28 U.S.C. § 1920, the prevailing party may recover the following costs: (1) fees of the clerk and marshal; (2) fees for printed or electronically recorded transcripts necessarily obtained for use in this case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) docket fees under 28 U.S.C. § 1923; and (6) compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under 28 U.S.C. § 1828. See also D. Del. LR 54.1.

### E.   ATTORNEY'S FEES

35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." In *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, the Supreme Court construed the text of 35 U.S.C. § 285 and rejected the prevailing framework for evaluating whether a case is "exceptional" under Section 285 as unduly restrictive. 134 S. Ct. 1749, 1755 (2014). The Court held that, in accordance with its ordinary meaning, an "'exceptional' case is simply one that stands out from others with respect to the substantive straight of a party's litigating position . . . or the unreasonable manner in which the case was litigated," to be determined at the district court's discretion under the totality of the circumstances based on a preponderance of the evidence. Id. at 1756, 1758.

The Court in *Octane Fitness* also rejected the litigation misconduct portion of the previous standard as too restrictive because "sanctionable conduct is not the appropriate benchmark." *Id.* at 1756. Rather, a district court may award fees in the rare case in which a party's unreasonable conduct is "exceptional" enough to justify an award of fees for conduct that may not be independently sanctionable. *Id.* at 1757. "[A] district court may award minimal or no fees after considering the amount of success to the prevailing party." *SSL Servs. LLC v. Citrix Sys. Inc.*, 769 F.3d 1073, 1087 (Fed. Cir 2014).

## VI.   INJUNCTIVE RELIEF

### A.   ISSUES TO BE LITIGATED

- In the event the Asserted Claims are found infringed and not invalid, whether Sonos is entitled to injunction relief.

### B.   AN EXTRAORDINARY REMEDY

A permanent injunction is an extraordinary remedy. *Nken v. Holder*, 556 U.S. 418, 428 (2009); *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941). A successful plaintiff is not entitled to injunctive relief as a matter of course, but must make a showing that the circumstances require the Court to enter an injunction. *Salazar v. Buono*, 559 U.S. 700, 714 (2010); *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-38 (1933). "An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)).

The U.S. Supreme Court has set forth a four-factor test to determine whether the remedy on an injunction is warranted in a particular case. Specifically, the plaintiff bears the burden of showing:

1. that plaintiff has suffered an irreparable injury;

2. that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury;

3. that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

4. that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 861 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011).

Further, although "[t]he essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent," *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008), the Supreme Court in *eBay* made it clear that the statutory right to exclude under patent law does not justify a general rule favoring injunctions in patent cases. *eBay*, 547 U.S. at 392.

A district court's decision to grant or deny an injunction is discretionary and depends on the facts of each case. *See Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1002 (Fed. Cir. 1986); *Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 966 (N.D. Cal. 2009) ("a court must structure injunctive relief based on each case's granular facts"). Accordingly, the specific facts of each particular case are highly significant to the Court's decision on whether to grant an injunction.

a) ***eBay* Factor #1 – Irreparable Injury**

"To satisfy the first *eBay* factor, the patentee must show that it is irreparably harmed by the infringement." *Apple Inc. v. Samsung Elecs. Co.,* 809 F.3d 633, 639 (Fed. Cir. 2015).

(i) *"Causal Nexus" Test*

"This [factor] requires proof that a 'causal nexus relates the alleged harm to the alleged infringement.'" *Id.* "This just means that there must be proof that the infringement causes the harm." *Id.*

As the Federal Circuit has stated:

> We hold that the district court was correct to require a showing of some causal nexus between Samsung's infringement and the alleged harm to Apple as part of the showing of irreparable harm. To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. Sales lost to an infringing product cannot irreparably harm a patentee if consumers buy that product for reasons other than the patented feature. If the patented feature does not drive the demand for the product, sales would be lost even if the offending feature were absent from the accused product. Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct. *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1329 (Fed. Cir. 2008) (explaining that "the district court did not clearly err in finding that [the plaintiff] failed to show that [defendant's] infringement caused *him* irreparable injury") (emphasis in original).
> . . .
> [W]e conclude that the district court was correct to require a nexus between infringement of the patent and some market-based injury, be it as a result of consumer preference or some other kind of causal link. Absent such a showing, Apple cannot establish a likelihood of irreparable harm necessary for a preliminary injunction.

*Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1324, 1327 (Fed. Cir. 2012).

**(ii)** *Considerations*

**Direct Competition**. "Courts . . . have frequently focused upon the nature of the competition between plaintiff and defendant in the relevant market in the context of evaluating irreparable harm and the adequacy of money damages." *INVISTA N. Am. S.a.r.l. v. M&G USA Corp.*, 35 F. Supp. 3d 583, 608 (D. Del. 2014) (citing *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 531 (D. Del. 2008)). Indeed, the plaintiff's status as a competitor or non-competitor of the defendant weighs heavily in the court's determination whether to grant injunctive relief. "Where two companies are in competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." *Douglas Dynamics, LLC v. Buyers Prods. Co.,* 717 F.3d 1336, 1345 (Fed. Cir. 2013); *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 558 (D. Del. 2008) ("Courts awarding permanent injunctions typically do so under

41

circumstances where plaintiff practices its invention and is a direct market competitor.").

"Courts awarding permanent injunctions typically do so under circumstances in which the plaintiff practices its invention and is a direct market competitor." *INVISTA*, 35 F. Supp. 3d at 608 (citations omitted). "Plaintiffs also frequently succeed when their patented technology is at the core of their business, and/or where the market for the patented technology is volatile or still developing." *Id*. (citations omitted).

However, this Court has stated that minimal loss in plaintiff's market share is insufficient to warrant an injunction:

> A mere showing that Apple might lose some insubstantial market share as a result of Samsung's infringement is not enough. As the Supreme Court has pointed out, a party seeking injunctive relief must make "a clear showing" that it is at risk of irreparable harm, [*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)], which entails showing "a likelihood of substantial and immediate irreparable injury," *O'Shea v. Littleton*, 414 U.S. 488, 502 [ ] (1974). *See Weinberger*, 456 U.S. at 311 (holding that an injunction should not issue as a matter of course for irreparable harm that is "merely trifling").

*Apple*, 678 F.3d at 1324. *See also IGT v. Bally Gaming Int'l., Inc.*, 675 F. Supp. 2d 487, 489-93 (D. Del. 2009) (finding that while the parties appeared to be competitors, there was insufficient evidence, including no evidence of specific market percentages and other information, and thus denying injunction); *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 311 (1982) (holding that an injunction should not issue as a matter of course for irreparable harm that is "merely trifling").

### (iii)   *Injunction Cannot Be Used For Leverage*

It is not a permissible reason for a court to issue an injunction based on the plaintiff claiming that loss of negotiating power without an injunction is in irreparable injury. *See eBay*, 547 U.S. at 396 (Kennedy, J., concurring) (an injunction is not meant to be employed "as a bargaining tool to charge exorbitant fees" or to allow for "undue leverage in negotiations"); *Foster v. Am. Mach. & Foundry Co.*, 492 F.2d 1317, 1324 (2d Cir. 1974) (an injunction "is not intended

as a club to be wielded by a patentee to enhance his negotiating stance"); *Hynix Semiconductor*, 609 F. Supp. 2d at 983 n.29 (denying injunction where patentee's "motivation in seeking an injunction is less about preventing irreparable harm and more about extracting punishment or leverage in negotiating with" infringer); *MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 582 (E.D. Va. 2007) ("Utilization of a ruling in equity as a bargaining chip suggests both that such party never deserved a ruling in equity and that money is all that such party truly seeks, rendering monetary damages an adequate remedy in the first instance."); *Ricoh*, 2010 WL 1607908, at *4 (denying injunction where it "would [not] serve any purpose other than to increase [patentee's] leverage in negotiations for a higher licensing fee").

### (iv) *Plaintiff's Litigation Costs*

The plaintiff's litigation costs do not support alleged irreparable harm. "Litigation costs are undoubtedly undesirable and may take funds away from other endeavors, but they are not an irreparable harm in the injunction calculus." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1337 (Fed. Cir. 2012) (citing *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1381 n. 8 (Fed. Cir. 2008) ("If litigation costs were a factor, injunctive relief would be warranted in every litigated patent case.").

### b) *eBay* Factor #2 – Availability of Adequate Remedies at Law

The first two *eBay* factors are often assessed together. *See ActiveVideo*, 694 F.3d at 1337 ("[T]he issues of irreparable harm and adequacy of remedies at law are inextricably intertwined."); *Acumed*, 551 F.3d at 1327 (treating "the first two factors, irreparable harm and lack of an adequate remedy at law, in connection with each other"); *MercExchange,* 500 F. Supp. 2d at 569 n.11 ("The irreparable harm inquiry and remedy at law inquiry are essentially two sides of the same coin . . . .").

Monetary damages are inadequate to compensate a plaintiff where the plaintiff would be forced to compete against a rival gaining market share with plaintiff's technology. *See E.I. Dupont De Nemours*, 2017 U.S. Dist. LEXIS 146949 at *4-5 (citing *Douglas*, 717 F.3d at 1345) ("[M]ere damages will not compensate for a competitor's increasing share of the market, a market which [the plaintiff] competes in, and a market that [the plaintiff] has in part created with its investment in patented technology."). Moreover, at least in the *E.I. Dupont De Nemours* case, the Delaware court found that a monetary royalty to obviate an injunction would have to be greater than or equal to plaintiff's profit margin. *Id.*

### c) *eBay* Factor #3 – Balance of Hardships

This factor entails assessing the respective hardships that the grant or denial of an injunction would visit on the respective parties. To the extent that monetary relief is deemed adequate to compensate the plaintiff for any future injury it is likely to suffer largely indicates that denial of an injunction would not work any undue hardship on the plaintiff with respect to its entitlement to meaningful and complete relief on its claim. *See ActiveVideo*, 694 F.3d at 1341 ("It is certainly true that ActiveVideo would suffer substantial hardship if it was not compensated for Verizon's infringement. But there is no evidence that an injunction is necessary to avoid hardship to ActiveVideo."); *XpertUniverse v. Cisco Sys., Inc.*, 2013 WL 6118447, *13 (D. Del. Nov. 20, 2013) ("As explained in the context of [the patentee's] claim of irreparable injury, [the patentee] has not shown that it would substantially benefit from an injunction, nor that it would suffer additional harm without one."); *Soverain Software LLC v. Newegg Inc.*, 836 F. Supp. 2d 462, 482 (E.D. Tex. 2010) ("Because Soverain has not shown irreparable harm in the absence of a permanent injunction, any harm Soverain might suffer can be adequately remedied through the recovery of monetary damages . . . .").

This factor weighs against the grant of an injunction where the injunction would have substantial adverse effect on a defendant's business. *See CardSoft, Inc. v. VeriFone Holdings, Inc.*, 2013 WL 5862762, at *1 (E.D. Tex. Oct. 30, 2013) ("The Court finds that the cost and burden associated with switching Defendants' customers to non-infringing systems weighs against granting a permanent injunction."); *VirnetX Inc. v. Apple Inc.*, 925 F. Supp. 2d 816, 846-47 (E.D. Tex. 2013) (Apple "bears a considerable burden to comply with the proposed injunction . . . . [A]n injunction would not only harm Apple, but also its customers and other third parties."); *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 854 (E.D. Tex. 2012) ("Fractus's requested injunction will severely hamper Samsung's cell phone business, but most importantly, it will significantly disrupt related third-party businesses such as Samsung's suppliers and customers."); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2010 WL 2574059, at *3 (E.D. Tex. June 22, 2010) ("[A]n injunction would not only interrupt [defendant's] business but also that of related businesses, including suppliers and customers of [the defendant].").

To the extent a plaintiff claims that an adjudged infringer should not be heard to complain if a sought injunction would destroy the infringer's business, courts have found that "[t]aken to its logical limits, that proposition would effectively preempt consideration of the 'balance of hardships' factor in any case in which infringement [ ] has been found." *Sabatino Bianco v. Globus Medical, Inc.*, 2014 U.S. Dist. LEXIS 35256, *35-36 (E.D. Tex. Mar. 17, 2014). Recognizing that point, the Federal Circuit has stated that consideration of a judgement against the infringer "does not overcome the equities of a case." *Standard Havens Prods. v. Gencor Indus.*, 897 F.2d 511, 515 (Fed. Cir. 1990); *see Hynix Semiconductor*, 609 F. Supp. 2d at 970 (stating that to ignore the harm to the infringer because arguably "it cannot be heard to complain" runs contrary to *eBay*'s mandate to "consider[] the balance of hardships between the plaintiff and defendant.") (citation omitted).

However, a party "should not be permitted to prevail on a theory that 'successful exploitation of infringing technology shields [that] party from injunctive relief,'" *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008), and thus that successful exploitation of an infringing product does not itself justify freeing the infringer from the burden of an injunction. *See i4i Ltd. P'ship*, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief. [The defendant] is not entitled to continue infringing simply because it successfully exploited its infringement.") (citations omitted).

### d) *eBay* Factor #4 – Public Interest

The final *eBay* factor asks whether "the public interest would not be disserved by a permanent injunction." *eBay*, 547 U.S. at 391. Although the heart of the patent grant is the right to exclude, *see* 35 U.S.C. § 154(a)(1) ("Every patent shall contain . . . a grant to the patentee . . . of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States."), and enforcing the right to exclude serves the public interest, the public interest factor requires consideration of other aspects of the public interest. *See ActiveVideo*, 694 F.3d at 1341 (citing 7 Donald A. Chisum, *Chisum on Patents* § 20.04[2][c][vii] (2009) ("The proper question on the public interest should be: will an injunction harm a specific public interest that outweighs the public's interest in a robust patent system?") (internal citations and quotation marks omitted)).

# SCHEDULE D1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>SONOS'S LIST OF WITNESSES</u>**

Plaintiff Sonos, Inc. ("Sonos") respectfully submits this list of witnesses that it may call to testify at trial either in person or by deposition during Sonos's case-in-chief, in support of the issues on which Sonos bears the burden of proof.

Sonos reserves the right to call rebuttal witnesses who are not listed below to testify at trial either in person or by deposition in response to the testimony offered by Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M") and/or with respect to any defenses or issues on which D&M bears the burden of proof.

Sonos further reserves the right to call additional witnesses to testify at trial either in person or by deposition to provide foundation testimony should any party contest the authenticity or admissibility of any material proffered at trial. After the parties exchange objections to such materials, Sonos will address this issue with D&M and/or the Court, and will provide notice of any additional witnesses it will or may call to establish the authenticity and admissibility of materials to be proffered at trial.

Sonos's list of potential witnesses for its case-in-chief is made to comply with the Court's Order and the parties' agreements and to preserve its rights, based on the present status of the case.  The parties will exchange objections and motions in *limine* and otherwise present to the Court disputes regarding the issues and evidence to be presented to the jury and the relevancy and admissibility of certain testimony and exhibits. Sonos's list of potential witnesses does not waive Sonos's right to object to certain categories of evidence as irrelevant or otherwise inadmissible, and does not waive its right to pursue motions in *limine*.  Until the Court addresses and rules on such disputes, Sonos reserves its rights to make final decisions regarding what witnesses to call, and what exhibits to proffer.  The inclusion of a witness on Sonos's list of

potential witnesses does not represent or otherwise require that Sonos call that witness to testify, does not constitute a representation that Sonos will bring an identified potential witness to trial, and does not mean that Sonos has the power to compel the attendance or live testimony of that potential witness.

Sonos's listing of potential witnesses and designations of deposition testimony for its case-in-chief is also made based on Sonos's present understanding of the trial date, the availability of potential witnesses, and the issues.  In the event that an individual whom Sonos identified as a potential witness is not available for trial or otherwise cannot testify in person, Sonos may designate a replacement witness to testify either in person or by deposition, and will provide reasonable notice to D&M.

After the parties complete their pretrial exchanges and the Court rules on motions or other disputes that are presented during pretrial, Sonos reserves the right to further clarify the witness it will call and whether the respective witnesses will provide their testimony in person or by deposition.

Subject to the foregoing, Sonos's current list of witnesses that it may call to testify at trial either in person or by deposition during Sonos's case-in-chief is set forth below.

## I.      WITNESSES THAT SONOS WILL OR MAY CALL IN PERSON

Sonos's current list of witnesses that it will or may call to testify in person at trial during Sonos's case-in-chief is as follows:

1.      Andrew Schulert

2.      Nicholas Millington

3.      Robert Lambourne

4.      Michael Papish

5.    David Feick

6.    Thomas Cullen

7.    Dr. Kevin C. Almeroth

8.    Michael E. Tate

9.    Dr. Andrew Wolfe

## II.    WITNESSES THAT SONOS LIKELY WILL NOT CALL IN PERSON

Sonos's current list of witnesses that it likely will not call to testify at trial during Sonos's case-in-chief is as follows:

1.    Jonathan Lang

2.    Michael Groeninger

3.    Jon Cotter

4.    Tad Coburn

5.    Christopher Kallai

## III.    WITNESSES THAT SONOS WILL OR MAY CALL BY DEPOSITION

Sonos's current list of witnesses that it will or may call to testify by deposition at trial during Sonos's case-in-chief is as follows:

1.    Brendan Stead

2.    Evan Stuart-Muirk

3.    Peter Celinski

4.    Christopher Commons

5.    Satoshi Fukuzuka

6.    Martin Wachter

7.    Kevin Zarrow

8.    Nicholas Murrells

9.    Samuel Baxter

In the event that D&M calls any of the above witnesses to testify in person at trial, Sonos also reserves the right to question any of the above witnesses fully in person at trial, and to call such witnesses in person at trial during Sonos's rebuttal case.

## IV.    WITNESSES CALLED BY D&M

Sonos reserves the right to call live or by deposition any of the witnesses that D&M calls live or by deposition.

# SCHEDULE D2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. 14-1330 (RGA) |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| D&M HOLDINGS INC. d/b/a THE | § | |
| D+M GROUP, D&M HOLDINGS U.S. | § | |
| INC., and DENON ELECTRONICS | § | |
| (USA), LLC, | § | |
| | § | |
| Defendants. | § | |

## <u>DEFENDANTS' TRIAL WITNESS LIST</u>

Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and

Denon Electronics (USA), LLC (collectively, "Defendants"), pursuant to the Court's Scheduling

Order (Dkt No. 65), issued on August 25, 2015, serve this Witness List for identification and

categorization of trial witnesses.

Defendants make no representation that each or any of the witnesses on this list will

ultimately be able to attend trial. Defendants have made its designation of live witnesses based

on Defendants' good faith belief as to which witnesses will be able to attend. Defendants do not

know the precise nature or scope of the testimony and evidence that Sonos may seek to present at

trial.  As such, Defendants reserve the right to modify, amend or supplement this list throughout

the trial based on case developments, including but not limited to the right (1) to call some of the

witnesses listed, (2) call, live or by deposition as its witness at trial, any witness identified on

Sonos's witness lists, and any witnesses necessary to authenticate or lay the foundation for the

introduction of documents to which Sonos objects (including but not limited to custodian of

records or authors of prior art), (3) add additional witnesses to testify live or by deposition (4)

introduce deposition testimony as impeachment evidence, or (5) change a witness from a live

witness to a witness testifying by deposition, and vice versa. Defendants also reserve the right to supplement or modify this list in response to rulings by the Court (including on any motions). Defendants include in this list individuals who may be listed on Sonos's witness list without prejudice to its right to object to Sonos's presentation of those witnesses at trial, the admissibility of all or part of those witnesses' testimony, or Defendants' right to move for the exclusion of those witnesses' testimony.

At this time, Defendants identify the following witnesses for trial:

| WITNESS | LIVE OR BY VIDEO _____ WILL CALL (WC)/ MAY CALL  (MC)/ LIKELY WILL NOT CALL (LWNC) |
|---|---|
| John Bone<br>Stout Risius Ross, Inc.<br>1100 Connecticut Avenue, N.W.,<br>Suite 825<br>Washington, DC 20036<br>(Contact through Defendant's Counsel Only) | WC – live |
| Jay Kesan<br>2709 Windward Blvd.<br>Champaign, IL 61821<br>(Contact through Defendant's Counsel Only) | WC – live |
| Harry Bims<br>1314 Chilco Street<br>Menlo Park, CA 94025<br>(Contact through Defendant's Counsel Only) | WC – live |
| Brendon Stead<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | WC - live |
| Evan Stuart-Muirk<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | MC – live or by deposition |

| WITNESS | LIVE OR BY VIDEO<br>_____<br>WILL CALL (WC)/<br>MAY CALL  (MC)/<br>LIKELY WILL NOT<br>CALL (LWNC) |
|---|---|
| Peter Celinski<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | WC - live |
| Christopher Commons<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | WC - live |
| Satoshi Fukuzuka<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | MC – live or by deposition |
| Kevin Zarow<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | MC – live or by deposition |
| Nick Murrells<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | MC – live or by deposition |
| Samuel Baxter<br>100 Corporate Drive<br>Mahwah, N.J. 07430-2041<br>(Contact through Defendant's Counsel Only) | MC – live or by deposition |
| Martin Wachter<br>(Contact through Defendant's Counsel Only) | MC – live or by deposition |
| Mike Groeninger<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |
| Nick Millington<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | WC – live or by deposition |

| WITNESS | LIVE OR BY VIDEO<br>———————<br>WILL CALL (WC)/<br>MAY CALL (MC)/<br>LIKELY WILL NOT<br>CALL (LWNC) |
|---|---|
| Tom Cullen<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | WC – live or by deposition |
| Robert Lambourne<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |
| Jonathan Lang<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |
| Christopher Kallai<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |
| Michael Papish<br>614 Chapala Street<br>Santa Barbara, CA 93101<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |
| Tim Sheen<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |
| Gang Song<br>(Contact through Plaintiff's Counsel Only) | MC - live or by deposition |
| Steve Hambling<br>(Contact through Plaintiff's Counsel Only) | MC - live or by deposition |
| Cullen Harwood<br>(Contact through Plaintiff's Counsel Only) | MC - live or by deposition |
| Benjamin Rappaport<br>(Contact through Plaintiff's Counsel Only) | MC - live or by deposition |
| John Cotter<br>(Contact through Plaintiff's Counsel Only) | MC – live or by deposition |

**DEFENDANTS TRIAL WITNESS LIST—PAGE 4**

| WITNESS | LIVE OR BY VIDEO _____ WILL CALL (WC)/ MAY CALL  (MC)/ LIKELY WILL NOT CALL (LWNC) |
|---|---|
| David Feick (Contact through Plaintiff's Counsel Only) | MC – Live or by deposition |
| Tad Coburn (Contact through Plaintiff's Counsel Only) | MC – Live or by deposition |

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ John M. Jackson*
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

OF COUNSEL:

Robert P. Latham
John M. Jackson
Matthew C. Acosta
Blake T. Dietrich
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000

*Attorneys for D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc. and Denon Electronics (USA), LLC*

David Folsom
JACKSON WALKER L.L.P.
6002 Summerfield, Suite B
Texarkana, TX 75503
(903) 255-3250

Wasif Qureshi
JACKSON WALKER LLP
1401 McKinney, Ste. 1900
Houston, Texas 77010
(713) 752-4521
wqureshi@jw.com

## CERTIFICATE OF SERVICE

I certify that I caused copies of the foregoing document to be served on October 17, 2017,

upon the following in the manner indicated:

Philip A. Rovner, Esquire                                          *VIA ELECTRONIC MAIL*
Jonathan A. Choa, Esquire
POTTER ANDERSON &CORROON LLP
Hercules Plaza
Wilmington, DE 19801

George I. Lee, Esquire                                            *VIA ELECTRONIC MAIL*
Sean M. Sullivan, Esquire
Rory P. Shea, Esquire
John Dan Smith III, Esquire
Michael P. Boyea, Esquire
Jae Pak
LEE SULLIVAN SHEA &SMITH LLP
224 North Desplaines Street, Suite 250
Chicago, IL 60661

*Attorneys for Plaintiff*

/s/ John M. Jackson
John M. Jackson

**DEFENDANTS TRIAL WITNESS LIST—PAGE 7**

# SCHEDULE E1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE D+M GROUP, D&M HOLDINGS U.S. INC., and DENON ELECTRONICS (USA), LLC, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OBJECTIONS TO PLAINTIFF'S TRIAL DEPOSITION DESIGNATIONS**

Attached please find Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "Defendants") objections to the revised deposition designations that Plaintiff identified on November 8, 2017. Objections are stated in the chart, according to the following key. In addition to the objections listed in the chart below, Defendants object to the designation of attorney objections during the deposition. Defendants further objects to the inclusion of attorney objections within deposition video clips played at trial and requests that objectiosn be removed from all video testimony to the extent technically feasible.

**OBJECTION KEY**

| CODE | OBJECTION | FRE |
|---|---|---|
| A | Argumentative | 611(a) |

| ATTY | Attorney objections/colloquy not removed | 402, 403 |
|------|------------------------------------------|----------|
| C | Compound | 611(a) |
| 604 | Lacks Proper Interpreter | 604 |
| 608 | Improper Character Evidence | 608 |
| D | Duplicative/asked and answered | 611(a) (also 403) |
| EO | Improper expert opinion testimony | 702/703 |
| EX | Exhibit not listed on Plaintiffs' exhibit list | |
| H | Hearsay | 801/802/805 |
| I | Improper Impeachment | 613(a) |
| IN | Incomplete designation (cut off question or answer) | 106 |
| L | Leading | 611(c) |
| LC | Calls for legal conclusion | 611(a) |
| BE | Best Evidence – Improper Description of Writing Contents | 1002 |

| AF | Assumes facts not in evidence; | 611(a) |
|---|---|---|
| EQ | Lack of expert qualifications; | 702 |
| IH | Improper hypothetical | 611(a) |
| ME | Mischaracterized evidence (e.g. – testimony, docs) | 601, 602 |
| PK | No showing of personal knowledge | 601, 602 |
| LO | Improper lay opinion testimony | 701 |
| MIL | Subject to motion in limine | |
| N | Non-responsive | 611 (a) |
| NA | Calls for narrative | 611 (a) |
| P | Privilege | 501 |
| Scope | Testimony by 30(b)(6) designee outside of scope of topics | FRCP 30(b)(6) |
| R | Relevance | 401/402 |
| S | Speculation/lacks personal knowledge | 602 |
| V | Vague & ambiguous | 611 (a) |

| | | |
|---|---|---|
| 403 | Overly prejudicial, confusing, misleading, or cumulative | 403 |
| 404 | Other crimes, wrongs, or acts /improper character evidence | 404 |

**Sonos's Objections to D&M's Counter-Designations**

| Code | Objection |
|------|-----------|
| 402 | **Not Relevant** – Sonos objects to this deposition designation because the testimony is not relevant to any fact of consequence in this action. FRE 401-402. |
| 403 | **Prejudice Outweighs Probative Value** – Sonos objects to this deposition designation because the testimony's probative value is substantially outweighed by a risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and/or needlessly presenting cumulative evidence. FRE 403. |
| 408 | **Compromise and Offers to Compromise** – Sonos objects to this deposition designation because it constitutes or contains alleged statements made during compromise negotiations. FRE 408. |
| 602 | **Lack of Foundation/Personal Knowledge** – Sonos objects to this deposition designation because the foundation necessary for its admission was not established by defendants and/or the deponent testified that he/she lacked personal knowledge of the subjects. FRE 602. |
| BSD | **Beyond the Scope of Opening Designation** – Sonos objects to this deposition designation because it is beyond the scope of Sonos's opening designation. FRE 403, 611. |
| CM | **Cumulative** – Sonos objects to this deposition designation because it is duplicative and/or cumulative of other designations.  FRE 611. |
| H | **Hearsay** – Sonos objects to this deposition designation because the testimony constitutes or contains hearsay. FRE 801-802. |
| IMP | **Improper Designation** – Sonos objects to this deposition designation because the designation improperly includes statements that are not evidence, such as cross communications between attorneys. FRE 601-603, 611 |
| INC | **Remainder of or Related Writings or Recorded Statements** – Sonos objects to this deposition designation because it is itself incomplete or the question asks the deponent to offer testimony on a document where the remainder of the document, or another document, should fairly be considered at the same time. FRE 106. |
| LO | **Lay Opinion** – Sonos objects to this deposition designation because it constitutes or contains an improper opinion by a lay witness. FRE 701-702. |
| MIL | **Subject to a motion *in limine* or agreement between the parties** – Sonos objects to this deposition designation because it falls within the scope of one or more of Sonos's pending motions *in limine* or within the scope of an agreement between the parties concerning motions *in limine*. |
| NR | **Non-Responsive Testimony** – Sonos objects to this deposition designation because it includes statement that are not response to the question that was asked.  FRE 611. |

*Denotes an apparent error in Defendants' designation; Sonos reserves the right to object to such a designation once corrected by Defendants.

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 30(b)(6) Deposition Testimony of Peter Celinski | | | |
| 007:16 - 007:18 | | | |
| 010:03 - 010:07 | Scope | | |
| 011:07 - 011:14 | Scope | | |
| 011:21 - 013:03 | Scope | 13:15-14:1 | - |
| 026:23 - 027:03 | | | |
| 030:13 - 030:18 | Scope | | |
| 036:06 - 036:09 | Scope | 36:10-36:13; 36:18-36:23; 39:4-39:19 | BSD; 402; 403 |
| 051:16 - 051:23 | | | |
| 052:04 - 052:07 | Scope | | |
| 052:24 - 053:05 | Scope | 54:4-54:6 | BSD; 402; 403 |
| 056:16 - 057:01 | | | |
| 057:10 - 057:15 | | | |
| 057:18 - 058:03 | | 66:4-66:23; 77:3-78:19; 78:25-79:16; 79:19-80:16; 81:14-81:19; 84:12-85:13; 85:19-87:5; 89:12-90:24; 100:6-100:20; 105:6-106:5; 106:8-106:9;  106:14-106:23; 107:1-107:4; 107:19-107:23; 112:18-113:12 | BSD; 402; 403; INC; IMP |
| 114:25 - 115:05 | 114:24-115:5 - Scope | 121:9-121:11 | BSD; 402; 403; INC |
| 127:03 - 127:24 | | | |
| 129:05 - 129:13 | | | |
| 129:20 - 129:23 | | | |
| 130:08 - 130:11 | | | |
| 130:19 - 130:21 | | | |
| 131:15 - 132:09 | | | |
| 132:18 - 132:23 | | | |
| 133:05 - 134:06 | | | |
| 139:18 - 140:06 | | | |
| 141:08 - 141:22 | | | |
| 143:13 - 143:19 | | 143:2-143:12 | NR |
| 143:21 - 144:23 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 145:05 - 145:11 | | | |
| 145:16 - 145:20 | | | |
| 147:25 - 148:09 | R | | |
| 151:14 - 152:03 | 151:23-152:03 - R | | |
| 152:05 - 152:11 | R | | |
| 152:21 - 153:01 | | | |
| 153:15 - 153:18 | | | |
| 154:03 - 154:17 | | | |
| 157:16 - 157:17 | R | | |
| 159:11 - 160:14 | | | |
| 161:02 - 161:12 | | | |
| 161:17 - 162:11 | | | |
| 163:06 - 163:12 | | | |
| 163:23 - 165:13 | | 167:24-168:8 | BSD; 402; 403; INC |
| 168:24 - 169:01 | | | |
| 169:03 - 171:24 | | | |
| 172:03 - 173:06 | | | |
| 174:07 - 174:14 | | | |
| 174:16 - 175:23 | | | |
| 176:09 - 176:23 | | | |
| 177:02 - 177:17 | | | |
| 178:07 - 183:06 | 181:9-181:181:18 - R/L/Scope | | |
| 183:17 - 183:21 | | | |
| 184:03 - 184:05 | Scope | 184:6-184:11 | - |
| 184:20 - 185:01 | Scope | | |
| 185:10 - 185:12 | Scope | | |
| 185:24 - 186:05 | Scope | 187:10-187:17; 187:24-188:10; 189:14-189:21 | BSD; 402; 403 |
| 190:07 - 190:23 | Scope | | |
| 191:01 - 191:05 | Scope | | |
| 191:12 - 191:22 | Scope | | |
| 192:01 - 192:06 | Scope | | |
| 192:15 - 193:06 | Scope | | |
| 193:09 - 193:21 | Scope | | |
| 195:06 - 195:08 | Scope | | |
| 196:06 - 196:15 | Scope | | |
| 197:06 - 198:15 | Scope | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 199:05 - 200:09 | Scope | | |
| 200:14 - 200:16 | Scope | | |
| 201:11 - 202:02 | Scope | | |
| 202:05 - 202:07 | Scope | | |
| 202:24 - 203:08 | Scope | | |
| 203:19 - 203:25 | Scope | | |
| 204:22 - 205:17 | Scope | | |
| 206:06 - 206:19 | 206:6-206:9 - R/Scope; 206:10-19 - Scope | | |
| 208:04 - 208:18 | Scope | | |
| 209:02 - 209:16 | Scope | | |
| 210:05 - 211:18 | Scope | | |
| 211:20 - 212:04 | Scope | | |
| 212:06 - 212:25 | 212:6-212:20 - Scope; 212:21-212:25 - R | | |
| 213:20 - 216:12 | Scope | | |
| 216:14 - 216:17 | Scope | | |
| 217:04 - 217:06 | Scope | | |
| 217:08 - 218:07 | 217:8-217:25 - Scope;    218:1-218:7 - A/I/L/Scope | | |
| 218:10 - 218:12 | A/I/L/Scope | | |
| 218:16 - 218:20 | A | | |
| 218:22 - 219:22 | A/Scope | | |
| 219:24 - 220:04 | Scope | | |
| 220:06 - 220:12 | Scope | | |
| 220:14 - 221:13 | Scope | | |
| 221:18 - 222:05 | Scope | | |
| 222:10 - 223:04 | Scope | | |
| 223:13 - 223:15 | Scope | | |
| 228:08 - 228:12 | Scope | | |
| 228:16 - 230:25 | 228:16-229:8 - Scope; 229:229:16 - Scope/403; 229:17-230:25 - Scope | | |
| 231:02 - 231:02 | Scope | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 231:14 - 231:23 | Scope/R/403/MIL | | |
| 232:18 - 233:03 | R/Scope/403/MIL | | |
| 233:08 - 233:17 | R/Scope/403/MIL | | |
| 233:19 - 233:24 | R/Scope/403/MIL | | |
| 235:07 - 235:12 | Scope | | |
| 235:14 - 235:15 | Scope | 235:17-235:19; 235:21-235:23 | LO |
| 238:02 - 238:25 | | | |
| 239:02 - 239:14 | | | |
| 239:25 - 240:02 | Scope/403/MIL | | |
| 240:05 - 241:07 | Scope/403/MIL | | |
| 242:06 - 242:14 | Scope/403/MIL | | |
| 242:21 - 243:05 | Scope | 249:6-249:15; 250:19-251:19; 252:4-252:19 | BSD; IMP; MIL; 402; 403 |
| **30(b)(6) Deposition Testimony of Satoshi Fukuzuka** | | | |
| 008:20 - 008:23 | | | |
| 011:07 - 012:01 | | | |
| 012:07 - 012:08 | | | |
| 012:22 - 013:02 | | | |
| 013:07 - 013:13 | | | |
| 013:15 - 013:15 | | | |
| 014:11 - 014:15 | | | |
| 014:20 - 014:23 | | | |
| 015:05 - 015:10 | | | |
| 015:12 - 015:13 | | 15:21-16:13 | - |
| 022:02 - 022:06 | | | |
| 022:18 - 022:20 | | 22:21-23:1 | - |
| 023:02 - 023:04 | | | |
| 023:09 - 023:24 | | | |
| 024:01 - 024:06 | | | |
| 024:10 - 024:11 | | | |
| 024:14 - 024:18 | 24:17-24:18 - IR/Scope | | |
| 024:21 - 025:02 | IR/Scope | 25:3-4; 25:7-25:8; 25:11-25:21; 25:23 | 403; BSD |
| 025:25 - 026:01 | IR/Scope | | |
| 026:03 - 026:16 | IR/Scope | | |
| 026:18 - 026:18 | IR/Scope | | |
| 026:25 - 027:11 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 027:13 - 027:14 | | | |
| 027:19 - 028:01 | | | |
| 028:03 - 028:05 | | | |
| 028:07 - 028:09 | | | |
| 028:11 - 028:13 | | | |
| 028:16 - 028:18 | | | |
| 029:25 - 030:05 | | | |
| 030:09 - 030:10 | | | |
| 031:01 - 031:04 | | | |
| 033:03 - 033:11 | | | |
| 034:15 - 035:01 | | | |
| 039:12 - 039:18 | | | |
| 039:20 - 040:02 | | | |
| 040:04 - 040:06 | | 40:22-41:3; 41:8-41:9; 41:11 | - |
| 040:12 - 040:14 | | | |
| 041:04 - 041:07 | | | |
| 041:13 - 041:22 | | | |
| 041:24 - 042:01 | | | |
| 042:08 - 042:11 | | | |
| 042:15 - 042:18 | | 42:19-42:21; 42:23-42:24 | - |
| 043:02 - 043:09 | | | |
| 043:14 - 043:16 | | | |
| 043:19 - 043:22 | | | |
| 044:19 - 045:07 | | 46:6-46:8 | BSD; INC; 403 29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 047:01 - 047:20 | | | |
| 048:03 - 048:05 | | | |
| 048:10 - 048:17 | | | |
| 048:21 - 049:07 | | | |
| 049:21 - 050:02 | | | |
| 050:06 - 050:08 | Scope | | |
| 050:10 - 050:19 | Scope | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 051:15 - 052:01 | Scope | 51:3-51:8 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 052:03 - 052:12 | Scope | | |
| 052:15 - 052:16 | Scope | | |
| 052:18 - 052:21 | Scope | 52:24-53:8;   53:10-53:14;   53:16-53:20 | BSD |
| 054:16 - 054:23 | Scope | | |
| 054:25 - 055:04 | Scope | | |
| 055:06 - 055:13 | Scope | | |
| 055:15 - 055:20 | Scope | | |
| 055:22 - 055:22 | Scope | 55:24-56:1;   56:3-56:5 | - |
| 056:07 - 056:09 | Scope | | |
| 056:11 - 056:17 | Scope | | |
| 057:03 - 057:06 | | | |
| 058:03 - 058:10 | Scope | | |
| 058:21 - 059:02 | Scope | | |
| 059:14 - 060:23 | 59:14-59:18 - Scope; 59:19-60:23 - Scope/IR/BE | | |
| 062:04 - 062:06 | Scope/IR | | |
| 063:15 - 064:02 | | | |
| 064:04 - 064:05 | | | |
| 064:12 - 064:18 | | | |
| 065:06 - 065:10 | Scope/PK/BE/IR | | |
| 065:17 - 065:19 | Scope/PK/BE/IR | | |
| 065:21 - 065:21 | Scope/PK/BE/IR | | |
| 067:03 - 067:11 | | | |
| 067:14 - 067:18 | | | |
| 067:21 - 068:14 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 068:17 - 068:25 | | 69:1-69:3; 69:5-6 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 069:08 - 069:13 | | | |
| 069:16 - 069:22 | | | |
| 069:24 - 069:24 | | | |
| 070:02 - 070:08 | | | |
| 070:20 - 071:11 | | | |
| 072:09 - 072:10 | | | |
| 072:12 - 072:12 | | | |
| 072:18 - 072:20 | BE/Scope/IR/PK | | |
| 073:09 - 073:22 | BE/Scope/IR/PK | | |
| 073:24 - 073:24 | BE/Scope/IR/PK | | |
| 074:02 - 074:06 | Scope/BE/PK/IR/403 | 74:7-74:11; 74:15-74:17; 74:19-74:21 | - |
| 075:21 - 076:02 | 75:21-76:1 - Scope/BE/PK/IR/404;   76:2-76:04 - Scope/IR/403 | | |
| 076:04 - 076:19 | | 76:20-76:24 | - |
| 077:04 - 077:11 | | | |
| 077:13 - 077:17 | | | |
| 078:14 - 079:04 | | | |
| 079:06 - 079:14 | | | |
| 081:22 - 081:23 | | | |
| 082:07 - 082:08 | | | |
| 082:17 - 082:17 | | | |
| 082:19 - 082:25 | | | |
| 083:02 - 083:15 | | | |
| 083:17 - 084:01 | | 84:2-84:3;    84:5-84:7 | - |
| 084:13 - 084:16 | Scope | | |
| 084:24 - 085:01 | Scope | | |
| 085:03 - 085:14 | Scope/403 | | |
| 085:16 - 085:17 | Scope/403 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 086:01 - 086:04 | Scope | | |
| 086:06 - 086:06 | Scope | | |
| 086:22 - 086:24 | Scope/PK/403 | | |
| 087:02 - 087:07 | Scope/PK/403 | | |
| 087:22 - 087:23 | PK/Scope/BE/403 | | |
| 088:18 - 088:20 | PK/Scope/BE/403 | 88:21-88:22; 88:24 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 089:02 - 089:04 | PK/Scope/BE/403 | | |
| 089:14 - 089:18 | PK/Scope/BE/403 | 89:19-89:21 | - |
| 090:03 - 090:04 | PK/Scope/BE/403 | | |
| 090:06 - 090:12 | PK/Scope/BE/403 | | |
| 090:14 - 090:15 | PK/Scope/BE/403 | 90:17; 90:19-90:22 | INC; 403<br>90:24-91:9 |
| 091:10 - 091:13 | PK/Scope/BE/403 | | |
| 091:16 - 091:23 | Scope/PR/403 | | |
| 092:01 - 092:01 | Scope/PR/403 | | |
| 092:09 - 092:10 | | | |
| 092:22 - 093:09 | | | |
| 093:11 - 093:11 | | | |
| 093:18 - 093:25 | | | |
| 094:02 - 094:21 | 94:12-94:21 - Scope/403/PK/BE | 94:22; 94:25-95:5; 95:8-95:13; 95:16-95:25 | - |
| 097:10 - 097:15 | Scope/PK/BE/403 | | |
| 097:17 - 097:18 | Scope/PK/BE/403 | | |
| 097:23 - 098:04 | Scope/PK/BE/403 | | |
| 098:06 - 098:09 | Scope/PK/BE/403 | | |
| 098:11 - 098:11 | Scope/PK/BE/403 | | |
| 098:17 - 098:18 | Scope/PK/BE/403 | | |
| 098:20 - 099:03 | Scope/PK/BE/403 | | |
| 099:05 - 099:08 | Scope/PK/BE/403 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 099:10 - 099:10 | Scope/PK/BE/403 | 99:12-99:15; 99:18-99:19 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 099:21 - 099:21 | Scope/PK/BE/403 | | |
| 099:24 - 100:04 | Scope/PK/BE/403 | | |
| 101:20 - 101:24 | | | |
| 102:05 - 102:21 | | | |
| 102:23 - 103:10 | | | |
| 103:15 - 103:19 | | | |
| 104:03 - 104:09 | | | |
| 104:11 - 104:17 | | | |
| 104:21 - 105:04 | | | |
| 105:06 - 105:09 | | | |
| 105:17 - 105:21 | | | |
| 106:05 - 106:10 | | | |
| 106:14 - 106:15 | | | |
| 106:17 - 106:18 | | | |
| 106:22 - 107:01 | | | |
| 108:08 - 108:11 | | | |
| 109:17 - 109:23 | | 109:24-109:25; 110:2-110:4 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 110:12 - 110:22 | | 111:22-111:25; 112:2-112:3; 112:5-112:9; 112:11-112:12 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 112:14 - 112:20 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 112:22 - 113:03 | | 113:5-113:9;   113:11-113:20 | 403<br>29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 113:21 - 113:23 | | | |
| 114:07 - 114:10 | | | |
| 114:12 - 114:15 | | | |
| 114:17 - 115:02 | | | |
| 115:04 - 115:04 | | | |
| 116:14 - 116:15 | | 117:2-117:5; 117:7 | - |
| 117:14 - 117:19 | BE/403/IR/Scope/PK | | |
| 117:21 - 118:04 | BE/403/IR/Scope/PK | | |
| 118:17 - 118:19 | PK/Scope/403/IR | | |
| 118:23 - 119:01 | PK/Scope/403/IR | | |
| 119:16 - 119:18 | PK/Scope/403/IR | | |
| 119:20 - 120:08 | 119:20-120:1 - PK/Scope/403/IR; 120:1-120:8 - PK/Scope/403/BE/IR/S | | |
| 120:10 - 120:17 | 120:10-120:14 - PK/Scope/403/BE/IR/S | | |
| 120:25 - 121:02 | | | |
| 121:04 - 121:12 | 121:10-121:12 - Scope/IR/403/404 | | |
| 121:23 - 121:25 | 121:10-121:22 - Scope/IR/403/405 | | |
| 122:02 - 122:06 | 121:23-122:06 - Scope/IR/403/404/608 | | |
| 122:20 - 122:25 | Scope/IR/403/404/608 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 123:02 - 123:14 | Scope/IR/403/404/608 | | |
| 123:21 - 123:24 | Scope/IR/403 | | |
| 124:07 - 124:09 | Scope/IR/403 | | |
| 125:21 - 125:23 | Scope/IR/403 | | |
| 125:25 - 126:01 | Scope/IR/403 | 126:3-126:5; 126:7-126:8 | 403 29:25-30:5; 30:9-10; 31:1-4; 31:19-21; 31:22-25; 32:3-10; 32:12-15; 33:3-11; 33:14-17; 33:23-34:4; 34:7-9; 34:15-35:7; 35:19-25; 37:7-9 |
| 126:12 - 126:17 | Scope/IR/403 | | |
| 127:04 - 127:14 | Scope/IR/403 | | |
| 127:16 - 127:16 | Scope/IR/403 | | |
| 127:20 - 128:02 | Scope/IR/403 | | |
| 128:11 - 128:15 | | | |
| 128:23 - 129:03 | | | |
| 129:07 - 129:11 | | | |
| 129:13 - 129:15 | | | |
| 129:18 - 129:20 | | | |
| 130:10 - 130:12 | | 130:13-130:15; 130:17; 130:19-130:21; 130:23-131:1 | - |
| 131:03 - 131:06 | | | |
| 131:16 - 131:17 | | | |
| 131:20 - 131:23 | | | |
| 132:01 - 132:10 | | | |
| 132:16 - 132:19 | | | |
| 133:02 - 133:03 | | | |
| 133:05 - 133:05 | | | |
| 135:22 - 135:23 | | | |
| 136:02 - 136:15 | | | |
| 136:23 - 137:01 | | | |
| 137:03 - 137:03 | | | |
| 137:08 - 137:14 | | | |
| 137:18 - 137:23 | | | |
| 139:02 - 139:07 | | 139:15-139:17; 139:19; 139:21-140:3 | BSD |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 141:25 - 142:04 | Scope/PK/IR/403 | | |
| 142:11 - 142:15 | Scope/PK/IR/403 | | |
| 143:04 - 143:06 | IR/403 | | |
| 143:13 - 143:15 | IR/403 | | |
| 144:01 - 144:07 | IR/403 | | |
| 144:09 - 144:14 | IR/403 | | |
| 144:16 - 145:08 | IR/403 | | |
| 145:16 - 145:20 | IR/403 | 145:21-145:23; 146:1-146:4 | - |
| 146:05 - 146:07 | IR/403 | | |
| 146:10 - 146:10 | IR/403 | 147:3-147:4 | - |
| 148:18 - 148:20 | | | |
| 148:22 - 149:05 | | | |
| 149:07 - 149:13 | | | |
| 149:21 - 149:25 | IR/Scope/PK/403 | | |
| 150:24 - 151:01 | IR/Scope/PK/403 | | |
| 152:23 - 152:25 | IR/PK/Scope/403/BE | | |
| 153:04 - 153:08 | IR/PK/Scope/403/BE | | |
| 153:12 - 153:17 | IR/PK/Scope/403/BE | | |
| 154:08 - 154:13 | IR/PK/Scope/403 | | |
| 154:21 - 155:02 | IR/PK/Scope/403 | | |
| 155:04 - 155:04 | IR/PK/Scope/403 | 155:24-156:3; 156:6-156:13 | - |
| 156:14 - 156:22 | IR/PK/Scope/403/D | | |
| 156:25 - 156:25 | IR/PK/Scope/403/D | 157:21-157:22; 157:25 | - |
| 158:24 - 159:02 | IR/PK/Scope/403/D | | |
| 159:04 - 159:06 | IR/PK/Scope/403/D | | |
| 159:08 - 159:21 | IR/PK/Scope/403/D | | |
| 160:03 - 160:06 | IR/PK/Scope/403/D | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 160:08 - 160:09 | IR/PK/Scope/403/D | | |
| 160:11 - 160:15 | | | |
| 161:14 - 162:02 | | | |
| 162:07 - 162:16 | | | |
| 163:02 - 163:24 | | | |
| 164:06 - 164:09 | | | |
| 164:13 - 164:15 | | | |
| 164:20 - 164:20 | | | |
| 164:22 - 164:22 | | | |
| 165:19 - 167:25 | 165:19-165:21 - ATTY/IR/403 | | |
| 168:05 - 168:08 | | | |
| 169:06 - 169:12 | | | |
| 170:13 - 171:19 | | | |
| 171:21 - 172:20 | | | |
| 173:05 - 174:14 | | | |
| 175:04 - 175:06 | | | |
| 175:09 - 175:15 | | | |
| 175:18 - 175:20 | | | |
| 176:03 - 176:07 | | | |
| 176:09 - 177:06 | | | |
| 177:08 - 177:25 | | | |
| 178:02 - 178:11 | 178:7-178:11 - Scope/PK/IR/403 | | |
| 178:21 - 179:02 | Scope/PK/IR/403 | | |
| 179:05 - 179:05 | Scope/PK/IR/403 | | |
| 179:18 - 180:04 | | | |
| 181:10 - 181:16 | | | |
| 181:18 - 181:24 | | | |
| 182:02 - 182:03 | | | |
| 182:08 - 182:13 | | | |
| 182:15 - 182:20 | | | |
| 182:22 - 183:21 | | | |
| 183:23 - 184:07 | | | |
| 184:09 - 184:09 | | | |
| 185:07 - 185:18 | IR/403 | | |
| 191:08 - 191:18 | | | |
| 192:02 - 192:21 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 193:03 - 193:07 | | | |
| 193:15 - 193:19 | IR/403/BE/604 | | |
| 194:06 - 194:08 | IR/403/BE/604 | | |
| 194:23 - 195:08 | IR/403/BE/604 | | |
| 195:13 - 195:14 | IR/403/BE/604 | | |
| 195:16 - 196:03 | IR/403/BE/604 | | |
| 196:11 - 197:03 | IR/403/BE/604 | | |
| 197:10 - 198:06 | IR/403/BE/604 | | |
| 198:12 - 198:18 | IR/403/BE/604 | | |
| 198:20 - 199:18 | IR/403/BE/604 | | |
| 199:20 - 199:23 | IR/403/BE/604 | | |
| 201:22 - 202:02 | IR/403/BE/604 | | |
| 202:10 - 202:12 | IR/403/BE/604 | | |
| 202:16 - 203:19 | IR/403/BE/604 | | |
| 203:21 - 203:25 | IR/403/BE/604 | | |
| 204:02 - 204:03 | IR/403/BE/604 | | |
| 206:10 - 206:12 | Scope | | |
| 206:14 - 206:19 | Scope | | |
| 207:07 - 207:13 | Scope | | |
| 207:16 - 207:21 | Scope | 207:22-207:23; 207:25-208:4 | - |
| 208:05 - 208:11 | Scope/D | | |
| 208:14 - 208:17 | Scope/D | | |
| 209:02 - 209:08 | Scope | | |
| 209:18 - 209:24 | IR/403/V/D/PK | | |
| 210:25 - 211:10 | IR/403/V/D/PK/ME | | |
| 211:16 - 211:16 | IR/403/V/D/PK/ME | | |
| 212:01 - 213:12 | | | |
| 219:16 - 219:17 | | | |
| 220:08 - 220:21 | | | |
| 220:25 - 221:06 | | | |
| 221:09 - 221:19 | | | |
| 222:01 - 222:19 | | | |
| 223:18 - 224:07 | | | |
| 224:09 - 224:09 | | | |
| 224:19 - 224:21 | LC/V/403/LO/EO | 226:25-227:8 | BSD; INC |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 227:25 - 228:11 | IR/403/Scope/PK/BE | | |
| 228:16 - 229:09 | IR/403/Scope/PK/BE | | |
| 229:11 - 229:21 | IR/403/Scope/PK/BE/604 | | 11:7-20 |
| **30(b)(6) Deposition Testimony of Brendon Stead** | | | |
| 009:15 - 009:18 | | | |
| 013:06 - 013:08 | | 13:9-13:17 | - |
| 013:18 - 013:22 | | | |
| 015:07 - 015:13 | | | |
| 016:05 - 017:05 | | | |
| 019:15 - 020:07 | Scope/LO/EO | | |
| 020:17 - 021:01 | Scope/LO/EO | | |
| 021:13 - 021:18 | Scope/LO/EO | | |
| 021:25 - 022:09 | 21:25-22:5 - Scope/LO/EO | | |
| 022:15 - 022:21 | | | |
| 023:09 - 023:14 | | | |
| 024:02 - 024:10 | | | |
| 024:14 - 024:24 | | 25:7-25:14 | BSD; INC; 403 |
| 030:24 - 031:12 | Scope | | |
| 031:18 - 031:21 | Scope | 32:4-32:7 | - |
| 032:17 - 033:01 | | 33:2-33:5 | - |
| 038:13 - 039:09 | | | |
| 046:23 - 047:23 | | 48:14-48:25; 49:10-49:23; 50:14-51:3 | BSD; 402; 403; H; 602; LO |
| 051:18 - 052:01 | | 52:2-52:6;   53:4-53:12;   53:18-54:9 | BSD; 402; 403; LO |
| 055:15 - 055:24 | Scope/LO/EO | 55:25-56:3 | - |
| 056:04 - 056:06 | | | |
| 056:08 - 056:12 | | | |
| 056:14 - 057:03 | | | |
| 060:25 - 061:23 | Scope | | |
| 063:08 - 063:18 | Scope | | |
| 063:22 - 064:08 | Scope | | |
| 066:07 - 066:14 | | 66:15-66:23 | 402; 403; LO |
| 066:24 - 067:22 | Scope | | |
| 068:03 - 068:04 | Scope | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 068:06 - 068:13 | PK | | |
| 069:11 - 069:13 | | | |
| 069:22 - 069:25 | | | |
| 070:07 - 070:08 | | | |
| 070:13 - 070:20 | | | |
| 075:14 - 075:20 | | | |
| 075:25 - 076:07 | | | |
| 079:25 - 080:10 | | 80:24-81:5 | - |
| 081:06 - 082:17 | | | |
| 083:07 - 083:14 | | 83:20-83:23;  84:9-84:13 | INC; 602 |
| 085:11 - 085:16 | | | |
| 088:02 - 088:07 | | | |
| 088:11 - 088:17 | | | |
| 097:15 - 097:18 | R/403 | | |
| 102:10 - 102:13 | R/403 | | |
| 103:02 - 103:19 | | | |
| 104:05 - 105:08 | | 105:14-105:24 | - |
| 106:04 - 106:07 | Scope/R/403 | | |
| 107:12 - 107:15 | Scope/R/403 | 108:5-108:6; 108:8-108:10; 109:5-109:10; 109:15-109:23 | BSD; 402; 403; 602; NR |
| 111:11 - 111:14 | Scope/PK/IH/AF | | |
| 111:17 - 111:18 | Scope/PK/IH/AF | | |
| 111:22 - 112:10 | 111:22-111:25 - AF/IH/Scope | | |
| 113:05 - 113:16 | | | |
| 113:18 - 113:22 | Scope/R/403/PK | | |
| 113:24 - 113:24 | Scope/R/403/PK | | |
| 122:18 - 122:24 | | | |
| 123:19 - 123:22 | | | |
| 124:02 - 124:13 | Scope/R/403/IH/AF | | |
| 124:25 - 125:03 | Scope/R/403 | | |
| 125:05 - 125:16 | Scope/R/403 | | |
| 148:05 - 148:09 | | | |
| 148:12 - 148:16 | | | |
| 148:24 - 149:02 | | | |
| 149:04 - 149:05 | | 149:16-149:24 | BSD; 402; 403 |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 150:03 - 150:22 | | | |
| 151:24 - 153:01 | Scope/R/403 | | |
| 153:06 - 153:16 | IR/403 | | |
| 153:20 - 153:23 | V | | |
| 153:25 - 154:01 | V | | |
| 154:08 - 154:17 | | | |
| 154:19 - 154:19 | | | |
| 155:18 - 155:20 | | | |
| 155:22 - 155:22 | | | |
| 156:04 - 157:01 | | 157:2-158:6 | - |
| 158:22 - 159:12 | IH/Scope/D | 160:19-161:8 | BSD |
| 162:22 - 163:01 | | 163:4-163:8 | - |
| 163:09 - 163:14 | | | |
| 163:21 - 164:02 | | | |
| 164:18 - 165:07 | Scope/PK/BE/H | | |
| 165:11 - 167:01 | Scope/PK/BE/H | | |
| 167:07 - 167:22 | Scope/PK/BE/H | | |
| 167:24 - 169:01 | 168:24-169:01 - Scope/PK/BE/H | | |
| 169:03 - 169:15 | Scope/PK/BE/H | 169:18-169:24 | BSD |
| 170:20 - 171:08 | | | |
| 172:12 - 173:03 | | | |
| 173:10 - 173:16 | | | |
| 174:06 - 175:21 | Scope/PK/BE/H | | |
| 175:23 - 175:24 | Scope/PK/BE/H | 176:2-176:6; 176:9-176:15; 177:23-178:7 | 402; 403; LO |
| 176:16 - 177:22 | Scope/PK/BE/H | | |
| 178:08 - 178:13 | | | |
| 179:04 - 179:21 | | | |
| 180:11 - 180:13 | | | |
| 182:05 - 182:13 | | | |
| 182:17 - 183:15 | 183:2-183:15 - Scope/D | | |
| 184:07 - 184:14 | | | |
| 184:22 - 184:25 | | | |
| 185:07 - 185:16 | | | |
| 185:20 - 185:23 | | | |
| 186:08 - 187:01 | Scope/BE/H | | |
| 187:12 - 187:15 | Scope | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 188:04 - 188:13 | Scope/PK/BE | | |
| 188:15 - 189:07 | Scope/PK/BE | | |
| 189:12 - 189:23 | Scope/PK/BE | 189:24-190:1; 190:3-190:7 | LO |
| 190:15 - 191:20 | | | |
| 191:22 - 191:22 | | | |
| 192:24 - 193:07 | Scope | | |
| 193:09 - 194:12 | Scope | | |
| 194:19 - 194:24 | Scope | | |
| 195:22 - 196:15 | | | |
| 196:21 - 196:23 | | | |
| 197:05 - 197:10 | | | |
| 197:17 - 198:05 | | | |
| 199:07 - 199:14 | | 199:15-199:16 | - |
| 199:17 - 199:19 | | | |
| 199:24 - 199:25 | | | |
| 200:05 - 200:12 | BE | 200:23-201:2; 201:9-201:10; 201:12-201:15 | INC |
| 201:17 - 202:19 | 201:17-201:21 - BE;  201:22-202:19 - Scope | | |
| 203:02 - 203:06 | R/403/ME | | |
| 203:23 - 205:03 | Scope/BE/R/403/H | | |
| 205:10 - 205:22 | Scope/BE/R/403/H | 205:23-206:1 | - |
| 206:06 - 206:21 | Scope/BE/R/403/H | | |
| 207:22 - 208:05 | Scope/BE/R/403/H | | |
| 208:08 - 208:17 | Scope/BE/R/403/H /S | | |
| 208:19 - 208:20 | Scope/BE/R/403/H /S | | |
| 209:07 - 210:03 | Scope | | |
| 210:07 - 212:01 | 210:07-210:20 - Scope | | |
| 212:18 - 213:04 | | | |
| 213:09 - 214:18 | 214:2-214:18 - Scope | | |
| 215:12 - 216:19 | | | |
| 216:23 - 218:04 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 218:13 - 218:25 | | | |
| 219:09 - 220:14 | 219:16-219:24 - Scope/PK; 219:25-220:3 - Scope; 220:4-220:14 - Scope/PK | | |
| 220:16 - 221:06 | Scope/PK | | |
| 221:18 - 221:23 | Scope/ME | | |
| 222:01 - 222:11 | Scope | | |
| 222:13 - 222:22 | 222:13-222:18 - Scope; 222:19-222:22 - Scope/C | | |
| 223:02 - 223:03 | Scope/R/403/IH | | |
| 223:05 - 223:06 | Scope/R/403/IH | | |
| 223:22 - 223:24 | | | |
| 224:12 - 224:17 | | | |
| 224:25 - 225:02 | Scope/R/403/IH | | |
| 225:09 - 226:10 | Scope/R/403/IH | 225:11-226:10 | BSD; 402; 403 |
| 226:18 - 226:20 | | 226:24-227:1 | - |
| 227:09 - 227:22 | Scope/R/403/BE | 227:23-228:2 | - |
| 228:03 - 228:06 | | | |
| 229:24 - 230:09 | Scope/R/403 | | |
| 230:13 - 230:15 | Scope/R/403 | | |
| 230:25 - 231:03 | Scope/R/404 | 231:9-232:5 | BSD; LO |
| 233:01 - 233:02 | Scope/PK/R/403 | | |
| 233:04 - 233:08 | Scope/PK/R/403 | | |
| 233:16 - 233:18 | | | |
| 233:25 - 234:03 | | | |
| 234:06 - 235:05 | 234:21-235:5 - BE/Scope/R/403 | 235:6-236:4; 236:7-236:8 | BSD; LO |
| 236:25 - 237:10 | | | |
| 238:09 - 238:10 | Scope/PK/R/403 | | |
| 238:12 - 238:20 | Scope/PK/R/403 | | |
| 238:22 - 239:02 | Scope/PK/R/403 | | |
| 239:16 - 239:18 | Scope/PK/R/403 | | |
| 239:21 - 240:10 | Scope/PK/R/403 | 240:11-240:16; 240:19-240:20 | LO; 602 |
| 240:21 - 241:07 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 241:15 - 242:03 | 241:15-241:25 - BE/PK; 242:1-242:03 - Scope | | |
| 242:06 - 242:17 | Scope | | |
| 242:19 - 243:10 | 242:19-242:23 - Scope; 242:24-243:10 - R/403/Scope | | |
| 243:12 - 244:03 | Scope/BE | | |
| 244:05 - 245:14 | Scope/BE | | |
| 245:19 - 245:22 | Scope/V | | |
| 245:25 - 246:17 | 246:1-246:8 - Scope/BE/V; 246:9-246:17 - Scope/BE/A/ATTY/R/403 | | |
| 246:20 - 247:04 | | | |
| 247:06 - 247:19 | | | |
| 247:21 - 247:21 | | | |
| 249:03 - 250:20 | | | |
| 250:24 - 252:23 | | | |
| 253:04 - 253:25 | | | |
| 254:02 - 254:07 | | | |
| 254:09 - 254:10 | | 254:12-254:14; 254:16-254:20; 254:22 | - |
| 255:03 - 255:17 | | | |
| 256:19 - 256:23 | BE/PK/Scope | 256:24-257:1; 257:3-257:5 | - |
| 257:07 - 257:09 | PK/BE | | |
| 257:11 - 257:14 | 257:11 - PK/BE; 257:13-257:14 - 608/403/Scope/R | | |
| 257:16 - 258:12 | 257:16 - 608/403/Scope/R; 257:18-258:4 - 608/403/Scope/R | 258:13-258:16 | - |
| 259:05 - 259:17 | | | |
| 259:23 - 259:25 | Scope/R/403 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 260:02 - 260:12 | 260:02-260:9 - Scope/R/403 | | |
| 260:14 - 261:02 | | | |
| 261:04 - 261:15 | 261:13-261:15 - 403/IR/IH/EO/LO | | |
| 261:17 - 261:25 | 261:17-261:22 - 403/IR/IH/EO/LO | | |
| 262:08 - 262:15 | | | |
| 265:17 - 265:18 | IH/Scope/PK/EO/LO | | |
| 265:20 - 265:20 | IH/Scope/PK/EO/LO | | |
| 267:23 - 268:06 | R/403 | | |
| 268:16 - 268:23 | R/403 | | |
| 269:06 - 269:25 | R/403 | | |
| 270:04 - 270:16 | R/403/PK | | |
| 270:20 - 270:24 | R/403/PK | | |
| 271:01 - 271:23 | R/403 | | |
| 279:17 - 279:19 | 403/R | | |
| 279:21 - 279:22 | 403/R | 280:20-281:14 | BSD |
| 281:25 - 282:03 | Scope/R/403/PK | | |
| 282:07 - 282:08 | Scope/R/403/PK/BE/H | | |
| 282:10 - 282:23 | Scope/R/403/PK/BE/H | | |
| 296:05 - 296:12 | | | |
| 296:14 - 298:09 | | 298:10-298:15 | - |
| 298:16 - 299:03 | | | |
| 299:08 - 301:07 | 300:13-301:7 - Scope/PK/R/403 | | |
| 301:23 - 302:01 | | 302:2-302:5; 302:7-302:19 | BSD |
| 304:01 - 304:06 | | | |
| 304:13 - 304:23 | | | |
| 306:12 - 306:15 | | | |
| 306:19 - 307:02 | | | |
| 307:19 - 308:18 | | 308:22-309:4; 309:6-309:9 | NR; 402; 403; LO |
| 309:14 - 309:17 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 326:23 - 327:04 | | | |
| 327:06 - 327:08 | | | |
| 331:12 - 332:10 | 403/R | | |
| 332:12 - 332:14 | 403/R | | |
| 334:01 - 334:10 | 403/R | | |
| 338:17 - 338:20 | 403/R | 340:7-340:23; 341:4-341:13 | BSD; LO; 402; 403 |
| 344:10 - 344:25 | 403/R | | |
| 345:13 - 346:07 | 345:13-345:25 - R/403/PK/BE; 346:1-346:7 - PK/R/403 | | |
| 346:09 - 346:15 | PK/R/403 | | |
| 348:19 - 349:22 | R/403 | | |
| 366:19 - 367:15 | R/403 | 367:16-367:24; 368:1 | - |
| 368:05 - 368:06 | | | |
| 368:10 - 369:19 | R/PK/403/BE/H | | |
| 369:24 - 369:25 | R/PK/403/BE/H | | |
| 370:02 - 370:03 | R/PK/403/BE/H | | |
| 372:02 - 372:09 | R/403/AF/ATTY/A | | |
| 372:11 - 372:16 | R/403/AF/ATTY/A | 372:17-372:19; 372:21-373:2 | NR; 402; 403 |
| 378:17 - 378:22 | R/403 | | |
| 378:24 - 378:24 | R/403 | | |
| 379:02 - 379:07 | R/403 | 379:8-379:10; 379:19-380:4; 380:6-380:11; 380:14-380:17; 381:23-382:9; 382:11-382:14 | BSD; INC; 602; LO; 402; 403 |
| 394:13 - 395:22 | | | |
| 396:01 - 396:24 | Scope/R/403/LL/EO/LO | | |
| 397:07 - 397:14 | | | |
| 397:19 - 397:22 | | | |
| 398:02 - 398:08 | | | |
| 398:16 - 398:25 | | | |
| 399:13 - 401:12 | 400:18-401:12 - R/403 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 402:05 - 403:02 | Scope/R/403 | 403:3-403:19 | BSD; MIL; 408; H; INC |
| 404:17 - 404:23 | Scope/R/403 | 404:24-405:1; 405:3 | - |
| 405:08 - 405:09 | | | |
| 405:18 - 405:20 | PK/BE/Scope/R/403 | | |
| 405:23 - 406:09 | PK/BE/Scope/R/403 | 406:10-406:11; 406:14-406:16 | BSD; MIL; 408; H |
| 406:24 - 407:02 | ATTY/A/PK/BE/Scope/R/403 | | |
| 407:04 - 407:04 | ATTY/A/PK/BE/Scope/R/403 | 407:11-407:16 | BSD; MIL; 408; H |
| 408:03 - 408:04 | | | |
| 408:15 - 409:07 | R/403/BE | | |
| 409:14 - 409:24 | R/403/BE | | |
| 413:22 - 413:24 | Scope/PK/R/403 | | |
| 414:01 - 414:01 | PK/R/403 | | |
| 414:17 - 414:19 | R/403/Scope/BE | | |
| 414:22 - 416:13 | 414:22-416:23 - R/403/Scope/BE; 416:24-416:13 - Scope/PK/403/R/BE | | |
| 416:15 - 416:15 | Scope/PK/403/R/BE | | |
| 417:14 - 417:18 | Scope/PK/403/R | | |
| 418:10 - 418:12 | Scope/V/R/403 | | |
| 418:14 - 418:14 | Scope/V/R/403 | | |
| 420:10 - 420:13 | Scope/R/403/H | | |
| 420:16 - 420:19 | Scope/R/403/H | | |
| 421:02 - 421:16 | Scope/R/403/H | | |
| 422:19 - 423:08 | Scope/R/403 | | |
| 423:11 - 425:18 | 424:5-425:18 - Scope/PK/R/403 | | |
| 425:20 - 425:20 | Scope/PK/R/403 | 426:4-426:9 | BSD; 403 |
| 426:12 - 427:01 | | | |
| 427:05 - 427:06 | Scope/R/403 | | |
| 427:08 - 427:12 | Scope/R/403 | | |
| 427:14 - 427:25 | Scope/R/403 | | |
| 428:02 - 428:06 | Scope/R/403 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 428:08 - 428:18 | 428:9-428:16 - Scope/R/403 | | |
| 428:20 - 429:02 | | | |
| 429:04 - 429:08 | | | |
| 429:19 - 429:21 | | | |
| 430:19 - 431:11 | | | |
| 431:13 - 431:18 | 431:17-431:18 - R/403 | | |
| 431:20 - 432:18 | 431:20-432:4 - R/403;   432:5-432:18 - Scope/R/PK/LC/IE/IL | | |
| 433:03 - 433:25 | 433:03-433:07 - ME;   433:8-433:25 - Scope/PK/IE/IL/IH | | |
| 434:02 - 434:10 | Scope/PK/IE/IL/IH | | |
| 434:13 - 434:20 | Scope/PK/IE/IL/IH | | |
| 434:23 - 434:24 | Scope/PK/IE/IL/IH | 434:25-435:1; 435:4-435:21 | 402; 403 |
| 435:22 - 436:06 | | | |
| 436:21 - 437:15 | 436:21-436:24 - Scope/PK | | |
| 437:17 - 437:23 | | | |
| 437:25 - 439:07 | | | |
| 439:09 - 439:23 | | | |
| 439:25 - 440:11 | | | |
| 440:13 - 440:18 | | | |
| 440:23 - 440:25 | | | |
| 442:16 - 443:13 | 442:16-442:23 - V/R/403 | | |
| 443:22 - 444:12 | | | |
| 444:14 - 444:14 | | | |
| 444:16 - 445:13 | 445:9-445:13 - ATTY/403/R | | |
| 445:25 - 446:03 | V/R/403 | | |
| 446:05 - 446:18 | 446:5-446:6 - V/R/403 | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 446:20 - 447:02 | | | |
| 447:04 - 447:09 | | | |
| 447:11 - 447:17 | | | |
| 447:19 - 448:17 | | | |
| 448:20 - 448:22 | V/R/403 | | |
| 448:24 - 449:07 | 448:24 - V/R/403 | | |
| 449:09 - 449:15 | | | |
| 449:17 - 449:22 | | | |
| 449:24 - 450:04 | | | |
| 450:06 - 450:08 | | | |
| 450:16 - 451:10 | 450:16-450:21 - ATTY/R/403 | | |
| 451:14 - 451:15 | | | |
| 451:17 - 451:25 | | | |
| 452:09 - 452:11 | | | |
| 452:13 - 452:23 | | | |
| 453:01 - 453:04 | | 453:5-453:8; 453:9 | * |
| 459:17 - 459:21 | | | |
| 460:01 - 460:04 | | | |
| 460:08 - 461:07 | | | |
| 461:09 - 461:12 | | | |
| 461:20 - 461:22 | | | |
| 461:24 - 461:24 | | | |
| 462:23 - 464:10 | | | |
| 464:20 - 465:16 | 465:2-465:5 - ME/AF/403 | | |
| 465:25 - 466:16 | | | |
| 467:11 - 469:25 | 467:25-468:11 - Scope; 468:12-468:25 - IH/PK/Scope | | |
| 470:02 - 473:07 | R/403 | | |
| 473:23 - 473:25 | R/Scope/403 | | |
| 474:03 - 474:08 | R/Scope/403 | | |
| 474:11 - 474:14 | R/Scope/403 | | |
| **30(b)(6) Deposition Testimony of Evan Stuart** | | | |
| 007:14 - 007:18 | | | |
| 010:03 - 010:05 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 011:07 - 011:24 | | 13:11-13:22; 14:2-14:14; 14:21-14:25; 15:11-15:23; 16:25-17:11; 18:9-18:16; 20:12-20:17 | BSD; 402 |
| 029:16 - 029:21 | Scope/IR/403 | | |
| 029:25 - 030:13 | Scope/IR/403 | | |
| 030:15 - 031:18 | Scope/IR/403 | | |
| 031:20 - 031:21 | Scope/IR/403 | | |
| 034:16 - 034:24 | Scope/IR/403 | | |
| 035:01 - 035:15 | Scope/IR/403 | | |
| 036:05 - 036:09 | | | |
| 037:22 - 038:07 | | | |
| 042:21 - 043:06 | | | |
| 044:04 - 045:05 | R/403 | | |
| 045:07 - 045:11 | R/403 | | |
| 045:19 - 045:23 | R/403 | | |
| 045:25 - 045:25 | R/403 | | |
| 051:16 - 052:12 | | | |
| 052:14 - 052:24 | | | |
| 053:01 - 053:05 | | | |
| 053:07 - 053:11 | | | |
| 053:14 - 053:14 | | | |
| 053:16 - 053:17 | IR/403/V | | |
| 053:19 - 053:24 | IR/403/V | 54:6-54:12 | - |
| 054:13 - 054:19 | | | |
| 056:05 - 056:08 | | | |
| 056:10 - 057:13 | | | |
| 059:18 - 060:04 | | 60:5-60:14 | 402 |
| 060:15 - 060:18 | | | |
| 061:09 - 061:14 | R/403 | | |
| 061:21 - 061:22 | R/403 | | |
| 061:25 - 061:25 | R/403 | | |
| 062:09 - 062:11 | | | |
| 062:20 - 062:23 | | | |
| 063:01 - 063:04 | | | |
| 063:16 - 063:18 | | | |
| 063:20 - 064:06 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 064:08 - 064:08 | | 64:10-64:23; 65:5-65:7 | 402; BSD |
| 065:23 - 066:07 | | 66:8-66:9; 66:11-66:12 | 402 |
| 066:16 - 066:19 | | | |
| 068:02 - 068:23 | | | |
| 068:25 - 069:05 | | | |
| 069:07 - 069:07 | | | |
| 070:08 - 070:10 | | | |
| 071:02 - 071:04 | R/403 | | |
| 071:06 - 071:06 | R/403 | | |
| 071:08 - 071:24 | R/403 | | |
| 072:06 - 072:11 | R/403 | | |
| 072:13 - 072:13 | R/403 | | |
| 072:24 - 073:24 | R/403 | | |
| 074:01 - 074:01 | R/403 | | |
| 075:15 - 076:10 | R/403 | | |
| 076:12 - 076:14 | R/403 | | |
| 077:14 - 077:19 | 77:14-77:17 - ME/R/403; 77:18-77:19 - R/403 | | |
| 077:21 - 078:01 | R/403 | | |
| 078:06 - 078:21 | 78:6-78:15 - Scope/R/403 | | |
| 078:23 - 079:06 | | | |
| 079:08 - 079:08 | | 79:10-79:11; 79:13-79:15; 79:17-79:18 | 402 |
| 079:19 - 079:21 | | | |
| 079:23 - 080:02 | | | |
| 080:14 - 081:21 | | | |
| 082:05 - 082:06 | | | |
| 082:08 - 082:15 | | | |
| 082:18 - 083:05 | | | |
| 083:12 - 083:18 | | | |
| 083:22 - 084:08 | | | |
| 084:10 - 085:16 | | | |
| 085:18 - 086:10 | | | |
| 086:12 - 087:22 | | 87:23-87:25 | - |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 088:01 - 088:05 | | 88:6-88:18 | 402; 403; NR |
| 088:19 - 088:22 | | 88:23-88:25; 89:2 | - |
| 089:04 - 089:07 | | | |
| 089:09 - 089:09 | | | |
| 090:03 - 090:14 | | | |
| 091:05 - 091:24 | | | |
| 092:22 - 093:03 | R/403 | | |
| 093:05 - 093:05 | R/403 | | |
| 094:03 - 094:19 | | | |
| 094:21 - 095:07 | | | |
| 099:08 - 099:22 | 99:8-99:13 - ATTY; 99:14-99:18 - ATTY/R/403 | | |
| 099:24 - 100:11 | | | |
| 100:14 - 101:05 | | | |
| 101:07 - 101:15 | | | |
| 101:17 - 101:17 | | 101:19-101:21; 101:23-101:24; 102:2-102:4 | - |
| 102:08 - 102:09 | D | | |
| 102:11 - 102:18 | 102:11-102:15- D | | |
| 102:20 - 103:01 | | | |
| 103:03 - 103:10 | | | |
| 103:12 - 103:12 | | | |
| 104:02 - 104:05 | | | |
| 104:07 - 104:14 | | | |
| 105:07 - 105:10 | | | |
| 105:12 - 105:16 | | | |
| 106:13 - 106:20 | | | |
| 106:22 - 106:22 | | | |
| 107:13 - 107:17 | | | |
| 108:10 - 108:12 | | 109:21-109:23; 109:25-110:6 | - |
| 110:11 - 111:05 | 110:11-110:21 - V/R/403 | | |
| 111:15 - 111:24 | | | |
| 112:01 - 112:01 | | | |
| 112:03 - 113:12 | 112:3-112:8 - BE | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 113:19 - 113:21 | | | |
| 113:23 - 113:25 | | 114:9-114:17 | CM; 403 |
| 114:22 - 115:11 | | 115:12-115:13; 115:15-115:17 | CM; 403 |
| 115:19 - 116:12 | | | |
| 116:14 - 116:23 | | | |
| 116:25 - 117:25 | | | |
| 118:02 - 120:01 | | | |
| 120:11 - 120:18 | 120:11-120:16 - ATTY/ME | | |
| 120:20 - 121:20 | | 120:21-121:9 | * |
| 121:22 - 122:15 | 121:22-121:23 - IN | | |
| 122:20 - 124:19 | | | |
| 124:21 - 124:24 | | | |
| 125:02 - 127:11 | | | |
| 127:13 - 127:25 | | | |
| 131:14 - 132:02 | | | |
| 132:04 - 132:16 | | 132:24-133:5 | 402; 403 |
| 137:23 - 140:19 | | | |
| 141:01 - 141:06 | | | |
| 141:14 - 141:16 | | | |
| 141:18 - 141:18 | | 142:3-142:6 | BSD |
| 143:12 - 143:24 | | 144:9-144:14; 144:16-144:22 | 402; 403; NR |
| 144:24 - 145:11 | | | |
| 146:02 - 146:06 | | 146:7-146:24 | 402; 403 |
| 146:25 - 147:19 | | | |
| 147:21 - 147:21 | | | |
| 147:23 - 148:03 | | 148:4-148:7 | - |
| 148:08 - 148:21 | | | |
| 148:24 - 149:05 | | 149:21-149:23; 149:25 | 402; 403 |
| 150:06 - 150:19 | | | |
| 151:18 - 151:25 | | | |
| 152:02 - 152:02 | | | |
| 152:10 - 153:20 | | 152:21-153:20 | - |
| 154:05 - 155:03 | | 155:4-155:7 | - |
| 155:08 - 155:14 | | 155:18-155:23; 156:8-156:10; 156:12 | - |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 156:19 - 157:06 | | | |
| 157:08 - 157:08 | | | |
| 157:10 - 158:13 | | | |
| 158:15 - 158:16 | | | |
| 158:22 - 159:04 | | | |
| 159:15 - 159:19 | | 159:20-159:23; 159:25-160:4 | - |
| 160:05 - 160:10 | | | |
| 160:12 - 161:10 | 160:15-161:10 - D/403 | | |
| 161:12 - 161:14 | D/403 | | |
| 161:16 - 161:22 | D/403 | | |
| 162:13 - 163:22 | | | |
| 164:10 - 165:05 | | | |
| 165:20 - 166:10 | | | |
| 166:16 - 166:24 | | | |
| 167:01 - 167:07 | | 167:8-167:25 | 402; 403 |
| 168:01 - 168:09 | | | |
| 168:13 - 168:15 | | | |
| 168:20 - 168:23 | | 168:24-169:1 | 402; 403 |
| 169:24 - 171:10 | | | |
| 171:13 - 171:18 | | | |
| 171:20 - 172:04 | | | |
| 172:16 - 173:05 | | 173:17-174:7; 174:22-175:9; 178:6-178:12; 193:9-194:4 | 402; 403; BSD |
| 207:25 - 208:17 | | | |
| 209:14 - 210:10 | | | |
| 248:24 - 249:07 | R/403 | | |
| 249:09 - 250:13 | R/403 | 250:14-250:18 | 402; 403 |
| 250:19 - 250:22 | R/403 | | |
| 265:18 - 265:21 | | | |
| 266:12 - 266:15 | | | |
| 266:17 - 266:25 | | | |
| 267:02 - 267:04 | | | |
| **30(b)(6) Deposition Testimony of Kevin Zarow** | | | |
| 008:07 - 008:10 | | | |
| 011:23 - 012:07 | | 14:8-14:17 | BSD |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 017:20 - 018:17 | 17:20 - 18:12 - Scope/C | 18:18-18:20; 19:4-19:6; 19:8-19:13; 19:15-19:16 | INC 18:21-19:01 |
| 022:21 - 023:19 | Scope/D | | |
| 024:11 - 024:14 | | | |
| 025:18 - 025:21 | | | |
| 026:10 - 026:23 | | | |
| 027:12 - 027:17 | | | |
| 028:04 - 028:11 | | | |
| 028:21 - 028:23 | | | |
| 037:06 - 038:03 | | 38:14-38:15; 38:18; 38:20; 38:23 | BSD; INC 39:14-16; 39:18-20 |
| 039:22 - 040:16 | Scope | | |
| 041:13 - 042:07 | Scope | | |
| 048:02 - 048:25 | | | |
| 056:15 - 056:18 | | | |
| 057:20 - 057:22 | | | |
| 062:06 - 062:12 | | | |
| 063:01 - 066:01 | | | |
| 066:09 - 067:01 | 66:16-67:1 - Scope/S | | |
| 067:08 - 068:08 | 67:8-67:14 - Scope/S; 68:6-68:8 - S | | |
| 071:25 - 074:21 | 72:10-72:13 - S; 73:1-73:4 - S; 73:21-73:24 - S; 74:16-74:21 - S | | |
| 075:01 - 075:09 | 75:6-75:9 - Scope | 75:11-75:23 | 403; INC 76:20-77:01; 77:07-09 |
| 077:10 - 077:15 | Scope | 77:21-77:23; 77:25-78:3 | INC 77:16-20 |
| 078:04 - 080:07 | 78:4-79:19 - Scope | 81:24-82:2; 82:4-82:6 | 403; INC 82:07; 82:10-14; 82:16-17 |
| 082:18 - 084:18 | 82:18-83:24 - Scope | | |
| 085:13 - 085:16 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 087:13 - 088:25 | 87:14-87:21 - Scope | | |
| 095:18 - 095:23 | 95:18-95:23 - Scope | 95:24-95:25; 96:3-96:17 | 403; INC 96:18-19; 96:21-25; 98:14-15; 98:17-20; 98:23 |
| 098:25 - 099:15 | | | |
| 099:24 - 100:01 | | | |
| 102:14 - 103:09 | | | |
| 104:17 - 104:20 | | | |
| 108:13 - 109:02 | 108:13-108:19 - Scope | | |
| 109:20 - 109:24 | | | |
| 110:08 - 110:16 | Scope | | |
| 114:11 - 114:19 | | | |
| 115:17 - 115:20 | | | |
| 116:13 - 116:24 | | | |
| 117:17 - 118:04 | 117:17-117:25 - S/Scope/PK/V/AF | | |
| 121:19 - 121:25 | Scope/IH/PK | | |
| 125:15 - 125:18 | | | |
| 128:23 - 129:04 | | | |
| 129:10 - 129:20 | | | |
| 130:16 - 131:01 | | | |
| 131:07 - 131:14 | | | |
| 134:08 - 135:10 | 134:8-134:19 - Scope; 134:18-134:20 - S | | |
| 135:20 - 135:23 | Scope | 137:22-137:25 | 403; INC 136:02-08; 137:14-17; 137:19-21 |
| 145:24 - 146:17 | | | |
| 149:07 - 150:12 | | | |
| 164:14 - 165:19 | | | |
| 168:10 - 169:20 | | | |
| 171:01 - 171:15 | | | |

| Sonos Opening Cite | D&M Objections | D&M Counter-Designations | Sonos Objections to D&M Counter-Designations |
|---|---|---|---|
| 183:25 - 185:01 | 183:25-184:7 - Scope/R; 184:12-184:17 - Scope/R; 184:18-184:21 - Scope | | |
| 187:13 - 188:11 | 187:14-187:187:25 - Scope; 188:6-188:11 - Scope | | |
| 188:24 - 189:07 | | | |
| 197:04 - 197:14 | | | |
| 222:09 - 223:08 | | | |
| 247:17 - 247:22 | | | |
| 248:16 - 249:01 | | | |
| 249:23 - 250:14 | 250:11-250:14 - Scope | | |
| 254:25 - 255:12 | | | |
| 256:03 - 256:07 | | | |
| 256:21 - 256:25 | | | |
| 257:10 - 258:13 | 258:9-258:13 - Scope | | |

# SCHEDULE E2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SONOS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 14-1330-RGA |
| v. | ) |
| | ) JURY TRIAL DEMANDED |
| | ) |
| D&M HOLDINGS INC. d/b/a THE | ) |
| D+M GROUP, D&M HOLDINGS U.S. | ) |
| INC., and DENON ELECTRONICS | ) |
| (USA), LLC, | ) |
| | ) |
| Defendants. | ) |

**SONOS'S OBJECTIONS TO DEFENDANTS' DEPOSITION DESIGNATIONS**

| Code | Objection |
|---|---|
| 402 | **Not Relevant** – Sonos objects to this deposition designation because the testimony is not relevant to any fact of consequence in this action. FRE 401-402. |
| 403 | **Prejudice Outweighs Probative Value** – Sonos objects to this deposition designation because the testimony's probative value is substantially outweighed by a risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, and/or needlessly presenting cumulative evidence. FRE 403. |
| 602 | **Lack of Foundation/Personal Knowledge** – Sonos objects to this deposition designation because the foundation necessary for its admission was not established by defendants and/or the deponent testified that he/she lacked personal knowledge of the subjects. FRE 602. |
| AA | **Asked and Answered -** Sonos objects to this deposition designation because it contains a question that calls for the deponent to repeat his/her testimony that was previously elicited during the deposition. FRE 611. |
| AF | **Assumes Fact Not in Evidence** – Sonos objects to this deposition designation because the question asked assumed a fact that was not in evidence.  FRE 611. |
| CL | **Calls for Legal Conclusion** – Sonos objects to this deposition designation because it contains a legal conclusion.  FRE 602, 701-702. |
| CM | **Cumulative** – Sonos objects to this deposition designation because it is duplicative and/or cumulative of other designations.  FRE 611. |
| CS | **Calls for Speculation** – Sonos objects to this deposition designation because the question asked called for the deponent to speculate and/or the testimony contains statements that are speculative as to matters of fact or law. FRE 602. |

| F | **Form -** Sonos objects to this deposition designation because the question contains lawyer argument and/or colloquy and not testimony of the deponent, the question was asked in compound form, or the question has some other defect.  FRE 611. |
|---|---|
| H | **Hearsay** – Sonos objects to this deposition designation because the testimony constitutes or contains hearsay. FRE 801-802. |
| HYP | **Improper/Incomplete Hypothetical** – Sonos objects to this deposition designation because the question asked contained an improper and/or incomplete hypothetical. FRE 602, 611. |
| IMP | **Improper Designation** – Sonos objects to this deposition designation because the designation improperly includes statements that are not evidence, such as cross communications between attorneys. FRE 601-603, 611 |
| INC | **Remainder of or Related Writings or Recorded Statements** – Sonos objects to this deposition designation because it is itself incomplete or the question asks the deponent to offer testimony on a document where the remainder of the document, or another document, should fairly be considered at the same time. FRE 106. |
| L | **Leading** – Sonos objects to this deposition designation because the question was asked in a leading manner.  FRE 611. |
| LO | **Lay Opinion** – Sonos objects to this deposition designation because it constitutes or contains an improper opinion by a lay witness. FRE 701-702. |
| M | **Mischaracterization/Misrepresentation** – Sonos objects to this deposition designation because the question asked (1) mischaracterizes the deponent's prior testimony and/or the question asked mischaracterizes the document being shown to the deponent or (2) is premised on a mischaracterization of facts.  FRE 611. |
| MIL | **Subject to a motion *in limine* or agreement between the parties** – Sonos objects to this deposition designation because it falls within the scope of one or more of Sonos's pending motions *in limine* or within the scope of an agreement between the parties concerning motions *in limine*. |
| NP | **Not Provided for this Case / Produced Untimely** – Sonos objects to this deposition designation because the testimony was not provided for this case and/or the question asked the deponent to offer testimony on a document that was not produced during the course of discovery for the present case.  FRCP 26. |
| NR | **Non-Responsive Testimony** – Sonos objects to this deposition designation because it includes statement that are not response to the question that was asked.  FRE 611. |
| SCOPE | **Beyond Scope of 30(b)(6) Topics** – Sonos objects to this deposition designation because it is outside the scope of the topics for which the deponent was designated as a corporate representative |
| VA | **Vague and Ambiguous** – Sonos objects to this deposition designation because the question and/or testimony includes vague and ambiguous statements.  FRE 611. |

*Denotes an apparent error in Defendants' designation; Sonos reserves the right to object and/or counter designate such a designation once corrected by Defendants.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 14-1330-RGA |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OBJECTIONS TO PLAINTIFF'S TRIAL DEPOSITION DESIGNATIONS

Attached please find Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "Defendants") objections to the revised deposition designations that Plaintiff identified on November 8, 2017. Objections are stated in the chart, according to the following key. In addition to the objections listed in the chart below, Defendants object to the designation of attorney objections during the deposition. Defendants further objects to the inclusion of attorney objections within deposition video clips played at trial and requests that objectiosn be removed from all video testimony to the extent technically feasible.

## OBJECTION KEY

| CODE | OBJECTION | FRE |
|---|---|---|
| A | Argumentative | 611(a) |

| ATTY | Attorney objections/colloquy not removed | 402, 403 |
|---|---|---|
| C | Compound | 611(a) |
| 604 | Lacks Proper Interpreter | 604 |
| 608 | Improper Character Evidence | 608 |
| D | Duplicative/asked and answered | 611(a) (also 403) |
| EO | Improper expert opinion testimony | 702/703 |
| EX | Exhibit not listed on Plaintiffs' exhibit list | |
| H | Hearsay | 801/802/805 |
| I | Improper Impeachment | 613(a) |
| IN | Incomplete designation (cut off question or answer) | 106 |
| L | Leading | 611(c) |
| LC | Calls for legal conclusion | 611(a) |
| BE | Best Evidence – Improper Description of Writing Contents | 1002 |

| AF | Assumes facts not in evidence; | 611(a) |
|---|---|---|
| EQ | Lack of expert qualifications; | 702 |
| IH | Improper hypothetical | 611(a) |
| ME | Mischaracterized evidence (e.g. – testimony, docs) | 601, 602 |
| PK | No showing of personal knowledge | 601, 602 |
| LO | Improper lay opinion testimony | 701 |
| MIL | Subject to motion in limine | |
| N | Non-responsive | 611 (a) |
| NA | Calls for narrative | 611 (a) |
| P | Privilege | 501 |
| Scope | Testimony by 30(b)(6) designee outside of scope of topics | FRCP 30(b)(6) |
| R | Relevance | 401/402 |
| S | Speculation/lacks personal knowledge | 602 |
| V | Vague & ambiguous | 611 (a) |

| 403 | Overly prejudicial, confusing, misleading, or cumulative | 403 |
|---|---|---|
| 404 | Other crimes, wrongs, or acts /improper character evidence | 404 |

Thomas Cullen:

| Defendants Designations | Plaintiff's Objections | Plaintiff's Counter-Designation | Defendant Objections to Counter-Designations |
|---|---|---|---|
| 9:6 - 9:7 | - | - | |
| 22:15 – 22:18 | - | - | |
| 91:10 – 91:14 | - | 91:19-20; 92:2-3 | |
| 92:15 – 93:3 | INC | - | |
| 100:3 – 100:14 | - | 89:3-13; 90:25-91:7; 97:12-15; 97:17-22; 97:24-98:6; 100:22-23 | 97:12-98:6 - N, S |
| 100:24 – 101:3 | F; L; SCOPE; 402; 403; H | 100:22-23; 101:18-20; 101:22-23 | |
| 101:5 – 101:6 | F; L; SCOPE; 402; 403; H | 100:22-23; 101:18-20; 101:22-23 | |
| 101:8 – 101:9 | F; L; SCOPE; 402; 403 | 100:22-23; 101:18-20; 101:22-23 | |
| 101:11 - 101:17 | F; L; SCOPE; 402; 403 | 100:22-23; 101:18-20; 101:22-23 | |
| 101:25 – 102:18 | F; L; SCOPE; 402; 403; CS | 100:22-23; 101:18-20; 101:22-23 | |
| 106:25 – 107:4 | INC | 106:6-10; 107:9-10 | |
| 107:16 – 107:19 | 602; CS | 106:6-10; 107:9-10; 108:15-22 | 108:15-108:22 - S, Scope, LO, EO |
| 107:25 – 108:3 | 602; CS | 106:6-10; 107:9-10 | |
| 109:15 – 109:25 | F; SCOPE; 402; 403; 602 | 106:6-10; 107:9-10 | |
| 110:2 | F; SCOPE; 402; 403 | 106:6-10; 107:9-10 | |
| 110:4 - 110:12 | F; SCOPE; 402; 403 | 106:6-10; 107:9-10; 110:16-20 | |
| 118:3 – 118:9 | SCOPE; 402; 403 | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 118:25 – 119:3 | SCOPE; 402; 403; 602 | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 121:3 – 121:17 | SCOPE; 402; 403; 602; F; L; M | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 121:19 – 122:6 | SCOPE; 402; 403; 602; F | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |

| 122:8 – 122:14 | SCOPE; 402; 403; 602; F | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
|---|---|---|---|
| 123:16 - 123:20 | SCOPE; 402; 403; 602; F; CS | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 123:22 – 124:1 | SCOPE; 402; 403; 602; F; L; CS | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 124:3 | SCOPE; 402; 403; 602; F; L; CS | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 124:5 – 124:6 | SCOPE; 402; 403; 602; F; L; CS | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 124:8 – 124:12 | SCOPE; 402; 403; 602; F; L; CS | 118:14-15; 118:22-24; 123:4-5; 123:7-15 | 123:4-123:15 - S |
| 124:15 – 125:6 | F; 402; 403 | 116:5-6; 116:8-9; 123:4-5; 123:7-15; 125:12-14; 125:16-19 | 123:4-123:15; 125:12-125:19 - S |
| 125:8 – 125:10 | F; 402; 403 | 123:4-5; 123:7-15; 125:12-14; 125:16-19 | 123:4-123:15; 125:12-125:19 - S |
| 126:4 – 126:7 | F; 402; 403; H | 125:12-14; 125:16-19; 126:8; 126:10-15; 126:17-23 | 125:12-125:19; 126:8-126:23 - S |
| 127:3 – 127:11 | MIL; 402; 403 | 127:12; 127:14 | |
| 127:16 – 127:17 | MIL; 402; 403; CS; F | 127:12; 127:14 | |
| 127:19 – 127:21 | MIL; 402; 403; CS; F | 127:12; 127:14 | |
| 128:1 | INC | - | |
| 128:5 – 128:12 | MIL; 402; 403 | | |
| 128:16 – 128:17 | 402; 403; F | 116:5-6; 116:8-9 | |
| 128:19 – 128:23 | 402; 403; F | 116:5-6; 116:8-9 | |
| 140:16 – 140:23 | F; L; H | 141:2-4; 141:7-10; 145:3-13 | 145:10-145:13 - S |
| 140:25 | F; L; H | 141:2-4; 141:7-10; 145:3-13 | 145:10-145:13 - S |
| 142:9 – 142:17 | - | - | |
| 147:1 – 147:13 | F | - | |
| 147:15 – 147:24 | F; 402; 403; SCOPE | - | |
| 148:1 | F; 402; 403; SCOPE | - | |
| 148:3 – 148:4 | F; 402; 403; SCOPE | 148:20-25 | |
| 148:6 | F; 402; 403; SCOPE | 148:20-25 | |

| | | | |
|---|---|---|---|
| 149:18 – 150:1 | F; L; 402; 403; SCOPE | - | |
| 150:3 – 150:10 | F; L; 402; 403; SCOPE | - | |
| 166:2 – 166:7 | F; L; SCOPE; 402; 403 | 165:22-166:1 | |
| 166:9 – 166:11 | F; L; SCOPE; 402; 403 | 165:22-166:1; 166:12-15; 166:17-167:1 | 166:12-167:1 - N, S |
| 170:24 – 171:6 | 402; 403; SCOPE | - | |
| 171:13 – 171:19 | 402; 403; SCOPE | - | |
| 173:3 – 173:5 | F; 402; 403 | - | |
| 173:7 – 173:9 | F; 402; 403 | - | |
| 173:11 – 173:17 | F; 402; 403 | - | |
| 173:19 | F; 402; 403 | - | |
| 174:23 – 175:6 | 402; 403; SCOPE | 175:7-11; 175:21-23; 188:11-18; 219:2-7 | |
| 175:12 – 175:20 | 402; 403; SCOPE | 175:7-11; 175:21-23; 188:11-18; 219:2-7 | |
| 176:12 – 177:17 | 402; 403; SCOPE | - | |
| 182:12 – 182:14 | F | 179:14-16 | |
| 182:16 – 182:23 | F | 179:14-16 | |
| 182:25 | F | 179:14-16 | |
| 187:14 – 187:16 | F; 402; 403 | 175:21-23; 188:11-18; 219:2-7 | |
| 187:20 – 187:25 | 402; 403; SCOPE | 175:21-23; 188:11-18; 219:2-7 | |
| 188:1 – 188:2 | F; 402; 403 | 175:21-23; 188:11-18; 219:2-7 | |
| 188:4 – 188:7 | F; 402; 403 | 175:21-23; 188:11-18; 219:2-7 | |
| 188:9 | F; 402; 403 | 175:21-23; 188:11-18; 219:2-7 | |
| 188:11 – 189:3 | F | 175:21-23; 219:2-7 | |
| 189:5 – 189:6 | F | - | |
| 189:8 – 189:11 | F; SCOPE | 191:23-192:16 | |
| 189:13 | F; SCOPE | 191:23-192:16 | |
| 189:15 – 189:17 | F; SCOPE | 191:14-17; 191:19-21; 191:23-192:16 | |
| 189:19 – 189:21 | F; SCOPE | 191:14-17; 191:19-21; 191:23-192:16 | |
| 189:23 – 190:20 | F | 191:14-17; 191:19-21; 191:23-192:16 | |

| 190:22 – 190:23 | F | 191:23-192:16 | |
| 190:25 – 191:3 | F | 191:23-192:16 | |
| 194:10 – 196:10 | F; 402; 403; SCOPE | 92:15-93:10; 174:23-175:23; 183:16-25; 184:5-10; 188:11-18 | 183:16-183:25; 184:5-184:10 - S |
| 196:12 – 196:22 | F; 402; 403 | 92:15-93:10; 174:23-175:23; 183:16-25; 184:5-10; 188:11-18 | 183:16-183:25; 184:5-184:10 - S |
| 210:20 – 212:1 | F; L; NR | 201:9-13; 201:19-24; 216:1-3; 216:5-8 | 216:1-216:8 - N |
| 212:3 – 212:15 | F; L | - | |
| 212:17 – 212:24 | F; L | - | |
| 213:1 – 213:6 | F; L | - | |
| 219:10 – 219:19 | - | - | |
| 220:18 - 221:4 | F | 175:21-23; 219:2-7; 222:17-8; 222:24-223:9; 223:11-14; 223:21-224:7 | 222:17-223:5 - N, S 223:21-224: - N |
| 221:6 – 221:14 | F | 175:21-23; 219:2-7; 222:17-8; 222:24-223:5; 223:11-14; 223:21-224:7 | 222:17-223:5 - N, S 223:21-224: - N |
| 238:12 – 128:21 | *; 402; SCOPE | - | |
| 238:24 – 239:1 | 402; SCOPE | - | |
| 239:3 – 239:5 | 402; SCOPE | - | |
| 239:7 – 239:13 | SCOPE | - | |
| 239:15 – 239:18 | - | - | |
| 240:3 – 240:5 | - | 239:20-24 | |
| 240:11 – 240:21 | - | 239:20-24 | |
| 241:1 – 241:15 | INC | 241:16-17; 241:19; 242:9-14; 243:20-244:12 | 241:16-241:19 - IL, Scope 242:9-242:14 – Scope, H, LO, EO; 243:20-244:12 – H, LO, EO, Scope, BE |
| 244:15 – 244:17 | - | - | |
| 247:4 – 247:8 | - | 246:8-9; 246:11-15; 246:17-247:2; 247:9-248:10; 249:8-18; 250:3-12 | 246:8-247:2 – Scope, LO, EO 247:9-248:10 – Scope, LO, EO 249:8-249:18 – Scope, LO, EO, H; 250:3-250:12 – Scope, LO |

Jonathan Lang:

| Defendants Designations | Plaintiff's Objections | Plaintiff's Counter-Designation | Defendant Objections to Counter-Designations |
|---|---|---|---|
| 9:7 – 9:9 | - | - | |
| 20:4 – 20:7 | - | - | |

| 22:15 – 22:17 | - | 22:20-25 | |
| 63:1 – 63:3 | MIL; 402; 403 | 63:4-7 | |
| 63:8 – 63:13 | F; MIL; 402; 403 | - | |
| 63:15 | F; MIL; 402; 403 | - | |
| 64:7 – 64:20 | MIL; 402; 403 | 64:23-25 | |
| 68:14 – 68:17 | MIL; 402; 403 | 40:23-41:7 | |
| 69:24 – 70:10 | MIL; 402; 403 | 70:19-21; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 71:7 – 71:11 | MIL; 402; 403 | - | |
| 72:1 – 72:10 | MIL; 402; 403 | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 72:15 – 72:17 | MIL; 402; 403 | 72:21-23 | |
| 72:24 – 73:15 | MIL; 402; 403; F | 72:21-23; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 73:17 – 73:18 | MIL; 402; 403; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 73:20 – 74:7 | MIL; 402; 403; 602 | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 74:25 – 75:9 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 75:11 – 76:09 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; | |

| | | 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
|---|---|---|---|
| 77:14 – 77:25 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 78:2 – 78:6 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 78:8 – 78:9 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 78:15 – 78:19 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 78:21 – 78:25 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 79:2 – 79:24 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |

| | | | |
|---|---|---|---|
| 80:1 – 80:2 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 80:23 – 81:4 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 81:11-17; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 81:6 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 81:11-17; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 81:8 – 81:10 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 81:11-17; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 81:21 – 82:5 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 82:7 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |

| 82:9 – 82:13 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 82:15 – 83:2 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 83:4 – 83:18 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 83:20 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 83:22 – 84:12 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 84:14 | MIL; 402; 403; 602; F | 72:11-14; 74:8-10; 74:12-13; 74:16-19; 74:21-23; 76:10-11; 76:13-15; 77:1-5; 77:7-12; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 85:18 – 85:19 | - | - | |
| 86:1 – 86:5 | * | - | |
| 85:25 – 87:1 | *; F; INC; 402; 403; MIL | 87:3-7; 87:13-15; 88:15-17 | |

| | | | |
|---|---|---|---|
| 87:8 – 87:12 | 402; 403; MIL | 87:3-7; 87:13-15; 88:15-17 | |
| 87:16 – 87:21 | 402; 403; MIL | 87:3-7; 87:13-15; 88:15-17; 92:7-8; 93:13-14; 93:16; 93:20-24; 136:18-21 | |
| 90:6 – 90:13 | 402; 403; MIL | 90:14-15 | |
| 90:19 – 90:25 | F; L; 402; 403; MIL | 90:14-15; 92:7-8; 93:13-14; 93:16; 93:20-24 | |
| 91:7 – 91:10 | F; L; 402; 403; MIL | 90:14-15; 91:11; 91:13; 91:15-17; 91:19; 92:4-5; 92:7-8; 93:13-14; 93:16; 93:20-24 | |
| 91:21 – 92:1 | INC; F; L; 402; 403; MIL | 90:14-15; 92:4-5; 92:7-8; 93:13-14; 93:16; 93:20-24 | |
| 91:22 – 91:25 | * | | |
| 94:15 – 94:24 | 402; 403 | 95:22-24; 96:1-2 | S |
| 96:4 – 96:12 | 402; 403; MIL | - | |
| 100:20 – 100:21 | - | - | |
| 100:24 – 101:6 | - | 101:7-9 | |
| 101:14 – 101:21 | - | 101:7-9 | |
| 102:8 – 102:17 | F; 402; 403; MIL | 108:17-18; 108:20-24 | |
| 102:19 – 103:4 | F; 402; 403; MIL | 108:17-18; 108:20-24 | |
| 103:14 – 103:15 | - | - | |
| 103:21 – 104:2 | - | - | |
| 104:6 – 104:11 | - | - | |
| 104:17 – 104:22 | - | - | |
| 105:6 – 105:13 | F; 602 | 107:1-19 | S, 403 |
| 105:20 – 105:22 | F; CS | 107:1-19 | S, 403 |
| 105:24 – 105:25 | F; CS | 107:1-19 | S, 403 |
| 106:2 – 106:12 | 602 | 107:1-19 | S, 403 |
| 108:9 – 108:18 | F; 602 | 107:1-19 | S, 403 |
| 108:20 -108:24 | F | 107:1-19 | S, 403 |
| 109:12 – 109:14 | F; 602 | 107:1-19 | S, 403 |
| 109:16 – 110:7 | F; 402; 403; 602 | 107:1-19 | S, 403 |
| 111:9 – 111:10 | - | - | |
| 111:16 – 112:6 | INC | - | |
| 115:6 – 116:1 | F; MIL; 402; 403; 602 | 114:14-25 | |

| | | | |
|---|---|---|---|
| 116:3 – 116:14 | F; MIL; M; 402; 403; 602 | 114:14-25 | |
| 116:16 – 117:3 | F; MIL; 402; 403; 602 | 114:14-25 | |
| 117:5 – 117:6 | F; MIL; 402; 403; 602 | 114:14-25 | |
| 117:18 – 118:1 | F; MIL; 402; 403; 602; INC; H; CS; L | 114:14-25 | |
| 118:3 – 118:6 | F; MIL; 402; 403; 602; H; CS; L | 114:14-25 | |
| 118:16 – 119:1 | MIL; 402; 403; 602 | 114:14-25 | |
| 119:6 – 119:16 | MIL; 402; 403 | 114:14-25 | |
| 123:7 – 123:8 | - | - | |
| 123:11 – 123:14 | - | - | |
| 123:19 – 124:14 | - | - | |
| 125:2 – 125:24 | - | 125:25-126:2 | |
| 126:3 – 126:4 | F; 402 | - | |
| 126:6 – 126:7 | F; 402 | - | |
| 127:13 – 127:14 | - | - | |
| 127:24 – 128:10 | 402; 403 | 126:17-19; 126:23-127:2; 127:21-23 | |
| 128:15 – 128:18 | 402; 403; 602; INC | - | |
| 129:9 – 129:15 | 402; 403; F; 602 | - | |
| 129:18 – 129:20 | 402; 403; F | - | |

Christopher Kallai:

| Defendants Designations | Plaintiff's Objections | Plaintiff's Counter-Designation | Defendant Objections to Counter-Designations |
|---|---|---|---|
| 8:4 – 8:6 | - | - | |
| 67:9 – 67:22 | AF; INC | 10:17-23; 11:22-12:4; 15:24-16:7; 16:14-16; 21:20-22:5; 22:17-23:1 | 21:20-22:5 – Scope/403 22:17-23:1 – Scope/403 |
| 84:8 – 84:9 | 402; 403 | 84:22-25; 85:21-86:6; 86:13-19; 86:25-87:15; 88:6-9; 89:11-13; 89:15-24 | 86:25-87:15 – S/403 89:11-89:24 – S/403 |
| 84:12 – 84:15 | 402; 403 | 84:22-25; 85:21-86:6; 86:13-19; 86:25-87:15; 88:6-9; 89:11-13; 89:15-24 | 86:25-87:15 – S/403 89:11-89:24 – S/403 |
| 90:17 – 90:20 | 402; 403 | 84:22-25; 85:21-86:6; 86:13-19; 86:25-87:15; 88:6-9; | 86:25-87:15 – S/403 89:11-89:24 – S/403 90:9-90:16 – S/403 |

| | | 89:11-13; 89:15-24; 90:9-16 | |
|---|---|---|---|
| 94:3 – 94:21 | H | 91:19-92:13; 92:19-22; 93:1-6; 94:22-24; 95:3-95:25; 96:2-10; 99:17-19; 99:21-100:1; 109:9-12; 110:19-25 | 95:3-95:25 – S/403 96:2-96:10 – S/403 99:17-100:1 – S/403 |
| 97:8 – 97:16 | H | 91:19-92:13; 92:19-22; 93:1-6; 94:22-24; 95:3-95:25; 96:2-10; 99:17-19; 99:21-100:1; 109:9-12; 110:19-25 | 95:3-95:25 – S/403 96:2-96:10 – S/403 99:17-100:1 – S/403 |
| 97:18 – 98:7 | H | 91:19-92:13; 92:19-22; 93:1-6; 94:22-24; 95:3-95:25; 96:2-10; 99:17-19; 99:21-100:1; 109:9-12; 110:19-25 | 95:3-95:25 – S/403 96:2-96:10 – S/403 99:17-100:1 – S/403 |
| 104:12 – 105:1 | H; CS; L; INC | 104:9-11; 106:11-14; 106:16-18; 109:9-12; 110:19-25 | |
| 105:3 – 105:24 | H; CS; L; INC | 104:9-11; 106:11-14; 106:16-18; 109:9-12; 110:19-25 | |
| 107:10 – 107:12 | 402; 403 | 10:17-23; 11:22-12:4; 15:24-16:7; 107:7-9; 107:13-16 | |
| 107:17 – 107:21 | 402; 403 | 10:17-23; 11:22-12:4; 15:24-16:7; 107:22-108:17 | |
| 182:6 – 182:12 | 402; 403; LO; INC | 181:1-7; 181:14-17; 181:21; 182:2-5 | 181:1-181:7 – LO/EO/S/LC/403 181:14-181:21 – LO/EO/S/LC/403 |
| 182:17 – 183:3 | 402; 403; LO; INC | 181:1-7; 181:14-17; 181:21; 182:2-5 | 181:1-181:7 – LO/EO/S/LC/403 181:14-181:21 – LO/EO/S/LC/403 |

Jonathan Cotter:

| Defendants Designations | Plaintiff's Objections | Plaintiff's Counter-Designation | Defendant Objections to Counter-Designations |
|---|---|---|---|
| 6:7 – 6:9 | - | - | |
| 24:5 – 24:7 | - | - | |
| 24:10 – 24:15 | - | - | |

| 45:7 – 45:12 | 402; 403; INC; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19- | |

| | | | |
|---|---|---|---|
| | | 48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 46:2 – 46:9 | 402; 403; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19-48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 46:15 – 46:18 | 402; 403; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19-48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 47:8 – 47:18 | 402; 403; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19-48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 48:4 – 48:13 | 402; 403; F; IMP; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19-48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 48:22 – 48:24 | 402; 403; F; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19-48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 49:1 – 49:2 | 402; 403; F; SCOPE | 44:4-14; 44:16-45:5; 45:13-46:1; 47:19-48:3; 48:14-16; 48:19-21; 49:4-8; 49:10-19 | |
| 105:5 – 105:11 | 403 | 26:3-4; 26:6-8; 104:9-105:4; 111:11-19; 132:1-2; 132:4-5; 179:6-17 | |
| 111:11 – 111:15 | 602; CS | 26:3-4; 26:6-8; 111:16-19; 179:6-17 | |
| 179:6 – 179:17 | 403; 602; CS; M | 26:3-4; 26:6-8; 104:9-105:11; 111:11-19; 132:1-2; 132:4-5 | |

Nicholas Millington:

| Defendants Designations | Plaintiff's Objections | Plaintiff's Counter-Designation | Defendant Objections to Counter-Designations | Defendant Designation based on Sonos incomplete designations |
|---|---|---|---|---|
| 11:6 – 11:10 | - | - | | |
| 14:16 – 14:24 | IMP | - | | |
| 15:2 | IMP | - | | |
| 15:5 – 15:7 | - | - | | |
| 17:19 – 18:3 | - | - | | |
| 18:9 – 18:12 | - | 18:13-16; 18:22-23 | | |
| 19:16 – 19:23 | - | - | | |
| 22:9 – 22:12 | F; SCOPE | - | | |
| 22:15 – 22:22 | F; SCOPE | 22:24-23:9 | | |
| 23:10 – 23:18 | F; L; SCOPE | - | | |
| 23:20 – 24:5 | F; SCOPE | - | | |
| 28:7 – 28:11 | MIL; F; L; SCOPE; 402; 403; 602 | - | | |
| 28:13 – 28:22 | MIL; F; L; SCOPE; 402; 403; 602 | - | | |
| 28:24 | MIL; F; L; SCOPE; 402; 403; 602 | - | | |
| 29:1 – 29:4 | MIL; F; L; SCOPE; 402; 403; 602 | - | | |
| 29:6 – 29:9 | MIL; F; L; SCOPE; 402; 403; 602 | - | | |
| 29:21 – 29:23 | MIL; F; L; SCOPE; 402; 403; 602; CL | - | | |
| 29:25 – 30:2 | MIL; F; L; SCOPE; 402; 403; 602; CL | - | | |
| 66:9 – 67:11 | F | - | | |
| 67:13 | F | - | | |
| 71:11 – 71:19 | F; L; INC | 17:6-18; 19:16-23; 42:2-10; 73:21-22; 73:24-74:7; 74:9-14; 94:13-22 | | |
| 71:21 – 71:25 | F; L; INC | 17:6-18; 19:16-23; 42:2-10; 73:21-22; 73:24-74:7; 74:9-14; 94:13-22 | | |
| 78:6 – 78:8 | - | - | | |

14

| 78:11 – 80:12 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 80:14 – 81:1 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; | | |

| | | 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
|---|---|---|---|---|
| 81:3 – 81:14 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 81:16 – 82:3 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 82:5 – 82:18 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 82:20 – 83:5 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 83:7 – 83:17 | MIL; F; L; 402; 403; CS; CL | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 83:19 – 84:4 | MIL; F; L; 402; 403; CS; CL | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 84:6 – 84:13 | MIL; F; L; 402; 403; CS | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 84:15 – 84:25 | MIL; F; L; 402; 403 | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 85:2 – 85:3 | MIL; F; L; 402; 403 | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 94:13-22 | | |
| 90:18 – 91:3 | F; L; AA | - | | |
| 91:5 – 91:20 | F; L; AA | - | | |
| 93:8 – 93:11 | F; L; SCOPE; 402; 403; 602; CS; CL | 93:17; 93:19-20 | | |
| 93:13 – 93:15 | F; L; SCOPE; 402; 403; 602; CS; CL | 93:17; 93:19-20 | | |
| 95:25 – 96:3 | F | 96:9-17 | | |
| 96:5 – 96:7 | F | 96:9-17 | | |

| 115:2 – 115:9 | F; L; AF; VA; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 115:11 -115:19 | F; L; HYP; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 115:21 – 116:2 | F; L; HYP; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 116:4 – 116:25 | F; L; AF; M; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 117:2 – 117:11 | F; L; M; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 117:13 – 117:25 | F; L; HYP; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 118:2 – 118:9 | F; L; HYP; AF; M; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 118:11 – 118:18 | F; L; AF; M; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 118:20 – 118:21 | F; L; INC | 106:20-22; 106:24; 107:1-11; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 123:7 – 123:9 | F; L; INC | 106:20-22; 106:24; 107:1-11; 119:16-120:15; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 123:11 – 123:25 | F; L; INC | 106:20-22; 106:24; 107:1-11; 119:16-120:15; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 124:24 – 126:13 | F; L; INC | 106:20-22; 106:24; 107:1-11; 119:16-120:15; 124:7-23 | 106:20-107:11 – R/403 124:16-124:23 – S/403 | |
| 126:23 – 127:3 | F; L; M; INC | 106:20-22; 106:24; 107:1-11; 124:7-23; 128:18-23; 128:25-129:16; 129:18-25 | 106:20-107:11 – R/403 124:16-124:23 – S/403 128:18-129:12 - N | |
| 127:5 – 127:6 | F; L; M; INC | 106:20-22; 106:24; 107:1-11; 124:7-23; 128:18-23; 128:25-129:16; 129:18-25 | 106:20-107:11 – R/403 124:16-124:23 – S/403 128:18-129:12 - N | |
| 128:2 – 128:3 | F; L | 128:18-23; 128:25-129:16; 129:18-25 | 128:18-129:12 - N | |
| 128:5 – 128:15 | F; L | 128:18-23; 128:25-129:16; 129:18-25 | 128:18-129:12 - N | |
| 131:23 – 132:8 | F; L; M | 130:16-17; 130:19-131:9; 131:11-21 | | |
| 132:22 – 132:23 | SCOPE; 402 | 17:6-18; 19:16-23; 42:2-10; 73:21-22; 73:24-74:7; 74:9-14; 94:13-22 | | |

| | | | | |
|---|---|---|---|---|
| 132:25 – 133:3 | MIL; F; L; M; AF; 402; 403 | 17:6-18; 19:16-23; 42:2-10; 73:21-22; 73:24-74:7; 74:9-14; 94:13-22 | | |
| 133:5 – 133:13 | MIL; F; L; M; AF; 402; 403 | 17:6-18; 19:16-23; 42:2-10; 73:21-22; 73:24-74:7; 74:9-14; 94:13-22 | | |
| 133:15 – 133:17 | MIL; F; L; M; AF; 402; 403 | 17:6-18; 19:16-23; 42:2-10; 73:21-22; 73:24-74:7; 74:9-14; 94:13-22 | | |
| 135:6 – 135:25 | F; L; M; 402; 403 | - | | |
| 136:3 – 136:8 | F; L; 402; 403 | - | | |
| 139:15 – 139:16 | F; L; 402; 403 | 144:2-3; 144:5-11; 145:11-21 | 144:2-144:11 – 403/IN 145:11-145:21 – 403/IN | 140:14-141:9 141:11-141:20 141:22-142:10 142:12-142:23 143:4-143:7 143:9-143:16 144:22-145:10 |
| 139:18 – 140:1 | F; L; 402; 403 | 144:2-3; 144:5-11; 145:11-21 | 144:2-144:11 – 403/IN 145:11-145:21 – 403/IN | 140:14-141:9 141:11-141:20 141:22-142:10 142:12-142:23 143:4-143:7 143:9-143:16 144:22-145:10 |
| 147:8 – 147:10 | F; L; AF; HYP | - | | |
| 147:12 – 148:8 | F; L; M | - | | |
| 148:11 – 148:13 | F; VA; AF; HYP | - | | |
| 148:15 – 148:25 | F; VA; AF; HYP | - | | |
| 149:2 – 149:19 | F; VA; AF; HYP | - | | |
| 149:22 – 150:2 | F; VA; AF; HYP; AA | - | | |
| 150:4 – 150:18 | F; VA; AF; HYP; AA | 150:19-20; 150:22-25; 151:1-5; 151:7-10 | | |
| 153:8 – 153:11 | F; L; VA; SCOPE | 152:15-18; 152:20-22 | 152:15-152:22 – S/403/Scope/R | |
| 153:13 – 153:21 | F; L; VA; AF; 602; CS | 152:15-18; 152:20-22 | | |
| 153:23 – 154:6 | F; L; VA; AF; 602; CS; CL | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 152:15-18; 152:20-22 | | |

| 154:8 – 154:13 | F; VA; 602; CL | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 152:15-18; 152:20-22 | | |
|---|---|---|---|---|
| 154:15 – 155:9 | F; L; VA; CL | 19:16-23; 42:2-10; 66:14-20; 67:10-11; 67:13; 87:12-14; 87:16-21; 152:15-18; 152:20-22 | | |

| | | | | |
|---|---|---|---|---|
| 155:25 | F; L; AF; SCOPE; 402 | | | |
| 156:2 – 156:13 | F; L; SCOPE; 402 | | | |
| 156:15 – 157:13 | F; L; 402; MIL; SCOPE | 160:1-3; 160:5-8 | S/403/R | |
| 157:15 – 157:23 | F; L; 402; 403; MIL | 160:1-3; 160:5-8 | S/403/R | |
| 157:25 – 158:4 | F; L; 402; 403; MIL; CS | 160:1-3; 160:5-8 | S/403/R | |
| 158:6 – 158:25 | F; L; 402; 403; MIL; M; AF | 160:1-3; 160:5-8 | S/403/R | |
| 159:2 – 159:21 | F; L; 402; 403; MIL; M; AF | 160:1-3; 160:5-8 | S/403/R | |
| 160:23 – 162:2 | F; L; 402; 403; MIL | 160:1-3; 160:5-8 | S/403/R | |
| 162:4 – 162:7 | F; L; 402; 403; MIL | 160:1-3; 160:5-8; 162:8-15 | S/403/R | |
| 172:23 – 173:16 | F; L; 402; 403; MIL; SCOPE | 160:1-3; 160:5-8 | S/403/R | |
| 173:18 – 173:23 | F; L; 402; 403; MIL; SCOPE; CS | 160:1-3; 160:5-8 | S/403/R | |
| 173:25 – 174:6 | F; L; 402; 403; MIL; SCOPE; CS | 160:1-3; 160:5-8 | S/403/R | |
| 174:8 – 174:13 | F; L; 402; 403; MIL; SCOPE; CS | 160:1-3; 160:5-8 | S/403/R | |
| 174:15 – 174:17 | F; L; 402; 403; MIL; SCOPE; CS | 160:1-3; 160:5-8 | S/403/R | |
| 180:14 – 181:21 | F; L; 402; 403 | - | | |
| 181:23 – 182:6 | F; 402; 403 | - | | |
| 182:8 – 182:17 | F; L; 402; 403 | 182:18-25 | | |
| 183:3 – 184:4 | F; L; 402; 403 | - | | |
| 184:6 – 184:15 | F; L; 402; 403 | 184:17-23; 184:25-185:2 | | |
| 186:12 – 186:20 | F; L; 402; 403; SCOPE; H | - | | |
| 186:22 – 187:4 | F; L; 402; 403; SCOPE; H | - | | |
| 189:6 – 189:14 | F; L; H; 402; 403; SCOPE; INC; CS | 188:25-189:5; 190:1-10 | | |
| 189:16 – 189:24 | F; L; H; 402; 403; SCOPE; INC; CS | 188:25-189:5; 190:1-10 | | |
| 193:14 – 193:25 | F; L; 402; 403; MIL; INC; SCOPE | - | | |
| 194:8 – 194:9 | 402; 403; MIL; INC; SCOPE | - | | |
| 197:4 – 197:5 | AF; M; F; L; 402; 403; MIL; SCOPE | - | | |

| | | | |
|---|---|---|---|
| 197:7 – 197:10 | AF; M; F; L; 402; 403; MIL; SCOPE | - | |
| 197:12 – 197:15 | M; F; L; 402; 403; MIL; SCOPE | - | |
| 197:17 – 197:24 | M; F; L; 402; 403; MIL; SCOPE; CS | - | |
| 198:1 – 198:3 | M; F; L; 402; 403; MIL; SCOPE; CS | - | |
| 199:11 – 200:18 | F; L | 198:21-199:10; 200:19-20; 200:22-24; 201:1-2; 201:4-8 | |
| 201:25 – 202:1 | F; AA | 201:10-11; 201:13-16 | Scope |
| 202:3 –203:4 | F; AA | 201:10-11; 201:13-16; 203:5-7; 203:9-10 | 201:10-201:16 - Scope |
| 203:20 – 205:25 | F | - | |
| 206:2 – 206:18 | F; SCOPE; CM | 133:11-13; 133:15-17 | |
| 206:20 – 206:23 | F; SCOPE; CM | 133:11-13; 133:15-17 | |
| 206:25 – 207:5 | F; SCOPE; CM | 133:11-13; 133:15-17 | |
| 207:8 – 207:10 | F; SCOPE; CM | 133:11-13; 133:15-17 | |
| 222:1 – 222:25 | F; SCOPE | 226:21-23 | |
| 223:7 – 224:8 | F; L; SCOPE | 226:21-23 | |
| 224:10 – 225:15 | F; L; SCOPE; M | 226:21-23 | |
| 225:17 – 225:24 | F; L; SCOPE; M | 226:21-23 | |
| 226:13 – 226:20 | F; L; SCOPE | 226:21-23 | |
| 227:1 – 227:2 | F | 226:21-23 | |
| 227:4 – 227:8 | F; L; SCOPE; MIL; 402; 403 | 226:21-23 | |
| 227:10 – 227:16 | F; L; SCOPE; MIL; 402; 403; AA | - | |
| 227:18 – 228:7 | F; L; SCOPE; MIL; 402; 403; AA | - | |
| 228:9 – 228:15 | F; SCOPE; MIL; 402; 403 | - | |
| 228:17 – 228:19 | F; SCOPE; MIL; 402; 403 | 228:21-24; 229:1-2; 229:1-12 | |
| 231:17 – 233:1 | F; M; MIL; 402; 403 | 160:1-3; 160:5-8; 233:16-18; 233:24-25; 234:2-4 | S/403/R |

| 233:3 – 233:10 | F; M; MIL; 402; 403 | 160:1-3; 160:5-8; 233:16-18; 233:24-25; 234:2-4 | S/403/R | |
|---|---|---|---|---|
| 233:12 – 233:14 | F; M; MIL; 402; 403 | 160:1-3; 160:5-8; 233:16-18; 233:24-25; 234:2-4 | S/403/R | |

Tad Coburn:

| Defendants Designations | Plaintiff's Objections | Plaintiff's Counter-Designation | Defendant Objections to Counter-Designations |
|---|---|---|---|
| 5:17 – 5:22 | NP | - | |
| 8:4 – 8:9 | NP | - | |
| 25:14 - 25:15 | NP; 602; CS; L; F | 25:20-22; 25:24-26:6 | |
| 25:17 – 25:18 | NP; 602; CS; L; F | 25:20-22; 25:24-26:6 | |
| 171:3 – 171:4 | NP; 602; CS; L | 169:18-21; 169:23-24; 170:1-14; 170:16-20 | |
| 171:6 - 171:13 | NP; 602; CS; L | 169:18-21; 169:23-24; 170:1-14; 170:16-20 | |

# SCHEDULE G1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SONOS, INC., )
)
Plaintiff, )
)   Civil Action No. 14-1330-RGA
v. )
)   JURY TRIAL DEMANDED
)
D&M HOLDINGS INC. d/b/a THE )
D+M GROUP, D&M HOLDINGS U.S. )
INC., and DENON ELECTRONICS )
(USA), LLC, )
)
Defendants. )

**SONOS'S BRIEF STATEMENT OF INTENDED PROOFS**

Plaintiff Sonos, Inc. ("Sonos") respectfully submits this statement of what Sonos expects to prove in support of its claims, including information regarding its claims of relief.  Sonos's statement is limited to its expected proof with regard to its claims, and does not address the proof that Sonos may choose to present in response to the defenses that Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M") may present at trial.  Sonos's statement is based upon the current status of the case and the Court's current rulings.  Sonos reserves the right to revise this statement in light of any further decisions or orders of the Court, including without limitation any rulings on pending motions.

## ISSUES ON WHICH SONOS BEARS THE BURDEN OF PROOF

### I.    DIRECT INFRINGEMENT

Below are the issues on which Sonos bears the burden of proof related to whether D&M has directly infringed the Asserted Claims of the Asserted Sonos Patents.  For the Court's convenience, the following table shows the current list of Asserted Claims and Accused HEOS Instrumentalities[1] for each Asserted Sonos Patent:

---

[1] Sonos's infringement theories set forth herein apply equally to both the first generation of HEOS players (i.e., the "HS1" version of HEOS players) and the second generation of HEOS players (i.e., the "HS2" version of HEOS players).  Thus, any reference to a given model of HEOS player herein is intended to cover both generations of that HEOS player model (e.g., a reference to the HEOS 1 player model covers both the HS1 and HS2 versions of the HEOS 1 player model).  Likewise, Sonos's infringement theories set forth herein apply equally to the HEOS controller app for iOS, Android, and Kindle.  Thus, any reference to the HEOS controller app is intended to cover the HEOS iOS app, the HEOS Android app, and the HEOS Kindle app.

| Patent | Asserted Claims | Accused HEOS Instrumentalities |
|--------|-----------------|--------------------------------|
| 9,195,258 | 11, 17, 18, 21, 24 | HEOS 1, HEOS 3, HEOS 5, HEOS 7, HEOS HomeCinema, HEOS Link, HEOS Amp, and HEOS Drive players installed with any version of the HEOS firmware (collectively, the "Accused HEOS Players") |
| 7,571,014 | 21, 25, 38 | Devices installed with any version of the HEOS controller app prior to Version "U2" |
| 8,588,949 | 1, 16 | Devices installed with any version of the HEOS controller app |

A.     The '258 Patent

1.      Sonos intends to prove, by a preponderance of the evidence, that D&M has directly infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent by making, using, offering to sell, selling, and/or importing the Accused HEOS Players within the United States.

2.      Sonos intends to prove, by a preponderance of the evidence, that D&M has directly infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent by virtue of the fact that Accused HEOS Players have automatically downloaded and installed updated versions of the HEOS firmware, which also constitutes "making" the invention claimed in Asserted Claims 17, 18, 21, and 24 of the '258 Patent.

3.      Sonos intends to prove, by a preponderance of the evidence, that D&M has directly infringed Asserted Claim 11 of the '258 Patent by making, offering to sell, and/or using, within the United States, any HEOS system including at least two Accused HEOS Players and at least two devices installed with any version of the HEOS controller app that are within the same local area network (LAN).

B.     The '014 Patent

4.      Sonos intends to prove, by a preponderance of the evidence, that D&M has directly infringed Asserted Claims 25 and 38 of the '014 Patent by installing any version of the HEOS controller app prior to Version "U2" onto a device (and thus "making" the claimed

invention) within the United States and/or by using devices installed with any version of the
HEOS controller app prior to Version "U2" within the United States.

5.      Sonos intends to prove, by a preponderance of the evidence, that D&M has
directly infringed Asserted Claim 21 of the '014 Patent by using, within the United States, a
HEOS system including a device installed with any version of the HEOS controller app prior to
Version "U2" and at least two Accused HEOS Players and in a manner that caused every
limitation of these Asserted Claims to be performed, either literally or under the Doctrine of
Equivalents.

### C.      The '949 Patent

6.      Sonos intends to prove, by a preponderance of the evidence, that D&M has
directly infringed Asserted Claim 1 of the '949 Patent by installing any version of the HEOS
controller app prior to Version "U2" onto a device (and thus "making" the claimed invention)
within the United States and/or by using devices installed with any version of the HEOS
controller app within the United States.

7.      Sonos intends to prove, by a preponderance of the evidence, that D&M has
directly infringed Asserted Claim 16 of the '949 Patent by using, within the United States,
devices installed with any version of the HEOS controller app in a manner that caused the device
to perform every limitation of this Asserted Claim, either literally or under the Doctrine of
Equivalents.

## II.     INDIRECT INFRINGEMENT

### A.      The '258 Patent

8.      Sonos intends to prove, by a preponderance of the evidence, that D&M has
induced infringement of Asserted Claims 17, 18, 21, and 24 of the '258 Patent under 35 U.S.C. §

271(b) by actively inducing others to install HEOS firmware updates into Accused HEOS Players (and thus "make" the claimed invention) within the United States and/or to use Accused HEOS Players within the United States.

9.      Sonos intends to prove, by a preponderance of the evidence, that D&M has induced infringement of Asserted Claim 11 of the '258 Patent under 35 U.S.C. § 271(b) by actively inducing others to make and/or use, within the United States, a HEOS system including at least two Accused HEOS Players and at least two devices installed with any version of the HEOS controller app that are within the same LAN.

**B.      The '014 Patent**

10.      Sonos intends to prove, by a preponderance of the evidence, that D&M has induced infringement of Asserted Claims 25 and 38 of the '014 Patent under 35 U.S.C. § 271(b) by actively inducing others to install any version of the HEOS controller app prior to Version "U2" onto a device (and thus "make" the claimed invention) within the United States and/or to use devices installed with any version of the HEOS controller app prior to Version "U2" within the United States.

11.      Sonos intends to prove, by a preponderance of the evidence, that D&M has induced infringement of Asserted Claim 21 of the '014 Patent under 35 U.S.C. § 271(b) by actively inducing others to use, within the United States, a HEOS system including a device installed with any version of the HEOS controller app prior to Version "U2" and at least two Accused HEOS Players and in a manner that caused every limitation of these Asserted Claims to be performed, either literally or under the Doctrine of Equivalents.

### C.    The '949 Patent

12.    Sonos intends to prove, by a preponderance of the evidence, that D&M has induced infringement of Asserted Claim 1 of the '949 Patent under 35 U.S.C. § 271(b) by actively inducing others to others to install any version of the HEOS controller app onto a device (and thus "make" the claimed invention) within the United States and/or to use devices installed with any version of the HEOS controller app.

13.    Sonos intends to prove, by a preponderance of the evidence, that D&M has induced infringement of Asserted Claim 16 of the '949 Patent under 35 U.S.C. § 271(b) by actively inducing others to use, within the United States, any device installed with any version of the HEOS controller app in a manner that caused the device to perform every limitation of this Asserted Claim, either literally or under the Doctrine of Equivalents.

## III.    CONTRIBUTORY INFRINGEMENT

### A.    The '258 Patent

14.    Sonos intends to prove, by a preponderance of the evidence, that D&M has contributorily infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent under 35 U.S.C. § 271(c) by supplying HEOS firmware updates for the Accused HEOS Players in the United States.

15.    Sonos intends to prove, by a preponderance of the evidence, that D&M has contributorily infringed Asserted Claim 11 of the '258 Patent under 35 U.S.C. § 271(c) by supplying HEOS firmware updates for the Accused HEOS Players in the United States.

**B.      The '014 Patent**

16.      Sonos intends to prove, by a preponderance of the evidence, that D&M has contributorily infringed Asserted Claims 25 and 38 of the '014 Patent under 35 U.S.C. § 271(c) by supplying versions of the HEOS controller app prior to Version "U2" in the United States.

17.      Sonos intends to prove, by a preponderance of the evidence, that D&M contributorily infringed Asserted claim 21 of the '014 Patent under 35 U.S.C. § 271(c) by supplying versions of the HEOS controller app prior to Version "U2" in the United States.

**C.      The '949 Patent**

18.      Sonos intends to prove, by a preponderance of the evidence, that D&M has contributorily infringed Asserted Claim 1 of the '949 Patent under 35 U.S.C. § 271(c) by supplying the HEOS controller app in the United States.

19.      Sonos intends to prove, by a preponderance of the evidence, that D&M has contributorily infringed Asserted Claim 16 of the '949 Patent under 35 U.S.C. § 271(c) by supplying the HEOS controller app in the United States.

**IV.    WILLFULLNESS**

20.      Sonos intends to prove, by a preponderance of the evidence, that D&M's infringement of each of the Asserted Claims was willful.

**V.     RELIEF & DAMAGES**

21.      Sonos intends to prove that it is entitled to a judgment that D&M directly infringed each Asserted Claim.

22.      Sonos intends to prove that it is entitled to a judgment that D&M induced infringement of each Asserted Claim.

23.     Sonos intends to prove that it is entitled to a judgment that D&M contributorily infringed each Asserted Claim.

24.     Sonos intends to prove that it is entitled to a judgment that any infringement by D&M was willful.

25.     Sonos intends to prove that it is entitled to a permanent injunction enjoining D&M, their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with D&M, and their parents, subsidiaries, divisions, successors and assigns, from further infringement of the Asserted Claims.

26.     Sonos intends to prove that it is entitled to a judgment awarding lost profits for D&M's infringement of the Asserted Claims and the amount of such lost profits.

27.     Sonos intends to prove that it is entitled to a judgment awarding reasonable royalties for D&M's infringement of the Asserted Claims and the amount of such reasonable royalties.

28.     Sonos intends to prove that it is entitled to a judgment awarding enhanced damages for, *inter alia*, D&M's willful infringement of the Asserted Claims.

29.     Sonos intends to prove that it is entitled to a judgment awarding pre-judgment and post-judgment interest.

30.     Sonos intends to prove that it is entitled to a judgment awarding attorneys' fees and/or costs.

## ISSUES ON WHICH D&M BEARS THE BURDEN OF PROOF

I.   **NON-INFRINGING ALTERNATIVES**

31.   Sonos intends to show that D&M cannot carry its burden of proving that non-infringing alternatives exist to practicing claims 11, 17, 18, 21, and 24 of the '258 Patent.

32.   Sonos intends to show that D&M cannot carry its burden of proving that non-infringing alternatives exist to practicing claims 21, 25, and 38 of the '014 Patent.

33.   Sonos intends to show that D&M cannot carry its burden of proving that non-infringing alternatives exist to practicing claims 1 and 16 of the '949 Patent.

II.   **INVALIDITY OF THE ASSERTED PATENTS**

34.   Below are the statements of intended proof related to whether the Asserted Patents are invalid under 35 U.S.C. §§ 102, 103 and 112.[2]

   A.   **The '258 Patent**

35.   Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any Asserted Claim of the '258 Patent is invalid under 35 U.S.C. § 102 as being anticipated by any of D&M's asserted prior art references.

---

[2] Sonos objects to the invalidity contentions set forth in D&M's pretrial exhibits for several reasons. First, D&M's expansive list of asserted prior art references goes well beyond the limits set forth by the Court. Second, D&M's contentions that the Asserted Claims are "invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of" D&M's asserted prior art references is vague, ambiguous, misleading, and confusing. Third, D&M's inclusion of invalidity allegations under § 102 go beyond the scope of D&M's final invalidity contentions and its expert reports, and in many instances, violate the legal standards regarding what constitutes a single reference for purposes of § 102. Fourth, D&M's contentions that the Asserted Claims are "invalid under 35 U.S.C. § 112" – without providing any specificity regarding the grounds for D&M's § 112 challenges – are vague, ambiguous, misleading, and confusing. For at least these reasons, Sonos respectfully submits that D&M should be required to provided an updated statement of invalidity contentions that remedies these deficiencies. Further, Sonos expressly reserves its right to update its statement of the issues of fact related to D&M's invalidity defenses once D&M provides its updated statement of invalidity contentions.

36.    Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any Asserted Claim of the '258 Patent is invalid under 35 U.S.C. § 103 as being rendered obvious by any of D&M's asserted prior art references, either alone or in combination.

37.    Sonos intends to prove that, even if D&M could establish a *prima facie* case of obviousness with respect to any Asserted Claim of the '258 Patent, there are secondary considerations of non-obviousness that overcome this *prima facie* case of obviousness.

38.    Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any of the Asserted Claims of the '258 Patent is invalid under 35 U.S.C. § 112.

**B.    The '014 Patent**

39.    Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any Asserted Claim of the '014 Patent is invalid under 35 U.S.C. § 102 as being anticipated by any of D&M's asserted prior art references.

40.    Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any Asserted Claim of the '014 Patent is invalid under 35 U.S.C. § 103 as being rendered obvious by any of D&M's asserted prior art references, either alone or in combination.

41.    Sonos intends to prove that, even if D&M could establish a *prima facie* case of obviousness with respect to any Asserted Claim of the '014 Patent, there are secondary considerations of non-obviousness that overcome this *prima facie* case of obviousness.

42.     Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any of the Asserted Claims of the '014 Patent is invalid under 35 U.S.C. § 112.

### C.     The '949 Patent

43.     Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any Asserted Claim of the '949 Patent is invalid under 35 U.S.C. § 102 as being anticipated by any of D&M's asserted prior art references.

44.     Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any Asserted Claim of the '949 Patent is invalid under 35 U.S.C. § 103 as being rendered obvious by any of D&M's asserted prior art references, either alone or in combination.

45.     Sonos intends to prove that, even if D&M could establish a *prima facie* case of obviousness with respect to any Asserted Claim of the '949 Patent, there are secondary considerations of non-obviousness that overcome this *prima facie* case of obviousness.

46.     Sonos intends to show that D&M cannot carry its burden of proving, by clear and convincing evidence, that any of the Asserted Claims of the '949 Patent is invalid under 35 U.S.C. § 112.

## III.   ABSOLUTE INTERVENING RIGHTS

47.     Sonos intends to show that D&M cannot carry its burden of proving by a preponderance of evidence that the claims of the '949 Patent were substantively changed during reexamination.

48.     Sonos intends to prove that D&M cannot carry its burden of proving by a

preponderance of evidence that absolute intervening rights apply to the Asserted Claims of the

'949 Patent.

# SCHEDULE G2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC. | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION No. 14-1330-RGA |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| | § | |
| D&M HOLDINGS INC. d/b/a THE | § | |
| D+M GROUP, D&M HOLDINGS U.S. | § | |
| INC., and DENON ELECTRONICS | § | |
| (USA), LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' BRIEF STATEMENT OF INTENDED PROOFS

Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and

Denon Electronics (USA), LLC (collectively, "Defendants") submit this Statement of Intended

Proofs regarding the issues Defendants expect to prove in response to Plaintiff Sonos, Inc.'s

("Sonos") allegations of patent infringement and requests for relief.  Defendants' statement is

based on Defendants' current understanding of the claims asserted by Sonos and the proceedings

in this action to date.  Defendants reserve the right to revise this statement in light of the Court's

rulings or any amendments, modifications, or extensions to Sonos's positions.

## ISSUES ON WHICH SONOS BEARS THE BURDEN OF PROOF

**I.     NO DIRECT INFRINGEMENT**

**A.     The '258 Patent**

1.     Defendants intend to prove that Sonos cannot carry its burden of establishing that

Defendants have directly infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent by

making, using, offering to sell, selling, and/or importing, within the United States, HEOS 1, HEOS

1

3, HEOS 5, HEOS 7, HEOS HomeCinema, HEOS Link, HEOS Amp, and HEOS Drive players installed with any version of the HEOS firmware.

2.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have made the inventions claimed in Asserted Claims 17, 18, 21, and 24 of the '258 Patent, and thus directly infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent, by virtue of the fact that HEOS 1, HEOS 3, HEOS 5, HEOS 7, HEOS HomeCinema, HEOS Link, HEOS Amp, and HEOS Drive players have downloaded and installed updated versions of the HEOS firmware.

3.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have directly infringed Asserted Claim 11 of the '258 Patent by making, offering to sell, and/or using, within the United States, any HEOS system including at least two HEOS players installed with any version of the HEOS firmware and at least two devices installed with any version of the HEOS controller app that are within the same local area network (LAN).

**B.      The '014 Patent**

4.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have directly infringed Asserted Claims 25 and 38 of the '014 Patent by making and/or using, within the United States, devices installed with any version of the HEOS controller app prior to Version "U2."

5.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have directly infringed Asserted Claim 21 of the '014 Patent by using, within the United States, a HEOS system including a device installed with any version of the HEOS controller app prior to Version "U2" and at least two HEOS players installed with any version of the HEOS firmware and in a manner that caused every limitation of these Asserted Claims to be performed, either literally or under the Doctrine of Equivalents.

C.      **The '949 Patent**

6.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have directly infringed Asserted Claim 1 of the '949 Patent by making and/or using, within the United States, devices installed with any version of the HEOS controller app.

7.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have directly infringed Asserted Claim 16 of the '949 Patent by using, within the United States, devices installed with any version of the HEOS controller app in a manner that caused the device to perform every limitation of this Asserted Claim, either literally or under the Doctrine of Equivalents.

## II.      NO INDIRECT INFRINGEMENT

A.      **The '258 Patent**

8.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have induced infringement of Asserted Claims 17, 18, 21, and 24 of the '258 Patent under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors to make and/or use, within the United States, HEOS 1, HEOS 3, HEOS 5, HEOS 7, HEOS HomeCinema, HEOS Link, HEOS Amp, and HEOS Drive players installed with any version of the HEOS firmware.

9.      Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have induced infringement of Asserted Claim 11 of the '258 Patent under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors to make and/or use, within the United States, a HEOS system including at least two HEOS players installed with any version of the HEOS firmware and at least two devices installed with any version of the HEOS controller app that are within the same LAN.

**B.     The '014 Patent**

10.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have induced infringement of Asserted Claims 25 and 38 of the '014 Patent under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors to make and/or use, within the United States, devices installed with any version of the HEOS controller app prior to Version "U2."

11.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have induced infringement of Asserted Claim 21 of the '014 Patent under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors to use, within the United States, a HEOS system including a device installed with any version of the HEOS controller app prior to Version "U2" and at least two HEOS players installed with any version of the HEOS firmware and in a manner that caused every limitation of these Asserted Claims to be performed, either literally or under the Doctrine of Equivalents.

**C.     The '949 Patent**

12.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have induced infringement of Asserted Claim 1 of the '949 Patent under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors to make and/or use, within the United States, devices installed with any version of the HEOS controller app.

13.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have induced infringement of Asserted Claim 16 of the '949 Patent under 35 U.S.C. § 271(b) by actively inducing third-party users and/or distributors to use, within the United States, any device installed with any version of the HEOS controller app in a manner that caused the device to perform every limitation of this Asserted Claim, either literally or under the Doctrine of Equivalents.

4

### III.     NO CONTRIBUTORY INFRINGEMENT

#### A.     The '258 Patent

14.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have contributorily infringed Asserted Claims 17, 18, 21, and 24 of the '258 Patent under 35 U.S.C. § 271(c) by supplying HEOS firmware updates in the United States.

15.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have contributorily infringed Asserted Claim 11 of the '258 Patent under 35 U.S.C. § 271(c) by supplying HEOS firmware updates in the United States.

#### B.     The '014 Patent

16.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have contributorily infringed Asserted Claims 25 and 38 of the '014 Patent under 35 U.S.C. § 271(c) by supplying versions of the HEOS controller app prior to Version "U2" in the United States.

17.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have contributorily infringed Asserted claim 21 of the '014 Patent under 35 U.S.C. § 271(c) by supplying versions of the HEOS controller app prior to Version "U2" in the United States.

#### C.     The '949 Patent

18.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have contributorily infringed Asserted Claim 1 of the '949 Patent under 35 U.S.C. § 271(c) by supplying the HEOS controller app in the United States.

19.     Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants have contributorily infringed Asserted Claim 16 of the '949 Patent under 35 U.S.C. § 271(c) by supplying the HEOS controller app in the United States.

## IV.    NO WILLFULNESS

20.    Defendants intend to prove that Sonos cannot carry its burden of establishing that Defendants willfully infringed any of the Asserted Claims of the Asserted Patents.

## V.    SONOS IS NOT ENTITLED TO RELIEF & DAMAGES

21.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment that Defendants directly infringed each Asserted Claim.

22.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment that Defendants induced infringement of each Asserted Claim.

23.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment that Defendants contributorily infringed each Asserted Claim.

24.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment that any infringement by Defendants was willful.

25.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a permanent injunction enjoining Defendants, their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with Defendants, and their parents, subsidiaries, divisions, successors and assigns, from further infringement of the Asserted Claims.

26.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment awarding lost profits for Defendants' infringement of the Asserted Claims and the amount or calculation of such lost profits.

27.    Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment awarding reasonable royalties for Defendants' infringement of the Asserted Claims and the amount and calculation of such reasonable royalties.

28.     Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment awarding enhanced damages for, *inter alia*, Defendants' willful infringement of the Asserted Claims.

29.     Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment awarding pre-judgment and post-judgment interest.

30.     Defendants intend to prove that Sonos cannot carry its burden of establishing that it is entitled to a judgment awarding attorneys' fees and/or costs.

## ISSUES ON WHICH DEFENDANTS BEAR THE BURDEN OF PROOF

## VI.     NON-INFRINGING ALTERNATIVES[1]

31.     Defendants intend to prove that non-infringing alternatives exist to practicing claims 11, 17, 18, 21, and 24 of the '258 Patent.

32.     Defendants intend to prove that non-infringing alternatives exist to practicing claims 21, 25, and 38 of the '014 Patent.

33.     Defendants intend to prove that non-infringing alternatives exist to practicing claims 1 and 16 of the '949 Patent.

## VII.    INVALIDITY OF THE ASSERTED PATENTS

Below are the statements of intended proof related to whether the Asserted Patents are invalid under 35 U.S.C. §§ 102, 103 and 112.

### A.     The '258 Patent

34.     Defendants intend to prove, by clear and convincing evidence, that claim 11 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the UPnP

---

[1] As described in Defendants' Issues of Law to be Litigated, Sonos bears the burden of proof for the purposes of obtaining lost profits that there is an absence of non-infringing alternatives. Regardless of whether Sonos can meet its burden, Defendants intend to prove the existence of non-infringing alternatives.

Design by Example book, including the Intel UPnP Media Renderer, UPnP Media Server, UPnP Media Controller and Intel Device Spy software that was included in a CD with that book, and the documents specifically identified and incorporated by reference into that book (including UPnP Design by Example; Intel UPnP Software Suite (Renderer, Server, Controller, Device Spy); "RenderingControl:1 Service Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000115187-249); "AVTransport:1 Service Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000114882-947); "Connection Manager: 1 Service Template Version 1.01 For UPnP, Version 1.0" June 25, 2002 (SONDM000114948-72); Windows Universal Plug and Play (UPnP) Client Support (D+M_0402007-24); Universal Plug and Play AV Architecture:1 For UPnP, Version 1.0, June 25, 2002 (D+M_0298151-172); "MediaRenderer:1 Device Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000115163-74); "MediaServer:1 Device Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000115175-86); "ContentDirectory:1 Service Template Version 1.01 For UPnP, Version 1.0, June 25, 2002" (SONDM000114973-5061); Universal Plug and Play Device Architecture," Version 1.0, June 8, 2000 (SONDM000164289-0342); RTP (RFC 1889); IEEE 1394; NTP (RFC-1305); (RFC 2616); Microsoft, Universal Plug and Play (UPnP) Client Support, August 2001 ("Microsoft UPnP") (D+M_0402007-24)) (collectively, "UPnP") (collectively, "UPnP").

35.     Defendants intend to prove, by clear and convincing evidence, that claim 11 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the Home Director System as evidenced by U.S. Patent Application Publication No. US2002/0124097 to Isely and D+M_0402137-140 (collectively, "Home Director").

36.     Defendants intend to prove, by clear and convincing evidence, that claim 11 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

37.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 11 of the '258 Patent.

38.     Defendants intend to prove, by clear and convincing evidence, that claim 11 of the '258 Patent is invalid under 35 U.S.C. § 112.

39.     Defendants intend to prove, by clear and convincing evidence, that claim 17 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

40.     Defendants intend to prove, by clear and convincing evidence, that claim 17 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

41.     Defendants intend to prove, by clear and convincing evidence, that claim 17 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

42.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 17 of the '258 Patent.

43.     Defendants intend to prove, by clear and convincing evidence, that claim 17 of the '258 Patent is invalid under 35 U.S.C. § 112.

44.     Defendants intend to prove, by clear and convincing evidence, that claim 18 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

45.     Defendants intend to prove, by clear and convincing evidence, that claim 18 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

46.     Defendants intend to prove, by clear and convincing evidence, that claim 18 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

47.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 18 of the '258 Patent.

48.     Defendants intend to prove, by clear and convincing evidence, that claim 18 of the '258 Patent is invalid under 35 U.S.C. § 112.

49.     Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

50.     Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

51.     Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

52.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 21 of the '258 Patent.

53.     Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '258 Patent is invalid under 35 U.S.C. § 112.

54.     Defendants intend to prove, by clear and convincing evidence, that claim 24 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

55.     Defendants intend to prove, by clear and convincing evidence, that claim 24 of the '258 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Home Director.

56.     Defendants intend to prove, by clear and convincing evidence, that claim 24 of the '258 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP and/or Home Director.

57.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 24 of the '258 Patent.

58.     Defendants intend to prove, by clear and convincing evidence, that claim 24 of the '258 Patent is invalid under 35 U.S.C. § 112.

**B.     The '014 Patent**

59.     Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

60.     Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System which comprises of the Escient Fireball System (as evidenced by The Fireball Digital Music Manager E-40 AND E-120 Installation and User Guide, January 2003 (D+M_0297671-906); The FireBall remote control guide, December 23, 2003 (D+M_0296627-645); Meet the Fireball, August 26, 2003 (D+M_0298092-3); FireBall Digital Music Player MP-100, Installation

11

and User's Guide, January 2003 (D+M_0318272-432)) in combination with Denon AVRs (as evidenced by "DVD and Music Manager DVDM-100 Installation and User's Guide" October 2003 (D+M_0323045-229); "AVR-5800 Operating Instructions" August 2000 (D+M_0295690-756); "AVR-1604/684 Operating Instructions" June 2003 (D+M_0000326-453)) and in further combination with U.S. Patent 6,469,633 to Wachter (collectively, the "D&M System").

61.    Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of U.S. Patent Application Publication No. US20020072816A1 to Shdema ("Shdema").

62.    Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '014 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

63.    Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 21 of the '014 Patent.

64.    Defendants intend to prove, by clear and convincing evidence, that claim 21 of the '014 Patent is invalid under 35 U.S.C. § 112.

65.    Defendants intend to prove, by clear and convincing evidence, that claim 25 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

66.    Defendants intend to prove, by clear and convincing evidence, that claim 25 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

67.    Defendants intend to prove, by clear and convincing evidence, that claim 25 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

68.     Defendants intend to prove, by clear and convincing evidence, that claim 25 of the '014 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

69.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 25 of the '014 Patent.

70.     Defendants intend to prove, by clear and convincing evidence, that claim 25 of the '014 Patent is invalid under 35 U.S.C. § 112.

71.     Defendants intend to prove, by clear and convincing evidence, that claim 38 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

72.     Defendants intend to prove, by clear and convincing evidence, that claim 38 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

73.     Defendants intend to prove, by clear and convincing evidence, that claim 38 of the '014 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

74.     Defendants intend to prove, by clear and convincing evidence, that claim 38 of the '014 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

75.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 38 of the '014 Patent.

76.     Defendants intend to prove, by clear and convincing evidence, that claim 38 of the '014 Patent is invalid under 35 U.S.C. § 112.

### C.      The '949 Patent

77.      Defendants intend to prove, by clear and convincing evidence, that the '949 Patent is not entitled to a priority date earlier than February 21, 2008.

78.      Defendants intend to prove, by clear and convincing evidence, that claim 1 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

79.      Defendants intend to prove, by clear and convincing evidence, that claim 1 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

80.      Defendants intend to prove, by clear and convincing evidence, that claim 1 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

81.      Defendants intend to prove, by clear and convincing evidence, that claim 1 of the '949 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

82.      Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 1 of the '949 Patent.

83.      Defendants intend to prove, by clear and convincing evidence, that claim 1 of the '949 Patent is invalid under 35 U.S.C. § 112.

84.      Defendants intend to prove, by clear and convincing evidence, that claim 16 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of UPnP.

85.      Defendants intend to prove, by clear and convincing evidence, that claim 16 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of the D&M System.

86.     Defendants intend to prove, by clear and convincing evidence, that claim 16 of the '949 Patent is invalid under 35 U.S.C. §§ 102, 103, alone or in combination, in view of Shdema.

87.     Defendants intend to prove, by clear and convincing evidence, that claim 16 of the '949 Patent is invalid under 35 U.S.C. § 103 in view of a combination of UPnP, the D&M System and/or Shdema.

88.     Defendants intend to prove that Sonos cannot carry its burden of establishing secondary considerations of nonobviousness, including the necessary nexus between the evidence and claimed invention, which salvage the otherwise invalid claim 16 of the '949 Patent.

89.     Defendants intend to prove, by clear and convincing evidence, that claim 16 of the '949 Patent is invalid under 35 U.S.C. § 112.

## VIII.   ADDITIONAL AFFIRMATIVE DEFENSES

Below are the statements of intended proof related to Defendants' additional affirmative defenses.

### A.     The '949 Patent

90.     Defendants intend to prove, by a preponderance of the evidence, that Sonos's claims for relief for the '949 Patent are limited and/or barred by absolute intervening rights. [2]

        a.      Defendants intend to prove, by a preponderance of the evidence, that the claims of the '949 Patent were amended during reexamination. [3]

---

[2] Although Defendants have identified the issue of absolute intervening rights in the statement of intended proof related to Defendants' affirmative defenses, there are no pending issues of fact which require the jury's attention or that need be proven.  Instead, the issue of absolute intervening rights is a matter of law for the Court to decide for the reasons set forth below.  Nevertheless, out of an abundance of caution, Defendants have identified these issues in this statement to avoid any claims of waiver or incompleteness.

[3] There is no dispute that claims 1 and 16 of the '949 Patent were amending during reexamination. See D.I. 428 at 8 ("Language was added to both claims 1 and 16 (through claim 15) during reexamination.").  As such, there is no further need for the jury to consider this issue and this should be deemed proven.

     b.     Defendants intend to prove, by a preponderance of the evidence, that the amendments to the '949 Patent claims were substantive. [4]

---

[4] The Court has determined – and the Parties are in agreement –  that the issue of whether amendments were substantive is a matter of law to be determined by the Court. *See* Hrg. Tr. p. 8, ll. 4-25, October 30, 2017.  As such, there is no need for the jury to consider this issue either as there are no outstanding questions of fact which need be proven.

# SCHEDULE H1

# Sonos's Opening Briefs in Support of its Motions *in Limine* Nos. 1-3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 14-1330-RGA |
| v. | ) | |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | JURY TRIAL DEMANDED |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SONOS, INC.'S MOTIONS *IN LIMINE*

OF COUNSEL:
George I. Lee
Sean M. Sullivan
Rory P. Shea
J. Dan Smith
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
224 N Desplaines St, Suite 250
Chicago, IL 60661
(312) 754-0002

Dated: October 27, 2017

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff Sonos, Inc.*

## I.      MIL NO. 1 TO PRECLUDE EVIDENCE OF D&M'S PATENTS AND REFERENCE TO D&M'S COUNTERSUIT

Sonos respectfully moves *in limine* to preclude D&M from (i) introducing evidence or testimony related to any D&M patents ("D&M Patents"), and (ii) referring to D&M's countersuit against Sonos, *D&M Holdings Inc. v. Sonos, Inc.*, Civ. A. No. 16-141 (RGA) ("the 2016 Case").

Rule 402 provides that irrelevant evidence is not admissible.  Fed. R. Evid. 402.  Rule 401 defines relevant evidence as evidence that has a tendency to make a fact of consequence to the action more or less probable.  Fed. R. Evid. 401.  Moreover, Rule 403 requires that "a cost/benefit analysis must be employed to determine whether or not to admit evidence; relevance alone does not ensure its admissibility."  *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1343 (3d. Cir. 2000).  As a result, relevant evidence should be excluded if its probative value is substantially outweighed by unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403.

Sonos anticipates that D&M will seek to offer evidence or testimony related to the D&M Patents.  *See, e.g.,* U.S. Pat. Nos.  7,343,435; 6,539,210; 7,305,694; 6,469,633; 7,987,294; 8,755,667; 6,473,441; 7,734,850; and 7,995,899.  More specifically, D&M may try to use these D&M Patents to avoid infringement of Sonos's patents by arguing that D&M's accused HEOS products practice these D&M Patents, and therefore are "patented" over Sonos's patents.  Sonos also anticipates that D&M will seek to use the 2016 Case to cast Sonos in a bad light as an accused infringer.

As explained in more detail below, D&M should be precluded from using the D&M Patents and referring to the 2016 Case because neither are relevant to Sonos's claims or D&M's defenses in this lawsuit.  Fed. R. Evid. 402.  Even if the D&M Patents or the 2016 Case had

some probative value to a claim or defense in this action, any such value is substantially outweighed by its potential to confuse and mislead the jury.  Fed. R. Evid. 403.

First, the D&M Patents are not relevant to any claim or defense in this case.  For instance, the grant of a patent on an accused product does not avoid infringement.  *Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1559 (Fed. Cir. 1996) ("The existence of one's own patent does not constitute a defense to infringement of someone else's patent.  It is elementary that a patent grants only the right to exclude others and confers no right on its holder to make, use, or sell."); *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1580 (Fed. Cir. 1984) ("[W]here defendant has appropriated the material features of the patent in suit, infringement will be found even when those features have been supplemented and modified to such an extent that the defendant may be entitled to a patent for the improvement.").  Likewise, because they have not been asserted as prior art, the D&M Patents are not relevant to any of D&M's defenses.

Likewise, the 2016 Case is also not relevant to this action.  The 2016 Case involves different issues, patents, and accused products than the present case.  Indeed, this is why the Court elected to sever the 2016 Case from the present case.  *See* D.I. 100.

Second, the D&M Patents and the 2016 Case would confuse the issues and mislead the jury regarding Sonos's patent infringement claims.  For example, the HEOS products  are accused of infringement, not the D&M Patents.  Admitting the D&M Patents would confuse and mislead the jury into wrongly thinking the Patent and Trademark Office ("PTO") determined that the HEOS products do not infringe Sonos's patents, or that the PTO otherwise condoned the sale of the HEOS products when it allowed the D&M Patents.  *See Cameco Indus. v. Louisiana Cane Mfg.*, Civ. No. 92-3158, 1995 WL 468234, at *5-6 (E.D. La. July 27, 1995) (excluding evidence of defendant's patent, as "issuance of a patent is not presumptive evidence of noninfringement,"

and admission "would be unfairly prejudicial to the plaintiff, as this evidence is likely to give the jury the false impression that a patent on the accused [device] means that it is substantially different from the [device] claimed in plaintiff's patent").

Moreover, it is fundamental that a patent is a grant of a right to exclude, not of a right to make, use, or sell.  35 U.S.C. § 154(a)(1); *Atlas*, 750 F.2d at 1580.  Thus, while the D&M Patents may give D&M the right to exclude others from making, using or selling a product claimed in these patents, they do not give D&M the right to make, use, or sell such a product. Given its lack of probative value, the danger that jurors would mistake the grant of the D&M Patents for PTO approval of D&M's accused products warrants the exclusion of the D&M Patents.  *See EZ Dock, Inc. v. Schafer Sys.*, Civ. No. 98-2364, 2003 WL 1610781, at *11 (D. Minn. Mar. 8, 2003) (excluding evidence of Defendants' own patents under F.R.E. 402 and 403 in part based on "the common misconception by the public that a patent grants an affirmative right to make the patented article").

Similarly, referring to the 2016 Case in this litigation would only serve to confuse and mislead the jury as to basic core issues, such as who the plaintiff and defendant are, which patents are being asserted, and what products have been accused of infringement.

Because the D&M Patents and the 2016 Case have no probative value, and stand only to confuse the issues and mislead the jury, Sonos respectfully requests that the Court exclude these materials, and any references thereto, from evidence pursuant to Rules 402 and 403.

## II.      MIL NO. 2 TO PRECLUDE EVIDENCE OF PRIOR LITIGATION AND DR. BONE'S  SUPPLEMENTAL EXPERT REPORT

Sonos respectfully moves *in limine* to preclude D&M from offering any evidence, testimony, opinions, or arguments related to the prior litigation between Sonos and BHM, *Black Hills Media, LLC v. Sonos, Inc.*, Case No. 2:14-CV-00486 (C.D. Cal) (the "BHM Case").  As one example, Sonos anticipates that D&M will seek to offer evidence or testimony from Dr. Bone's Supplemental Expert Report on damages, which was prepared and submitted for the sole purpose of addressing positions taken by Sonos and its experts in the BHM Case.  *See* Ex. A at ¶4 ("I have limited this supplemental report to only the information recently produced by Sonos in response to Judge Andrews' Order granting D&M's opposed request for production of documents related to the BHM Litigation . . . .").  The BHM Case, however, is not relevant to the issues to be decided in this case, and any mention of the BHM Case would be unfairly prejudicial to Sonos and could also confuse the issues to be tried or mislead the jury.

Specifically, Rule 402 of the Federal Rules of Evidence provides that irrelevant evidence is not admissible.  Fed. R. Evid. 402.  Rule 401 defines relevant evidence as evidence that has a tendency to make a fact of consequence to the action more or less probable.  Fed. R. Evid. 401.  Here, no aspect of the BHM Case touches upon the questions the jury must consider in this case.

In fact, the BHM Case focused on BHM's asserted patents, which are not related to Sonos's Asserted Patents in any way and have entirely different specifications directed to entirely different claimed inventions.  *See Multimedia Patent Trust v. Apple Inc.*, No. 10-CV-2618-H (KSC), 2012 WL 12868264, at *8 (S.D. Cal. Nov. 20, 2012) (precluding evidence of prior litigation involving different patents and different accused products).  Moreover, damages issues from the BHM Case have no relevance to this case, as Sonos never entered into any kind of license or agreement with BHM.  Furthermore, unlike here, BHM and Sonos were not

competitors in the marketplace, and lost profits was not at issue in the BHM Case. Instead, the hypothetical license negotiation in the BHM Case was between Sonos and a non-practicing entity (BHM). It involved patents that had their own unique licensing history as the patents were (i) purchased through public auction or from a different non-practicing entity and (ii) previously licensed by BHM as part of an industry wide licensing campaign. In stark contrast, the present cases involve the enforcement of a practicing entity's patents, which have never been licensed before, against a specific direct competitor in the marketplace. Thus, the damages analysis for BHM's patents has no relevance to the damages that D&M owes Sonos for infringing Sonos's patents.

Likewise, the depositions of Sonos's fact witnesses in the BHM Case are irrelevant to this case. For instance, the testimony of Sonos's technical witnesses in the BHM Case related to specific features of Sonos's products that were accused of infringing BHM's patent claims, and the testimony of Sonos's financial witnesses related to the sales of Sonos's products. Similarly, Sonos's summary judgment motions in the BHM Case all related to non-infringement and invalidity of BHM's asserted patents. Accordingly, this material has nothing to do with the infringement of Sonos's patents by D&M's products.[1]

Second, while this Court ordered the production of the BHM Case materials for discovery purposes, this Court recognized that the relevance of such materials to this case is "marginal":

> It is certainly the case that the materials would be, at minimum, ***much less relevant to the 14-1330 case*** than to the 16-141 case. If there were nothing but the 14-1330 case, this might be a difficult decision. However, there is no extra burden to Sonos producing the materials in both cases, and there is ***some marginal possibility that some of it will be relevant to the 14-1330 case***.

---

[1] Fed. R. Civ. P. 32(a)(8) allows the use of depositions from earlier actions when the "later action involve[es] the same subject matter between the same parties . . . ." That is certainly not the case here, as the BHM Case involved both different subject matter (e.g., different patents) and different parties than the present case.

D.I. 281, p. 2 (emphasis added).

Even if the facts or circumstances related to the BHM Case have some "marginal" relevance to this case, they should be excluded because their probative value is substantially outweighed by the danger of unfairly prejudicing Sonos, confusing the issues to be tried, misleading the jury, and needlessly presenting cumulative evidence.  *See* Fed. R. Evid. 403; *see also Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1573 (Fed. Cir. 1993) (affirming preclusion of prior litigation evidence because of the "possibility of prejudice" and "confusion of the jury was very high."); *Multimedia Patent Trust,* 2012 WL 12868264, at *8 (holding that "any probative value the [prior litigation] might have would be substantially outweighed by the danger of unfair prejudice.").  For example, the fact that BHM filed suit against Sonos to assert BHM patents may improperly cause the jury to scrutinize the credibility of Sonos's evidence and witnesses for reasons unrelated to this case.  *See World Wide Stationery Mfg., Co. v. Bensons Int'l Sys., Inc.*, No. 3:11 CV 523, 2012 WL 12894226, at *2 (N.D. Ohio Sept. 12, 2012) ("Simply put, introducing evidence of prior cases involving different parties and different patents will not only waste judicial time and resources, but also distract the jury from the relevant issues in this case.").

 For the foregoing reasons, Sonos moves the Court for an order instructing D&M to refrain from offering evidence, testimony, opinions, or arguments related to the BHM Case at trial, including Dr. Bone's Supplemental Expert Report.

## III.    MIL NO. 3 TO PRECLUDE EVIDENCE OR SUGGESTION OF IMPROPRIETY

Sonos moves to preclude D&M from offering any evidence or suggestion of impropriety by Sonos.  For example, Sonos anticipates that D&M will seek to offer evidence and elicit testimony that suggests some purported impropriety related to (1) Sonos's prosecution of the Asserted Patents, (2) Sonos's drafting of certain claims of the Asserted Patents to allegedly cover D&M's products, (3) competitive acts by Sonos, and (4) settlement or compromise discussions between the parties concerning this case.

First, despite D&M's attempts to plead inequitable conduct, D&M has no affirmative defense or counterclaim of inequitable conduct in this case.[2]  Nevertheless, D&M's expert reports on invalidity and non-infringement are riddled with spurious accusations that Sonos acted improperly during prosecution.[3]  Aside from being meritless, these accusations by D&M and its experts are irrelevant under Rule 402.[4]

Moreover, even if these accusations have some marginal relevance to this case (which they do not), their probative value is substantially outweighed by the danger of unfairly prejudicing Sonos, and unnecessarily confusing or misleading the jury.  *See* Fed. R. Evid. 403. Notably, D&M's invalidity expert, Dr. Kesan, claimed that "certain documents pertaining to prior art were both in the possession of Sonos and not in the possession of the Patent Office during its consideration of the validity of the proposed claims in the associated applications," and

---

[2] *See* D.I. 141, 160, 172, 176-77, 192, 226-27.

[3] *See, e.g.*, Ex. B at pp. 6, 11, 32, 39-42, 58, 82 (repeatedly alleging that Sonos improperly withheld prior art from the USPTO); Ex. C at ¶ 267 (alleging that Sonos "buried" references during ex parte reexamination proceedings).

[4] *See Electro-Mechanical Corp. v. Power Distribution Products, Inc.*, No. 11-71, 2013 WL 1859229, at *2 (W.D. Va. Mar. 13, 2013) ("[A]rguments and evidence implying wrongful conduct on the part of the applicant in withholding or failing to disclose such prior art are not relevant where, as here, the defendants have asserted no defense or counterclaim of inequitable conduct."); Fed. R. Evid. 402.

this purported fact was "relevant to [his] invalidity opinions." *See* Ex. D at ¶ 904. However, whether Sonos was in possession or aware of prior art that was not disclosed during prosecution is irrelevant to D&M's invalidity defenses and would unnecessarily confuse or mislead the jury.

Second, D&M accused Sonos of drafting certain claims of the Asserted Patents to cover D&M's products. *See, e.g.*, Ex. C at ¶ 182 ("Sonos **could have** analyzed the accused HEOS devices using software . . . to try to determine how it operated . . . to try and claim such prior art functionality.") (emphasis added). All the Asserted Patents, however, have effective filing dates well before the HEOS products were ever launched. Even if D&M's purely speculative accusation was true, there is nothing improper, illegal, or inequitable about drafting claims to cover a competitor's product.[5] Thus, D&M's accusation is not only irrelevant under Rule 402, but also serves no other purpose than to make Sonos "appear unprincipled in the jurors' eyes." Therefore, it should also be precluded under Rule 403.[6]

Third, Sonos anticipates that D&M will seek to introduce evidence and testimony that Sonos engaged in competitive activities in developing Sonos's products. *See, e.g.*, Ex. E at 157:5-160:8 (D&M counsel questioning Sonos employee regarding whether Sonos performed teardowns of competitor products); Ex. F at ¶ 126; Ex. C at ¶ 106 ("Sonos merely copied the UPnP Standards and other commercially available products that beat Sonos to the market."); *see also, e.g., id.* at ¶¶ 74, 79-80, 189. However, evidence and testimony regarding **Sonos's**

---

[5] *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 874 (Fed. Cir. 1988) ("[T]here is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product . . . . [I]ts genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent.").
[6] *Erfindergemeinshaft UroPep GbR v. Eli Lilly & Co.*, No. 15-1202, 2017 WL 959592, at *1-3 (E.D. Tex. Mar. 13, 2017) ("[T]he law is clear that it is not improper for patentees to seek claims in an original or continuation application with the purpose of obtaining patent rights that would cover products that have come on the market.").

competitive activities are irrelevant to any claim or defense in this case, and should therefore be precluded under Rule 402.  To be sure, D&M's infringing actions vis-à-vis Sonos's patents are at issue in this case, not any of Sonos's competitive actions.  As such, any proffer of evidence by D&M regarding **Sonos's** competitive activities would mislead or distract the jury from the core issues in this case.  Therefore, it should also be precluded under Rule 403.[7]

Fourth, Sonos anticipates that D&M will seek to offer evidence and elicit testimony related to settlement or compromise discussions between the parties, including statements made in a teleconference between the parties shortly after this case was filed.  During this teleconference, Sonos allegedly made statements to D&M suggesting that D&M's removal of a certain feature would nullify Sonos's claims with respect to U.S. Patent No. 7,571,014.  *See, e.g.,* Ex. G at 403:4-19.  Rule 408 (a), however, bars evidence related to settlement or compromise discussions that is offered to invalidate a claim in a case.  *See* Fed. R. Evid. 408 (a).[8]  Indeed, D&M's intent to offer such evidence at trial "runs directly afoul of Rule 408(a)."[9]

For the foregoing reasons, Sonos requests that the Court exclude any evidence or suggestion of impropriety related to Sonos's prosecution activities, competitive acts, and/or settlement discussions with D&M regarding this case.

---

[7] *Radware, Ltd. v. F5 Networks, Inc.*, No. 13-2024, 2016 WL 590121, at *11 (N.D. Cali. Feb. 13, 2016) ("[T]he court also agrees with Radware that any marginal relevance of Radware's alleged bad [competitive] acts would be greatly outweighed by the associated unfair prejudice, waste of time, and confusion.").

[8] *See also Bishop v. JP Morgan Chase & Co.*, No. CV 13-001-RGA, 2014 WL 1382393, at *3 (D. Del. Apr. 7, 2014) ("The purpose behind Rule 408 is the 'promotion of the public policy favoring the compromise and settlement of disputes that would otherwise be discouraged with the admission of such evidence.'") (citation omitted).

[9] *Hypertherm, Inc. v. Am. Torch Tip Co.*, No. CIV. 05-CV-373-JD, 2009 WL 435324, at *5 (D.N.H. Feb. 19, 2009) (precluding the defendant from asserting evidence of the "changes it made in its designs for some of the accused products," after mediation discussions to support its defense against the patentee's charge of willful infringement).

# D&M's Oppositions to Sonos's Motions *in Limine* Nos. 1-3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. 14-1330 (RGA) |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| D&M HOLDINGS INC. d/b/a THE | § | |
| D+M GROUP, D&M HOLDINGS U.S. | § | |
| INC., and DENON ELECTRONICS | § | |
| (USA), LLC, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' RESPONSE TO SONOS' MOTIONS *IN LIMINE*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ John M. Jackson

OF COUNSEL:

John M. Jackson
Matthew C. Acosta
Blake T. Dietrich
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000

David Folsom
JACKSON WALKER L.L.P.
6002 Summerfield, Suite B
Texarkana, TX 75503
(903) 255-3250

Wasif Qureshi
JACKSON WALKER LLP
1401 McKinney, Ste. 1900
Houston, Texas 77010
(713) 752-4521
wqureshi@jw.com

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc. and Denon Electronics (USA), LLC*

Defendants D&M Holdings, Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics, (USA), LLC (collectively, "Defendants") respond to Plaintiff Sonos, Inc. ("Plaintiff") motions *in limine* as set forth below:

I.      **SONOS'S MOTION *IN LIMINE* #1:  TO PRECLUDE EVIDENCE OF D&M'S PATENTS AND REFERENCE TO D&M'S COUNTERSUIT**

Sonos moves in limine to preclude D&M from mentioning (a) any patents owned by D&M; and (b) any reference to Defendants' severed patent infringement counterclaims (Severed Counterclaims). *See* C.A. No. 16-141.  This motion should be denied.

While Sonos lists the nine patents that D&M asserted in the Severed Counterclaims, its motion is overly broad because it arguably covers all patents owned by D&M.  Because this motion would even preclude elected prior art, the scope of the motion goes too far.  D&M does not intend to introduce as evidence patents that are irrelevant to this case including the nine patents listed by Sonos in its motion.  However, D&M does intend to introduce relevant evidence of (a) patents owned by D&M that are disclosed in connection with D&M's elected invalidity defenses and motivation to combine those references[1]; (b) D&M's acquisition of technology, patents, and personnel from several companies in connection with its development of the accused products; (c) the undisputed fact that D&M has patents relating to the accused products; and (d) the undisputed fact that D&M has infringement counterclaims asserted against Sonos.  These facts and evidence are relevant under Federal Rules of Evidence 402 and 403.

**D&M's Prior Art Patents**:  The patents listed in Footnote 1 are directly relevant to D&M's invalidity defense.  D&M has asserted the Wachter patent as evidence of a D&M audio system that is prior art to the asserted '014 and '949 Patents.  In addition, the Fujishiro, Commons, Namatame, and Nakajima patents are evidence of the motivation to combine D&M's asserted prior art references.  All of those patents are owned by D&M and Sonos has not articulated any reason why they should be wholly stricken from this case.[2]

---

[1] Those patents include: US7263110 ("Fujishiro"); US7305694 ("Commons"); US7308188 ("Namatame"); US6919771 ("Nakajima"); and U.S. 6,469,633 ("Wachter").

[2] During the meet and confer relating to the motions in limine, counsel for Sonos acknowledged

1

**Development History of the Accused Products**:   Sonos has made it clear that they intend to present evidence of copying and seek a finding of willful infringement.   As such, the history of development, design, and operation of the accused devices and D&M's acquisition of technology, including patents and personnel, developed by technology companies known as Avega, Altec Lansing and Escient will be highly relevant to refute Sonos's contentions.   D&M's witnesses cannot testify concerning the development of the accused system without referencing the D&M patents, the patented technology that was ultimately incorporated into the accused products, and the role of the inventors of that technology (many of whom are now D&M employees further developing the HEOS products).

For example, Escient was a D&M subsidiary for many years.   An Escient product known as "Fireball" is asserted prior art in this case.   Escient patents developed in connection with Fireball were acquired by D&M from a subsidiary and cover the accused HEOS products. Patented technology created by Avega was also acquired as part of D&M's efforts to the Accused Products.   While D&M has no intention of engaging in an in-depth discussion of these patents outside the asserted prior art, the fact that D&M acquired patented technology to incorporate into the HEOS technology is highly relevant to combat Plaintiff's allegations of willful infringement, long felt need, failure of others, among other issues.   That is especially true because Sonos will be arguing that it has many patents implying that D&M has no patents and merely copied Sonos products.

**The Fact of the Severed Counterclaims**:   D&M does not intend to "use the 2016 Case to cast Sonos in a bad light as an accused infringer."   Nor does D&M intend to argue or suggest that "the Patent and Trademark Office ("PTO") determined that the HEOS products do not

---

that its motion would not preclude patents relating to D&M's invalidity defenses.

infringe Sonos's patents . . ."   However, D&M expects that Sonos will introduce evidence or argument that (a) it has obtained patents on its own technology beyond those that are asserted in this litigation,[3] (b) it is an "innovator" or "reinvented audio for the digital age" because of its patent portfolio;[4] and (c) features and aspects of its products other than those covered by the claimed technology, but allegedly covered by other patents are relevant to secondary considerations of non-obviousness.[5]  D&M should be permitted to respond to these arguments by demonstrating that (a) it also owns patents covering its accused products; (b) that it has asserted those patents against Sonos in a related case; and (c) that it and its related or acquired companies are "innovators" as well.

In essence, if Sonos intends to tout itself as an innovator based in part on its own patent portfolio, its claim that its patents cover Sonos products, and through the mere fact that it asserted its patents against D&M, then D&M should be able to do the same.  Sonos is not prejudiced, nor are the issues in this case confused, if D&M is allowed to mention its side of the story.  In fact, the issues are more confused, and D&M is unfairly prejudiced, if it is *not* able to respond.  Sonos should not be permitted to argue that is an innovator in the industry, and D&M is not, to improperly support its infringement, validity, damages and willfulness cases.  Rather, D&M should be allowed to state that it too has patents  related to its technology and has asserted patent infringement counterclaims against Sonos.  No more and no less.  Sonos's motion should be denied.

---

[3] Ex, 1 (Sonos Second Supplement to Third Amended Complaint at ¶ 14)
[4] Ex. 1 (Sonos Second Supplement to Third Amended Complaint at ¶ 12)
[5] See, e.g., Ex., 2 (Wolfe Rebuttal Report) at ¶¶ 1321, 1322, 1327- 1333, 1353, 1342.

## II.   SONOS'S MOTION *IN LIMINE* #2:  TO PRECLUDE EVIDENCE OF PRIOR LITIGATION AND DR. BONE'S SUPPLEMENTAL EXPERT REPORT

Sonos seeks to preclude any evidence, testimony, opinions or argument related to the

*Black Hills Media, LLC v. Sonos, Inc.*, Case No. 2:14-CV-00486 (C.D. Cal) (the "BHM Case")

under Rules 402 and 403.  Sonos was compelled to produce the BHM documents on May 17,

2017, *see* D.I. 281, and completed its production on May 26, 2017.  Thereafter, Mr. Bone,

D&M's damages expert, submitted a Supplemental Report relating exclusively to the impact of

Mr. Tate's statements in the BHM Case pertinent to his opinion in this litigation.  *See* Ex. 3,

(Bone Supp. Report) at ¶ 4.  In that case, BHM accused Sonos's products of infringing patents

concerning synchronization technology. The Abstract of both BHM Patents states, in part, "The

present invention details a novel application of *wireless networking and digital music

technologies to achieve coordinated and synchronized music playback* . . . ."  The accused

products in that case were the same products that Sonos claims are embodiments of its asserted

patents in this case.  Sonos seeks to preclude depositions of Sonos's fact and expert witnesses

and Sonos's expert reports in the BHM case. Sonos's experts in the BHM Case are the same

experts, testifying on the opposite side of the same general issues (invalidity, non-infringement

and damages) as in this case.  Four of the five fact witnesses deposed in the BHM Case were

deposed in this case, and three of those are expected to testify at trial.

Initially, there is no question that the prior statements of Sonos's witnesses in this

litigation are relevant and admissible for the purposes of impeachment.  *See* F.R.E. 613; F.R.E.

801(d)(1); 801(d)(2); Fed. R. Civ. P. 32(a)(8).  Sonos has not argued otherwise.[6]  The only

"prejudice" from the BHM evidence that Sonos has identified in its motion is that "the fact that

---

[6] In Sonos's cited case *Multimedia Patent Trust v. Apple Inc.*, the movant specified that it was not
moving to preclude evidence of prior litigation for impeachment purposes.  No. 10-cv-2618,
2012 WL 12868264, at *2 (S.D. Cal. Nov. 20, 2012).

4

BHM filed suit against Sonos to assert BHM patents may improperly cause the jury to scrutinize the credibility of Sonos's witnesses."   D&M has no intention of arguing that a patent infringement lawsuit against Sonos should impair the credibility of its witnesses.   However, witnesses' prior inconsistent statements do impeach their credibility and are admissible for that purpose.   F.R.E. 613, 801(d)(1).   Prior inconsistent witness statements, while certainly prejudicial to Sonos's case, are not "unfairly prejudicial" under Rule 403.

Under Rules 401 and 402, the BHM evidence overwhelmingly makes "a fact [of consequence] more or less probable than it would be without the evidence." As the Federal Circuit stated in Sonos's own cited case, "we agree that it may be appropriate to admit evidence of prior litigation, but such evidence must pass muster, like any other evidence, as relevant and probative of an issue in the second case. . .  There is no exemption from Rule 403 for evidence of prior litigation. None of the proffered evidence is *per se* admissible or excludable." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1573 (Fed. Cir. 1993). Specifically, "[p]rior litigation may be evidence of the 'secondary' considerations of commercial success or copying." *Id.*

Listing all relevant and probative portions of the BHM documents would take many pages of briefing.  As examples, the BHM evidence is relevant to the following disputed issues: (a) the market definition for Sonos's products; (b) the demand for "synchronization" in Sonos's product market (c) the market benefits of the allegedly patented features (d) the plain and ordinary meaning of the "synchronization" terms; (e) whether synchronization of multiroom audio systems was well known in the prior art; and (f) the operation and scope of UPnP and motivation to combine the same.

Mr. Bone's supplemental report addresses the effect of Mr. Tate's factual and opinion testimony in the BHM litigation as it impacts issues (a)-(c) in this case. *See, e.g.,* Ex. 3, (Bone's

Supp. Report) at ¶¶ 6-10.  None of that testimony relates to the character of the patents in the BHM litigation.  In other words, Mr. Tate's testimony and factual statements concerning Sonos's business and the competitive market generally are independent of the BHM patents. Mr. Tate's BHM statements tend to support Mr. Bone's opinions in this case and undermine his own.

Similarly, Dr. Wolfe's testimony relates to issues (d) and (e).  In this litigation, Dr. Wolfe states "the field of networked multi-zone audio systems certainly was not 'highly developed' in the early 2000s. . . ."  Ex. 2 (Wolfe Reb. Rpt) at  ¶ 131.  In the BHM Litigation, Dr. Wolfe opines, "synchronized playback in wireless networked devices . . . was well known in the prior art before the invention of the BHM Patents [in May 2001]." *See, e.g.*, Ex. 4 (Wolfe BHM Rpt, part 2) at ¶ 983.  The latter statement bolsters the opinion of D&M's fact and expert witnesses, as 2001 is a relevant period for prior art asserted in this case.

Sonos's fact witness testimony relates to issues (a)-(f) above.  Mr. Coburn testifies concerning Sonos's awareness, use and application of UPnP. *See* Ex. 5 (BHM Coburn Depo.) at 32:7-24, 62:8-64:4.  Mr. Cullen testifies concerning (1) the prior art's ability to play in multiple rooms and zones (specifically mentioning Denon) (*see* Ex. 6 (BHM Cullen Depo.) at 21:4-14); (2) Sonos's market competitors ( *Id.* at 42:18-43:5); and (3) that Sonos's marketing is concerned with brand awareness foremost as opposed to Sonos alleged patented features (*Id.* at 1:19-54:22).  Mr. Lang testifies concerning his understanding of the word "synchrony" in the context of Sonos technology.  Ex. 7 (BHM Lang Depo.) at 114:21-115:11.

In sum, the BHM evidence relates to highly contested factual issues in this case, thus meeting the requirements of Rules 401 and 402.  Moreover, there is no likelihood of unfair prejudice or jury confusion because D&M will not use the evidence for anything other than to bolster the relevant factual issues to which the evidence relates Sonos's motion should be denied.

III.   **SONOS'S MOTION *IN LIMINE* #3:  TO PRECLUDE EVIDENCE OR SUGGESTION OF IMPROPRIETY**

Sonos next seeks to exclude a random collection of evidence by arguing that D&M should not be able to argue that Sonos has ever acted with "impropriety."  The collection of evidence is vaguely defined, but is characterized by its decided relevance to many issues of consequence.  As discussed below, D&M does not intend to argue that Sonos has done anything legally improper based on the facts described in Sonos's Motion.  However, to the extent that Sonos requests that the court exclude *the facts* entirely, Sonos's motion should be denied.

**Improper Claims of Inequitable Conduct**:   D&M recognizes that no inequitable conduct defense is being tried in this case.  In addition, D&M has recently dropped its patent misuse and prosecution laches defenses.  Accordingly, D&M does not intend to argue that Sonos's prosecution of the asserted patents is improper.  However, the prosecution history itself, and Sonos's knowledge, use and application of the prior art in the development of its own products and invention of the patented technology is highly relevant to the issues in this case, such as, (a) motivation to combine, (b) long felt need, (c) failure of others, (d) teaching away, and (e) commercial success, among others.[7]  Furthermore, the fact that the patent office did not have asserted prior art when the patents were filed is relevant to the issue of invalidity

**Allegations that Sonos improperly drew its claims to D&M's System**:  It is unclear what factual evidence, if any, Sonos is attempting to exclude on this basis.  D&M does not intend to argue to the jury that Sonos has improperly drawn its claims to D&M's accused products.  However, the fact that Sonos prosecuted its claims while in possession of D&M's Products is relevant, among other things, to rebut Sonos's allegations of willful infringement.[8]   It is

---

[7] Ex. 8 (Kesan Report) at pp. 33-34, 38, 39-40

[8] D&M has filed a motion *in limine* to preclude Sonos from offering evidence or argument of willful infringement of the asserted claims of the '949 and '258 Patent.

7

impossible, and at the very least unlikely, that D&M willfully infringed patent claims not in existence when its accused products were released. It is even less likely that D&M willfully infringed claims that were intentionally drawn to its products, regardless of whether that is proper. Furthermore, the fact and timing of Sonos's claim drafting are part of the prosecution history of the patents and are clearly relevant. The timing of the lawsuit and D&M's first release of the Accused Products are also highly relevant to Sonos's willfulness allegations in addition to being relevant background facts to put this dispute in context.

**Evidence of Competitive Activities**: Although Sonos seeks to exclude all evidence of "competitive activities," the only specific examples are (a) the fact that Sonos routinely performs teardowns of competitor products and (b) the fact that Sonos extensively incorporates the UPnP standard and other third-party technology to more quickly bring its products to market. Importantly, however, Sonos makes these same allegations against D&M to support its willfulness case.[9] For example, Sonos implied during its questioning of D&M's witnesses that "tear downs" of Sonos products are improper and evidence of copying/willfulness.[10] D&M will prove with extensive evidence, including Sonos's own admissions, that these allegations reflect industry practice and are not evidence of infringement, much less willful infringement.[11]

**Sonos's Proposal, and Subsequent Breach, Involving the '014 Patent**: Shortly after this case was filed, Sonos represented to D&M during a telephone conference that it would drop allegations of infringement of the '014 Patent if Defendants modified their accused devices.[12] Defendants did so, and Sonos's allegations persisted. Sonos now intends to use the fact of the

---

[9] Ex. 9 (Almeroth Opening Report) at ¶¶ 603-608.
[10] *See, e.g.*, Ex. 10 (Christopher Commons Depo) at 118:15-125:3
[11] *See Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 723 F. Supp. 2d 1284, 1324 (S.D. Cal. 2010), rev'd on other grounds by 702 F.3d 1351.
[12] Ex. 11 (Brendon Stead Depo. Vol II) at 402:23-403:22.

product modification to support its infringement and willfulness claims.[13]  Given Sonos's intended arguments, evidence of these transactions is admissible for several reasons.

The fact of the product modification is relevant to the issue of "non-infringing alternatives."  Sonos has not sought damages for infringement of the '014 Patent after the modification, yet claims that there are no non-infringing alternatives to that patent.[14]  Because the fact of the modification is relevant for various legitimate purposes in this case (non-infringing alternatives and the calculation of damages) and illegitimate purposes (suggesting that the modification is an admission of infringement[15]), Sonos's motion is an attempt to preclude Defendants from explaining the reasoning behind the product modification.   In essence, Sonos attempts to use Defendants' full performance of a modification made to narrow the disputed issues and facilitate settlement to prove liability and willful conduct, while excluding its own breach of that settlement proposal, or indeed, any factual context leading to the modification.   In related circumstances, Courts have admitted evidence of negotiations to combat claims of willful infringement.[16]  Finally, the context of the '014 discussions is not related to validity or amount of a disputed claim, but rather, Sonos's charge that D&M's subjective intent, and thus, the evidence is admissible under Federal Rule of Evidence 408(b).[17]

---

[13] *See, e.g.*, Ex. 11 (Brendon Stead Depo. Vol II) at 404:17-405:3.

[14] *See, e.g.*, Ex. 12 (Tate Report) at pp. 37-38.

[15] *See* F.R.E. 407 (barring evidence of subsequent remedial measures to prove culpable conduct).

[16] *McKesson Info. Sols. LLC v. Trizetto Grp., Inc.*, No. 04-1258, 2006 WL 940543, at *1 (D. Del. Apr. 11, 2006) (admitting evidence of the "parties' prior negotiations" for purposes of willfulness defense); *Carpenter Tech. Corp. v. Allegheny Techs., Inc.*, No. 08-2907, 2012 WL 5507447, at *1 (E.D. Pa. Nov. 14, 2012) ("To the extent Carpenter seeks to introduce evidence of the parties' negotiations for the limited purpose of defending against willfulness, Rule 408(b) does not preclude it from doing so and neither will I."); *see also Microban Prod. Co. v. API Indus., Inc.*, No. 14-cv-41, 2014 WL 1856471 at *3, n. 10 (S.D.N.Y. May 8, 2014).

[17] *See Leeper v. Allstate Fire & Cas. Ins. Co.*, No. 13-cv-03460, 2016 WL 1089701, at *2 (D. Colo. Mar. 21, 2016) (collecting cases).

EXHIBIT
1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 14-1330-WCB |
| v. | ) | |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | JURY TRIAL DEMANDED |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND SUPPLEMENT TO THIRD AMENDED COMPLAINT

## FOR PATENT INFRINGEMENT

Plaintiff Sonos, Inc. ("Sonos"), by its undersigned attorneys, for its Second Supplement to Third Amended Complaint ("Complaint") for Patent Infringement and Jury Demand against Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "Defendants"), states as follows:

## THE PARTIES

1.      Plaintiff Sonos, Inc. is a Delaware corporation with its principal place of business at 223 E. De La Guerra Street, Santa Barbara, California 93101.

2.      On information and belief, Defendant D&M Holdings Inc. d/b/a The D+M Group is a Japanese corporation with its principal place of business at 2-1 Nisshin-cho, Kawasaki-ku, Kawasaki-shi, Kanagawa 210-8569, Japan.  D&M Holdings Inc. d/b/a The D+M Group is a Bain Capital portfolio company.

3.      On information and belief, Defendant D&M Holdings U.S. Inc. is a Delaware corporation with its principal place of business at 100 Corporate Drive, Mahwah, NJ 07430. D&M Holdings U.S. Inc. is a wholly-owned subsidiary of D&M Holdings Inc.

4.      On information and belief, Defendant Denon Electronics (USA), LLC is a Delaware limited liability company with its principal place of business at 100 Corporate Drive, Mahwah, NJ 07430.  Denon Electronics (USA), LLC is a wholly-owned subsidiary of D&M Holdings U.S. Inc.

## JURISDICTION AND VENUE

5.      This is a civil action for patent infringement arising under the patent laws of the United States, Title 35, United States Code.  This Court has jurisdiction under 35 U.S.C. §§ 271, *et seq.*, and 28 U.S.C. §§ 1331 and 1338.

6.      This Court has personal jurisdiction over Defendants.

7.      D&M Holdings U.S. Inc. is incorporated in Delaware and is therefore subject to the jurisdiction of this Court.  As a domestic corporation, D&M Holdings U.S. Inc. is registered to do business with the State of Delaware Division of Corporations.

8.      Denon Electronics (USA), LLC is incorporated in Delaware and is therefore subject to the jurisdiction of this Court.  As a domestic corporation, Denon Electronics (USA), LLC is registered to do business with the State of Delaware Division of Corporations.

9.      To the extent that Defendants are not subject to the jurisdiction of this Court as residents of Delaware, Defendants are subject to the jurisdiction of the Court pursuant to 10 *Del. C.* § 3104.  Specifically, on information and belief, Defendants cause tortious injury in Delaware, namely from the tort of patent infringement.  Defendants also conduct or solicit business and

engage in a persistent course of conduct in Delaware, and Defendants derive substantial revenue from things used and/or sold in Delaware.

10.     On information and belief, Defendants have (1) transacted business in this district (directly and/or through intermediaries) by engaging in activities such as shipping, distributing, offering for sale, selling, and/or advertising their products in the State of Delaware, and (2) delivered their products into the stream of commerce with the expectation that they will be purchased by consumers in Delaware.  Thus, on information and belief, Defendants are doing business in this District, and have committed acts of patent infringement in this District.

11.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b).

### FACTUAL BACKGROUND

12.     Sonos is an innovator and industry leader in the field of wireless audio technology.  As acknowledged by the media, Sonos reinvented home audio for the digital age. *See, e.g.*, Ex. A (from www.nbcnews.com) ("If you're not familiar with Sonos, this company revolutionized the home audio world a decade ago. . . ."); Ex. B (from www.consumerreports.org) ("Sonos not only helped to invent the wireless speaker category, the company also set the bar for performance, ease of use, and flexibility."); Ex. C (from www.mensjournal.com) ("Sonos almost singlehandedly established the stand-alone wireless home speaker system category . . . .").

13.     Sonos has been making, distributing, and selling a line of wireless home audio products for nearly 10 years.  Sonos's current line of products includes the "PLAY:5" speaker, the "PLAY:3" speaker, the "PLAY:1" speaker, the "CONNECT" pre-amplifier, and the "CONNECT:AMP" amplifier, all of which are controlled by the Sonos app (for iOS, Android,

3

PC, or Mac).  *See*, *e.g.*, Ex. D (from www.sonos.com).  Sonos also offers a "PLAYBAR"

speaker and a "SUB" speaker for wireless home theater.  *Id.*

14.     Sonos is the owner of more than 100 U.S. Patents related to modern audio

technology, and also over 300 pending U.S. patent applications.  Sonos provides a link to its U.S.

Patents and published U.S. Patent Applications, as well as a table that correlates Sonos's patents

to its products, on Sonos's website at www.sonos.com/legal/terms#patents.  *See* Ex. E.   In

addition, Sonos encloses notices of its patents with its product inserts and manuals for its

products, which provide that "[o]ur patent-to-product information can be found here:

***sonos.com/legal/patents***."  *See*, *e.g.*, Ex. F.

15.     In June 2014, Defendants launched their own wireless audio system, which is

called "HEOS by Denon" (or "the HEOS system").  This HEOS system is made up of a line of

HEOS wireless audio products, including the "HEOS 7" speaker, the "HEOS 5" speaker, the

"HEOS 3" speaker, "HEOS 1" speaker, the "HEOS LINK" pre-amplifier, the "HEOS AMP"

amplifier, the "HEOS Drive" multi-room amplifier, and the "HEOS HomeCinema" TV sound

system (collectively, "HEOS players"), all of which are controlled by the HEOS app (for iOS,

Android, or Kindle).  *See*, *e.g.,* Exs. G-H (from usa.denon.com and heosbydenon.denon.com).

16.     Defendants are trying to market the HEOS system as a direct competitor to

Sonos's wireless audio system.  *See*, *e.g.*, Ex. G (Denon is "[o]ne of the most well-equipped

contenders to take on Sonos at the game it knows so well.").  However, on information and

belief, instead of innovating, Defendants are merely copying Sonos's system.  As Digital Trends

noted:

> For those unfamiliar, about 10 years ago Sonos created a line of extremely
> succinct wireless speakers that operate in tandem, allowing users to stream music
> over Wi-Fi from a single source to multiple rooms without latency, or send a
> different source to each speaker, all from an extremely intuitive and powerful app

> on a computer or mobile device. Since then, the genre has exploded, spawning copycats from the likes of Samsung, Bose, and others.  With HEOS, Denon appears to be making little effort to hide its mimicry of the popular system.  Like Sonos, Denon's gorgeous new speakers come in three sizes and price points, and offer minimalist designs.

Ex. I (from www.digitaltrends.com).

17.     On information and belief, Defendants have even copied various aspects of Sonos's marketing and branding for its wireless audio system.  For example, Defendants' use of the "HEOS" name for its wireless audio system is similar enough to "Sonos" that it led one industry publication to remark that "we can't help but feel the similarity was deliberate." *See* Ex. J (from www.avhub.com.au).

18.      As another example, Defendants' naming convention for their line of HEOS speakers closely resembles Sonos's naming convention for its line of wireless speakers (*e.g.*, Denon's HEOS 1, HEOS 3, HEOS 5, HEOS 7 vs. Sonos's PLAY:1, PLAY:3, PLAY:5). *Compare* Ex. D *with* Ex. G.

19.     Defendants' website for the HEOS products also has a layout that is similar to Sonos's website, as shown below.

## SONOS



www.sonos.com/shop/products/play5

## DENON



usa.denon.com/us/heos-5-medium-sized-speakers

20.     Further, Defendants' marketing materials for the HEOS system use graphics that

closely resemble graphics used in Sonos's marketing materials, as shown below.





21.    Further yet, Defendants are using taglines in connection with the HEOS system that closely resemble taglines used by Sonos.  For instance, Defendants' tagline of "Fill every room with music" (*see* Ex. G) closely resembles Sonos's tagline of "Fill your home with music."

22.    On information and belief, Defendants have also incorporated Sonos's patented innovations into the HEOS system, as explained below.

23.    In view of at least the facts set forth above in paragraphs 12-22, on information and belief, Defendants had actual knowledge of Sonos's patents prior to the filing of this action. For instance, at a minimum, Defendants have been aware (or should have been aware) of Sonos's patents in view of Sonos's position in the industry (including its direct competition with Defendants), Sonos's prominent display of its patents on Sonos's website, and Sonos's inclusion of a notice of its patents in Sonos's product inserts and manuals.  In fact, prior to Sonos's filing

7

of this action, Defendants' website was promoting the HEOS system by expressly contrasting it with Sonos's wireless audio system—which definitively establishes that Defendants were aware of Sonos's products prior to this suit—and this awareness must have come from (i) reviewing Sonos's website, which prominently displays Sonos's patents, and/or (ii) obtaining Sonos's actual products, which come with product inserts and manuals that include a notice of Sonos's patents. Defendants' copying of Sonos's products, its marketing, and its branding likewise establishes that Defendants were aware of Sonos's products—and thus had notice of Sonos's patents—prior to this suit. Finally, Defendants' had knowledge of Sonos's patents and pending applications as a result of Sonos's filing of this action.

24. To the extent Defendants did not have actual knowledge of Sonos's patents prior to the filing of this action, then Defendants were at least willfully blind to the existence of Sonos's patents. Indeed, as set forth above, Defendants were undeniably aware of Sonos's products prior to this suit, and this awareness must have come from (i) reviewing Sonos's website, which prominently displays Sonos's patents, and/or (ii) obtaining Sonos's actual products, which come with product inserts and manuals that include a notice of Sonos's patents. Defendants cannot undertake efforts to learn about Sonos's products but then turn a blind eye to Sonos's patents.

**COUNT I:**
**INFRINGEMENT OF U.S. PATENT NO. 9,219,959**

25. Sonos incorporates paragraphs 1-24 above as if fully set forth herein.

26. Sonos is the owner U.S. Patent No. 9,219,959 ("the '959 patent"), entitled "Multi-Channel Pairing in a Media System," which was duly and legally issued by the United States Patent and Trademark Office ("the USPTO") on December 22, 2015, and a reexamination

8

certificate was issued on April 5, 2017. A copy of the '959 Patent (including the reexamination certificate) is attached hereto as Exhibit K.

27.     Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '959 Patent.

28.     On information and belief, Defendants had actual knowledge of the '959 patent and/or the application that led to the issuance of the '959 patent prior to the filing of this Complaint. *See* ¶¶ 12-24 above.

29.     Defendants have had actual knowledge of the '959 patent since the filing of this Complaint.

30.     The '959 patent is directed to devices and methods for providing audio in a multi-channel listening environment.

31.     Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by one or more of the claims of the '959 patent. For example, at a minimum, Defendants' HEOS 1, HEOS 3, HEOS 5, and HEOS 7 players—which are configured to operate either in a "no pairing" mode or in a "stereo pairing" mode—each embody one or more of the devices and/or methods claimed in the '959 patent. *See, e.g.*, Ex. K-1 ('959 Patent Initial Claim Chart); Ex. L (from usa.denon.com); Ex. M (from denon.custhelp.com).

32.     Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '959 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

33.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '959 patent, in violation of 35

U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '959 patent. In particular, on information and belief, (a) Defendants had actual knowledge of the '959 Patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '959 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses (*see* '959 Patent Initial Claim Chart, Exs. L-M, touting the configuration and use of two HEOS speakers as a stereo pair), (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '959 patent, and (d) users of the HEOS system directly infringe one or more claims of the '959 patent. For instance, at a minimum, Defendants have supplied and continue to supply HEOS products (*e.g.*, HEOS 1, HEOS 3, HEOS 5, and HEOS 7 speakers) to customers while knowing that use of these products will infringe one or more claims of the '959 patent, and that Defendants' customers then directly infringe one or more claims of the '959 patent by using these HEOS products in accordance with Defendants' product literature.

34. Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '959 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '959 patent by users of the HEOS system. In particular, on information and belief, (a) Defendants had actual knowledge of the '959 Patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more

10

material components of the invention of the '959 patent that are not staple articles of commerce

suitable for substantial noninfringing use, (c) Defendants know (or should know) that such

component(s) are especially made or especially adapted for use in an infringement of the '959

patent, and (d) users of the HEOS products that comprise such material component(s) directly

infringe one or more claims of the '959 patent. For instance, at a minimum, Defendants offer for

sale, sell, and/or import software updates for HEOS products (*e.g.*, HEOS 1, HEOS 3, HEOS 5,

and HEOS 7 speakers) that meet one or more claims of the '959 patent. *See, e.g.*, Ex. N, at p. 41.

These software updates are material components of the HEOS products that meet the one or

more claims of the '959 patent. Further, Defendants especially made and/or adapted these

software updates for use in the HEOS products that meet the one or more claims of the '959

patent, and these software updates are not staple articles of commerce suitable for substantial

noninfringing use. Defendants' customers then directly infringe the one or more claims of the

'959 patent by installing and using the software updates on the HEOS products.

35.     Defendants' infringement of the '959 patent is also willful because, on

information and belief, Defendants (a) had actual knowledge of the '959 patent or were willfully

blind to its existence prior to the filing of this Complaint (*see* ¶¶ 12-24 above), (b) engaged in the

aforementioned activity despite an objectively high likelihood that Defendants' actions

constituted infringement of the '959 patent, and (c) this objectively-defined risk was either

known or so obvious that it should have been known to Defendants.

36.     Defendants' infringement of the '959 patent has caused irreparable harm to Sonos

and will continue to do so unless enjoined by this Court.

## COUNT II:
## INFRINGEMENT OF U.S. PATENT NO. 7,571,014

37.     Sonos incorporates paragraphs 1-36 above as if fully set forth herein.

38.     Sonos is the owner U.S. Patent No. 7,571,014 ("the '014 patent"), entitled

"Method and Apparatus for Controlling Multimedia Players in a Multi-Zone system," which was

duly and legally issued by the USPTO on August 4, 2009, and a reexamination certificate was

issued on September 1, 2017.  A copy of the '014 Patent (including the reexamination certificate)

is attached hereto as Exhibit O.

39.     Sonos is in compliance with any applicable marking and notice provisions of 35

U.S.C. § 287 with respect to the '014 Patent.

40.     On information and belief, Defendants had actual knowledge of the '014 patent

prior to the filing of this action.  *See* ¶¶ 12-24 above.

41.     Defendants have had actual knowledge of the '014 patent since the filing of this

action.

42.     The '014 patent is directed to methods and devices for "controlling a plurality of

players."

43.     Defendants' HEOS system is covered (either literally or under the Doctrine of

Equivalents) by one or more of the claims of the '014 patent.  For instance, at a minimum,

Defendants' HEOS controller app—which is configured to group HEOS speakers, synchronize

grouped HEOS speakers, and adjust a "Master" volume for grouped HEOS speakers—embodies

one or more of the methods and/or devices claimed in the '014 patent.  *See, e.g.*, Exs. O-1 ('014

Patent Initial Claim Chart), N, P (from usa.denon.com).  An example of this "Master" volume

adjustment in the HEOS system is shown below:

12



44.     Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '014 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

45.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '014 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '014 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '014 Patent or were willfully blind to its existence prior to, and no later than, the filing of this action (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '014 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses (*see* '014 Patent Initial Claim Chart, Exs. N, P-R), (c) Defendants know (or should know) that their actions will induce users of the

13

HEOS system to directly infringe one or more claims the '014 patent, and (d) users of the HEOS system directly infringe one or more claims of the '014 patent. For instance, at a minimum, Defendants have supplied and continue to supply the HEOS controller app to customers while knowing that installation and use of the HEOS controller app will infringe one or more claims of the '014 patent, and that Defendants' customers then directly infringe one or more claims of the '014 patent by installing and using the HEOS controller app in accordance with Defendants' product literature.

46. Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '014 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '014 patent by users of the HEOS system. In particular, on information and belief, (a) Defendants had actual knowledge of the '014 patent or were willfully blind to its existence prior to, and no later than, the filing of this action (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '014 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) are especially made or especially adapted for use in an infringement of the '014 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more of the claims of the '014 patent. For instance, at a minimum, Defendants offer for sale, sell, and/or import HEOS controller software for installation on user devices that meet one or more claims of the '014 patent. This HEOS controller software is a material component of the user devices that meet the one or more claims of the '014 patent. Further, Defendants especially

14

made and/or adapted the HEOS controller software for use in the user devices that meet the one or more claims of the '014 patent, and the HEOS controller software is not a staple article of commerce suitable for substantial noninfringing use. Defendants' customers then directly infringe the one or more claims of the '014 patent by installing and using the HEOS controller software on the customers' user devices.

47.      Defendants' infringement of the '014 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '014 patent or were willfully blind to its existence prior to the filing of this action (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '014 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

48.      Defendants' infringement of the '014 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

## COUNT III:
## INFRINGEMENT OF U.S. PATENT NO. 8,588,949

49.      Sonos incorporates paragraphs 1-48 above as if fully set forth herein.

50.      Sonos is the owner U.S. Patent No. 8,588,949 ("the '949 patent"), entitled "Method and Apparatus for Adjusting Volume Levels in a Multi-Zone System," which was duly and legally issued by the USPTO on November 19, 2013, and a reexamination certificate was issued on November 5, 2015. A copy of the '949 Patent is attached hereto as Exhibit S.

51.      Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '949 Patent.

52.      On information and belief, Defendants had actual knowledge of the '949 patent prior to the filing of this action. *See* ¶¶ 12-24 above.

15

53.     Defendants have had actual knowledge of the '949 patent since the filing of this action.

54.     The '949 patent is directed to devices and methods for controlling a plurality of players in a local area network.

55.     Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by one or more of the claims of the '949 patent.  For instance, at a minimum, Defendants' HEOS controller app—which is configured to group HEOS speakers and adjust both individual volumes and a "Master" volume for grouped HEOS speakers—embodies one or more of the devices, methods, and/or computer-readable media claimed in the '949 patent.  *See*, *e.g.*, Exs. N, P, S-1 ('949 Patent Initial Claim Chart).  An example of this individual and "Master" volume adjustment in the HEOS system is shown below:



56.     Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '949 patent, in violation of 35

16

U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

57.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '949 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '949 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '949 Patent or were willfully blind to its existence prior to, and no later than, the filing of this action (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '949 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '949 Patent Initial Claim Chart, Exs. N, P-R) and (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '949 patent, and (d) users of the HEOS system directly infringe one or more claims of the '949 patent.  For instance, at a minimum, Defendants have supplied and continue to supply the HEOS controller app to customers while knowing that installation and use of the HEOS controller app will infringe one or more claims of the '949 patent, and that Defendants' customers then directly infringe one or more claims of the '949 patent by installing and using the HEOS controller app in accordance with Defendants' product literature.

58.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '949 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct

infringement of the '949 patent by users of the HEOS system. In particular, on information and belief, (a) Defendants had actual knowledge of the '949 patent or were willfully blind to its existence prior to, and no later than, the filing of this action (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '949 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '949 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more claims of the '949 patent. For instance, at a minimum, Defendants offer for sale, sell, and/or import HEOS controller software for installation on user devices that meet one or more claims of the '949 patent. This HEOS controller software is a material component of the user devices that meet the one or more claims of the '949 patent. Further, Defendants especially made and/or adapted the HEOS controller software for use in the user devices that meet the one or more claims of the '949 patent, and the HEOS controller software is not a staple article of commerce suitable for substantial noninfringing use. Defendants' customers then directly infringe the one or more claims of the '949 patent by installing and using the HEOS controller software on the customers' user devices.

59.     Defendants' infringement of the '949 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '949 patent or were willfully blind to its existence prior to the filing of this action (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '949 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

60.     Defendants' infringement of the '949 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

**COUNT IV:**
**INFRINGEMENT OF U.S. PATENT NO. D559,197**

61.     Sonos incorporates paragraphs 1-60 above as if fully set forth herein.

62.     Sonos is the owner U.S. Patent No. D559,197 ("the '197 design patent"), entitled "Control Strip for Electronic Appliances," which was duly and legally issued by the USPTO on January 8, 2008.  A copy of the '197 design patent is attached hereto as Exhibit T.

63.     Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '197 design patent.

64.     On information and belief, Defendants had actual knowledge of the '197 design patent prior to the filing of this action.  *See* ¶¶ 12-24 above.

65.     Defendants have had actual knowledge of the '197 design patent since the filing of this action.

66.     The '197 design patent is directed to an "ornamental design for a control strip for electronic appliances."



# Fig. 1

67.     Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by the '197 design patent. For instance, at a minimum, Defendants' HEOS 1, HEOS 3, HEOS AMP, HEOS LINK, and HEOS HomeCinema products all include a "control strip" as shown and described in the '197 design patent. *See* Ex. T-1 ('197 Patent Initial Claim Chart). As one representative example, the picture below illustrates the "control strip" on the HEOS 3 product (from usa.denon.com):



68.     Thus, Defendants have directly infringed and continue to directly infringe the

'197 design patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or

selling HEOS 1, HEOS 3, HEOS AMP, HEOS LINK, and HEOS HomeCinema products within

the United States and/or importing such HEOS products into the United States.

69.     On information and belief, Defendants had actual knowledge of the '197 design

patent or were willfully blind to its existence prior to, and no later than, the filing of this action

(*see* ¶¶ 12-24 above).  Nonetheless, on information and belief, Defendants have supplied and

continue to supply HEOS 1, HEOS 3, HEOS AMP, HEOS LINK, and HEOS HomeCinema

products to customers while knowing that use of these products will infringe the '197 design

patent.

70.     Defendants' infringement of the '197 design patent is also willful because, on

information and belief, Defendants (a) had actual knowledge of the '197 design patent or were

willfully blind to its existence prior to the filing of this action (*see* ¶¶ 12-24 above), (b) engaged

in the aforementioned activity despite an objectively high likelihood that Defendants' actions

constituted infringement of the '197 design patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

71.     Defendants' infringement of the '197 design patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court

## COUNT V:
## INFRINGEMENT OF U.S. PATENT NO. 9,042,556

72.     Sonos incorporates paragraphs 1-71 above as if fully set forth herein.

73.     Sonos is the owner U.S. Patent No. 9,042,556 ("the '556 patent"), entitled "Shaping Sound Responsive to Speaker Orientation," which was duly and legally issued by the USPTO on May 26, 2015.  A copy of the '556 patent is attached hereto as Exhibit U.

74.     Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '556 patent.

75.     On information and belief, Defendants had actual knowledge of the '556 patent and/or the application that led to the issuance of the '556 patent prior to the filing of this Complaint.  *See* ¶¶ 12-24 above.

76.     Defendants have had actual knowledge of the '556 patent since the filing of this Complaint.

77.     The '556 patent is directed to devices, methods, and computer-readable media for shaping sound in accordance with speaker orientation.

78.     Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by one or more claims of the '556 patent.  For instance, at a minimum, Defendants' HEOS 3 player—which is configured to shape sound based on an orientation and a configuration state—embodies one or more of the devices, methods, and/or computer-readable media claimed

in the '556 patent.  *See, e.g.*, Ex. U-1 ('556 Patent Initial Claim Chart), Ex. G (from

usa.denon.com), Ex. L (from usa.denon.com).

79.    Thus, Defendants and/or users of the HEOS system have directly infringed and

continue to directly infringe one or more of the claims of the '556 patent, in violation of 35

U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the

United States and/or importing the HEOS system into the United States.

80.    Additionally and/or alternatively, Defendants have indirectly infringed and

continue to indirectly infringe one or more of the claims of the '556 patent, in violation of 35

U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or

more claims of the '556 patent.  In particular, on information and belief, (a) Defendants had

actual knowledge of the '556 Patent or were willfully blind to its existence prior to, and no later

than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge,

or encourage users of the HEOS system to directly infringe one or more claims of the '556 patent

by promoting, advertising, and instructing customers and potential customers about the HEOS

system and uses of the system, including infringing uses, (*see* '556 Patent Initial Claim Chart,

Exs. G, L, N) and (c) Defendants know (or should know) that their actions will induce users of

the HEOS system to directly infringe one or more claims the '556 patent, and (d) users of the

HEOS system directly infringe one or more claims of the '556 patent.  For instance, at a

minimum, Defendants have supplied and continue to supply the HEOS 3 players to customers

while knowing that use of these products will infringe one or more claims of the '556 patent, and

that Defendants' customers then directly infringe one or more claims of the '556 patent by using

these HEOS 3 players in accordance with Defendants' product literature.

81.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '556 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '556 patent by users of the HEOS system.  In particular, on information and belief, (a) Defendants had actual knowledge of the '556 patent or were willfully blind to its existence prior to, and no later than, this Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '556 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '556 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more claims of the '556 patent.  For instance, at a minimum, Defendants offer for sale, sell, and/or import software updates for HEOS 3 players that meet one or more claims of the '556 patent. *See, e.g.*, Ex. N, at p. 41. These software updates are material components of the HEOS 3 players that meet the one or more claims of the '556 patent.  Further, Defendants especially made and/or adapted these software updates for use in the HEOS 3 players that meet the one or more claims of the '556 patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use.  Defendants' customers then directly infringe the one or more claims of the '556 patent by installing and using the software updates on the HEOS 3 players.

82.     Defendants' infringement of the '556 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '556 patent or were willfully blind to its existence prior to the filing of this Complaint (*see* ¶¶ 12-24 above), (b) engaged in the

aforementioned activity despite an objectively high likelihood that Defendants' actions

constituted infringement of the '556 patent, and (c) this objectively-defined risk was either

known or so obvious that it should have been known to Defendants.

83.     Defendants' infringement of the '556 patent has caused irreparable harm to Sonos

and will continue to do so unless enjoined by this Court.

### COUNT VI:
### INFRINGEMENT OF U.S. PATENT NO. 9,202,509

84.     Sonos incorporates paragraphs 1-83 above as if fully set forth herein.

85.     Sonos is the owner U.S. Patent No. 9,202,509 ("the '509 patent"), entitled

"Controlling and Grouping in a Multi-Zone Media System," which was duly and legally issued

by the USPTO on December 1, 2015, and a reexamination certificate was issued on May 30,

2017 . A copy of the '509 patent (including the reexamination certificate) is attached hereto as

Exhibit V.

86.     Sonos is in compliance with any applicable marking and notice provisions of 35

U.S.C. § 287 with respect to the '509 patent.

87.     On information and belief, Defendants had actual knowledge of the '509 patent

and/or the application that led to the issuance of the '509 patent prior to the filing of this

Complaint.  *See* ¶¶ 12-24 above.

88.     Defendants have had actual knowledge of the '509 patent since the filing of this

Complaint.

89.     The '509 patent is directed to methods, systems, and computer-readable media for

controlling a plurality of multimedia players in groups.

90.     Defendants' HEOS system is covered (either literally or under the Doctrine of

Equivalents) by the '509 patent.  For instance, at a minimum, Defendants' HEOS controller

app—which is configured to instruct HEOS players to form a stereo pair and then display an indication of this stereo pair—embodies one or more of the methods, systems, and/or computer-readable media claimed in the '509 patent. *See, e.g.*, Exs. V-1 ('509 Patent Initial Claim Chart), L-N.

91.     Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '509 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

92.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '509 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '509 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '509 Patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '509 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '509 Patent Initial Claim Chart, Exs. L-N) and (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '509 patent, and (d) users of the HEOS system directly infringe one or more claims of the '509 patent.  For instance, at a minimum, Defendants have supplied and continue to supply the HEOS controller app to customers while knowing that installation and use of the HEOS controller app will infringe one or more claims of the '509 patent, and that Defendants' customers then directly infringe one or more claims of the

'509 patent by installing and using the HEOS controller app in accordance with Defendants' product literature.

93.     Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '509 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '509 patent by users of the HEOS system.  In particular, on information and belief, (a) Defendants had actual knowledge of the '509 patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '509 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '509 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more claims of the '509 patent.  For instance, at a minimum, Defendants offer for sale, sell, and/or import HEOS controller software for installation on user devices that meet one or more claims of the '509 patent.  This HEOS controller software is a material component of the user devices that meet the one or more claims of the '509 patent.  Further, Defendants especially made and/or adapted the HEOS controller software for use in the user devices that meet the one or more claims of the '509 patent, and the HEOS controller software is not a staple article of commerce suitable for substantial noninfringing use.  Defendants' customers then directly infringe the one or more claims of the '509 patent by installing and using the HEOS controller software on the customers' user devices.

94.     Defendants' infringement of the '509 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '509 patent or were willfully blind to its existence prior to the filing of this Complaint (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '509 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

95.     Defendants' infringement of the '509 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

**COUNT VII:**
**INFRINGEMENT OF U.S. PATENT NO. 8,938,312**

96.     Sonos incorporates paragraphs 1-95 above as if fully set forth herein.

97.     Sonos is the owner U.S. Patent No. 8,938,312 ("the '312 patent"), entitled "Smart In-Line Processing," which was duly and legally issued by the USPTO on January 20, 2015.  A copy of the '312 patent is attached hereto as Exhibit W.

98.     Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '312 patent.

99.     On information and belief, Defendants had actual knowledge of the '312 patent and/or the application that led to the issuance of the '312 patent prior to the filing of this Complaint.  *See* ¶¶ 12-24 above.

100.     Defendants have had actual knowledge of the '312 patent since the filing of this Complaint.

101.     The '312 patent is directed to devices, methods, and computer-readable media for smart line-in processing.

102.    Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by one or more claims of the '312 patent.  For instance, at least Defendants' HEOS HomeCinema product—which includes a HEOS Soundbar equipped with an "Auto-Play" feature—embodies one or more of the devices, methods, and/or computer-readable media claimed in the '312 patent.  *See*, *e.g.*, Exs. W-1 ('312 Patent Initial Claim Chart), X.

103.    Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '312 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

104.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '312 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '312 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '312 Patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '312 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '312 Patent Initial Claim Chart, Ex. X), (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '312 patent, and (d) users of the HEOS system directly infringe one or more claims of the '312 patent.  For instance, at a minimum, Defendants have supplied and continue to supply HEOS HomeCinema products to customers while knowing that use of these products will infringe one or more claims of the '312 patent, and that

29

Defendants' customers then directly infringe one or more claims of the '312 patent by using these HEOS HomeCinema products in accordance with Defendants' product literature.

105.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '312 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '312 patent by users of the HEOS system.  In particular, on information and belief, (a) Defendants had actual knowledge of the '312 patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '312 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '312 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more claims of the '312 patent.  For instance, at a minimum, Defendants offer for sale, sell, and/or import software updates for HEOS HomeCinema products that meet one or more claims of the '312 patent.  *See, e.g.*, Ex. X, at p. 51. These software updates are material components of the HEOS HomeCinema products that meet the one or more claims of the '312 patent.  Further, Defendants especially made and/or adapted these software updates for use in the HEOS HomeCinema products that meet the one or more claims of the '312 patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use. Defendants' customers then directly infringe the one or more claims of the '312 patent by installing and using the software updates on the HEOS HomeCinema products.

30

106.     Defendants' infringement of the '312 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '312 patent or were willfully blind to its existence prior to the filing of this Complaint (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '312 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

107.     Defendants' infringement of the '312 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

## COUNT VIII:
## INFRINGEMENT OF U.S. PATENT NO. 8,843,224

108.     Sonos incorporates paragraphs 1-107 above as if fully set forth herein.

109.     Sonos is the owner U.S. Patent No. 8,843,224 ("the '224 patent"), entitled "Method and System for Controlling Amplifiers," which was duly and legally issued by the USPTO on September 23, 2014.  A copy of the '224 patent is attached hereto as Exhibit Y.

110.     Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '224 patent.

111.     On information and belief, Defendants had actual knowledge of the '224 patent prior to the filing of this action.  *See* ¶¶ 12-24 above.

112.     Defendants have had actual knowledge of the '224 patent since the filing of the Second Amended Complaint.

113.     The '224 patent is directed to devices, methods, and computer-readable media for controlling an audio amplifier.

114.     Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by one or more claims of the '224 patent.  For instance, at least Defendants' HEOS

31

players (other than the HEOS LINK) include an amplifier that is controlled based on whether or not received data packets include audio data. *See*, *e.g.*, Exs. Y-1 ('224 Patent Initial Claim Chart), L. Indeed, these HEOS players are configured to (a) activate a "Network Standby" mode (during which the amplifier is powered down) when no audio data from a source device (e.g., another HEOS product) has been received for the past 20 minutes and then (b) deactivate the "Network Standby" mode once audio data is received from the source device. *See*, *e.g.*, '224 Patent Initial Claim Chart, Ex. N at p. 43. Based at least on this functionality, Defendants' HEOS speaker and HEOS amplifier products embody one or more of the devices, methods, and/or computer-readable media claimed in the '224 patent.

115. Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '224 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

116. Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '224 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '224 patent. In particular, on information and belief, (a) Defendants had actual knowledge of the '224 Patent or were willfully blind to its existence prior to, and no later than, the filing of the Second Amended Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '224 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '224 Patent Initial Claim Chart, Ex. N at p. 43) and (c) Defendants know (or should know)

that their actions will induce users of the HEOS system to directly infringe one or more claims

the '224 patent, and (d) users of the HEOS system directly infringe one or more claims of the

'224 patent. For instance, at a minimum, Defendants have supplied and continue to supply

HEOS players to customers while knowing that use of these players (other than the HEOS

LINK) will infringe one or more claims of the '224 patent, and that Defendants' customers then

directly infringe one or more claims of the '224 patent by using these HEOS players in

accordance with Defendants' product literature.

117.    Additionally and/or alternatively, Defendants have indirectly infringed and

continue to indirectly infringe one or more of the claims of the '224 patent, in violation of 35

U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the

United States, components in connection with the HEOS system that contribute to the direct

infringement of the '224 patent by users of the HEOS system. In particular, on information and

belief, (a) Defendants had actual knowledge of the '224 patent or were willfully blind to its

existence prior to, and no later than, the filing of the Second Amended Complaint (*see* ¶¶ 12-24

above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system,

one or more material components of the invention of the '224 patent that are not staple articles of

commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that

such component(s) were especially made or especially adapted for use in an infringement of the

'224 patent, and (d) users of the HEOS products that comprise such material component(s)

directly infringe one or more claims of the '224 patent. For instance, at a minimum, Defendants

offer for sale, sell, and/or import software updates for HEOS players that meet one or more

claims of the '224 patent. *See, e.g.*, Ex. N, at p. 41. These software updates are material

components of the HEOS players that meet the one or more claims of the '224 patent. Further,

Defendants especially made and/or adapted these software updates for use in the HEOS players that meet the one or more claims of the '224 patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use. Defendants' customers then directly infringe the one or more claims of the '224 patent by installing and using the software updates on the HEOS players (other than the HEOS LINK).

118. Defendants' infringement of the '224 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '224 patent or were willfully blind to its existence prior to the filing of the Second Amended Complaint (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '224 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

119. Defendants' infringement of the '224 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

## COUNT IX:
## INFRINGEMENT OF U.S. PATENT NO. 9,213,357

120. Sonos incorporates paragraphs 1-119 above as if fully set forth herein.

121. Sonos is the owner U.S. Patent No. 9,213,357 ("the '357 patent"), entitled "Obtaining Content From Remote Source," which was duly and legally issued by the USPTO on February 5, 2013. A copy of the '357 patent is attached hereto as Exhibit Z.

122. Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '357 patent.

123. On information and belief, Defendants had actual knowledge of the '357 patent and/or the application that led to the issuance of the '357 patent prior to the filing of this Complaint. *See* ¶¶ 12-24 above.

34

124.    Defendants have had actual knowledge of the '357 patent since the filing of this Complaint.

125.    The '357 patent is directed to devices, methods, and computer-readable media for synchronizing audio playback.

126.    Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by the '357 patent.  Indeed, Defendants tout that their HEOS system provides "[i]ndustry leading microsecond audio synchronization between speakers" and that their HEOS players are configured with functionality that enable them to be grouped together to "play[] the same music in perfect sync."  *See, e.g.,* Ex. N, at p. 6, 26.  To achieve this synchronization, Defendants' HEOS players include functionality that causes such players to embody one or more of the devices, methods, and/or computer-readable media claimed in the '357 patent.  *See, e.g.*, Ex. Z-1 ('357 Patent Initial Claim Chart).

127.    Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '357 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

128.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '357 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '357 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '357 Patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '357 patent

by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '357 Patent Initial Claim Chart, Ex. N) and (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '357 patent, and (d) users of the HEOS system directly infringe one or more claims of the '357 patent. For instance, at a minimum, Defendants have supplied and continue to supply HEOS players to customers while knowing that use of these products will infringe one or more claims of the '357 patent, and that Defendants' customers then directly infringe one or more claims of the '357 patent by using these HEOS players in accordance with Defendants' product literature.

129. Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '357 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '357 patent by users of the HEOS system. In particular, on information and belief, (a) Defendants had actual knowledge of the '357 patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '357 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '357 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more claims of the '357 patent. For instance, at a minimum, Defendants offer for sale, sell, and/or import software updates for HEOS players that meet one or more claims of the

36

'357 patent. *See, e.g.*, Ex. N, at p. 41. These software updates are material components of the HEOS products that meet the one or more claims of the '357 patent. Further, Defendants especially made and/or adapted these software updates for use in the HEOS players that meet the one or more claims of the '357 patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use. Defendants' customers then directly infringe the one or more claims of the '357 patent by installing and using the software updates on the HEOS players.

130. Defendants' infringement of the '357 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '357 patent or were willfully blind to its existence prior to the filing of this Complaint (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '357 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

131. Defendants' infringement of the '357 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

## COUNT X:
## INFRINGEMENT OF U.S. PATENT NO. 9,195,258

132. Sonos incorporates paragraphs 1-131 above as if fully set forth herein.

133. Sonos is the owner U.S. Patent No. 9,195,258 ("the '258 patent"), entitled "System and Method for Synchronizing Operations Among a Plurality of Independently Clocked Digital Data Processing Devices," which was duly and legally issued by the USPTO on November 24, 2015. A copy of the '258 patent is attached hereto as Exhibit AA.

134.    Sonos is in compliance with any applicable marking and notice provisions of 35 U.S.C. § 287 with respect to the '258 patent.

135.    On information and belief, Defendants had actual knowledge of the '258 patent and/or the application that led to the issuance of the '258 patent prior to the filing of this Complaint. *See ¶¶* 12-24 above.

136.    Defendants have had actual knowledge of the '258 patent since the filing of this Complaint.

137.    The '258 patent is directed to devices, systems, methods for synchronizing audio playback.

138.    Defendants' HEOS system is covered (either literally or under the Doctrine of Equivalents) by the '258 patent. Indeed, Defendants tout that their HEOS system provides "[i]ndustry leading microsecond audio synchronization between speakers" and that their HEOS players are configured with functionality that enable them to be grouped together to "play[] the same music in perfect sync." *See, e.g.,* Ex. P, at p. 6, 26. To achieve this synchronization, Defendants' HEOS players include functionality that cause such players to embody one or more of the devices, methods, and/or computer-readable media claimed in the '258 patent. *See, e.g.*, Ex. AA-1 ('258 Patent Initial Claim Chart).

139.    Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '258 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

140.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '258 patent, in violation of 35

38

U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '258 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '258 Patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '258 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '258 Patent Initial Claim Chart, Ex. N) and (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '258 patent, and (d) users of the HEOS system directly infringe one or more claims of the '258 patent.  For instance, at a minimum, Defendants have supplied and continue to supply HEOS players to customers while knowing that use of these products will infringe one or more claims of the '258 patent, and that Defendants' customers then directly infringe one or more claims of the '258 patent by using these HEOS players in accordance with Defendants' product literature.

141.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '258 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '258 patent by users of the HEOS system.  In particular, on information and belief, (a) Defendants had actual knowledge of the '258 patent or were willfully blind to its existence prior to, and no later than, the filing of this Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '258 patent that are not staple articles of commerce

suitable for substantial noninfringing use, (c) Defendants know (or should know) that such

component(s) were especially made or especially adapted for use in an infringement of the '258

patent, and (d) users of the HEOS products that comprise such material component(s) directly

infringe one or more claims of the '258 patent. For instance, at a minimum, Defendants offer for

sale, sell, and/or import software updates for HEOS players that meet one or more claims of the

'258 patent. *See, e.g.*, Ex. N, at p. 41. These software updates are material components of the

HEOS players that meet the one or more claims of the '258 patent. Further, Defendants

especially made and/or adapted these software updates for use in the HEOS players that meet the

one or more claims of the '258 patent, and these software updates are not staple articles of

commerce suitable for substantial noninfringing use. Defendants' customers then directly

infringe the one or more claims of the '258 patent by installing and using the software updates on

the HEOS players.

     142.    Defendants' infringement of the '258 patent is also willful because, on

information and belief, Defendants (a) had actual knowledge of the '258 patent or were willfully

blind to its existence prior to the filing of this Complaint (*see* ¶¶ 12-24 above), (b) engaged in the

aforementioned activity despite an objectively high likelihood that Defendants' actions

constituted infringement of the '258 patent, and (c) this objectively-defined risk was either

known or so obvious that it should have been known to Defendants.

     143.    Defendants' infringement of the '258 patent has caused irreparable harm to Sonos

and will continue to do so unless enjoined by this Court.

**COUNT XI:**
**INFRINGEMENT OF U.S. PATENT NO. 8,938,637**

     144.    Sonos incorporates paragraphs 1-143 above as if fully set forth herein.

40

145.     Sonos is the owner U.S. Patent No. 8,938,637 ("the '637 patent"), entitled

"Systems and Methods for Synchronizing Operations Among a Plurality of Independently

Clocked Digital Data Processing Devices Without a Voltage Controlled Crystal Oscillator,"

which was duly and legally issued by the USPTO on January 20, 2015.  A copy of the '637

patent is attached hereto as Exhibit BB.

146.     Sonos is in compliance with any applicable marking and notice provisions of 35

U.S.C. § 287 with respect to the '637 patent.

147.     On information and belief, Defendants had actual knowledge of the '637 patent

and/or the application that led to the '637 patent prior to the filing of the Second Amended

Complaint.  *See* ¶¶ 12-24 above.

148.     Defendants have had actual knowledge of the '959 patent since the filing of the

Second Amended Complaint.

149.     The '637 patent is directed to devices, methods, and computer-readable media for

synchronizing audio playback.

150.     Defendants' HEOS system is covered (either literally or under the Doctrine of

Equivalents) by the '637 patent.  Indeed, Defendants tout that their HEOS system provides

"[i]ndustry leading microsecond audio synchronization between speakers" and that their HEOS

players can be grouped together to "play[] the same music in perfect sync."  *See, e.g.,* Ex. N, at

p. 6, 26.  To enable synchronization, Defendants' HEOS players are configured to receive audio

samples from a source device (e.g., another HEOS player) and then adjust how many audio

samples to play back based on timing information associated with the audio samples, clock

information associated with the source device, and the HEOS product's own clock information.

Based at least on this functionality, Defendants' HEOS players embody one or more of the

devices, methods, and/or computer-readable media claimed in the '637 patent. *See* Ex. BB-1 ('637 Patent Initial Claim Chart).

151.    Thus, Defendants and/or users of the HEOS system have directly infringed and continue to directly infringe one or more of the claims of the '637 patent, in violation of 35 U.S.C. § 271(a), by making, using, offering for sale, and/or selling the HEOS system within the United States and/or importing the HEOS system into the United States.

152.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '637 patent, in violation of 35 U.S.C. § 271(b), by actively inducing users of the HEOS system to directly infringe the one or more claims of the '637 patent.  In particular, on information and belief, (a) Defendants had actual knowledge of the '637 Patent or were willfully blind to its existence prior to, and no later than, the filing of the Second Amended Complaint (*see* ¶¶ 12-24 above), (b) Defendants intentionally cause, urge, or encourage users of the HEOS system to directly infringe one or more claims of the '637 patent by promoting, advertising, and instructing customers and potential customers about the HEOS system and uses of the system, including infringing uses, (*see* '637 Patent Initial Claim Chart, Ex. N) and (c) Defendants know (or should know) that their actions will induce users of the HEOS system to directly infringe one or more claims the '637 patent, and (d) users of the HEOS system directly infringe one or more claims of the '637 patent. For instance, at a minimum, Defendants have supplied and continue to supply HEOS players to customers while knowing that use of these products will infringe one or more claims of the '637 patent, and that Defendants' customers then directly infringe one or more claims of the '637 patent by using these HEOS players in accordance with Defendants' product literature.

153.    Additionally and/or alternatively, Defendants have indirectly infringed and continue to indirectly infringe one or more of the claims of the '637 patent, in violation of 35 U.S.C. § 271(c), by offering to sell or selling within the United States, and/or importing into the United States, components in connection with the HEOS system that contribute to the direct infringement of the '637 patent by users of the HEOS system.  In particular, on information and belief, (a) Defendants had actual knowledge of the '637 patent or were willfully blind to its existence prior to, and no later than, the filing of the Second Amended Complaint (*see* ¶¶ 12-24 above), (b) Defendants offer for sale, sell, and/or import, in connection with the HEOS system, one or more material components of the invention of the '637 patent that are not staple articles of commerce suitable for substantial noninfringing use, (c) Defendants know (or should know) that such component(s) were especially made or especially adapted for use in an infringement of the '637 patent, and (d) users of the HEOS products that comprise such material component(s) directly infringe one or more claims of the '637 patent.  For instance, at a minimum, Defendants offer for sale, sell, and/or import software updates for HEOS players that meet one or more claims of the '637 patent.  *See, e.g.*, Ex. N, at p. 41. These software updates are material components of the HEOS players that meet the one or more claims of the '637 patent.  Further, Defendants especially made and/or adapted these software updates for use in the HEOS players that meet the one or more claims of the '637 patent, and these software updates are not staple articles of commerce suitable for substantial noninfringing use.  Defendants' customers then directly infringe the one or more claims of the '637 patent by installing and using the software updates on the HEOS players.

154.    Defendants' infringement of the '637 patent is also willful because, on information and belief, Defendants (a) had actual knowledge of the '637 patent or were willfully

blind to its existence prior to the filing of the Second Amended Complaint (*see* ¶¶ 12-24 above), (b) engaged in the aforementioned activity despite an objectively high likelihood that Defendants' actions constituted infringement of the '637 patent, and (c) this objectively-defined risk was either known or so obvious that it should have been known to Defendants.

155.    Defendants' infringement of the '637 patent has caused irreparable harm to Sonos and will continue to do so unless enjoined by this Court.

## REQUEST FOR JURY TRIAL

Pursuant to FED. R. CIV. P. 38, Sonos demands a trial by jury of any issue triable of right by a jury.

## PRAYER FOR RELIEF

THEREFORE, Sonos prays for relief against Defendants as follows:

A.    A judgment that Defendants have infringed and continue to infringe one or more claims of the asserted patents in violation of 35 U.S.C. § 271(a), (b), and (c), and that such infringement is willful;

B.    A preliminary and permanent injunction enjoining Defendants, their officers, agents, servants, employees and attorneys, and other persons in active concert or participation with Defendants, and their parents, subsidiaries, divisions, successors and assigns, from further infringement of the asserted patents;

C.    A judgment awarding Sonos all damages adequate to compensate for Defendants' infringement of Sonos's asserted patents, and in no event less than a reasonable royalty for Defendants' acts of infringement, including damages for provisional rights (where applicable) and all pre-judgment and post-judgment interest at the maximum rate permitted by law;

D.    A judgment awarding Sonos all damages, including treble damages based on any infringement found to be willful, pursuant to 35 U.S.C. §§ 284 and/or 289, together with prejudgment interest;

E.    An assessment of costs, including reasonable attorney fees pursuant to 35 U.S.C. § 285, and prejudgment interest against Defendants; and

F.    Such other and further relief as this Court may deem just and proper.

Dated: September 26, 2017                    POTTER ANDERSON & CORROON LLP

By:    */s/ Philip A. Rovner*
        Philip A. Rovner (#3215)
        Jonathan A. Choa (#5319)
        Hercules Plaza
        P.O. Box 951
        Wilmington, DE 19899
        (302) 984-6000
        provner@potteranderson.com
        jchoa@potteranderson.com

*Attorneys for Plaintiff Sonos, Inc.*

EXHIBIT
2

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
3

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
4

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
5

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

EXHIBIT
7

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
8

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
9

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
10

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

EXHIBIT
11

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

EXHIBIT
12

**THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY**

# Sonos's Replies in Support of its Motions *in Limine* Nos. 1-3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SONOS, INC.,                                  )
                                             )
        Plaintiff,                       )
                                             )   Civil Action No. 14-1330-RGA
        v.                               )
                                             )
D&M HOLDINGS INC. d/b/a THE                   )   JURY TRIAL DEMANDED
D+M GROUP, D&M HOLDINGS U.S.                  )
INC., and DENON ELECTRONICS                   )
(USA), LLC,                                   )
                                             )
        Defendants.                      )

## SONOS, INC.'S REPLY IN SUPPORT OF ITS MOTIONS *IN LIMINE*

OF COUNSEL:
George I. Lee
Sean M. Sullivan
Rory P. Shea
J. Dan Smith
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
224 N Desplaines St, Suite 250
Chicago, IL 60661
(312) 754-0002

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

Dated: November 14, 2017

*Attorneys for Plaintiff Sonos, Inc.*

## I.      SONOS'S REPLY FOR MIL NO. 1

Without any legal support, D&M offers three unavailing arguments in opposition to this motion, while simply ignoring the legal authority cited by Sonos in its opening brief.

First, D&M misrepresents that "this motion would even preclude elected prior art."  That is not true.  Sonos is not using this motion to exclude any of D&M's elected prior art.  However, Sonos is seeking to preclude D&M from using its non-elected patents to expand D&M's invalidity contentions beyond the agreed to limit of 3 prior art references per patent.  Even if such non-elected D&M patents are somehow relevant and/or permissible in light of the prior art limit,  they should still be excluded, as their relevance is substantially outweighed by their potential to confuse and mislead the jury.  *See Cameco Indus.*, 1995 WL 468234 at *5-6.

Second, while D&M contends that its patents rebut Sonos's claim of willful infringement, as cited in Sonos's opening brief, at least one district court has already considered this issue and precluded such evidence under Rules 402 and 403.  *EZ Dock, Inc.*, 2003 WL 1610781 at *11.[1]  D&M conveniently ignores this legal authority.  Simply put, D&M cannot introduce its own non-elected patents to give the jury the false impression that D&M could not have copied Sonos's products and still have obtained patents related to the accused HEOS products.  *See id*.

Third, contrary to D&M's assertions, D&M's witnesses can testify concerning the development of the accused HEOS products without mentioning that the accused HEOS products are covered by D&M patents.  The non-elected D&M patents are simply not at issue here, and the countersuit involves different issues, asserted patents, and accused products.  As such, D&M's non-elected patents and its countersuit should be excluded from this case.

---

[1] D&M patents are also not relevant to any secondary consideration, which requires a nexus between the secondary considerations and the merits of the claimed *Sonos* inventions.

## II.     SONOS'S REPLY FOR MIL NO. 2

In its response, D&M simply disregards the fact that the BHM Case involved different plaintiffs and different patents.  As an initial matter, while D&M may introduce facts related to the BHM Case for the limited purposes of impeaching a witness, D&M may not introduce such evidence on direct examination to elicit testimony prior to an attack on a witness's credibility.[2]

In support of its response, D&M cites to *Mendenhall* to contend that the facts related to the BHM Case could be relevant, especially with respect to secondary considerations of commercial success or copying.  Even if so, the Federal Circuit in *Mendenhall* affirmed the preclusion of prior litigation evidence because of the "possibility of prejudice" and "confusion of the jury was very high." *Mendenhall*, 5 F.3d at 1573.  Moreover, the prior litigation in *Mendenhall* involved the same plaintiff and the same asserted patents, whereas the prior BHM Case involved a different plaintiff and different asserted patents than the present case. *See id.* at 1566.  Thus, while BHM had the burden of showing a nexus between any secondary consideration and the merits of its purported inventions in the BHM Case, Sonos has that burden with respect to Sonos's different inventions in the present case.

Likewise, as discussed in Sonos's opening brief, the damages analysis for BHM's patents has no relevance to the damages that D&M owes Sonos for infringing Sonos's patents.  In addition, the testimony of Sonos's witnesses in the BHM Case, which concerned the invalidity and noninfringement of BHM's patents, has no relevance to the validity of Sonos's patents or the accused features of D&M's HEOS products in the context of Sonos's patented claims.[3]

---

[2] *See, e.g., Smith v. City of Philadelphia*, No. 06-4312, 2009 WL 3353148, at *4 n.1 (E.D. Pa. Oct. 19, 2009) (citing *U.S. v. Lowe*, 65 F.3d 1137, 1144 (4th Cir. 1995)).

[3] Notably, D&M misleadingly takes Dr. Wolfes's BHM opinions out of context. *See* D&M Resp., Ex. 4 at ¶983 ("[S]ynchronized playback of music in wireless networked devices, ***like those using Bluetooth***, was well known in the prior art before the invention date for the [BHM] Patents.")  The present case, however, does not involve Bluetooth technology.

### III.     SONOS'S REPLY FOR MIL NO. 3

First, Sonos does not contend that D&M should be precluded from introducing evidence of the prosecution history itself.  Rather, Sonos contends that D&M should be precluded from accusing Sonos of acting improperly during prosecution, disclosing too much prior art, and/or being aware of prior art that was not disclosed.  Such evidence goes beyond the prosecution history itself, is irrelevant to D&M's defenses, and would unnecessarily mislead the jury.

Second, D&M clarified that it "does not intend to argue to the jury that Sonos has improperly drawn its claims to D&M's accused products."  As such, this part of Sonos's motion is no longer in dispute, and thus should be granted.

Third, while D&M's competitive acts concerning Sonos's products are directly relevant to evidence of willfulness, as it shows what D&M knew or should have known about Sonos's technology and the infringement of Sonos's patents on such technology, Sonos's competitive acts concerning other products are irrelevant to the issue of willfulness.  *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1336 (Fed. Cir. 2009).  Moreover, the *Presidio* case cited by D&M involved a patentee's evidence concerning the accused infringer's copying of the patentee's "unpatented" products.  *Presidio* at 723 F. Supp. 2d at 1324.  Thus, *Presidio* does not support D&M's intended use of evidence concerning Sonos's competitive acts.[4]

Fourth, Sonos does not intend to argue that D&M's product modification is an admission of infringement, and has not sought damages for infringement after this modification.  Thus, D&M has no basis to introduce evidence related to compromise discussions between the parties.  Such evidence is simply not relevant, and any probative value is substantially outweighed by the danger of unfairly prejudicing Sonos.  *See* Fed. R. Evid. 403.

---

[4] Despite D&M's speculation to the contrary, the ***impropriety*** of D&M's teardowns of Sonos's products is not at issue here, and the testimony cited by D&M does not support its position.

# SCHEDULE H2

# D&M's Opening Briefs in Support of its Motions *in Limine* Nos. 1-3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SONOS, INC.                              §
                                         §
                                         §
            Plaintiff,                   §
                                         §    C.A. No. 14-1330 (RGA)
v.                                       §
                                         §    **JURY TRIAL DEMANDED**
D&M HOLDINGS INC. d/b/a THE              §
D+M GROUP, D&M HOLDINGS U.S.             §
INC., and DENON ELECTRONICS             §
(USA), LLC,                              §
                                         §
            Defendants.                  §

## DEFENDANTS' MOTION IN LIMINE

TO THE HONORABLE COURT:

Pursuant to Federal Rule of Evidence 103(c), Defendants D&M Holdings, Inc., d/b/a The

D+M Group, D&M Holdings U.S. Inc.  and Denon Electronics (USA), LLC, ("Defendants" or

"D&M") file this Motion in Limine and respectfully requests that the court exclude from use at

trial, for any purpose, argument, evidence, testimony or suggestion of the following matters:

**I.** **MOTION IN LIMINE # 1:** MOTION TO PRECLUDE ANY EVIDENCE, TESTIMONY, OR ARGUMENT (A) COMPARING NON-ACCUSED ASPECTS OF THE PARTIES PRODUCTS AND MARKETING MATERIALS, INCLUDING THE DESIGN OF THE ACCUSED PRODUCTS, THE WEBSITES OF THE PARTIES, THE PARTIES' LOGO OR BRANDS, OR THE BRAND NAME OF THE ACCUSED DEVICES OR ALLEGED COMMERCIAL EMBODIMENTS OR (B) COMPARING THE ACCUSED PRODUCTS OR FUNCTIONALITY TO ANY UNASSERTED, UNELECTED, OR DISMISSED PATENTS.

Multiple paragraphs in Sonos's Second Supplement to its Third Amended Complaint (D.I. 417) alleged that (a) the accused products have a similar design to Sonos's Products; (b) Defendants' website has a similar layout to Sonos's website; (c) the Defendants' marketing logo is similar to Sonos's; (d) the marketing name of Defendants' accused products is similar to Sonos's marketing name. *See* D.I. 417 at ¶¶ 17-21. Defendants deny these allegations, but expect that Sonos will argue and attempt to use documents and testimony to support the allegations that these items are relevant to the case to inflame and confuse the jury.

It is axiomatic that the relevant issues in a patent infringement case involve only a comparison of the operation of the accused products and the prior art with the claims of the asserted patents. Accordingly, comparisons of the physical or visual appearances of products, websites, marking names, or any marketing materials for that matter is irrelevant should be excluded under Federal Rules of Evidence 401 and 403. In fact, the only design patent asserted at the start of this litigation has been invalidated and will not be tried by Sonos in this case. *See* D.I. 208, 229. None of Sonos's remaining asserted claims rely on a comparison of the physical appearances of the accused products, mobile applications, or any marketing materials.

Comparison between marketing materials, websites or trademarks is even less relevant than comparisons between commercial embodiments. In fact, Sonos originally challenged Defendants' "HEOS" trademark in the Patent and Trademark Office, but abandoned those efforts. *See* Ex. 1 (Trademark challenge). To the extent that Sonos has any recourse for allegations of trademark infringement, it has not pursued them. Even quasi-technical materials

to evidence infringement found on a website have been found irrelevant to the issue of infringement. *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1327–28 (Fed. Cir. 2007).

Further, none of the commercial embodiments displayed in the figures of the asserted patents themselves are analogous Sonos's current commercial products. For example the '014 and '949 Patents describes a stand-alone controller device:



FIG. 2B

*See* '014 Patent, Fig. 2B; '949 Patent, Fig. 2B.

No such stand-alone device is accused in this case, nor did Sonos sell any such embodiment when the accused products were launched. And the smartphone applications that are accused (iPhone, Android, etc.) bear no resemblance to those shown in patent figures. The '258 Patent has no depiction of commercial embodiments. Nor is there any evidence in this case, expert or otherwise, that Sonos's current implementations of its products, which have changed significantly through the years, are in fact "commercial embodiments." This further supports the fact that the design of commercial embodiments or marketing materials are irrelevant.

A comparison of physical design is not probative of "willfulness" or "copying" because those aspects of the accused products and alleged commercial embodiments are not at issue. *See Orthoarm, Inc. v. Forestadent USA, Inc.*, 682 F. Supp. 2d 978, 981 (E.D. Mo. 2008). Issues of copying and willfulness must have some relation to the technology described in the patents-in-suit and not any physical designs or marketing materials. Otherwise, comparisons of marketing materials, websites, names, and other irrelevant matter would be at issue in nearly every competitor patent case. To the extent that Sonos attempts to link this evidence to willfulness that evidence should not be considered by the jury in determining willful infringement, but rather, by the Court in determining whether to exercise its discretion to enhance damages *after* a finding of

willfulness.  *See Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017).  Presenting this type of evidence to the jury for the sole purpose of "willfulness," would effectively annex the role of the court in the enhancement analysis, unduly prejudice Defendants, and confuse the issues before the jury.

Moreover, throughout the course of this litigation, Sonos has dismissed, chosen not to assert, or has elected not to proceed to trial with 16 different Patents.  *See, e.g.*, D.I. 103; 151; 229; 424 (collectively, dismissing and replacing certain patents).  Evidence or argument concerning "copying" of functionality relating solely to unasserted or unelected patents would similarly confuse the issues before the jury and prejudice Defendants.  The purpose of reducing the number of patents for trial was to streamline and reduce the complexity of issues tried to the jury.  Sonos should not be allowed to allege "copying" or introduce functionality solely related to patents that will not be tried.  *See* Ex. 2 (Oct. 5, 2017 Hearing Trans.) at 9:5-12.

In this five-day bellwether trial, should Sonos be allowed to try issues regarding the similarity of marketing materials and design, or patents not at issue, then Defendants will have no choice but to rebut those allegations with evidence of design and marketing discussions, design history, analysis of irrelevant functionality and implementation that have absolutely nothing to do with the substantive issues that are being tried.  If viewed simply from a practical standpoint, if Sonos raises these issues, there will be even less time to try the relevant issues in this case, which is already subject to strict hourly limits.  Accordingly, the risks of prejudice to Defendants, confusing the issues, and misleading the jury far outweigh any probative value of this type of argument or evidence. Fed. R. Evid. 403.  It should be excluded.

## II.   __MOTION IN LIMINE # 2:__ MOTION TO PRECLUDE EVIDENCE OR ARGUMENT OF WILLFUL INFRINGEMENT PRIOR TO THE ISSUANCE OF ASSERTED PATENTS OR RELATING TO UNELECTED OR DISMISSED PATENTS.

Sonos's Second Supplement to its Third Amended Complaint alleges willful infringement of the asserted '949 and '258 Patents.   D.I. 417.   The asserted claims of both patents all issued after this lawsuit was filed.   The '258 Patent issued on November 24, 2015 and all of the asserted claims of the '949 Patent emerged from reexamination, following a rejection in light of the prior art, in substantially amended form on November 5, 2015.   The Federal Circuit and district courts have consistently held that evidence of willful infringement that predates the issuance of a patent is irrelevant.   *See, e.g., Gustafson, Inc. v. Intersystems Industrial Products, Inc.*, 897 F.2d 508, 13 USPQ2d 1972 (Fed. Cir. 1990)  ("It is obvious that a party cannot be held liable for 'infringement', and thus not for 'willful' infringement, of a nonexistent patent, i.e., no damages are payable on products manufactured and sold before the patent issued."); *American Original Corp. v. Jenkins Food Corp*., 774 F.2d 459, 227 USPQ 299 (Fed. Cir. 1985) (there was no copying of the patent because the defendant began developing its process before issuance of the patent; possible knowledge of a pending patent application cannot provide a basis for willful infringement of a patent); *W.S. Molnar Co. v. IKG Indus., a Div. of Harsco Corp.*, 82 F.3d 434 (Fed. Cir. 1996) (affirming district court's decision not to enhance damages, stating that "nearly all the activities supporting Molnar's assertion of copying occurred before the patents issued.").[1]

---

[1] *See also Emory University v. Glaxo Wellcome Inc.*, 45 USPQ2d 1534, 1536 (N.D. Ga. 1997) ("In order to bring a claim for willful infringement, [the patentee] must prove that the patent exists and the alleged infringer had knowledge of it."); *Smith & Nephew, Inc. v. Interlace Med., Inc.*, No. CIV.A. 10-10951-RWZ, 2012 WL 3560811, at *2 (D. Mass. Aug. 17, 2012) (in granting motions in limine, "Conduct before the patent issues is not willfulness and copying plaintiff's product is not infringement unless that product reads on the patent claims.").

Moreover, Sonos's *allegations* of willful infringement of the '258 Patent did not exist until March 8, 2016 when it filed its Third Amended Complaint for patent infringement (*see* D.I. 102).  In essence, Sonos intends to argue to the jury that Defendants copied patent claims that were drafted after the accused products launched in an effort to track Defendants' accused products.  Such an argument, or any evidence of alleged "copying" before the asserted claims were drafted, is both irrelevant under Federal Rule of Evidence 402, and highly prejudicial to Defendants in their attempts to focus the jury on the issues of infringement, invalidity and damages that are actually relevant in the case.

Should this evidence or argument be allowed at trial, Sonos will undoubtedly use the argument as an attempt to circumvent its burden to prove infringement of the '949 and '258 Patents.  This is precisely the type of evidence and argument that Federal Rule of Evidence 403 was intended to prevent when referring to the danger of "unfair prejudice, confusing the issues, and misleading the jury."  Accordingly, Defendants move to exclude any argument, evidence or suggestion that Defendants willfully infringed the asserted claims of the '949 or '258 Patents prior to their issuance.

III.   **MOTION IN LIMINE #3:** MOTION TO PRECLUDE ANY EVIDENCE OR ARGUMENT THAT THE DEFENDANTS INFRINGED, OR THAT SONOS IS ENTITLED TO DAMAGES, PRIOR TO THE REISSUE DATE OF THE '949 PATENT.

The '949 Patent was subject to a reexamination that was filed on January 5, 2015.  The claims were later rejected. To overcome the rejection, Sonos modified the claims. A reexamination certificate issued on November 5, 2015.  Notwithstanding the claim amendments that were necessary for the patent to survive reexamination, Sonos improperly seeks past damages beginning in June 2014 - 17 months before the '949 Patent's amended claims issued. Sonos nevertheless argues, incorrectly, that D&M is not entitled to absolute intervening rights because the claims were not "substantively changed."  That argument should be denied.

The application of absolute intervening rights, including the issue of whether reexamination amendments constitute a "substantive change" is ripe for the Court's decision. For example, in the context of a motion to dismiss, Judge Andrews recently took judicial notice that asserted claims had been reexamined and changed and dismissed all allegations of infringement prior to the claim amendments.  *Waters Techs. Corp. v. Aurora SFC Sys. Inc.*, No. CV 11-708-RGA, 2017 WL 3598648, at *3 (D. Del. Aug. 21, 2017).

This issue was previously briefed in the context of Sonos's Motions for Summary Judgment.[2] *See* D.I. 290, 343, 367.  In that context, Sonos argued that the claims of the '949 Patent were not substantively changed during reexamination for two reasons.  First, it relied on a single paragraph of its expert's opening infringement report alleging that the amendments to the '949 Patent were not substantive because they were "inherent" in the term "player group" within

---

[2] D&M's previous briefing, and argument during the October 30, 2017 hearing, is incorporated herein by reference.

**DEFENDANTS' MOTION IN LIMINE**          **Page 7**

the original claims.  *See* D.I. 367 at 9 (citing the expert report of Dr. Kevin Almeroth at ¶ 205).

Not only does this statement lack any analytical basis, it ignores the language of the claim.

There is nothing in "player group" that requires synchronized playback.  In fact, the '949's

specification specifically describes instances where groups are created and saved such that they

are not playing back any multimedia.  *See* '949 Patent at 2:28-37; 11:34-36.

Second, Sonos argued that its elected Claim 16 of the '949 Patent is a method claim, and

that method claims are not subject to intervening rights.  *See* D.I. 367 at 9.  Method claims are by

no means immune to intervening rights.  *See, e.g.*, *MonoSol Rx, LLC v. Biodelivery Scis. Int'l,

Inc.*, No. CIV. 10-5695 FLW/DEA, 2015 WL 5679891, at *17 (D.N.J. Sept. 25, 2015).  As the

Court has held, "intervening rights must extend not only to products that are asserted to infringe

a modified product claim, but also to processes that were used to make those specific products, if

those processes are asserted to infringe a modified process claim."  *See* D.I. 428 at 7.

Sonos's arguments that the '949 Patent was not substantively changed during

reexamination are baseless.  Amendments made to overcome a prior art rejection during

reexamination are "a highly influential piece of prosecution history," and that it "is difficult to

conceive of many situations in which the scope of a rejected claim that became allowable when

amended is not substantively changed by the amendment . . . ."  *See Laitram Corp. v. NEC

Corp.*, 163 F.3d 1342, 1348 (Fed. Cir. 1998); *See also* D.I. 428 at 9. An amendment that narrows

the scope of the claim may be considered a "substantive change" sufficient to invoke intervening

rights.  *See Bloom Eng'g Co., Inc. v. N Am. Mfg. Co. Inc.*, 129 F.3d 1247, 1249–50 (Fed. Cir.

1997).  A "substantive change" can also occur when the patentee narrows his claims in response

to a prior art rejection of the original claims.  *See Gen. Elec. Co. v. Hoechst Celanese Corp.*, 698

F. Supp. 1181, 1185 (D. Del. 1988).

**DEFENDANTS' MOTION IN LIMINE**          **Page 8**

The face of the reexamined '949 Patent modifies the scope of all independent claims of that patent.  During reexamination, Sonos added the phrase "*for synchronized playback of a multimedia output from the same multimedia source*" to each independent claim of the patent.  *See* Ex. 3 ('949 Reexam Certificate).  Prior to these additions, no claim of the '949 Patent required either "synchronized playback of two devices" nor that each player play "multimedia output from the same multimedia source."  Both of these limitations thus narrowed the claims of the patent in view of the prior art cited during reexamination.  Sonos's '949 Patent amendments were substantive and were made to overcome a prior art rejection.

Neither the word "synchronized" nor any derivative of that word appeared in any original claim of the '949 Patent.  *See* Ex. 3 (original '949 Patent claim).  Following reexamination, the "synchronized" limitation appears in *every* claim.  "Synchronized playback" is thus a new limitation.  Similarly, there was no limitation in any claim that required each player in a group to play multimedia from the "same multimedia source."  *See id.*  Prior to the amendment, the only limitation regarding a "multimedia source" was that each "independent playback device" required configuration to playback media from a multimedia source.  *See id.*  In fact, the original claims of the '949 Patent had no limitation requiring the claimed "player group" be configured to play any multimedia content at all, much less from the same "multimedia source."  *See id.*

Moreover, before the amendments, the "accept via the user interface" limitation required only that an "input" indicate that "at least two players . . . be included in [a] player group."  *See* Ex. 3 ('949 Reexam Certificate).  Following reexam, the input must indicate (1) at least two players be included in the player group; (2) that those players be synchronized to playback a multimedia output; and (3) the multimedia output must be from the same multimedia source.  *Id.*

Accordingly, Sonos should be precluded from presenting evidence of damages for

**DEFENDANTS' MOTION IN LIMINE**          **Page 9**

infringement of the '949 Patent prior to November 5, 2015 due to D&M's absolute intervening rights, and any evidence or allegation of damages prior to that date should be precluded.  *Id*.

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ John M. Jackson*
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for D&M Holdings Inc. d/b/a The D+M
Group, D&M Holdings U.S. Inc. and Denon
Electronics (USA), LLC*

OF COUNSEL:

John M. Jackson
Matthew C. Acosta
Blake T. Dietrich
Christopher J. Rourk
Robert P. Latham
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000

David Folsom
JACKSON WALKER L.L.P.
6002 Summerfield, Suite B
Texarkana, TX 75503
(903) 255-3250

Wasif Qureshi
JACKSON WALKER LLP
1401 McKinney, Ste. 1900
Houston, Texas 77010
(713) 752-4521
wqureshi@jw.com

## CERTIFICATE OF SERVICE

I certify that I caused copies of the foregoing document to be served on November 2, 2017, upon the following in the manner indicated:

George I. Lee                                                                         *VIA ELECTRONIC MAIL*
Sean M. Sullivan
Rory P. Shea
J. Dan Smith
Michael Boyea
Jae Pak
Cole Richter
LEE SULLIVAN SHEA & SMITH LLP
224 N. Desplaines Street
Suite 250
Chicago, IL 60661
(312) 754-9602

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*/s/ John M. Jackson*
John M. Jackson

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SONOS, INC.                              §
                                         §
                                         §
                    Plaintiff,           §
                                         §          C.A. No. 14-1330 (RGA)
v.                                       §
                                         §          PUBLIC VERSION
                                         §
                                         §
D&M HOLDINGS INC. d/b/a THE              §
D+M GROUP, D&M HOLDINGS U.S.             §
INC., and DENON ELECTRONICS             §
(USA), LLC,                              §
                                         §
                    Defendants.          §

## DECLARATION OF JOHN M. JACKSON IN SUPPORT OF DEFENDANTS' MOTIONS IN LIMINE

I, John M. Jackson, hereby declare as follows:

1.   I am an attorney with the law firm of Jackson Walker LLP. I am counsel for Defendants D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M" or "Defendants") in the above captioned matter.

2.   I make this declaration in support of Defendants' Motions in Limine.

3.   Attached hereto as Exhibit 1 is a true and correct copy of the docket sheet and requests for extension in TTAB proceeding Nos. 86223539 and 86169610.

4.   Attached hereto as Exhibit 2 is a true and correct copy of U.S. Patent No. 8,588,949.

5.   Attached hereto as Exhibit 3 is a true and correct copy of the transcript from the hearing held on October 5, 2017 regarding claim narrowing.

**Page 1**

Executed this 27th day of October, 2017, in Dallas, Texas.

/s/ John M. Jackson
John M. Jackson

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2017, I caused the foregoing to be served on the

following counsel of record.

George I. Lee
Sean M. Sullivan
Rory P. Shea
J. Dan Smith
Michael Boyea
Jae Pak
Cole Richter
LEE SULLIVAN SHEA & SMITH LLP
224 N. Desplaines Street

(312) 754-9602

Suite 250
Chicago, IL 60661
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*/s/ John M. Jackson*
John M Jackson

EXHIBIT
1



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | *e*Business | eBiz alerts | News | Help



**TTABVUE. Trademark Trial and Appeal Board Inquiry System**          **v1.9**

# Extension of Time

| | |
|---|---|
| **Number:** 86223539 | **Filing Date:** 08/26/2014 |
| **Status:** Terminated | **Status Date:** 01/02/2015 |
| **General Contact Number:** 571-272-8500 | |
| **Paralegal Name:** ROCHELLE L ADAMS | |

**Opposition #:**

**Defendant**

**Name:** D&M Holdings, Inc

**Correspondence:** PETER A. NIEVES
SHEEHAN PHINNEY BASS + GREEN PA
1000 ELM ST
MANCHESTER, NH 03105-1700

| | |
|---|---|
| **Serial #:** 86223539   Application File   Assignment | **Registration #:** 4818833 |
| **Application Status:** Registered | |
| **Mark:** HEOS | |

**Potential Opposer**

**Name:** Sonos, Inc.

**Correspondence:** Joi A. White
Carr & Ferrell LLP
120 Constitution Drive
Menlo Park, CA 93101
UNITED STATES
usptomail@carrferrell.com, jwhite@carrferrell.com,
shernandez@carrferrell.com
Phone: (650) 812-3400

**Granted To Date:** 12/17/2014

**Prosecution History**

| # | Date | History Text |
|---|---|---|
| 2 | 08/28/2014 | EXTENSION OF TIME GRANTED |
| 1 | 08/26/2014 | INCOMING - EXT TIME TO OPPOSE FILED |

Results as of 10/27/2017 10:27 AM          **Search:**

| .HOME | INDEX | SEARCH | *e*BUSINESS | CONTACT US | PRIVACY POLICY

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| ESTTA Tracking number: | **ESTTA623632** |
|---|---|
| Filing date: | **08/26/2014** |

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
## BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Applicant: | **D&M Holdings, Inc** |
|---|---|
| Application Serial Number: | **86223539** |
| Application Filing Date: | **03/17/2014** |
| Mark: | **HEOS** |
| Date of Publication | **08/19/2014** |

## First 90 Day Request for Extension of Time to Oppose for Good Cause

Pursuant to 37 C.F.R. Section 2.102, Sonos, Inc., 223 E. De La Guerra Street, Santa Barbara, CA 93101, UNITED STATES, a corporation organized under the laws of Delaware , respectfully requests that it be granted a 90-day extension of time to file a notice of opposition against the above-identified mark for cause shown .

Potential opposer believes that good cause is established for this request by:

- The potential opposer needs additional time to investigate the claim

The time within which to file a notice of opposition is set to expire on 09/18/2014. Sonos, Inc. respectfully requests that the time period within which to file an opposition be extended until 12/17/2014.

Respectfully submitted,
/Joi A. White/
08/26/2014

**Joi A. White**

**Carr & Ferrell LLP**

**120 Constitution Drive**

**Menlo Park, CA 93101**

**UNITED STATES**

**usptomail@carrferrell.com, jwhite@carrferrell.com, shernandez@carrferrell.com**

**(650) 812-3400**



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | *e*Business | eBiz alerts | News | Help



**TTABVUE. Trademark Trial and Appeal Board Inquiry System**      **v1.9**

# Extension of Time

| | | | |
|---|---|---|---|
| **Number:** | 86169610 | **Filing Date:** | 09/16/2014 |
| **Status:** | Terminated | **Status Date:** | 01/30/2015 |
| **General Contact Number:** | 571-272-8500 | | |
| **Paralegal Name:** | LALITA R WEBB | | |

**Opposition #:**

**Defendant**

**Name:** D&M Holdings, Inc.

**Correspondence:** PETER A. NIEVES
SHEEHAN PHINNEY BASS + GREEN PA
1000 ELM ST
MANCHESTER, NH 03105-1700
UNITED STATES

**Serial #:** 86169610    Application File    Assignment     **Registration #:** 4756918

**Application Status:** Registered

**Mark:** HEOS

**Potential Opposer**

**Name:** Sonos, Inc.

**Correspondence:** Joi A. White
Carr & Ferrell LLP
120 Constitution Drive
Menlo Park, CA 94025
UNITED STATES
usptomail@carrferrell.com, jwhite@carrferrell.com
Phone: 650-812-3400

**Granted To Date:** 01/14/2015

**Prosecution History**

| # | Date | History Text |
|---|---|---|
| 3 | 01/30/2015 | TERMINATED |
| 2 | 09/16/2014 | EXTENSION OF TIME GRANTED |
| 1 | 09/16/2014 | INCOMING - EXT TIME TO OPPOSE FILED |

Results as of 10/27/2017 10:28 AM      **Search:** [                    ]

| .HOME | INDEX | SEARCH | *e*BUSINESS | CONTACT US | PRIVACY POLICY |

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

| ESTTA Tracking number: | **ESTTA627459** |
|---|---|
| Filing date: | **09/16/2014** |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| Applicant: | **D&M Holdings, Inc.** |
|---|---|
| Application Serial Number: | **86169610** |
| Application Filing Date: | **01/19/2014** |
| Mark: | **HEOS** |
| Date of Publication | **09/16/2014** |

## First 90 Day Request for Extension of Time to Oppose for Good Cause

Pursuant to 37 C.F.R. Section 2.102, Sonos, Inc., 223 E. De La Guerra Street, Santa Barbara, CA 93101, UNITED STATES, a corporation organized under the laws of Delaware , respectfully requests that it be granted a 90-day extension of time to file a notice of opposition against the above-identified mark for cause shown .

Potential opposer believes that good cause is established for this request by:

- The potential opposer needs additional time to investigate the claim

The time within which to file a notice of opposition is set to expire on 10/16/2014. Sonos, Inc. respectfully requests that the time period within which to file an opposition be extended until 01/14/2015.

Respectfully submitted,
/Joi A. White/
09/16/2014

**Joi A. White**

**Carr & Ferrell LLP**

**120 Constitution Drive**

**Menlo Park, CA 94025**

**UNITED STATES**

**usptomail@carrferrell.com, jwhite@carrferrell.com**

**(650) 812-3400**

EXHIBIT
2

1

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF DELAWARE


SONOS, INC.,              )
                          )
          Plaintiff,      )   C.A. No. 14-1330-RGA-MPT
                          )
v.                        )
                          )
D&M HOLDINGS, INC.,       )
et al.,                   )
                          )
          Defendants.     )



              Thursday, October 5, 2017
              10:00 a.m.


              844 King Street
              Wilmington, Delaware


BEFORE:  THE HONORABLE WILLIAM CURTIS BRYSON
          United States District Court Judge


APPEARANCES:


          POTTER, ANDERSON & CORROON, LLP
          BY:  PHILLIP A. ROVNER, ESQ.

                    -and-

          LEE, SULLIVAN, SHEA & SMITH, LLP
          BY:  SEAN M. SULLIVAN, ESQ.
          BY:  GEORGE I. LEE, ESQ.

                    Counsel for the Plaintiff
```

2

```
 1   APPEARANCES CONTINUED:

 2

 3        MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
          BY: JACK B. BLUMENFELD, ESQ.
          BY: MICHAEL J. FLYNN, ESQ.
 4
               -and-
 5
          JACKSON WALKER, LLP
 6        BY: JOHN M. JACKSON, ESQ.
          BY: ROBERT P. LATHAM, ESQ.
 7

          Counsel for the Defendant
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1            THE COURT:  This is Judge Bryson.

 2   Do we have the parties and the court reporter on

 3   the line at this point.

 4            COURT REPORTER:  The court

 5   reporter is here, yes, Your Honor.

 6            THE COURT:  Okay.  Thank you.  How

 7   about the parties?

 8            MR. BLUMENFELD:  Your Honor, this

 9   is Jack Blumenfeld from Morris Nichols in

10   Wilmington for Denon, the Defendant.  And I

11   believe my co-counsel from Texas is also on,

12   that should be Bob Latham and John Jackson from

13   Jackson Walker in Dallas and my colleague,

14   Michael Flynn, also from Morris Nichols is also

15   on.

16            THE COURT:  Okay.  And do we have

17   anybody for the plaintiff?

18            MR. SULLIVAN:  Yes, Your Honor.

19   This is -- from Lee, Sullivan, Shae & Smith on

20   behalf of Sonos.

21            THE COURT:  I'm sorry, I didn't

22   get the name.  It cut out.  Can you give me your

23   name?

24            MR. SULLIVAN:  Yeah, it's Sean
```

4

```
 1   Sullivan on behalf of Sonos.

 2            THE COURT:  All right.  Do you

 3   expect anybody else to be joining us from the

 4   Plaintiff's side?

 5            MR. SULLIVAN:  I believe Phil

 6   Rovner of Potter Anderson is also joined.

 7            THE COURT:  Okay.  Is he on the

 8   line at this point?

 9            MR. SULLIVAN:  We have George Lee,

10   as well, from Lee, Sullivan, Shae & Smith on

11   behalf of Sonos.  And I believe Phil Rovner is

12   dialing in, but maybe he hasn't joined yet.

13            THE COURT:  While we're waiting

14   for Mr. Rovner, we have a court reporter on the

15   line and the court reporter will be preparing,

16   in case anybody needs a transcript, will be

17   preparing to provide one.  I'm also recording

18   the conference in the event that it's necessary,

19   but since we have a court reporter, that should

20   be everything we need.  Now, as I'm sure you

21   understand the drill, when speaking, in order to

22   make it possible for the court reporter to

23   identify who is speaking, please identify

24   yourself each time you speak.  Voices are
```

1 sometimes very familiar and it's difficult for a
2 court reporter who isn't very familiar with your
3 voice to know who is speaking.  So please, each
4 time you speak identify yourself.  I'll try to
5 do the same thing.  Also, it's particularly
6 important, since the court reporter is not in
7 your presence, to not speak over one another.
8 So we will speak and then if someone is
9 speaking, please do not interrupt.  I will try
10 to do the same, although I may have to stop you
11 at some point if I need for you to move to
12 another point.  But again, for the benefit of
13 the court reporter, please no overlapping
14 discussions.
15        All right.  Do we have Mr. Rovner?
16 I heard somebody sign in.
17        MR. ROVNER:  Yes, Your Honor.
18 This is Phil Rover.  I'm on the call.
19        THE COURT:  Okay.  Do we have --
20 so far as anybody knows, do we have everybody?
21 If there's anybody missing, then speak up,
22 please, on behalf of the missing person.  Okay.
23 I assume we've got everybody.
24        Now, this is a status conference

1 asserted here and my list contains nine patents.
2 I take it right now there are only eight that
3 are being asserted for purposes of the trial; is
4 that correct, Mr. Rovner?
5        MR. ROVNER:  Your Honor, I'm going
6 to direct that to Sean Sullivan.
7        THE COURT:  Oh, okay.  Mr.
8 Sullivan, you're -- I'm sorry.  This is Judge
9 Bryson.  Mr. Sullivan, you're going to be
10 carrying the ball on this conference call?
11        MR. SULLIVAN:  Yes, this is Sean
12 Sullivan.  I am, Your Honor.  I drew the short
13 straw this morning, so you have to deal with me,
14 unfortunately, but I can confirm there are only
15 eight patents, the '637 Patent we have not
16 elected any asserted claims from that patent.
17        THE COURT:  Okay.  That's one of
18 the synchronization patents, the '637, did I get
19 the number correct?
20        MR. SULLIVAN:  You did, Your
21 Honor.
22        THE COURT:  Okay.  Second
23 question.  There were, and I think the omission
24 of that patent explains the difference between

6

1 that was requested by Mr. Blumenfeld for the
2 purpose of determining how we're going to
3 proceed with respect to the length of the trial,
4 number of patents, the number of claims that are
5 going to be asserted.  I have read your
6 respective submissions and letters and I've read
7 the attached exhibits and I would first ask if
8 anybody has anything you would like to add to
9 what you've given me by way of exhibits and
10 letters?
11        MR. SULLIVAN:  Nothing on behalf
12 of Plaintiff Sonos, Your Honor.  This is John
13 Sullivan speaking.  Sorry.
14        THE COURT:  All right.  Mr.
15 Blumenfeld?
16        MR. BLUMENFELD:  Yes, Your Honor.
17 We don't have anything to add to what's in the
18 letters either.
19        THE COURT:  Okay.  Now, this is
20 Judge Bryson again.  I would like to ask a
21 couple of just questions to get -- make sure
22 I've got the the, the facts right so far as they
23 pertain to this issue.  Now, I have a list of
24 the patents that at some point were being

8

1 the 29 asserted claims that I have and the 27
2 that I understand were being asserted at last,
3 at last call, the 1 and 9 claims from the '637
4 having dropped out.  The rest of the claims were
5 the original 29 that were being asserted as of
6 the time that I have, is that correct?
7        MR. SULLIVAN:  This is Sean
8 Sullivan.  That is correct, Your Honor.
9        THE COURT:  All right.  One more
10 question along that line.  In your letter or in
11 Mr. Rovner's letter there was a reference to the
12 possibility of reducing the number of claims to
13 16.  Which are the 16 that you are proposing to
14 reduce the number to?
15        MR. SULLIVAN:  This is Sean
16 Sullivan, Your Honor.  We're going to take the
17 27 claims down to 16.  I'm not sure if it's
18 exactly two claims from each patent.  And I
19 don't have the exact list in front of me.  I'm
20 not sure we've worked that out exactly which
21 claims are going to be left in the 16, but we'd
22 be willing to go down to that number in order to
23 streamline the issues for trial.
24        THE COURT:  Okay.  Well, let me

9

1 start, then, by saying that in my experience it
2 is virtually impossible for a jury to handle
3 this many patents, even in eight days were we to
4 go to eight days, and come up with a rational
5 resolution of the case.  My impression is that
6 when you move from one patent to two patents to
7 three patents, you increase exponentially the
8 difficulty for the jury and you make it much
9 more likely that they will just come out with
10 a -- an across the board determination based on
11 factors that don't really bear on the merits of
12 the case very significantly.  So in the interest
13 of making sure that we have a jury that
14 understands something about the case by the time
15 they get to the deliberations, I just think that
16 having eight patents, even with only 16 claims,
17 it would be unmanageable and even with an
18 eight-day trial.  So what I'm looking at is
19 something more like what the Defendants have
20 proposed, a Bellwether trial with two and
21 perhaps as many as three patents.  Their
22 proviso, I think in that regard, is that the
23 three patent limit would be permissible if two
24 of the patents share the same specification.  I

11

1 proposal.
2         THE COURT:  Well, I'm willing to
3 hear from the Defendants on that proposal.  I
4 will tell you that I just finished a trial in
5 which there were six patents with the same
6 specification, but with quite different claims.
7 And it nearly killed me.  It was a bench trial
8 even, and I had lived with those patents for a
9 while, and I can tell you that my impression was
10 that trying to make sense of that many claims,
11 that many patents is very difficult, even for
12 the judge who has been living with the case for,
13 in this case a year, and it seems to me the
14 challenge for a jury is much, much greater.  So
15 you say three patent families, but I've looked
16 at these patents and I've looked at the
17 specifications and we're not talking about a
18 single specification for all of the patents.
19 The specifications differ, the claims differ,
20 sometimes small differences in the claims end up
21 being factors that are focuses of dispute and
22 end up making the case quite complicated for the
23 jury in my experience.  So I'm not sure that
24 going down to three patent families is a huge

10

1 am inclined to think that that is a good
2 approach and keeping the length of the trial at
3 five days.
4         Well, that's the Defendant's
5 proposal and Mr. Sullivan, I'd like your
6 response.
7         MR. SULLIVAN:  Yes, Your Honor,
8 this is Sean Sullivan again on behalf of Sonos.
9 We understand.  You know, the one thing about
10 these patents is that I should mention there's
11 only five different patent families.  Several of
12 the patents are related, so it really gets down
13 to five patents.  I wonder if we did three
14 patent families, which would be six patents,
15 again, they're related patents, so it's really
16 three features, it would be synchronization,
17 group volume and stereo pairing, for instance.
18 There's a lot of overlap with those issues.
19 They're all involving the same accused products.
20 I think we could probably work on that and get
21 that to a jury where they could understand the
22 concepts and probably even do that in the five
23 days that the Court has set.  I don't know what
24 your interest level or what you think about that

12

1 step forward here in terms of trying to give the
2 jury something it can intelligently absorb,
3 particularly because I would point out some of
4 these patents are actually quite long.  Some of
5 the patents are up to 40 columns long, if I
6 recall correctly, and hitting the jury with that
7 many patents of that length seems to me to be
8 asking too much, but I will hear from the
9 Defendants on this proposal.  Mr. Blumenfeld,
10 are you going to speak for the Defendants?
11         MR. BLUMENFELD:  Your Honor, Mr.
12 Jackson is going to speak for the Defendants
13 with Your Honor's permission.
14         THE COURT:  Okay.  Very good.
15         MR. JACKSON:  Thank you, Your
16 Honor.  This is John Jackson.  On behalf of
17 Defendants, we completely agree with you that
18 the six proposed patents would be completely
19 unmanageable for the case.  Only two of them
20 have a shared specification.  It's true that two
21 are related in the sense that they claim
22 priority to the same provisional patent and
23 there may be some overlap in the specification,
24 but we agree that the claims are different and

13

1  it would be completely unmanageable for the
2  jury. That's particularly true because we have
3  a number of dependent claims that are left. And
4  if some of the independent claims were dropped,
5  we could essentially have a situation where we
6  had pretty much the exact same coverage and
7  subject matter that's being implicated now and
8  really not much streamlining at all.
9        The other thing I would point out
10 is with respect to the Plaintiff's damages
11 model, their damages expert claims lost profits,
12 the full range of lost profits they're seeking
13 for infringement of only one patent, and that's
14 the '949 Patent. In other words, Sonos says
15 that the damages available to them for
16 infringement of just one patent are the same in
17 terms of lost profits as if all eight of their
18 patents were infringed. So from that
19 standpoint, they could get everything they need
20 in terms of potential damages if they just
21 include that one patent.
22       THE COURT: Okay. Mr. Sullivan,
23 I'll give you an opportunity to respond.
24       MR. SULLIVAN: Yes, Your Honor.

15

1  to be the next point I wanted to raise and for
2  this I will turn to Mr. Jackson. As the quid
3  pro quo for reduction in the number of patents,
4  Mr. Jackson, I would look to you for a proposal
5  as to the number of prior art references that
6  you're willing to limit yourself to.
7        MR. JACKSON: Yes. This is John
8  Jackson. Thank you, Your Honor. We propose
9  that we get down to no more than three prior art
10 references per patent. So if they have two
11 patents in the case, then we would have three
12 prior art references for each of them. And some
13 of those may very well be the same, we would
14 just have to wait and see which patents they
15 want to go forward with and then we'd be able to
16 very soon thereafter identify our three prior
17 art references per patent.
18       THE COURT: This is Judge Bryson.
19 Yes, I think that was in your letter, but let me
20 just make sure, circling back to Mr. Sullivan,
21 does that strike you, Mr. Sullivan, as an
22 acceptable number for purposes of making the
23 trial a workable exercise?
24       MR. SULLIVAN: Yeah, this is Sean

14

1  This is Sean Sullivan. And I know when we're
2  beaten. We'll concede on this point. I think
3  it's a valid -- some valid points that you
4  raised, Your Honor. And I think that we can go
5  along with the Bellwether on two to three
6  patents and I guess it would be stay the other
7  patents for possibly a second trial. I think
8  that proposal would be fine.
9        The only thing then, I think that
10 we'd need to tackle, which is the other side of
11 this coin is that there are way -- I mean, if we
12 talk about juries having difficult with, you
13 know, only a couple of patents being asserted, I
14 think we're going to have the same kind of
15 problem with the invalidity case that Defendants
16 are trying to bring forward, which involves
17 numerous different grounds with multiple,
18 sometimes up to 30 different references even in
19 a single ground. And I think it's just going to
20 bury the jury on the other side. So I think we
21 probably need to put some similar restraints
22 into this jury trial for the invalidity case as
23 well.
24       THE COURT: Yes. That was going

16

1  Sullivan. It does, Your Honor, with I guess one
2  clarification that we need. I'm not sure I
3  understand exactly what Mr. Jackson is referring
4  to when he says no more than three, quote
5  unquote, references, because sometimes when Mr.
6  Jackson, or I should say Defendants refer to a
7  reference, it's got 32 different documents in it
8  or 30 different documents in it. So, again, if
9  that's the kind of, you know, three references
10 we're talking about, where it's really actually
11 50 different pieces, again, I think that's going
12 to be awfully difficult for a jury to, to
13 process and get through all that information.
14       THE COURT: Well, let me -- this
15 is Judge Bryson. Let me turn back to Mr.
16 Jackson. The three references I had understood
17 from your letter, that three references in the
18 sense that one uses that term in patent law, not
19 three collections of references all of which
20 happen to be collected in a single exhibit. Am
21 I correct in assuming that's what you mean
22 by three references?
23       MR. JACKSON: Your Honor, this is
24 John Jackson. If you're trying to distinguish

17

1 between invalidity bases or just reliance on a
2 reference, so far the limitation has been just
3 reliance on a reference.  And with respect to
4 the UP&P prior art, for example, that is a, a
5 standard and there's a number of different
6 standards documents that all pertain to that
7 reference.  And as you can see from our Exhibit
8 A to the letter that we submitted, for purposes
9 of the reduction of prior art references, Sonos
10 has agreed that we can consider that as one
11 reference.  And so that's what we've done.  I
12 think what Mr. Sullivan may be referring to is
13 some of the evidentiary bases that we're relying
14 on to prove our arguments.  And I think the
15 problem is with respect to Plaintiff's
16 infringement position, Defendants are in the
17 same position.  So for example, Plaintiff has an
18 expert report and for infringement of one
19 particular claim of one patent, they may string
20 cite to 50, 60, 70 documents that span thousands
21 of pages and some of those pages don't clearly
22 identify what they're relying on, it's just a
23 collection of thousands of pages of documents.
24 And so I think before we would have to get down

19

1 that violating the five limit count for purposes
2 of that, but we did reserve our right to object
3 that that is a single reference for purposes of
4 anticipation or that it's combinable for
5 purposes of obviousness.  And none of that dealt
6 with what we're dealing with now, which is how
7 to streamline the issues for trial.  So that was
8 a much earlier agreement at a much earlier
9 deadline.  I think we do have a problem.  If
10 they're up to three references in this case, for
11 instance, and one references 30 different
12 pieces, which we don't think belong together,
13 another reference is 11 pieces, which again, we
14 don't think that that would go to together.
15 That's the home director reference.  They've
16 used some, some labels, some buckets, if you
17 will, to put a lot of different references into
18 those buckets and we're going to have a hard
19 time getting a jury to get through all of that
20 at trial.
21      THE COURT:  Okay.  I have not
22 looked at the UP&P standards, so I don't know
23 exactly what it is, but normally the standards
24 are not, as I've seen them at least, don't

18

1 into in terms of particular evidence we're
2 relying on, they would need to do the same thing
3 with respect to their infringement case.
4      THE COURT:  All right.  I think --
5 well, let me go back to Mr. Sullivan again.  Mr.
6 Sullivan, I want to make sure that we're talking
7 about something that is a real potential problem
8 here as opposed to simply hypothetical.  Your
9 concern, and I think it's a valid concern, is as
10 I understand it, to make sure that you don't
11 have a large number of what we would
12 conventionally call prior art references being
13 asserted because they are being lumped together
14 under something that is an umbrella, quote,
15 reference, end quote.  I don't know about the
16 UP&P standard.  I take it that that is not a
17 problem; is that correct?
18      MR. SULLIVAN:  Your Honor.  This
19 is Sean Sullivan.  It is a problem.  And let me
20 clarify what the agreement was that Mr. Jackson
21 is referring to.  That was dealing with, for an
22 assertion -- under the Court's rules and
23 scheduling order, under an assertion of prior
24 art at the time, we said we wouldn't object to

20

1 create a problem.  But perhaps this is unusual
2 in that it creates the problem that you've
3 identified.  As far as the bucket approach, Mr.
4 Jackson, are your references -- is it a fair
5 characterization that you are using references
6 in buckets as single references as Mr. Sullivan
7 suggestions?
8      MR. JACKSON:  Your Honor.  This is
9 John Jackson.  There are some instances where we
10 have prior art in buckets that relate to prior
11 art systems.  And so there could be patents, for
12 example, that are evidence of the system and
13 there could be other documents that are also
14 evidence of that same system.
15      THE COURT:  Well, that's not what
16 I would call a single reference.  Those sound
17 like multiple references to me.  So I will go
18 with the three references, but I don't want to
19 see multiple references that are linked together
20 and called a single reference simply because
21 they all apply to the same patent.  If you use
22 that theory, you could have a thousand
23 references with respect to each patent and you
24 would then be saying that you had only one

21

1  reference with respect to each patent.  So if I
2  understand your argument, it is one that I would
3  not accept as a permissible interpretation of a
4  restriction to three references.
5          MR. JACKSON:  Your Honor, this is
6  John Jackson.  I appreciate that.  The only
7  question I have is, for example, there could be
8  a prior art system, like the home director
9  system that's no longer available for purchase
10 and we couldn't get a sample of it.  And so in
11 that instance we have certain documents that all
12 evidence this one prior art system that we're
13 relying on and provide functionality and other
14 information concerning that particular prior art
15 system.  And so it's the system itself that's
16 the reference and not --
17         THE COURT:  Now -- I understand.
18 And that strikes me as being in the nature of a
19 single reference.  I haven't seen the documents,
20 obviously, but I understand what you're saying.
21 And if what you've got is essentially a
22 description that happens to be a single
23 description of a single piece of prior art that
24 happens to be found in more than one document,

22

1  that falls, it seems to me, on the one reference
2  side of the line.  Mr. Sullivan, do you take
3  issue with that?
4          MR. SULLIVAN:  Yeah, this is sean
5  Sullivan.  Well, I don't take issue with how
6  you're assessing things, Your Honor.  I do take
7  issue with the situation here in that what
8  they've done is they've put everything under the
9  umbrella of home director, for instance, and
10 they've used multiple different patents that
11 aren't really referring to any commercial
12 embodiment, but because they're part of --
13 they're from that company, they believe that
14 it's part of that product.  They've roped
15 together advertising with user manuals.  I mean,
16 I don't think this is, you know, where you're
17 putting together a user guide and an owners
18 manual to evidence what the product did
19 situation.  I think this is -- they've gone
20 beyond that and I think that's part of the
21 problem.  And the same exists also with the UPNP
22 protocol.  UPNP protocol may refer to other
23 protocols and so what they're doing is they're
24 using that reference to sweep those other

23

1  protocols in so that this UPNP, quote unquote,
2  protocol is now a mass of several different
3  protocols and documents discussing UPNP
4  articles, books, things like that.  Again,
5  they're just sweeping them all into this bucket
6  and we just -- to me it's got to get
7  streamlined.
8          THE COURT:  Again, Mr. Jackson, I
9  am concerned about the bucket problem.  I would
10 certainly, as I indicated, I would be prepared
11 to accept the notion that the multiple documents
12 can constitute a single reference if they are,
13 as, in the example that you used earlier, all
14 directed at explaining exactly what a piece of
15 prior art was.  But if what we're talking about
16 is a collection of patents and miscellaneous
17 documents all of which simply relate in some
18 general way to a prior art device, then I start
19 to have a problem.  That seems to me not only to
20 be inconsistent with the spirit of a single
21 reference requirement or a three reference
22 requirement, but also it doesn't strike me as
23 being particularly useful and helpful to hit the
24 jury with that much information that some of

24

1  which it sounds like, from at least Mr.
2  Sullivan's description, doesn't have any great
3  pertinence to the question of whether the prior
4  art reference renders the invention obvious or
5  is anticipated.  And your reaction, please.
6          MR. JACKSON:  Yes, Your Honor.
7  This is John Jackson.  I think, Your Honor, your
8  discussion today has been very helpful and I
9  think, you know, we can certainly go back and
10 take a look and once we're getting down to our
11 three prior art references, we'll certainly keep
12 your comments in mind and tighten those up and
13 provide more specificity concerning that which
14 forms the basis for our three references.  I
15 certainly understand your comments today.
16         THE COURT:  Okay.  Well, I think
17 we may have gone about as far as we can go with
18 this without my having the materials directly in
19 front of me.  But rather than simply keeping my
20 comments in mind, I would hope that you would
21 understand that the basic approach that I will,
22 I will take in looking at this question of the
23 multiple references, I've tried to be as
24 explicit as I can given that I don't have the

25

1  materials in front of me, but I don't want to
2  see, in effect, no aspersions intended, I don't
3  want to see multiple references smuggled in
4  under the cover of a single rubric.  So please,
5  when you put the list of prior art references
6  together, try to comply with what I have tried
7  to express by way of a directive on that score.
8  If I conclude that you've gone beyond a three
9  reference requirement with regard to permissible
10  three reference limit with respect to each of
11  the patents, then I will -- I will take a pen
12  knife to the list and I will eliminate some of
13  them.  So please comply with the directions and
14  the spirit of the directions that I'm trying to
15  give you today, even though I concede that I am
16  not able at this point to be as explicit about
17  each document as I would like to be.
18        I think that's probably as much as
19  we can get done today.  We will have an
20  opportunity, I think, to revisit this question
21  at the pretrial conference if not before.  So I
22  expect you to work together in the spirit of the
23  directions that I've tried to give and if
24  there's a problem that emerges before the

26

1  pretrial conference, it probably makes sense --
2  excuse me -- for you to get back to me and see
3  if we can't work it out so that no one has based
4  their whole approach to the case on an
5  assumption as to whether evidence is going to be
6  permitted and then is disappointed by something
7  that happens at the pretrial conference.  In
8  order to contact me, you can either do so by
9  letter or if you need to, you can call my law
10  clerk.  His name is Joshua Stein, S-T-E-I-N, and
11  he is at -- let me get his number.  Yeah, you
12  can just dial the chambers number, which is area
13  code 202-275 -- all right, 202-275-2680, is that
14  it?  Yeah.  This is embarrassing.  I don't know
15  my own phone number, but it's not the first
16  time.
17        MR. BLUMENFELD:  Your Honor, I
18  think we have Mr. Stein's information because
19  we've had some e-mail correspondence.
20        THE COURT:  Well, thank you.
21  That's -- let me just make sure that's the right
22  number.  Yeah, I think you've got all the
23  information.  So that's everything that I have.
24  Do either -- does either side have anything

27

1  further that you need from me at this point?
2        MR. SULLIVAN:  This is Sean
3  Sullivan for Sonos, Your Honor.  No.  And I just
4  want to say thank you for your time today as
5  well as for helping out with this case.  We
6  really appreciate it.
7        THE COURT:  All right.  And Mr.
8  Jackson, anything further?
9        MR. JACKSON:  Your Honor.  This is
10  John Jackson.  Just two quick points, Your
11  Honor.  In our letter we had requested that
12  Sonos also identify no more than 10 asserted
13  claims.  Is there any asserted claim limitation
14  in addition to the patent limitation?
15        THE COURT:  I think 10 claims is
16  pretty reasonable.  Mr. Sullivan, do you have a
17  problem with the 10 claim limit since you're --
18  since you were talking about reducing to two
19  claims per patent, then it sounds like the 10
20  claims actually is more than your two claims per
21  patent would be.
22        MR. SULLIVAN:  Yeah, Your Honor.
23  This is Sean Sullivan.  I don't think 10 will be
24  a problem.  I'm sure we can work with Mr.

28

1  Jackson and the Defendants on getting that
2  number down, perhaps even less than 10.  Since I
3  don't know what the two or three patents are
4  going to be at this time, though, what -- I'd
5  hate to put a limit on it right now.
6        THE COURT:  Okay.
7        MR. SULLIVAN:  If that would be
8  okay, but I think that's in the neighborhood.
9        THE COURT:  Here's what we'll do
10  then.  I will right now say tentatively 10
11  claims.  If you need more, you can come back to
12  me and show me why 10 is not enough and I will
13  be open to increasing the number, although I
14  will be skeptical if the number exceeds 10 by
15  any -- well, I'll be skeptical if it exceeds 10.
16  I will be highly skeptical if it exceeds 10 by
17  more than one or two.  But I would urge you to
18  keep it under 10 and it sounds to me as if that
19  really ought to be manageable.  Once again, I
20  find that there's an exponential complexity
21  factor that seems to work, in these cases,
22  against the jury's understanding the case as we
23  increase the number of claims, just as it
24  operates upon the increase in the number of

## 29

1  patents.  So I think it's in everybody's
2  interest, quite frankly, to keep the number as
3  low as it can be done consistent with your
4  having an opportunity to present your case under
5  the particular patents that you're asserting.
6  So we will revisit this whole thing in -- this
7  question and any other questions that may arise
8  at our pretrial conference.  Let me say, then,
9  that I will -- I can either put out an order.
10  If you would like, I'll put out an order of what
11  embodies what we've decided to go forward with
12  today or week just use this, this conference as
13  the basis for proceeding.  If you want an order,
14  I'll enter one.  If you don't really think one
15  is necessary, I'll save the effort.  Either
16  side?
17          MR. JACKSON:  Your Honor, on
18  behalf of Defendants, we don't believe an order
19  is necessary.  I think the call was sufficient
20  and very helpful.  I think the only additional
21  item we would request is just the date by which
22  Sonos would make its selection of patents and
23  asserted claims.
24          THE COURT:  Yes.  And that was

## 30

1  actually the last point I was going to raise.
2  And that is in your letter, Mr. Jackson, I think
3  you indicated a week.  Now, that might be a
4  little tight, a week from the date of the
5  conference.  That might be a little tight, but
6  let me turn to Mr. Sullivan and see what he has
7  to say about that.
8          MR. SULLIVAN:  Yeah.  Your Honor,
9  this is Sean Sullivan.  It is a little tight.
10  If we could get a, you know, a little more time
11  to come up with that, that list, we would
12  greatly appreciate it.
13          THE COURT:  Yeah.  I don't have a
14  problem.  Let's see, this is October 6th.  I
15  don't have a problem with your taking 10 days to
16  two weeks.  Would 10 days be enough,
17  presumably -- let's see, that would give us --
18  oh, today is the 5th, yeah.  10 days would give
19  you until the 16th of October.  Is that enough
20  time, Mr. Sullivan?
21          MR. SULLIVAN:  Your Honor, if we
22  could do the two weeks, I think that would be
23  better.
24          THE COURT:  All right.  I don't

## 31

1  have a problem with that.  Two weeks, so that
2  gives you until the 19th of October.  Now, Mr.
3  Jackson, how about you, how much time do you
4  need to put together your list of prior art?
5          MR. JACKSON:  Your Honor, I think
6  we could provide our list within one week after
7  Sonos provides its selection.
8          THE COURT:  Very well, so we're
9  talking about Plaintiff providing it's selection
10  on the 19th or earlier and the Defendant
11  providing its list on the 26th or earlier.  Is
12  that acceptable to everyone?
13          MR. SULLIVAN:  Yes, Your Honor.
14          THE COURT:  That was Mr. Sullivan
15  speaking?
16          MR. SULLIVAN:  That was Sean
17  Sullivan, yes, Your Honor.
18          THE COURT:  Okay.  Thank you.
19  And --
20          MR. JACKSON:  Your Honor, this is
21  John Jackson.  It's also acceptable to
22  Defendants.
23          THE COURT:  Okay.  I think we're
24  set.  So I will not enter an order.  I take it

## 32

1  neither side needs an order.  We do have a
2  transcript will be prepared if you want to order
3  one.  And my thanks to the court reporter.  This
4  came up on short notice, and I appreciate the
5  court reporter's being available.  And with that
6  we'll be adjourned.  Thank you.
7          (End at 10:37 a.m.)

1  State of Delaware)
                 )
2  New Castle County)


3
4
5          CERTIFICATE OF REPORTER
6
7          I, Stacy M. Ingram, Certified Court Reporter
8  and Notary Public, do hereby certify that the
9  foregoing record, Pages 1 to 33 inclusive, is a true
10 and accurate transcript of my stenographic notes
11 taken on October 5, 2017, in the above-captioned
12 matter.
13
14         IN WITNESS WHEREOF, I have hereunto set my
15 hand and seal this 5th day of October 2017, at
16 Wilmington.
17
18
19          _/s/ Stacy M. Ingram_
20          Stacy M. Ingram, CCR

21
22
23
24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697  FAX (302) 658-8418

**'** 

**'637** [3] - 7:15, 7:18, 8:3
**'949** [1] - 13:14

**/**

**/s** [1] - 33:19

**1**

**1** [2] - 8:3, 33:9
**10** [15] - 27:12, 27:15, 27:17, 27:19, 27:23, 28:2, 28:10, 28:12, 28:14, 28:15, 28:16, 28:18, 30:15, 30:16, 30:18
**10:00** [1] - 1:11
**10:37** [1] - 32:7
**11** [1] - 19:13
**14-1330-RGA-MPT** [1] - 1:4
**16** [5] - 8:13, 8:17, 8:21, 9:16
**16th** [1] - 30:19
**19th** [1] - 31:2, 31:10

**2**

**2017** [3] - 1:10, 33:11, 33:15
**202-275** [1] - 26:13
**202-275-2680** [1] - 26:13
**26th** [1] - 31:11
**27** [2] - 8:1, 8:17
**29** [2] - 8:1, 8:5

**3**

**30** [3] - 14:18, 16:8, 19:11
**32** [1] - 16:7
**33** [1] - 33:9

**4**

**40** [1] - 12:5

**5**

**5** [2] - 1:10, 33:11

**50** [2] - 16:11, 17:20
**5th** [2] - 30:18, 33:15

**6**

**60** [1] - 17:20
**6th** [1] - 30:14

**7**

**70** [1] - 17:20

**8**

**844** [1] - 1:12

**9**

**9** [1] - 8:3

**A**

**a.m** [2] - 1:11, 32:7
**able** [2] - 15:15, 25:16
**above-captioned** [1] - 33:11
**absorb** [1] - 12:2
**accept** [2] - 21:3, 23:11
**acceptable** [3] - 15:22, 31:12, 31:21
**accurate** [1] - 33:10
**accused** [1] - 10:19
**add** [2] - 6:8, 6:17
**addition** [1] - 27:14
**additional** [1] - 29:20
**adjourned** [1] - 32:6
**advertising** [1] - 22:15
**agree** [2] - 12:17, 12:24
**agreed** [1] - 17:10
**agreement** [2] - 18:20, 19:8
**al** [1] - 1:7
**Anderson** [1] - 4:6
**ANDERSON** [1] - 1:19
**anticipated** [1] - 24:5
**anticipation** [1] - 19:4
**APPEARANCES** [2] - 1:17, 2:1
**apply** [1] - 20:21
**appreciate** [4] - 21:6, 27:6, 30:12, 32:4
**approach** [4] - 10:2, 20:3, 24:21, 26:4

**area** [1] - 26:12
**argument** [1] - 21:2
**arguments** [1] - 17:14
**arise** [1] - 29:7
**ARSHT** [1] - 2:2
**art** [20] - 15:5, 15:9, 15:12, 15:17, 17:4, 17:9, 18:12, 18:24, 20:10, 20:11, 21:8, 21:12, 21:14, 21:23, 23:15, 23:18, 24:4, 24:11, 25:5, 31:4
**articles** [1] - 23:4
**aspersions** [1] - 25:2
**asserted** [12] - 6:5, 7:1, 7:3, 7:16, 8:1, 8:2, 8:5, 14:13, 18:13, 27:12, 27:13, 29:23
**asserting** [1] - 29:5
**assertion** [2] - 18:22, 18:23
**assessing** [1] - 22:6
**assume** [1] - 5:23
**assuming** [1] - 16:21
**assumption** [1] - 26:5
**attached** [1] - 6:7
**available** [3] - 13:15, 21:9, 32:5
**awfully** [1] - 16:12

**B**

**ball** [1] - 7:10
**based** [2] - 9:10, 26:3
**bases** [2] - 17:1, 17:13
**basic** [1] - 24:21
**basis** [2] - 24:14, 29:13
**bear** [1] - 9:11
**beaten** [1] - 14:2
**BEFORE** [1] - 1:15
**behalf** [8] - 3:20, 4:1, 4:11, 5:22, 6:11, 10:8, 12:16, 29:18
**Bellwether** [2] - 9:20, 14:5
**belong** [1] - 19:12
**bench** [1] - 11:7
**benefit** [1] - 5:12
**better** [1] - 30:23
**between** [2] - 7:24, 17:1
**beyond** [2] - 22:20, 25:8
**BLUMENFELD** [5] - 2:3, 3:8, 6:16,

12:11, 26:17
**Blumenfeld** [4] - 3:9, 6:1, 6:15, 12:9
**board** [1] - 9:10
**Bob** [1] - 3:12
**books** [1] - 23:4
**bring** [1] - 14:16
**BRYSON** [1] - 1:15
**Bryson** [5] - 3:1, 6:20, 7:9, 15:18, 16:15
**bucket** [3] - 20:3, 23:5, 23:9
**buckets** [5] - 19:16, 19:18, 20:6, 20:10
**bury** [1] - 14:20
**BY** [7] - 1:20, 1:22, 1:23, 2:3, 2:3, 2:6, 2:6

**C**

**C.A** [1] - 1:4
**captioned** [1] - 33:11
**carrying** [1] - 7:10
**case** [17] - 4:16, 9:5, 9:12, 9:14, 11:12, 11:13, 11:22, 12:19, 14:15, 14:22, 15:11, 18:3, 19:10, 26:4, 27:5, 28:22, 29:4
**cases** [1] - 28:21
**Castle** [1] - 33:2
**CCR** [1] - 33:20
**certain** [1] - 21:11
**certainly** [4] - 23:10, 24:9, 24:11, 24:15
**CERTIFICATE** [1] - 33:5
**Certified** [1] - 33:7
**certify** [1] - 33:8
**challenge** [1] - 11:14
**chambers** [1] - 26:12
**characterization** [1] - 20:5
**circling** [1] - 15:20
**cite** [1] - 17:20
**claim** [4] - 12:21, 17:19, 27:13, 27:17
**claims** [26] - 6:4, 7:16, 8:1, 8:3, 8:4, 8:12, 8:17, 8:18, 8:21, 9:16, 11:6, 11:10, 11:19, 11:20, 12:24, 13:3, 13:4, 13:11, 27:13, 27:15, 27:19, 27:20, 28:11, 28:23, 29:23
**clarification** [1] - 16:2

**clarify** [1] - 18:20
**clearly** [1] - 17:21
**clerk** [1] - 26:10
**co** [1] - 3:11
**co-counsel** [1] - 3:11
**code** [1] - 26:13
**coin** [1] - 14:11
**colleague** [1] - 3:13
**collected** [1] - 16:20
**collection** [2] - 17:23, 23:16
**collections** [1] - 16:19
**columns** [1] - 12:5
**combinable** [1] - 19:4
**comments** [3] - 24:12, 24:15, 24:20
**commercial** [1] - 22:11
**company** [1] - 22:13
**completely** [3] - 12:17, 12:18, 13:1
**complexity** [1] - 28:20
**complicated** [1] - 11:22
**comply** [2] - 25:6, 25:13
**concede** [2] - 14:2, 25:15
**concepts** [1] - 10:22
**concern** [1] - 18:9
**concerned** [1] - 23:9
**concerning** [2] - 21:14, 24:13
**conclude** [1] - 25:8
**conference** [9] - 4:18, 5:24, 7:10, 25:21, 26:1, 26:7, 29:8, 29:12, 30:5
**confirm** [1] - 7:14
**consider** [1] - 17:10
**consistent** [1] - 29:3
**constitute** [1] - 23:12
**contact** [1] - 26:8
**contains** [1] - 7:1
**CONTINUED** [1] - 2:1
**conventionally** [1] - 18:12
**correct** [6] - 7:4, 7:19, 8:6, 8:8, 16:21, 18:17
**correctly** [1] - 12:6
**correspondence** [1] - 26:19
**CORROON** [1] - 1:19
**counsel** [1] - 3:11
**Counsel** [2] - 1:24, 2:7
**count** [1] - 19:1

**County** [1] - 33:2
**couple** [2] - 6:21, 14:13
**COURT** [41] - 1:1, 3:1, 3:4, 3:6, 3:16, 3:21, 4:2, 4:7, 4:13, 5:19, 6:14, 6:19, 7:7, 7:17, 7:22, 8:9, 8:24, 11:2, 12:14, 13:22, 14:24, 15:18, 16:14, 18:4, 19:21, 20:15, 21:17, 23:8, 24:16, 26:20, 27:7, 27:15, 28:6, 28:9, 29:24, 30:13, 30:24, 31:8, 31:14, 31:18, 31:23
**court** [11] - 3:2, 3:4, 4:14, 4:15, 4:19, 4:22, 5:2, 5:6, 5:13, 32:3, 32:5
**Court** [3] - 1:15, 10:23, 33:7
**Court's** [1] - 18:22
**cover** [1] - 25:4
**coverage** [1] - 13:6
**create** [1] - 20:1
**creates** [1] - 20:2
**CURTIS** [1] - 1:15
**cut** [1] - 3:22

## D

**D&M** [1] - 1:6
**Dallas** [1] - 3:13
**damages** [4] - 13:10, 13:11, 13:15, 13:20
**date** [2] - 29:21, 30:4
**days** [7] - 9:3, 9:4, 10:3, 10:23, 30:15, 30:16, 30:18
**deadline** [1] - 19:9
**deal** [1] - 7:13
**dealing** [2] - 18:21, 19:6
**dealt** [1] - 19:5
**decided** [1] - 29:11
**Defendant** [3] - 2:7, 3:10, 31:10
**Defendant's** [1] - 10:4
**Defendants** [13] - 1:8, 9:19, 11:3, 12:9, 12:10, 12:12, 12:17, 14:15, 16:6, 17:16, 28:1, 29:18, 31:22
**DELAWARE** [1] - 1:1
**Delaware** [2] - 1:13, 33:1

**deliberations** [1] - 9:15
**Denon** [1] - 3:10
**dependent** [1] - 13:3
**description** [3] - 21:22, 21:23, 24:2
**determination** [1] - 9:10
**determining** [1] - 6:2
**device** [1] - 23:18
**dial** [1] - 26:12
**dialing** [1] - 4:12
**differ** [2] - 11:19
**difference** [1] - 7:24
**differences** [1] - 11:20
**different** [12] - 10:11, 11:6, 12:24, 14:17, 14:18, 16:7, 16:8, 16:11, 17:5, 19:11, 19:17, 22:10, 23:2
**difficult** [4] - 5:1, 11:11, 14:12, 16:12
**difficulty** [1] - 9:8
**direct** [1] - 7:6
**directed** [1] - 23:14
**directions** [3] - 25:13, 25:14, 25:23
**directive** [1] - 25:7
**directly** [1] - 24:18
**director** [3] - 19:15, 21:8, 22:9
**disappointed** [1] - 26:6
**discussing** [1] - 23:3
**discussion** [1] - 24:8
**discussions** [1] - 5:14
**dispute** [1] - 11:21
**distinguish** [1] - 16:24
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 1:15
**document** [2] - 21:24, 25:17
**documents** [11] - 16:7, 16:8, 17:6, 17:20, 17:23, 20:13, 21:11, 21:19, 23:3, 23:11, 23:17
**done** [4] - 17:11, 22:8, 25:19, 29:3
**down** [8] - 8:17, 8:22, 10:12, 11:24, 15:9, 17:24, 24:10, 28:2
**drew** [1] - 7:12
**drill** [1] - 4:21
**dropped** [2] - 8:4, 13:4

## E

**e-mail** [1] - 26:19
**effect** [1] - 25:2
**effort** [1] - 29:15
**eight** [7] - 7:2, 7:15, 9:3, 9:4, 9:16, 9:18, 13:17
**eight-day** [1] - 9:18
**either** [6] - 6:18, 26:8, 26:24, 29:9, 29:15
**elected** [1] - 7:16
**eliminate** [1] - 25:12
**embarrassing** [1] - 26:14
**embodies** [1] - 29:11
**embodiment** [1] - 22:12
**emerges** [1] - 25:24
**End** [1] - 32:7
**end** [3] - 11:20, 11:22, 18:15
**enter** [2] - 29:14, 31:24
**ESQ** [7] - 1:20, 1:22, 1:23, 2:3, 2:3, 2:6, 2:6
**essentially** [2] - 13:5, 21:21
**et** [1] - 1:7
**event** [1] - 4:18
**evidence** [6] - 18:1, 20:12, 20:14, 21:12, 22:18, 26:5
**evidentiary** [1] - 17:13
**exact** [2] - 8:19, 13:6
**exactly** [5] - 8:18, 8:20, 16:3, 19:23, 23:14
**example** [5] - 17:4, 17:17, 20:12, 21:7, 23:13
**exceeds** [3] - 28:14, 28:15, 28:16
**excuse** [1] - 26:2
**exercise** [1] - 15:23
**Exhibit** [1] - 17:7
**exhibit** [1] - 16:20
**exhibits** [2] - 6:7, 6:9
**exists** [1] - 22:21
**expect** [2] - 4:3, 25:22
**experience** [2] - 9:1, 11:23
**expert** [2] - 13:11, 17:18
**explaining** [1] - 23:14
**explains** [1] - 7:24

**explicit** [2] - 24:24, 25:16
**exponential** [1] - 28:20
**exponentially** [1] - 9:7
**express** [1] - 25:7

## F

**factor** [1] - 28:21
**factors** [2] - 9:11, 11:21
**facts** [1] - 6:22
**fair** [1] - 20:4
**falls** [1] - 22:1
**familiar** [2] - 5:1, 5:2
**families** [4] - 10:11, 10:14, 11:15, 11:24
**far** [5] - 5:20, 6:22, 17:2, 20:3, 24:17
**features** [1] - 10:16
**fine** [1] - 14:8
**finished** [1] - 11:4
**first** [2] - 6:7, 26:15
**five** [5] - 10:3, 10:11, 10:13, 10:22, 19:1
**FLYNN** [1] - 2:3
**Flynn** [1] - 3:14
**focuses** [1] - 11:21
**FOR** [1] - 1:1
**foregoing** [1] - 33:9
**forms** [1] - 24:14
**forward** [4] - 12:1, 14:16, 15:15, 29:11
**frankly** [1] - 29:2
**front** [3] - 8:19, 24:19, 25:1
**full** [1] - 13:12
**functionality** [1] - 21:13

## G

**general** [1] - 23:18
**George** [1] - 4:9
**GEORGE** [1] - 1:23
**given** [2] - 6:9, 24:24
**great** [1] - 24:2
**greater** [1] - 11:14
**greatly** [1] - 30:12
**ground** [1] - 14:19
**grounds** [1] - 14:17
**group** [1] - 10:17
**guess** [2] - 14:6, 16:1
**guide** [1] - 22:17

## H

**hand** [1] - 33:15
**handle** [1] - 9:2
**hard** [1] - 19:18
**hate** [1] - 28:5
**hear** [2] - 11:3, 12:8
**heard** [1] - 5:16
**helpful** [3] - 23:23, 24:8, 29:20
**helping** [1] - 27:5
**hereby** [1] - 33:8
**hereunto** [1] - 33:14
**highly** [1] - 28:16
**hit** [1] - 23:23
**hitting** [1] - 12:6
**HOLDINGS** [1] - 1:6
**home** [3] - 19:15, 21:8, 22:9
**Honor** [37] - 3:5, 3:8, 3:18, 5:17, 6:12, 6:16, 7:5, 7:12, 7:21, 8:8, 8:16, 10:7, 12:11, 12:16, 13:24, 14:4, 15:8, 16:1, 16:23, 18:18, 20:8, 21:5, 22:6, 24:6, 24:7, 26:17, 27:3, 27:9, 27:11, 27:22, 29:17, 30:8, 30:21, 31:5, 31:13, 31:17, 31:20
**Honor's** [1] - 12:13
**HONORABLE** [1] - 1:15
**hope** [1] - 24:20
**huge** [1] - 11:24
**hypothetical** [1] - 18:8

## I

**identified** [1] - 20:3
**identify** [6] - 4:23, 5:4, 15:16, 17:22, 27:12
**implicated** [1] - 13:7
**important** [1] - 5:6
**impossible** [1] - 9:2
**impression** [2] - 9:5, 11:9
**IN** [2] - 1:1, 33:14
**INC** [2] - 1:3, 1:6
**inclined** [1] - 10:1
**include** [1] - 13:21
**inclusive** [1] - 33:9
**inconsistent** [1] - 23:20

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697   FAX (302) 658-8418

11 of 14 sheets
Page 2 to 2 of 5

10/12/2017 12:38:11 PM

**increase** [3] - 9:7, 28:23, 28:24

**increasing** [1] - 28:13

**independent** [1] - 13:4

**indicated** [2] - 23:10, 30:3

**information** [5] - 16:13, 21:14, 23:24, 26:18, 26:23

**infringed** [1] - 13:18

**infringement** [5] - 13:13, 13:16, 17:16, 17:18, 18:3

**Ingram** [3] - 33:7, 33:19, 33:20

**instance** [4] - 10:17, 19:11, 21:11, 22:9

**instances** [1] - 20:9

**intelligently** [1] - 12:2

**intended** [1] - 25:2

**interest** [3] - 9:12, 10:24, 29:2

**interpretation** [1] - 21:3

**interrupt** [1] - 5:9

**invalidity** [3] - 14:15, 14:22, 17:1

**invention** [1] - 24:4

**involves** [1] - 14:16

**involving** [1] - 10:19

**issue** [4] - 6:23, 22:3, 22:5, 22:7

**issues** [3] - 8:23, 10:18, 19:7

**item** [1] - 29:21

**itself** [1] - 21:15

**J**

**JACK** [1] - 2:3

**Jack** [1] - 3:9

**JACKSON** [12] - 2:5, 2:6, 12:15, 15:7, 16:23, 20:8, 21:5, 24:6, 27:9, 29:17, 31:5, 31:20

**Jackson** [23] - 3:12, 3:13, 12:12, 12:16, 15:2, 15:4, 15:8, 16:3, 16:6, 16:16, 16:24, 18:20, 20:4, 20:9, 21:6, 23:8, 24:7, 27:8, 27:10, 28:1, 30:2, 31:3, 31:21

**JOHN** [1] - 2:6

**John** [10] - 3:12, 6:12,

**increase** 12:16, 15:7, 16:24, 20:9, 21:6, 24:7, 27:10, 31:21

**joined** [2] - 4:6, 4:12

**joining** [1] - 4:3

**Joshua** [1] - 26:10

**judge** [1] - 11:12

**Judge** [6] - 1:15, 3:1, 6:20, 7:8, 15:18, 16:15

**juries** [1] - 14:12

**jury** [14] - 9:2, 9:8, 9:13, 10:21, 11:14, 11:23, 12:2, 12:6, 13:2, 14:20, 14:22, 16:12, 19:19, 23:24

**jury's** [1] - 28:22

**K**

**keep** [3] - 24:11, 28:18, 29:2

**keeping** [2] - 10:2, 24:19

**killed** [1] - 11:7

**kind** [2] - 14:14, 16:9

**King** [1] - 1:12

**knife** [1] - 25:12

**knows** [1] - 5:20

**L**

**labels** [1] - 19:16

**large** [1] - 18:11

**last** [3] - 8:2, 8:3, 30:1

**LATHAM** [1] - 2:6

**Latham** [1] - 3:12

**law** [2] - 16:18, 26:9

**least** [2] - 19:24, 24:1

**Lee** [3] - 3:19, 4:9, 4:10

**LEE** [2] - 1:22, 1:23

**left** [2] - 8:21, 13:3

**length** [3] - 6:3, 10:2, 12:7

**less** [1] - 28:2

**letter** [8] - 8:10, 8:11, 15:19, 16:17, 17:8, 26:9, 27:11, 30:2

**letters** [3] - 6:6, 6:10, 6:18

**level** [1] - 10:24

**likely** [1] - 19:6

**limit** [6] - 9:23, 15:6, 19:1, 25:10, 27:17, 28:5

**limitation** [3] - 17:2,

27:13, 27:14

**line** [5] - 3:3, 4:8, 4:15, 8:10, 22:2

**linked** [1] - 20:19

**list** [9] - 6:23, 7:1, 8:19, 25:5, 25:12, 30:11, 31:4, 31:6, 31:11

**lived** [1] - 11:8

**living** [1] - 11:12

**LLP** [4] - 1:19, 1:22, 2:2, 2:5

**look** [2] - 15:4, 24:10

**looked** [3] - 11:15, 11:16, 19:22

**looking** [2] - 9:18, 24:22

**lost** [3] - 13:11, 13:12, 13:17

**low** [1] - 29:3

**lumped** [1] - 18:13

**M**

**mail** [1] - 26:19

**manageable** [1] - 28:19

**manual** [1] - 22:18

**manuals** [1] - 22:15

**mass** [1] - 23:2

**materials** [2] - 24:18, 25:1

**matter** [2] - 13:7, 33:12

**mean** [3] - 14:11, 16:21, 22:15

**mention** [1] - 10:10

**merits** [1] - 9:11

**Michael** [1] - 3:14

**MICHAEL** [1] - 2:3

**might** [2] - 30:3, 30:5

**mind** [2] - 24:12, 24:20

**miscellaneous** [1] - 23:16

**missing** [2] - 5:21, 5:22

**model** [1] - 13:11

**morning** [1] - 7:13

**Morris** [2] - 3:9, 3:14

**MORRIS** [1] - 2:2

**move** [2] - 5:11, 9:6

**MR** [37] - 3:8, 3:18, 3:24, 4:5, 4:9, 5:17, 6:11, 6:16, 7:5, 7:11, 7:20, 8:7, 8:15, 10:7, 12:11, 12:15, 13:24, 15:7,

15:24, 16:23, 18:18, 20:8, 21:5, 22:4, 24:6, 26:17, 27:2, 27:9, 27:22, 28:7, 29:17, 30:8, 30:21, 31:5, 31:13, 31:16, 31:20

**multiple** [7] - 14:17, 20:17, 20:19, 22:10, 23:11, 24:23, 25:3

**N**

**name** [3] - 3:22, 3:23, 26:10

**nature** [1] - 21:18

**nearly** [1] - 11:7

**necessary** [3] - 4:18, 29:15, 29:19

**need** [11] - 4:20, 5:11, 13:19, 14:10, 14:21, 16:2, 18:2, 26:9, 27:1, 28:11, 31:4

**needs** [2] - 4:16, 32:1

**neighborhood** [1] - 28:8

**New** [1] - 33:2

**next** [1] - 15:1

**NICHOLS** [1] - 2:2

**Nichols** [2] - 3:9, 3:14

**nine** [1] - 7:1

**none** [1] - 19:5

**normally** [1] - 19:23

**Notary** [1] - 33:8

**notes** [1] - 33:10

**nothing** [1] - 6:11

**notice** [1] - 32:4

**notion** [1] - 21:21

**number** [22] - 6:4, 7:19, 8:12, 8:14, 8:22, 13:3, 15:3, 15:5, 15:22, 17:5, 18:11, 26:11, 26:12, 26:15, 26:22, 28:2, 28:13, 28:14, 28:23, 28:24, 29:2

**numerous** [1] - 14:17

**O**

**object** [2] - 18:24, 19:2

**obvious** [1] - 24:4

**obviously** [1] - 21:20

**obviousness** [1] - 19:5

**October** [6] - 1:10,

30:14, 30:19, 31:2, 33:11, 33:15

**OF** [2] - 1:1, 33:5

**omission** [1] - 7:23

**once** [2] - 24:10, 28:19

**one** [26] - 4:17, 5:7, 7:17, 8:9, 9:6, 10:9, 13:13, 13:16, 13:21, 16:1, 16:18, 17:10, 17:18, 17:19, 19:11, 20:24, 21:2, 21:12, 21:24, 22:1, 26:3, 28:17, 29:14, 31:6, 32:3

**open** [1] - 28:13

**operates** [1] - 28:24

**opportunity** [3] - 13:23, 25:20, 29:4

**opposed** [1] - 18:8

**order** [11] - 4:21, 8:22, 18:23, 26:8, 29:9, 29:10, 29:13, 29:18, 31:24, 32:1, 32:2

**original** [1] - 8:5

**ought** [1] - 28:19

**overlap** [2] - 10:18, 12:23

**overlapping** [1] - 5:13

**own** [1] - 26:15

**owners** [1] - 22:17

**P**

**Pages** [1] - 33:9

**pages** [3] - 17:21, 17:23

**pairing** [1] - 10:17

**part** [3] - 22:12, 22:14, 22:20

**particular** [4] - 17:19, 18:1, 21:14, 29:5

**particularly** [4] - 5:5, 12:3, 13:2, 23:23

**parties** [3] - 3:2, 3:7

**Patent** [2] - 7:15, 13:14

**patent** [23] - 7:16, 7:24, 8:18, 9:6, 9:23, 10:11, 10:14, 11:15, 11:24, 12:22, 13:13, 13:16, 13:21, 15:10, 15:17, 16:18, 17:19, 20:21, 20:23, 21:1, 27:14, 27:19, 27:21

**patents** [40] - 6:4, 6:24, 7:1, 7:15,

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware   19801
(302) 658-6697   FAX (302) 658-8418
Page 3 to 3 of 3

10/12/2017 12:38:11 PM

12 of 14 sheets

7:18, 9:3, 9:6, 9:7,
9:16, 9:21, 9:24,
10:10, 10:12, 10:13,
10:14, 10:15, 11:5,
11:8, 11:11, 11:16,
11:18, 12:4, 12:5,
12:7, 12:18, 13:18,
14:6, 14:7, 14:13,
15:3, 15:11, 15:14,
20:11, 22:10, 23:16,
25:11, 28:3, 29:1,
29:5, 29:22
**pen** [1] - 25:11
**per** [4] - 15:10, 15:17,
27:19, 27:20
**perhaps** [3] - 9:21,
20:1, 28:2
**permissible** [3] - 9:23,
21:3, 25:9
**permission** [1] -
12:13
**permitted** [1] - 26:6
**person** [1] - 5:22
**pertain** [2] - 6:23, 17:6
**pertinence** [1] - 24:3
**Phil** [3] - 4:5, 4:11,
5:18
**PHILLIP** [1] - 1:20
**phone** [1] - 26:15
**piece** [2] - 21:23,
23:14
**pieces** [3] - 16:11,
19:12, 19:13
**Plaintiff** [5] - 1:4,
1:24, 6:12, 17:17,
31:9
**plaintiff** [1] - 3:17
**Plaintiff's** [3] - 4:4,
13:10, 17:15
**point** [12] - 3:3, 4:8,
5:11, 5:12, 6:24,
12:3, 13:9, 14:2,
15:1, 15:16, 27:1,
30:1
**points** [2] - 14:3,
27:10
**position** [2] - 17:16,
17:17
**possibility** [1] - 8:12
**possible** [1] - 4:22
**possibly** [1] - 14:7
**potential** [2] - 13:20,
18:7
**Potter** [1] - 4:6
**POTTER** [1] - 1:19
**prepared** [2] - 23:10,
32:2
**preparing** [2] - 4:15,

4:17
**presence** [1] - 5:7
**present** [1] - 29:4
**presumably** [1] -
30:17
**pretrial** [4] - 25:21,
26:1, 26:7, 29:8
**pretty** [2] - 13:6, 27:16
**priority** [1] - 12:22
**pro** [1] - 15:3
**problem** [17] - 14:15,
17:15, 18:7, 18:17,
18:19, 19:9, 20:1,
20:2, 22:21, 23:9,
23:19, 25:24, 27:17,
27:24, 30:14, 30:15,
31:1
**proceed** [1] - 6:3
**proceeding** [1] -
29:13
**process** [1] - 16:13
**product** [2] - 22:14,
22:18
**products** [1] - 10:19
**profits** [3] - 13:11,
13:12, 13:17
**proposal** [6] - 10:5,
11:1, 11:3, 12:9,
14:8, 15:4
**propose** [1] - 15:8
**proposed** [2] - 9:20,
12:18
**proposing** [1] - 8:13
**protocol** [3] - 22:22,
23:2
**protocols** [3] - 22:23,
23:1, 23:3
**prove** [1] - 17:14
**provide** [4] - 4:17,
21:13, 24:13, 31:6
**provides** [1] - 31:7
**providing** [2] - 31:9,
31:11
**provisional** [1] -
12:22
**proviso** [1] - 9:22
**Public** [1] - 33:8
**purchase** [1] - 21:9
**purpose** [1] - 6:2
**purposes** [6] - 7:3,
15:22, 17:8, 19:1,
19:3, 19:5
**put** [6] - 14:21, 19:17,
22:8, 25:5, 28:5,
29:9, 29:10, 31:4
**putting** [1] - 22:17

**Q**

**questions** [2] - 6:21,
29:7
**quick** [1] - 27:10
**quid** [1] - 15:2
**quite** [4] - 11:6, 11:22,
12:4, 29:2
**quo** [1] - 15:3
**quote** [4] - 16:4,
18:14, 18:15, 23:1

**R**

**raise** [2] - 15:1, 30:1
**raised** [1] - 14:4
**range** [1] - 13:12
**rather** [1] - 24:19
**rational** [1] - 9:4
**reaction** [1] - 24:5
**read** [2] - 6:5, 6:6
**real** [1] - 18:7
**really** [9] - 9:11,
10:12, 10:15, 13:8,
16:10, 22:11, 27:6,
28:19, 29:14
**reasonable** [1] - 27:16
**record** [1] - 33:9
**recording** [1] - 4:17
**reduce** [1] - 8:14
**reducing** [2] - 8:12,
27:18
**reduction** [2] - 15:3,
17:9
**refer** [2] - 16:6, 22:22
**reference** [23] - 8:11,
16:7, 17:2, 17:3,
17:7, 17:11, 18:15,
19:3, 19:13, 19:15,
20:16, 20:20, 21:1,
21:16, 21:19, 22:1,
22:24, 23:12, 23:21,
24:4, 25:9, 25:10
**references** [29] -
14:18, 15:5, 15:10,
15:12, 15:17, 16:5,
16:9, 16:16, 16:17,
16:19, 16:22, 17:9,
18:12, 19:10, 19:11,
19:17, 20:4, 20:5,
20:6, 20:17, 20:18,
20:19, 20:23, 21:4,
24:11, 24:14, 24:23,
25:3, 25:5
**referring** [4] - 16:3,
17:12, 18:21, 22:11
**regard** [2] - 9:22, 25:9

**relate** [2] - 20:10,
23:17
**related** [3] - 10:12,
10:15, 12:21
**reliance** [2] - 17:1,
17:3
**relying** [4] - 17:13,
17:22, 18:2, 21:13
**renders** [1] - 24:4
**report** [1] - 17:18
**reporter** [10] - 3:2,
3:5, 4:14, 4:15,
4:19, 4:22, 5:2, 5:6,
5:13, 32:3
**Reporter** [1] - 33:7
**REPORTER** [2] - 3:4,
33:5
**reporter's** [1] - 32:5
**request** [1] - 29:21
**requested** [2] - 6:1,
27:11
**requirement** [3] -
23:21, 23:22, 25:9
**reserve** [1] - 19:2
**resolution** [1] - 9:5
**respect** [8] - 6:3,
13:10, 17:3, 17:15,
18:3, 20:23, 21:1,
25:10
**respective** [1] - 6:6
**respond** [1] - 13:23
**response** [1] - 10:6
**rest** [1] - 8:4
**restraints** [1] - 14:21
**restriction** [1] - 21:4
**revisit** [2] - 25:20,
29:6
**ROBERT** [1] - 2:6
**roped** [1] - 22:14
**Rover** [1] - 5:18
**Rovner** [5] - 4:6, 4:11,
4:14, 5:15, 7:4
**ROVNER** [3] - 1:20,
5:17, 7:5
**rovner's** [1] - 8:11
**rubric** [1] - 25:4
**rules** [1] - 18:22

**S**

**sample** [1] - 21:10
**save** [1] - 29:15
**scheduling** [1] - 18:23
**score** [1] - 25:7
**seal** [1] - 33:15
**sean** [1] - 22:4
**Sean** [13] - 3:24, 7:6,
7:11, 8:7, 8:15,

10:8, 14:1, 15:24,
18:19, 27:2, 27:23,
30:9, 31:16
**SEAN** [1] - 1:22
**second** [2] - 7:22,
14:7
**see** [9] - 15:14, 17:7,
20:19, 25:2, 25:3,
26:2, 30:6, 30:14,
30:17
**seeking** [1] - 13:12
**selection** [3] - 29:22,
31:7, 31:9
**sense** [4] - 11:10,
12:21, 16:18, 26:1
**set** [3] - 10:23, 31:24,
33:14
**several** [2] - 10:11,
23:2
**Shae** [2] - 3:19, 4:10
**share** [1] - 9:24
**shared** [1] - 12:20
**SHEA** [1] - 1:22
**short** [2] - 7:12, 32:4
**show** [1] - 28:12
**side** [7] - 4:4, 14:10,
14:20, 22:2, 26:24,
29:16, 32:1
**sign** [1] - 5:16
**significantly** [1] - 9:12
**similar** [1] - 14:21
**simply** [4] - 18:8,
20:20, 23:17, 24:19
**single** [13] - 11:18,
14:19, 16:20, 19:3,
20:6, 20:16, 20:20,
21:19, 21:22, 21:23,
23:12, 23:20, 25:4
**situation** [3] - 13:5,
22:7, 22:19
**six** [3] - 10:14, 11:5,
12:18
**skeptical** [3] - 28:14,
28:15, 28:16
**small** [1] - 11:20
**Smith** [2] - 3:19, 4:10
**SMITH** [1] - 1:22
**smuggled** [1] - 25:3
**someone** [1] - 5:8
**sometimes** [4] - 5:1,
11:20, 14:18, 16:5
**Sonos** [11] - 3:20, 4:1,
4:11, 6:12, 10:8,
13:14, 17:9, 27:3,
27:12, 29:22, 31:7
**SONOS** [1] - 1:3
**soon** [1] - 15:16
**sorry** [3] - 3:21, 6:13,

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware  19801
(302) 658-6697   FAX (302) 658-8418

13 of 14 sheets

Page 4 to 4 of 5

10/12/2017 12:38:11 PM

7:8
**sound** [1] - 20:16
**sounds** [3] - 24:1, 27:19, 28:18
**span** [1] - 17:20
**speaking** [6] - 4:21, 4:23, 5:3, 5:9, 6:13, 31:15
**specification** [5] - 9:24, 11:6, 11:18, 12:20, 12:23
**specifications** [2] - 11:17, 11:19
**specificity** [1] - 24:13
**spirit** [3] - 23:20, 25:14, 25:22
**Stacy** [3] - 33:7, 33:19, 33:20
**standard** [2] - 17:5, 18:16
**standards** [3] - 17:6, 19:22, 19:23
**standpoint** [1] - 13:19
**start** [2] - 9:1, 23:18
**State** [1] - 33:1
**STATES** [1] - 1:1
**States** [1] - 1:15
**status** [1] - 5:24
**stay** [1] - 14:6
**Stein** [1] - 26:10
**STEIN** [1] - 26:10
**Stein's** [1] - 26:18
**stenographic** [1] - 33:10
**step** [1] - 12:1
**stereo** [1] - 10:17
**stop** [1] - 5:10
**straw** [1] - 7:13
**streamline** [2] - 8:23, 19:7
**streamlined** [1] - 23:7
**streamlining** [1] - 13:8
**Street** [1] - 1:12
**strike** [2] - 15:21, 23:22
**strikes** [1] - 21:18
**string** [1] - 17:19
**subject** [1] - 13:7
**submissions** [1] - 6:6
**submitted** [1] - 17:8
**sufficient** [1] - 29:19
**suggestions** [1] - 20:7
**Sullivan** [32] - 3:19, 4:1, 4:10, 6:13, 7:6, 7:8, 7:9, 7:12, 8:8, 8:16, 10:5, 10:8,

13:22, 14:1, 15:20, 15:21, 16:1, 17:12, 18:5, 18:6, 18:19, 20:6, 22:2, 22:5, 27:3, 27:16, 27:23, 30:6, 30:9, 30:20, 31:14, 31:17
**SULLIVAN** [23] - 1:22, 1:22, 3:18, 3:24, 4:5, 4:9, 6:11, 7:11, 7:20, 8:7, 8:15, 10:7, 13:24, 15:24, 18:18, 22:4, 27:2, 27:22, 28:7, 30:8, 30:21, 31:13, 31:16
**Sullivan's** [1] - 24:2
**sweep** [1] - 22:24
**sweeping** [1] - 23:5
**synchronization** [2] - 7:18, 10:16
**system** [7] - 20:12, 20:14, 21:8, 21:9, 21:12, 21:15
**systems** [1] - 20:11

## T

**tackle** [1] - 14:10
**tentatively** [1] - 28:10
**term** [1] - 16:18
**terms** [4] - 12:1, 13:17, 13:20, 18:1
**Texas** [1] - 3:11
**THE** [42] - 1:1, 1:1, 1:15, 3:1, 3:6, 3:16, 3:21, 4:2, 4:7, 4:13, 5:19, 6:14, 6:19, 7:7, 7:17, 7:22, 8:9, 8:24, 11:2, 12:14, 13:22, 14:24, 15:18, 16:14, 18:4, 19:21, 20:15, 21:17, 23:8, 24:16, 26:20, 27:7, 27:15, 28:6, 28:9, 29:24, 30:13, 30:24, 31:8, 31:14, 31:18, 31:23
**theory** [1] - 20:22
**thereafter** [1] - 15:16
**they've** [6] - 19:15, 22:8, 22:10, 22:14, 22:19
**thousand** [1] - 20:22
**thousands** [2] - 17:20, 17:23
**three** [26] - 9:7, 9:21, 9:23, 10:13, 10:16, 11:15, 11:24, 14:5,

15:9, 15:11, 15:16, 16:4, 16:9, 16:16, 16:17, 16:19, 16:22, 19:10, 20:18, 21:4, 23:21, 24:11, 24:14, 25:8, 25:10, 28:3
**Thursday** [1] - 1:10
**tight** [3] - 30:4, 30:5, 30:9
**tighten** [1] - 24:12
**today** [7] - 24:8, 24:15, 25:15, 25:19, 27:4, 29:12, 30:18
**together** [9] - 18:13, 19:12, 19:14, 20:19, 22:15, 22:17, 25:6, 25:22, 31:4
**transcript** [3] - 4:16, 32:2, 33:10
**trial** [13] - 6:3, 7:3, 8:23, 9:18, 9:20, 10:2, 11:4, 11:7, 14:7, 14:22, 15:23, 19:7, 19:20
**tried** [3] - 24:23, 25:6, 25:23
**true** [3] - 12:20, 13:2, 33:9
**try** [3] - 5:4, 5:9, 25:6
**trying** [5] - 11:10, 12:1, 14:16, 16:24, 25:14
**TUNNELL** [1] - 2:2
**turn** [3] - 15:2, 16:15, 30:6
**two** [16] - 8:18, 9:6, 9:20, 9:23, 12:19, 12:20, 14:5, 15:10, 27:10, 27:18, 27:20, 28:3, 28:17, 30:16, 30:22, 31:1

## U

**umbrella** [2] - 18:14, 22:9
**under** [7] - 18:14, 18:22, 18:23, 22:8, 25:4, 28:18, 29:4
**understood** [1] - 16:16
**unfortunately** [1] - 7:14
**UNITED** [1] - 1:1
**United** [1] - 1:15
**unmanageable** [3] - 9:17, 12:19, 13:1
**unquote** [2] - 16:5,

23:1
**unusual** [1] - 20:1
**up** [10] - 5:21, 9:4, 11:20, 11:22, 12:5, 14:18, 19:10, 24:12, 30:17, 32:4
**UP&P** [3] - 17:4, 18:16, 19:22
**UPNP** [4] - 22:21, 22:22, 23:1, 23:3
**urge** [1] - 28:17
**useful** [1] - 23:23
**user** [2] - 22:15, 22:17
**uses** [1] - 16:18

## V

**valid** [3] - 14:3, 18:9
**violating** [1] - 19:1
**virtually** [1] - 9:2
**voice** [1] - 5:3
**voices** [1] - 4:24
**volume** [1] - 10:17

## W

**wait** [1] - 15:14
**waiting** [1] - 4:13
**WALKER** [1] - 2:5
**Walker** [1] - 3:13
**week** [4] - 29:12, 30:3, 30:4, 31:6
**weeks** [3] - 30:16, 30:22, 31:1
**WHEREOF** [1] - 33:14
**whole** [2] - 26:4, 29:6
**WILLIAM** [1] - 1:15
**willing** [3] - 8:22, 11:2, 15:6
**Wilmington** [3] - 1:13, 3:10, 33:16
**WITNESS** [1] - 33:14
**wonder** [1] - 10:13
**words** [1] - 13:14
**workable** [1] - 15:23

## Y

**year** [1] - 11:13
**yourself** [3] - 4:24, 5:4, 15:6

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware   19801
(302) 658-6697   FAX (302) 658-8418
Page 5 to 5 of 5

10/12/2017 12:38:11 PM

14 of 14 sheets

EXHIBIT
3

US008588949B2

(12) **United States Patent**

Lambourne et al.

(10) **Patent No.:** **US 8,588,949 B2**

(45) **Date of Patent:** **Nov. 19, 2013**

(54) **METHOD AND APPARATUS FOR ADJUSTING VOLUME LEVELS IN A MULTI-ZONE SYSTEM**

(75) Inventors: **Robert A. Lambourne**, Santa Barbara, CA (US); **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **Sonos, Inc.**, Santa Barbara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/619,237**

(22) Filed: **Sep. 14, 2012**

(65) **Prior Publication Data**

US 2013/0014015 A1      Jan. 10, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 12/035,112, filed on Feb. 21, 2008, now Pat. No. 8,290,603, which is a continuation-in-part of application No. 10/861,653, filed on Jun. 5, 2004, now Pat. No. 7,571,014, which is a continuation-in-part of application No. 10/816,217, filed on Apr. 1, 2004, now Pat. No. 8,234,395.

(60) Provisional application No. 60/490,768, filed on Jul. 28, 2003.

(51) **Int. Cl.**
*G06F 17/00*      (2006.01)

(52) **U.S. Cl.**
USPC ............. **700/94**; 381/104; 381/105; 381/106; 381/107; 381/108; 381/109; 715/716

(58) **Field of Classification Search**
USPC .......................................................... 700/94
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,296,278 | A | 10/1981 | Cullison et al. |
| 4,816,989 | A | 3/1989 | Finn et al. |
| 5,182,552 | A | 1/1993 | Paynting |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0251584 A2 | 1/1988 |
| EP | 0672985 A1 | 9/1995 |

(Continued)

OTHER PUBLICATIONS

Yamaha DME 32 manual: copyright 2001.*

(Continued)

*Primary Examiner* — Paul McCord

(74) *Attorney, Agent, or Firm* — TechLaw LLP; Robert J. Irvine, III

(57) **ABSTRACT**

A multimedia controller including a processor, the controller configured to: provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is configured to playback a multimedia output from a multimedia source; accept an input to facilitate formation of the player group, indicating that at least two of the players in the local area network are to be included in the player group; for each of the plurality of players within the player group, accept an input to adjust a volume associated with the player, that causes the player to adjust its volume; and accept an input to adjust a volume associated with the player group, wherein the input to adjust the volume associated with the group causes the players in the player group to adjust their volumes.

**20 Claims, 14 Drawing Sheets**



**US 8,588,949 B2**

Page 2

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,406,634 | A | 4/1995 | Anderson et al. |
| 5,440,644 | A | 8/1995 | Farinelli et al. |
| 5,467,342 | A | 11/1995 | Logston et al. |
| 5,491,839 | A | 2/1996 | Schotz |
| 5,553,222 | A | 9/1996 | Milne et al. |
| 5,668,884 | A | 9/1997 | Clair, Jr. et al. |
| 5,673,323 | A | 9/1997 | Schotz et al. |
| 5,815,689 | A | 9/1998 | Shaw et al. |
| 5,867,691 | A | 2/1999 | Shiraishi |
| 5,875,354 | A | 2/1999 | Charlton et al. |
| 5,887,143 | A | 3/1999 | Saito et al. |
| 5,946,343 | A * | 8/1999 | Schotz et al. ................ 375/141 |
| 6,009,457 | A | 12/1999 | Moller |
| 6,026,150 | A | 2/2000 | Frank et al. |
| 6,031,818 | A | 2/2000 | Lo et al. |
| 6,128,318 | A | 10/2000 | Sato |
| 6,157,957 | A | 12/2000 | Berthaud |
| 6,175,872 | B1 | 1/2001 | Neumann et al. |
| 6,185,737 | B1 | 2/2001 | Northcutt et al. |
| 6,195,436 | B1 | 2/2001 | Scibora et al. |
| 6,199,169 | B1 | 3/2001 | Voth |
| 6,256,554 | B1 | 7/2001 | DiLorenzo |
| 6,308,207 | B1 | 10/2001 | Tseng et al. |
| 6,324,586 | B1 | 11/2001 | Johnson |
| 6,332,147 | B1 | 12/2001 | Moran et al. |
| 6,351,821 | B1 | 2/2002 | Voth |
| 6,430,353 | B1 | 8/2002 | Honda et al. |
| 6,487,296 | B1 | 11/2002 | Allen et al. |
| 6,526,325 | B1 | 2/2003 | Sussman et al. |
| 6,587,127 | B1 | 7/2003 | Leeke et al. |
| 6,598,172 | B1 | 7/2003 | VanDeusen et al. |
| 6,611,537 | B1 | 8/2003 | Edens et al. |
| 6,631,410 | B1 | 10/2003 | Kowalski et al. |
| 6,674,803 | B1 | 1/2004 | Kesselring |
| 6,757,517 | B2 | 6/2004 | Chang |
| 6,778,869 | B2 | 8/2004 | Champion |
| 6,826,283 | B1 | 11/2004 | Wheeler et al. |
| 6,836,788 | B2 | 12/2004 | Kim et al. |
| 6,898,642 | B2 | 5/2005 | Chafle et al. |
| 6,912,610 | B2 | 6/2005 | Spencer |
| 6,920,373 | B2 | 7/2005 | Xi et al. |
| 6,934,766 | B1 | 8/2005 | Russell |
| 6,985,694 | B1 | 1/2006 | De Bonet et al. |
| 7,007,106 | B1 | 2/2006 | Flood et al. |
| 7,020,791 | B1 | 3/2006 | Aweya et al. |
| 7,043,651 | B2 | 5/2006 | Aweya et al. |
| 7,047,308 | B2 | 5/2006 | Deshpande |
| 7,115,017 | B1 | 10/2006 | Laursen et al. |
| 7,130,608 | B2 | 10/2006 | Hollstrom et al. |
| 7,162,315 | B2 | 1/2007 | Gilbert |
| 7,185,090 | B2 | 2/2007 | Kowalski et al. |
| 7,187,947 | B1 | 3/2007 | White et al. |
| 7,206,367 | B1 | 4/2007 | Moore |
| 7,209,795 | B2 | 4/2007 | Sullivan et al. |
| 7,218,708 | B2 | 5/2007 | Berezowski et al. |
| 7,312,785 | B2 | 12/2007 | Tsuk et al. |
| 7,324,857 | B2 | 1/2008 | Goddard |
| 7,333,519 | B2 | 2/2008 | Sullivan et al. |
| 7,372,846 | B2 | 5/2008 | Zwack |
| 7,392,102 | B2 | 6/2008 | Sullivan et al. |
| 7,571,014 | B1 | 8/2009 | Lambourne et al. |
| 7,643,894 | B2 | 1/2010 | Braithwaite et al. |
| 7,668,990 | B2 | 2/2010 | Krzyzanowski et al. |
| 7,675,943 | B2 | 3/2010 | Mosig et al. |
| 7,720,096 | B2 | 5/2010 | Klemets |
| 7,742,740 | B2 | 6/2010 | Goldberg et al. |
| 7,934,239 | B1 | 4/2011 | Dagman |
| 8,014,423 | B2 | 9/2011 | Thaler et al. |
| 8,045,952 | B2 | 10/2011 | Qureshey et al. |
| 8,050,652 | B2 | 11/2011 | Qureshey et al. |
| 8,074,253 | B1 | 12/2011 | Nathan |
| 8,086,752 | B2 | 12/2011 | Millington et al. |
| 8,103,009 | B2 | 1/2012 | McCarty et al. |
| 8,131,390 | B2 | 3/2012 | Braithwaite et al. |
| 8,234,395 | B2 | 7/2012 | Millington |

| | | | |
|---|---|---|---|
| 8,370,678 | B2 | 2/2013 | Millington et al. |
| 8,423,659 | B2 | 4/2013 | Millington |
| 2001/0009604 | A1 | 7/2001 | Ando et al. |
| 2001/0022823 | A1 | 9/2001 | Renaud |
| 2001/0032188 | A1 | 10/2001 | Miyabe et al. |
| 2002/0002039 | A1 | 1/2002 | Qureshey et al. |
| 2002/0002562 | A1 | 1/2002 | Moran et al. |
| 2002/0003548 | A1 | 1/2002 | Krusche et al. |
| 2002/0034374 | A1 | 3/2002 | Barton |
| 2002/0042844 | A1 | 4/2002 | Chiazzese |
| 2002/0065926 | A1 | 5/2002 | Hackney et al. |
| 2002/0073228 | A1 | 6/2002 | Cognet et al. |
| 2002/0090914 | A1 | 7/2002 | Kang et al. |
| 2002/0093478 | A1 | 7/2002 | Yeh |
| 2002/0112244 | A1 | 8/2002 | Liou et al. |
| 2002/0124097 | A1 | 9/2002 | Isely et al. |
| 2002/0129156 | A1 | 9/2002 | Yoshikawa |
| 2002/0143998 | A1 | 10/2002 | Rajagopal et al. |
| 2002/0163361 | A1 | 11/2002 | Parkin |
| 2002/0165921 | A1 | 11/2002 | Sapieyevski |
| 2003/0020763 | A1 * | 1/2003 | Mayer et al. .................. 345/838 |
| 2003/0023741 | A1 | 1/2003 | Tomassetti et al. |
| 2003/0035444 | A1 | 2/2003 | Zwack |
| 2003/0041173 | A1 | 2/2003 | Hoyle |
| 2003/0041174 | A1 | 2/2003 | Wen et al. |
| 2003/0066094 | A1 | 4/2003 | Van et al. |
| 2003/0099212 | A1 | 5/2003 | Anjum et al. |
| 2003/0099221 | A1 | 5/2003 | Rhee |
| 2003/0126211 | A1 | 7/2003 | Anttila et al. |
| 2003/0195964 | A1 | 10/2003 | Mane |
| 2003/0198257 | A1 | 10/2003 | Sullivan et al. |
| 2003/0210796 | A1 | 11/2003 | McCarty et al. |
| 2003/0231871 | A1 | 12/2003 | Ushimaru |
| 2004/0001484 | A1 | 1/2004 | Ozguner |
| 2004/0001591 | A1 | 1/2004 | Mani et al. |
| 2004/0010727 | A1 * | 1/2004 | Fujinami ..................... 713/400 |
| 2004/0015252 | A1 * | 1/2004 | Aiso et al. ...................... 700/94 |
| 2004/0024925 | A1 | 2/2004 | Cypher et al. |
| 2004/0027166 | A1 | 2/2004 | Mangum et al. |
| 2004/0131192 | A1 * | 7/2004 | Metcalf ............................ 381/1 |
| 2004/0170383 | A1 | 9/2004 | Mazur |
| 2004/0203378 | A1 | 10/2004 | Powers |
| 2004/0249965 | A1 | 12/2004 | Huggins et al. |
| 2004/0249982 | A1 | 12/2004 | Arnold et al. |
| 2004/0252400 | A1 | 12/2004 | Blank et al. |
| 2005/0010691 | A1 | 1/2005 | Oyadomari et al. |
| 2005/0013394 | A1 | 1/2005 | Rausch et al. |
| 2005/0058149 | A1 | 3/2005 | Howe |
| 2005/0081213 | A1 | 4/2005 | Suzuoki et al. |
| 2005/0114538 | A1 | 5/2005 | Rose |
| 2005/0177643 | A1 | 8/2005 | Xu |
| 2005/0281255 | A1 | 12/2005 | Davies et al. |
| 2005/0283820 | A1 | 12/2005 | Richards et al. |
| 2005/0288805 | A1 | 12/2005 | Moore et al. |
| 2005/0289224 | A1 | 12/2005 | Deslippe et al. |
| 2007/0038999 | A1 | 2/2007 | Millington et al. |
| 2007/0054680 | A1 | 3/2007 | Mo et al. |
| 2007/0142022 | A1 | 6/2007 | Madonna et al. |
| 2007/0142944 | A1 * | 6/2007 | Goldberg et al. ............... 700/94 |
| 2007/0271388 | A1 | 11/2007 | Bowra et al. |
| 2008/0120429 | A1 | 5/2008 | Millington et al. |
| 2008/0144861 | A1 | 6/2008 | Melanson et al. |
| 2009/0157905 | A1 | 6/2009 | Davis |
| 2009/0228919 | A1 | 9/2009 | Zott et al. |
| 2012/0029671 | A1 | 2/2012 | Millington et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 1111527 A2 | 6/2001 |
| WO | 9525313 A1 | 9/1995 |
| WO | 9961985 A1 | 12/1999 |
| WO | 2005013047 A2 | 2/2005 |

OTHER PUBLICATIONS

Polycom Conference Composer manual; Copyright 2001.*
ID3 draft specificaiton; Copyright 1998.*

# US 8,588,949 B2

Page 3

(56)                **References Cited**

OTHER PUBLICATIONS

Akyildiz I.F., et al., "Multimedia Group Synchronization Protocols for Integrated Services Networks," IEEE Journal on Selected Areas in Communications, 1996, vol. 14 (1), pp. 162-173.

"AudioTron Quick Start Guide, Version 1.0", Voyetra Turtle Beach, Inc., Mar. 2001, 24 pages.

"AudioTron Reference Manual, Version 3.0", Voyetra Turtle Beach, Inc., May 2002, 70 pages.

"AudioTron Setup Guide, Version 3.0", Voyetra Turtle Beach, Inc., May 2002, 38 pages.

Benslimane A., "A Multimedia Synchronization Protocol for Multicast Groups," Proceedings of the 26th Euromicro Conference, 2000, vol. 1, pp. 456-463.

Biersack E., et al., "Intra- and Inter-Stream Synchronisation for Stored Multimedia Streams," IEEE International Conference on Multimedia Computing and Systems, 1996, pp. 372-381.

Bretl W.E., et al., MPEG2 Tutorial [online], 2000 [retrieved on Jan. 13, 2009] Retrieved from the Internet:< http://www.bretl.com/mpeghtml/MPEGindex.htm>, pp. 1-23.

Final Office Action mailed Jul. 13, 2009 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

"Final Office Action mailed Sep. 13, 2012 for U.S. Appl. No. 13/297,000", United States Patent and Trademark Office, Sep. 13, 2012, 17 pages.

Final Office Action mailed Oct. 21, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Final Office Action mailed Jan. 28, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Final Office Action mailed Jun. 30, 2008 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Huang C.M., et al., "A Synchronization Infrastructure for Multicast Multimedia at the Presentation Layer," IEEE Transactions on Consumer Electronics, 1997, vol. 43 (3), pp. 370-380.

International Search Report for Application No. PCT/US04/23102, mailed on Aug. 1, 2008, 5 pages.

Ishibashi Y., "A Group Synchronization Mechanism for Live Media in Multicast Communications," IEEE Global Telecommunications Conference, 1997, vol. 2, pp. 746-752.

Ishibashi Y., "A Group Synchronization Mechanism for Stored Media in Multicast Communications," IEEE Information Revolution and Communications, 1997, vol. 2, pp. 692-700.

Jo J., et al., "Synchronized One-to-many Media Streaming with Adaptive Playout Control," Proceedings of SPIE, 2002, vol. 4861, pp. 71-82.

Mills D.L., "Network Time Protocol (Version 3) Specification, Implementation and Analysis," Network Working Group, Mar. 1992, <http://www.ietf.org/rfc/rfc1305.txt>.

Mills D.L., "Precision Synchronization of Computer Network Clocks," ACM SIGCOMM Computer Communication Review, 1994, vol. 24 (2), pp. 28-43.

Motorola., "Simplefi, Wireless Digital Audio Receiver, Installation and User Guide", Dec. 31, 2001.

Non-Final Office Action mailed Jan. 18, 2008 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Non-Final Office Action mailed Jun. 21, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Non-Final Office Action mailed Jan. 22, 2009 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Non-Final Office Action mailed Jun. 25, 2010 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Non-Final Office Action mailed Feb. 29, 2012 for U.S. Appl. No. 13/297,000, filed Nov. 15, 2011.

Notice of Allowance Dec. 27, 2011 for U.S. Appl. No. 10/816,217, filed Apr. 1, 2004.

Park S., et al., "Group Synchronization in MultiCast Media Communications," Proceedings of the 5th Research on Multicast Technology Workshop, 2003.

PRISMIQ; Inc., "PRISMIQ Media Player User Guide", 2003, 44 pages.

Rothermel K., et al., "An Adaptive Stream Synchronization Protocol," 5th International Workshop on Network and Operating System Support for Digital Audio and Video, 1995.

Schulzrinne H., et al., "RTP: A Transport Protocol for Real-Time Applications, RFC 3550," Network Working Group, 2003, pp. 1-89.

The MPEG-2 Transport Stream. Retrieved from the Internet:< URL: http://www.coolstf.com/mpeg/#ts>.

"UPnP; "Universal Plug and Play Device Architecture";Jun. 8, 2000; version 1.0; Microsoft Corporation; pp. 1-54".

* cited by examiner



*FIG. 1*



*FIG. 2A*



FIG. 2B



*FIG. 2C*



*FIG. 3A*



*FIG. 3B*



FIG. 3C



**FIG. 3D**



FIG. 3E



*FIG. 4*



**FIG. 5A**



*FIG. 5B*



FIG. 5C



*FIG. 6*

US 8,588,949 B2

1

# METHOD AND APPARATUS FOR ADJUSTING VOLUME LEVELS IN A MULTI-ZONE SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATION

This application is a Continuation of U.S. Ser. No. 12/035, 112, entitled "User Interfaces For Controlling And Manipulating Groupings In A Multi-Zone Media System", filed Feb. 21, 2008, now U.S. Pat. No. 8,290,603, which is a Continuation-in-part of U.S. Ser. No. 10/861,653, entitled "Method and Apparatus for Controlling Zone Players in a Multi-zone System", filed Jun. 5, 2004, now U.S. Pat. No. 7,571,014, which is a Continuation-in-part of U.S. Ser. No. 10/816,217, entitled "System And Method For Synchronizing Operations Among A Plurality Of Independently Clocked Digital Data Processing Devices", filed Apr. 1, 2004, now U.S. Pat. No. 8,234,395, which claims priority from Provisional Application Ser. No. 60/490,768

## BACKGROUND OF THE INVENTION

### Field of the Invention

The invention is generally related to the area of consumer electronics and human-computer interaction. In particular, the invention is related to user interfaces for controlling or manipulating a plurality of multimedia players in a multi-zone system.

An enduring passion for quality audio reproduction or system is continuing to drive demands from users. One of the demands includes an audio system in a house in which, for example, one could grill to classic rock on a patio while another one may cook up his/her own music selections in a kitchen. This is all at the same time while a teenager catches a ballgame in a family room, and another one blasts pop in a bedroom. And the best part of such audio system is that each family member does not need his or her own stereo system— one system gives everyone access to all the music sources.

Currently, one of the systems that can meet part of such demand is a conventional multi-zone audio system that usually includes a number of audio players. Each of the audio players has its own amplifier(s) and a set of speakers and typically installed in one place (e.g., a room). In order to play an audio source at one location, the audio source must be provided locally or from a centralized location. When the audio source is provided locally, the multi-zone audio system functions as a collection of many stereo systems, making source sharing difficult. When the audio source is provided centrally, the centralized location may include a juke box, many compact discs, an AM or FM radio, tapes, or others. To send an audio source to an audio player demanding such source, a cross-bar type of device is used to prevent the audio source from going to other audio players that may be playing other audio sources.

In order to achieve playing different audio sources in different audio players, the traditional multi-zone audio system is generally either hard-wired or controlled by a pre-configured and pre-programmed controller. While the pre-programmed configuration may be satisfactory in one situation, it may not be suitable for another situation. For example, a person would like to listen to broadcast news from his/her favorite radio station in a bedroom, a bathroom and a den while preparing to go to work in the morning. The same person may wish to listen in the den and the living room to music from a compact disc in the evening. In order to satisfy

2

such requirements, two groups of audio players must be established. In the morning, the audio players in the bedroom, the bathroom and the den need to be grouped for the broadcast news. In the evening, the audio players in the den and the living room are grouped for the music. Over the weekend, the audio players in the den, the living room, and a kitchen are grouped for party music. Because the morning group, the evening group and the weekend group contain the den, it can be difficult for the traditional system to accommodate the requirement of dynamically managing the ad hoc creation and deletion of groups.

There is a need for dynamic control of the audio players as a group. With a minimum manipulation, the audio players may be readily grouped. There is further a need for user interfaces that may be readily utilized to group and control the audio players.

## SUMMARY OF THE INVENTION

This section is for the purpose of summarizing some aspects of the present invention and to briefly introduce some preferred embodiments. Simplifications or omissions in this section as well as in the abstract or the title of this description may be made to avoid obscuring the purpose of this section, the abstract and the title. Such simplifications or omissions are not intended to limit the scope of the present invention.

In general, the present invention pertains to controlling a plurality of multimedia players, or simply players, in groups. According to one aspect of the present invention, a mechanism is provided to allow a user to group some of the players according to a theme or scene, where each of the players is located in a zone. When the scene is activated, the players in the scene react in a synchronized manner. For example, the players in the scene are all caused to play an audio source or music in a playlist, wherein the audio source may be located anywhere on a network.

According to another aspect of the present invention, various user interfaces are provided to facilitate a user to create and manage a group and also create, edit or update a playlist for the group. Depending on implementation, the user interfaces may be displayed on a touch screen from which a user may act directly with the screen to group the players, the user interfaces may also be displayed on a display with other means (e.g., a stylus, a scroll wheel, or arrow buttons) to interact. In addition, the user displays are configured to show graphically how many players in a group versus other individual players.

According to still another aspect of the present invention, the scene may be activated at any time or a specific time. A user may activate the scene at any time so that only some selected zones in an entertainment system facilitate a playback of an audio source. When the scene is activated at a specific time, the scene may be used as an alarm or buzzer.

According to still another aspect of the present invention, a controlling device (also referred to herein as controller) is provided to facilitate a user to select any of the players in the system to form respective groups each of which is set up per a scene. Although various scenes may be saved in any of the members in a group, commands are preferably sent from the controller to the rest of the members when one of the scenes is executed. Depending on implementation, the commands include parameters pertaining to identifiers of the players, volumes settings, audio source and etc.

According to yet another aspect of the present invention, a configurable module is implemented in the controlling device that provides interactive graphic user interface for forming,

3

managing and controlling groups in the system, de-grouping a group or adjusting audio volume of individual players or a group of players.

The present invention may be implemented in many forms including software, hardware or a combination of both. According to one embodiment, the present invention is directed to a method for groupings in a multi-zone media system, the method comprises providing a mechanism to allow a user to determine which players in the system to be associated with a theme representing a group; and configuring the theme with parameters pertaining to the players, wherein the theme is activated at anytime or a specific time so that the players react in a synchronized manner. The players in a scene are configured to play a multimedia file when the scene is activated.

According to another embodiment, the present invention is directed to a method for groupings in a multi-zone media system, the method comprises providing a user interface to allow a user to determine which players in the system to be associated with a theme representing a group, the user interface showing all available players at the time the user interface is created; allowing the user to visually select one of the players to be a first member of the theme; allowing the user to add more of the available players to the theme, if desired; and configuring the theme with parameters pertaining to the players. The theme may be activated at anytime or a specific time so that the players react in a synchronized manner.

According to still another embodiment, the present invention is directed to an entertainment system for grouping players, the system comprises: a plurality of players, each located in one zone; and a controller providing a mechanism to allow a user to select which of the players to be associated with a theme representing a group; and configure the theme with parameters pertaining to the selected players, wherein the theme is activated at anytime or a specific time so that the selected players react in a synchronized manner. As a result, the selected players are synchronized to play a multimedia that is in a digital format and retrieved from a source over a network.

One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other.

Other objects, features, and advantages of the present invention will become apparent upon examining the following detailed description of an embodiment thereof, taken in conjunction with the attached drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

These and other features, aspects, and advantages of the present invention will become better understood with regard to the following description, appended claims, and accompanying drawings where:

FIG. **1** shows an exemplary configuration in which the present invention may be practiced;

FIG. **2**A shows an exemplary functional block diagram of a player in accordance with the present invention;

FIG. **2**B shows an example of a controller that may be used to remotely control one or more players of FIG. **2**A;

FIG. **2**C shows an exemplary internal functional block diagram of a controller in accordance with one embodiment of the present invention;

FIG. **3**A provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones

4

are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning";

FIG. **3**B shows that a user defines multiple groups to be gathered at the same time;

FIG. **3**C shows an exemplary user interface (UI) of individual zones in a house;

FIG. **3**D shows a user interface as a result of the use activating "link zones" of FIG. **3**C;

FIG. **3**E shows a user interface after the user has selected some of the available zone players into the scene;

FIG. **4** shows an exemplary user interface that may be displayed on a controller or a computer of FIG. **1**;

FIG. **5**A shows another user interface to allow a user to form a scene;

FIG. **5**B shows still another user interface to allow a user to form a scene;

FIG. **5**C shows a user interface to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively; and

FIG. **6** shows a flowchart or process of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The detailed description of the invention is presented largely in terms of procedures, steps, logic blocks, processing, and other symbolic representations that directly or indirectly resemble the operations of data processing devices coupled to networks. These process descriptions and representations are typically used by those skilled in the art to most effectively convey the substance of their work to others skilled in the art. Numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects of the present invention.

Reference herein to "one embodiment" or "an embodiment" means that a particular feature, structure, or characteristic described in connection with the embodiment can be included in at least one embodiment of the invention. The appearances of the phrase "in one embodiment" in various places in the specification are not necessarily all referring to the same embodiment, nor are separate or alternative embodiments mutually exclusive of other embodiments. Further, the order of blocks in process flowcharts or diagrams representing one or more embodiments of the invention do not inherently indicate any particular order nor imply any limitations in the invention.

Referring now to the drawings, in which like numerals refer to like parts throughout the several views. FIG. **1** shows an exemplary configuration **100** in which the present invention may be practiced. The configuration may represent, but not be limited to, a part of a residential home, a business building or a complex with multiple zones. There are a number of multimedia players of which three examples **102**, **104** and **106** are shown as audio devices. Each of the audio devices may be installed or provided in one particular area or zone and hence referred to as a zone player herein.

As used herein, unless explicitly stated otherwise, an audio source or audio sources are in digital format and can be transported or streamed over a data network. To facilitate the

US 8,588,949 B2

5

understanding of the present invention, it is assumed that the configuration **100** represents a home. Thus, the zone player **102** and **104** may be located in two of the bedrooms respectively while the zone player **106** may be installed in a living room. All of the zone players **102**, **104** and **106** are coupled directly or indirectly to a data network **108**. In addition, a computing device **110** is shown to be coupled on the network **108**. In reality, any other devices such as a home gateway device, a storage device, or an MP3 player may be coupled to the network **108** as well.

The network **108** may be a wired network, a wireless network or a combination of both. In one example, all devices including the zone players **102**, **104** and **106** are coupled to the network **108** by wireless means based on an industry standard such as IEEE 802.11. In yet another example, all devices including the zone players **102**, **104** and **106** are part of a local area network that communicates with a wide area network (e.g., the Internet).

Many devices on the network **108** are configured to download and store audio sources. For example, the computing device **110** can download audio sources from the Internet and store the downloaded sources locally for sharing with other devices on the Internet or the network **108**. The computing device **110** or any of the zone players can also be configured to receive streaming audio. Shown as a stereo system, the device **112** is configured to receive an analog audio source (e.g., from broadcasting) or retrieve a digital audio source (e.g., from a compact disk). The analog audio sources can be converted to digital audio sources. In accordance with the present invention, the audio source may be shared among the devices on the network **108**.

Two or more zone players may be grouped together to form a new zone group. Any combinations of zone players and an existing zone group may be grouped together. In one instance, a new zone group is formed by adding one zone player to another zone player or an existing zone group.

Referring now to FIG. 2A, there is shown an exemplary functional block diagram of a zone player **200** in accordance with the present invention. The zone player **200** includes a network interface **202**, a processor **204**, a memory **206**, an audio processing circuit **210**, a module **212**, and optionally, an audio amplifier **214** that may be internal or external. The network interface **202** facilitates a data flow between a data network (i.e., the data network **108** of FIG. **1**) and the zone player **200** and typically executes a special set of rules (i.e., a protocol) to send data back and forth. One of the common protocols used in the Internet is TCP/IP (Transmission Control Protocol/Internet Protocol). In general, a network interface manages the assembling of an audio source or file into smaller packets that are transmitted over the data network or reassembles received packets into the original source or file. In addition, the network interface **202** handles the address part of each packet so that it gets to the right destination or intercepts packets destined for the zone player **200**.

The network interface **202** may include one or both of a wireless interface **216** and a wired interface **217**. The wireless interface **216**, also referred to as a RF interface, provides network interface functions by a wireless means for the zone player **200** to communicate with other devices in accordance with a communication protocol (such as the wireless standard IEEE 802.11a, 802.11b or 802.11g). The wired interface **217** provides network interface functions by a wired means (e.g., an Ethernet cable). In one embodiment, a zone player includes both of the interfaces **216** and **217**, and other zone players include only a RF or wired interface. Thus these other zone players communicate with other devices on a network or retrieve audio sources via the zone player. The processor **204**

6

is configured to control the operation of other parts in the zone player **200**. The memory **206** may be loaded with one or more software modules that can be executed by the processor **204** to achieve desired tasks. According to one aspect of the present invention, a software module implementing one embodiment of the present invention is executed, the processor **204** operates in accordance with the software module in reference to a saved zone group configuration characterizing a zone group created by a user, the zone player **200** is caused to retrieve an audio source from another zone player or a device on the network.

According to one embodiment of the present invention, the memory **206** is used to save one or more saved zone configuration files that may be retrieved for modification at any time. Typically, a saved zone group configuration file is transmitted to a controller (e.g., the controlling device **140** or **142** of FIG. **1**, a computer, a portable device, or a TV) when a user operates the controlling device. The zone group configuration provides an interactive user interface so that various manipulations or control of the zone players may be performed.

The audio processing circuit **210** resembles most of the circuitry in an audio playback device and includes one or more digital-to-analog converters (DAC), an audio preprocessing part, an audio enhancement part or a digital signal processor and others. In operation, when an audio source is retrieved via the network interface **202**, the audio source is processed in the audio processing circuit **210** to produce analog audio signals. The processed analog audio signals are then provided to the audio amplifier **214** for playback on speakers. In addition, the audio processing circuit **210** may include necessary circuitry to process analog signals as inputs to produce digital signals for sharing with other devices on a network.

Depending on an exact implementation, the module **212** may be implemented as a combination of hardware and software. In one embodiment, the module **212** is used to save a scene. The audio amplifier **214** is typically an analog circuit that powers the provided analog audio signals to drive one or more speakers.

Referring now to FIG. 2B, there is shown an exemplary controller **240**, which may correspond to the controlling device **140** or **142** of FIG. **1**. The controller **240** may be used to facilitate the control of multi-media applications, automation and others in a complex. In particular, the controller **240** is configured to facilitate a selection of a plurality of audio sources available on the network, controlling operations of one or more zone players (e.g., the zone player **200**) through a RF interface corresponding to the RF interface **216** of FIG. **2A**. According to one embodiment, the wireless means is based on an industry standard (e.g., infrared, radio, wireless standard IEEE 802.11a, 802.11b or 802.11g). When a particular audio source is being played in the zone player **200**, a picture, if there is any, associated with the audio source may be transmitted from the zone player **200** to the controller **240** for display. In one embodiment, the controller **240** is used to synchronize more than one zone players by grouping the zone players. In another embodiment, the controller **240** is used to control the volume of each of the zone players in a zone group individually or together.

The user interface for the controller **240** includes a screen **242** (e.g., a LCD screen) and a set of functional buttons as follows: a "zones" button **244**, a "back" button **246**, a "music" button **248**, a scroll wheel **250**, "ok" button **252**, a set of transport control buttons **254**, a mute button **262**, a volume up/down button **264**, a set of soft buttons **266** corresponding to the labels **268** displayed on the screen **242**.

US 8,588,949 B2

7

The screen 242 displays various screen menus in response to a user's selection. In one embodiment, the "zones" button 244 activates a zone management screen or "Zone Menu", which is described in more details below. The "back" button 246 may lead to different actions depending on the current screen. In one embodiment, the "back" button triggers the current screen display to go back to a previous one. In another embodiment, the "back" button negates the user's erroneous selection. The "music" button 248 activates a music menu, which allows the selection of an audio source (e.g., a song) to be added to a zone player's music queue for playback.

The scroll wheel 250 is used for selecting an item within a list, whenever a list is presented on the screen 242. When the items in the list are too many to be accommodated in one screen display, a scroll indicator such as a scroll bar or a scroll arrow is displayed beside the list. When the scroll indicator is displayed, a user may rotate the scroll wheel 250 to either choose a displayed item or display a hidden item in the list. The "ok" button 252 is used to confirm the user selection on the screen 242.

There are three transport buttons 254, which are used to control the effect of the currently playing song. For example, the functions of the transport buttons may include play/pause and forward/rewind a song, move forward to a next song track, or move backward to a previous track. According to one embodiment, pressing one of the volume control buttons such as the mute button 262 or the volume up/down button 264 activates a volume panel. In addition, there are three soft buttons 266 that can be activated in accordance with the labels 268 on the screen 242. It can be understood that, in a multi-zone system, there may be multiple audio sources being played respectively in more than one zone players. The music transport functions described herein shall apply selectively to one of the sources when a corresponding one of the zone players or zone groups is selected.

FIG. 2C illustrates an internal functional block diagram of an exemplary controller 270, which may correspond to the controller 240 of FIG. 2B. The screen 272 on the controller 270 may be a LCD screen. The screen 272 communicates with and is commanded by a screen driver 274 that is controlled by a microcontroller (e.g., a processor) 276. The memory 282 may be loaded with one or more application modules 284 that can be executed by the microcontroller 276 with or without user input via the user interface 278 to achieve desired tasks. In one embodiment, an application module is configured to facilitate grouping a number of selected zone players into a zone group and synchronizing the zone players for one audio source. In another embodiment, an application module is configured to control together the audio volumes of the zone players in a zone group. In operation, when the microcontroller 276 executes one of the application modules 284, the screen driver 274 generates control signals to drive the screen 272 to display an application specific user interface accordingly, more of which will be described below.

The controller 270 includes a network interface 280 referred to as a RF interface 280 that facilitates wireless communication with a zone player via a corresponding RF interface thereof. In one embodiment, the commands such as volume control and audio playback synchronization are sent via the RF interfaces. In another embodiment, a saved zone group configuration is transmitted between a zone player and a controller via the RF interfaces. The controller 270 may control one or more zone players, such as 102, 104 and 106 of FIG. 1. Nevertheless, there may be more than one controllers, each preferably in a zone (e.g., a room) and configured to control any one and all of the zone players.

8

In one embodiment, a user creates a zone group including at least two zone players from the controller 240 that sends signals or data to one of the zone players. As all the zone players are coupled on a network, the received signals in one zone player can cause other zone players in the group to be synchronized so that all the zone players in the group playback an identical audio source or a list of identical audio sources in a timely synchronized manner. Similarly, when a user increases the audio volume of the group from the controller, the signals or data of increasing the audio volume for the group are sent to one of the zone players and causes other zone players in the group to be increased together in volume and in scale.

According to one implementation, an application module is loaded in memory 282 for zone group management. When a predetermined key (e.g. the "zones" button 244) is activated on the controller 240, the application module is executed in the microcontroller 276. The input interface 278 coupled to and controlled by the microcontroller 276 receives inputs from a user. A "Zone Menu" is then displayed on the screen 272. The user may start grouping zone players into a zone group by activating a "Link Zones" or "Add Zone" soft button, or de-grouping a zone group by activating an "Unlink Zones" or "Drop Zone" button. The detail of the zone group manipulation will be further discussed below.

As described above, the input interface 278 includes a number of function buttons as well as a screen graphical user interface. It should be pointed out that the controller 240 in FIG. 2B is not the only controlling device that may practice the present invention. Other devices that provide the equivalent control functions (e.g., a computing device, a hand-held device) may also be configured to practice the present invention. In the above description, unless otherwise specifically described, it is clear that keys or buttons are generally referred to as either the physical buttons or soft buttons, enabling a user to enter a command or data.

One mechanism for 'joining' zone players together for music playback is to link a number of zone players together to form a group. To link a number of zone players together, a user may manually link each zone player or room one after the other. For example, there is a multi-zone system that includes the following zones.

Bathroom
Bedroom
Den
Dining Room
Family Room
Foyer

If the user wishes to link 5 of the 6 zone players using the current mechanism, he/she must start with a single zone and then manually link each zone to that zone. This mechanism may be sometimes quite time consuming. According to one embodiment, a set of zones can be dynamically linked together using one command. Using what is referred to herein as a theme or a zone scene, zones can be configured in a particular scene (e.g., morning, afternoon, or garden), where a predefined zone grouping and setting of attributes for the grouping are automatically effectuated.

For instance, a "Morning" zone scene/configuration command would link the Bedroom, Den and Dining Room together in one action. Without this single command, the user would need to manually and individually link each zone. FIG. 3A provides an illustration of one zone scene, where the left column shows the starting zone grouping—all zones are separate, the column on the right shows the effects of grouping the zones to make a group of 3 zones named after "Morning".

US 8,588,949 B2

9

Expanding this idea further, a Zone Scene can be set to create multiple sets of linked zones. For example, a scene creates 3 separate groups of zones, the downstairs zones would be linked together, the upstairs zones would be linked together in their own group, and the outside zones (in this case the patio) would move into a group of its own.

In one embodiment as shown in FIG. 3B, a user defines multiple groups to be gathered at the same time. For example: an "Evening Scene" is desired to link the following zones:

Group 1
    Bedroom
    Den
    Dining Room
Group 2
    Garage
    Garden

where Bathroom, Family Room and Foyer should be separated from any group if they were part of a group before the Zone Scene was invoked.

One of the important features, benefits and objects in the present invention is that that zones do not need to be separated before a zone scene is invoked. In one embodiment, a command is provided and links all zones in one step, if invoked. The command is in a form of a zone scene. After linking the appropriate zones, a zone scene command could apply the following attributes:

Set volumes levels in each zones (each zone can have a different volume)

Mute/Unmute zones.

Select and play specific music in the zones.

Set the play mode of the music (Shuffle, Repeat, Shuffle-repeat)

Set the music playback equalization of each zone (e.g., bass treble).

A further extension of this embodiment is to trigger a zone scene command as an alarm clock function. For instance the zone scene is set to apply at 8:00 am. It could link appropriate zones automatically, set specific music to play and then stop the music after a defined duration. Although a single zone may be assigned to an alarm, a scene set as an alarm clock provides a synchronized alarm, allowing any zones linked in the scene to play a predefined audio (e.g., a favorable song, a predefined playlist) at a specific time or for a specific duration. If, for any reason, the scheduled music failed to be played (e.g., an empty playlist, no connection to a share, failed UPnP, no Internet connection for an Internet Radio station), a backup buzzer will sound. This buzzer will be a sound file that is stored in a zone player.

FIG. 3C shows an exemplary user interface (UI) 330 to show all available individual zones in a house. Each zone player can play a type of media (such as music, photographs and video) independently. Each zone player in the UI may be highlighted on the screen using either a touch screen or an input device such as a stylus, a scroll wheel, or arrow buttons. If a user wishes to link players in some rooms together to form a group so that players in these rooms are playing the same media in a synchronized fashion, the user may activate the grouping function by activating "link zones" 332 that leads to a user interface 340 as shown in FIG. 3D.

The UI 340 shows that the zone players available for grouping are selectable. In one embodiment, the UI 340 is displayed (e.g., a touch screen) to allow the user to choose what zone players to be included in a group named after "Bedroom" so that they are all playing the same song "The Beatles". It should be noted that the user may have an option to name the scene, for example, "afternoon", or "light music". In the example shown in FIGS. 3C and 3D, the user selects the

10

Bedroom zone and then the "Link Zones" button 332, as a result, the default name for the scene being created is named after "Bedroom". As shown FIG. 3D, a zone player may be selected or highlighted by "checking" it into the group. In another embodiment, the selection action could also be achieved through pressing the "+-" icon next to each zone.

FIG. 3E shows a user interface 350 after the user has selected some of the available zone players into the scene. The display 350 is so displayed that a user can easily tell a group of linked players from the isolated players. According to one embodiment, a display may be provided to visually tell a user what have been grouped and what are not grouped. The display may even show various groups by size to indicate a number of zone players in each of the groups, for example, the larger a group appears, the more zone players there are in the group.

In general, all players in a group are caused to play the media being played in the first member used to form the group. In the case of FIG. 3E, the zone player in the bedroom is used to initiate the group or the first one in the group. At the time of forming the group, the zone player in the bedroom is playing "the Beatles", as soon as a second zone player joins the group, the second zone player starts to be synchronized with the one already in the group and thus to play "the Beatles" in this case. As will be described below, the user now can switch the group of players to any other type of media or a different piece of music and all of the zone players in the group will play the selected media at the same time.

FIG. 4 shows an exemplary user interface 400 that may be displayed on a controller 142 or a computer 110 of FIG. 1. The interface 400 shows a list of items that may be set up by a user to cause a scene to function at a specific time. In the embodiment shown in FIG. 4, the list of items includes "Alarm", "Time", "Zone", "Music", "Frequency" and "Alarm length". "Alarm" can be set on or off. When "Alarm" is set on, "Time" is a specific time to set off the alarm. "Zone" shows which zone players are being set to play a specified audio at the specific time. "Music" shows what to be played when the specific time arrives. "Frequency" allows the user to define a frequency of the alarm. "Alarm length" defines how long the audio is to be played. It should be noted that the user interface 400 is provided herein to show some of the functions associated with setting up an alarm. Depending on an exact implementation, other functions, such as time zone, daylight savings, time synchronization, and time/date format for display may also be provided without departing from the present invention.

According to one embodiment, each zone player in a scene may be set up for different alarms. For example, a "Morning" scene includes three zone players, each in a bedroom, a den, and a dining room. After selecting the scene, the user may set up an alarm for the scene as whole. As a result, each of the zone players will be activated at a specific time.

FIG. 5A shows a user interface 500 to allow a user to form a scene. The panel on the left shows the available zones in a household. The panel on the right shows the zones that have been selected and be grouped as part of this scene. Depending on an exact implementation of a user interface, Add/Remove buttons may be provided to move zones between the panels, or zones may be dragged along between panels.

FIG. 5B shows another user interface 520 to allow a user to form a scene. The user interface 520 that may be displayed on a controller or a computing device, lists available zones in a system. A checkbox is provided next to each of the zones so that a user may check in the zones to be associated with the scene.

US 8,588,949 B2

11

FIG. **5**C shows a user interface **510** to allow a user to adjust a volume level of the zone players in a zone scene individually or collectively. As shown in the user interface **510**, the 'Volumes . . . ' button (shown as sliders, other forms are possible) allows the user to affect the volumes of the associated zone players when a zone scene is invoked. In one embodiment, the zone players can be set to retain whatever volume that they currently have when the scene is invoked. Additionally the user can decide if the volumes should be unmuted or muted when the scene is invoked.

FIG. **6** shows a flowchart or process **600** of providing a player theme or a zone scene for a plurality of players, where one or more of the players are placed in a zone. The process **600** is presented in accordance with one embodiment of the present invention and may be implemented in a module to be located in the memory **282** of FIG. **2**C.

The process **600** is initiated only when a user decides to proceed with a zone scene at **602**. The process **600** then moves to **604** where it allows a user to decide which zone players to be associated with the scene. For example, there are ten players in a household, and the scene is named after "Morning". The user may be given an interface to select four of the ten players to be associated with the scene. At **606**, the scene is saved. The scene may be saved in any one of the members in the scene. In the example of FIG. **1**, the scene is saved in one of the zone players and displayed on the controller **142**. In operation, a set of data pertaining to the scene includes a plurality of parameters. In one embodiment, the parameters include, but may not be limited to, identifiers (e.g., IP address) of the associated players and a playlist. The parameters may also include volume/tone settings for the associated players in the scene. The user may go back to **602** to configure another scene if desired.

Given a saved scene, a user may activate the scene at any time or set up a timer to activate the scene at **610**. The process **600** can continue when a saved scene is activated at **610**. At **612**, upon the activation of a saved scene, the process **600** checks the status of the players associated with the scene. The status of the players means that each of the players shall be in condition to react in a synchronized manner. In one embodiment, the interconnections of the players are checked to make sure that the players communicate among themselves and/or with a controller if there is such a controller in the scene.

It is assumed that all players associated with the scene are in good condition. At **614**, commands are executed with the parameters (e.g., pertaining to a playlist and volumes). In one embodiment, data including the parameters is transported from a member (e.g., a controller) to other members in the scene so that the players are caused to synchronize an operation configured in the scene. The operation may cause all players to play back a song in identical or different volumes or to play back a pre-stored file.

One of the features, benefits and advantages in the present invention is to allow sets of related devices (controllers and operating components) to exist as a group without interfering with other components that are potentially visible on the same wired or wireless network. Each of the sets is configured to a theme or a scene.

The present invention has been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of examples only and that numerous changes in the arrangement and combination of parts may be resorted without departing from the spirit and scope of the invention as claimed. While the embodiments discussed herein may appear to include some limitations as to the presentation of the information units, in terms of the

12

format and arrangement, the invention has applicability well beyond such embodiment, which can be appreciated by those skilled in the art. Accordingly, the scope of the present invention is defined by the appended claims rather than the forgoing description of embodiments.

We claim:

**1**. A multimedia controller including a processor, the controller configured to:

provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;

accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;

for each of the plurality of players within the player group, accept via the user interface an input to adjust a volume associated with the player, wherein the input to adjust the volume associated with the player causes the corresponding independent playback device to adjust its volume; and

accept via the user interface an input to adjust a volume associated with the player group, wherein the input to adjust the volume associated with the group causes the corresponding independent playback devices in the player group to adjust their volumes.

**2**. The multimedia controller of claim **1**, wherein the controller is further configured to accept via the user interface an input to remove one of the plurality of players from the player group.

**3**. The multimedia controller of claim **1**, wherein the controller is further configured to accept via the user interface an input to mute the volume of the player group, wherein the input to mute the player group causes the players within the player group to mute their volume.

**4**. The multimedia controller of claim **3**, wherein the input to mute the player group causes the players in the player group to adjust their volumes further comprises:

the controller sending an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale.

**5**. The multimedia controller of claim **1**, wherein the controller is further configured to accept via the user interface an input to name the player group.

**6**. The multimedia controller of claim **1**, wherein the controller is further configured to accept via the user interface an input to mute the volume of one of the players within the player group, wherein the input to mute one of the players within the player group causes the player within the player group to mute its volume.

**7**. The multimedia controller of claim **1**, wherein the controller is further configured to save a configuration associated with the player group, wherein the configuration includes one or more of the following parameters: a) a volume level for each player in the player group, b) a mute or unmute setting for each player in the player group, and d) an equalization setting for each player in the player group.

**8**. A non-transitory computer readable storage medium including a set of instructions for execution by a processor, the set of instructions, when implemented, implement a controller configured to:

provide a user interface for a player group, wherein the player group includes a plurality of players in a local

US 8,588,949 B2

13

area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;

accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;

for each of the plurality of players within the player group, accept via the user interface an input to adjust a volume associated with the player, wherein the input to adjust the volume associated with the player causes the corresponding independent playback device to adjust its volume; and

accept via the user interface an input to adjust a volume associated with the player group, wherein the input to adjust the volume associated with the group causes the corresponding independent playback devices in the player group to adjust their volumes.

**9**. The computer readable medium of claim **8**, wherein the controller is further configured to accept via the user interface an input to remove one of the plurality of players from the player group.

**10**. The computer readable medium of claim **8**, wherein the controller is further configured to accept via the user interface an input to mute the volume of the player group, wherein the input to mute the player group causes the players within the player group to mute their volume.

**11**. The computer readable medium of claim **10**, wherein the input to mute the player group causes the players in the player group to adjust their volumes comprises:

the controller sending an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale.

**12**. The computer readable medium of claim **8**, wherein the controller is further configured to accept via the user interface an input to name the player group.

**13**. The computer readable medium of claim **8**, wherein the controller is further configured to accept via the user interface an input to mute the volume of one of the players within the player group, wherein the input to mute one of the players within the player group causes the player within the player group to mute its volume.

**14**. The computer readable medium of claim **8**, wherein the controller is further configured to save a configuration associated with the player group, wherein the configuration

14

includes one or more of the following parameters: a) a volume level for each player in the player group, b) a mute or unmute setting for each player in the player group, and d) an equalization setting for each player in the player group.

**15**. A method comprising:

displaying a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;

receiving via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;

receiving via the user interface an input to adjust a volume associated with one of the players within the player group, and responsively instructing the corresponding independent playback device within the player group to adjust its volume; and

receiving via the user interface an input to adjust a volume associated with the player group, and responsively instructing the corresponding independent playback devices in the player group to adjust their volumes.

**16**. The method of claim **15**, further comprising:

receiving via the user interface an input to remove one of the plurality of players from the player group, and responsively removing the one of the plurality of players from the player group.

**17**. The method of claim **15**, further comprising:

receiving via the user interface an input to mute the volume of the player group, and responsively instructing the players within the player group to mute their volume.

**18**. The method of claim **15**, wherein instructing the players in the player group to adjust their volumes:

sending an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale.

**19**. The method of claim **15**, further comprising receiving an input to name the player group, and responsively assigning the name to the player group.

**20**. The method of claim **15**, further comprising receiving via the user interface an input to mute the volume of one of the players within the player group, and responsively instructing the player within the player group to mute its volume.

\* \* \* \* \*

US008588949C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10755th)

# United States Patent
Lambourne et al.

(10) **Number:** US 8,588,949 C1
(45) **Certificate Issued:** Nov. 5, 2015

(54) **METHOD AND APPARATUS FOR ADJUSTING VOLUME LEVELS IN A MULTI-ZONE SYSTEM**

(75) Inventors: **Robert A. Lambourne**, Santa Barbara, CA (US); **Nicholas A. J. Millington**, Santa Barbara, CA (US)

(73) Assignee: **SONOS, INC.**, Santa Barbara, CA (US)

**Reexamination Request:**
No. 90/013,423, Jan. 5, 2015

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **8,588,949** |
| Issued: | **Nov. 19, 2013** |
| Appl. No.: | **13/619,237** |
| Filed: | **Sep. 14, 2012** |

**Related U.S. Application Data**

(63) Continuation of application No. 12/035,112, filed on Feb. 21, 2008, now Pat. No. 8,290,603, which is a continuation-in-part of application No. 10/861,653, filed on Jun. 5, 2004, now Pat. No. 7,571,014, which is a continuation-in-part of application No. 10/816,217, filed on Apr. 1, 2004, now Pat. No. 8,234,395.

(60) Provisional application No. 60/490,768, filed on Jul. 28, 2003.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 17/00* | (2006.01) |
| *G11B 27/00* | (2006.01) |
| *G06F 17/30* | (2006.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 17/30283* (2013.01); *G11B 27/00* (2013.01)

(58) **Field of Classification Search**
CPC .................. G06F 17/30283; G06F 17/30265; G06F 17/30182; G06F 17/30056; G11B 27/00; G11B 2020/10574
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,423, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Sam Rimell

(57) **ABSTRACT**

A multimedia controller including a processor, the controller configured to: provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is configured to playback a multimedia output from a multimedia source; accept an input to facilitate formation of the player group, indicating that at least two of the players in the local area network are to be included in the player group; for each of the plurality of players within the player group, accept an input to adjust a volume associated with the player, that causes the player to adjust its volume; and accept an input to adjust a volume associated with the player group, wherein the input to adjust the volume associated with the group causes the players in the player group to adjust their volumes.



US 8,588,949 C1

# 1

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claims **1**, **3**, **4**, **6**, **7**, **8**, **10**, **11**, **13**, **14**, **15** and **17-20** are
determined to be patentable as amended.

Claims **2**, **5**, **9**, **12** and **16**, dependent on an amended claim,
are determined to be patentable.

**1**. A multimedia controller including a processor, the con-
troller configured to:
provide a user interface for a player group, wherein the
player group includes a plurality of players in a local
area network, and wherein each player is an independent
playback device configured to playback a multimedia
output from a multimedia source;
accept via the user interface an input to facilitate formation
of the player group, wherein the input to facilitate for-
mation of the player group indicates that at least two of
the plurality of players in the local area network are to be
included in the player group *for synchronized playback
of a multimedia output from the same multimedia
source*;
for [each of the plurality of players within] *any individual
player in* the player group, accept via the user interface
[an] *a player-specific* input to adjust a volume [associ-
ated with the] *of that individual* player, wherein the
*player-specific* input to adjust the volume [associated
with the] *of that individual* player causes [the corre-
sponding independent playback device] *that individual
player* to adjust its volume; and
accept via the user interface [an] *a group-level* input to
adjust a volume associated with the player group,
wherein the *group-level* input to adjust the volume asso-
ciated with the *player* group causes [the corresponding
independent playback devices] *each of the players* in the
player group to adjust [their volumes] *its respective vol-
ume*.

**3**. The multimedia controller of claim **1**, wherein the con-
troller is further configured to accept via the user interface
[an] *a group-level* input to mute the volume of the player
group, wherein the *group-level* input to mute *the volume of*
the player group causes *each of* the players [within] *in* the
player group to mute [their] *its respective* volume.

**4**. The multimedia controller of [claim **3**] *claim 1*, wherein
the *group-level* input to [mute] *adjust the volume associated
with* the player group *further* causes [the players in the player
group to adjust their volumes further comprises]:
the controller [sending] *to send* an instruction to one of the
players in the player group, the instruction indicating
that the volumes of each of the players in the player
group should be adjusted in scale.

**6**. The multimedia controller of claim **1**, wherein the con-
troller is further configured to accept via the user interface
[an] *a player-specific* input to mute the volume of [one of the
players within] *an individual player in* the player group,
wherein the *player-specific* input to mute [one of the players

# 2

within] *the volume of an individual player in* the player group
causes [the player within the player group] *that individual
player* to mute its volume.

**7**. The multimedia controller of claim **1**, wherein the con-
troller is further configured to save a configuration associated
with the player group, wherein the configuration includes one
or more of the following parameters: a) a volume level for
each player in the player group, b) a mute or unmute setting
for each player in the player group, and [d)] *c*) an equalization
setting for each player in the player group.

**8**. A non-transitory computer readable storage medium
including a set of instructions for execution by a processor,
the set of instructions, when implemented, implement a con-
troller configured to:
provide a user interface for a player group, wherein the
player group includes a plurality of players in a local
area network, and wherein each player is an independent
playback device configured to playback a multimedia
output from a multimedia source;
accept via the user interface an input to facilitate formation
of the player group, wherein the input to facilitate for-
mation of the player group indicates that at least two of
the plurality of players in the local area network are to be
included in the player group *for synchronized playback
of a multimedia output from the same multimedia
source*;
for [each of the plurality of players within] *an individual
player in* the player group, accept via the user interface
[an] *a player-specific* input to adjust a volume [associ-
ated with the] *of that individual* player, wherein the
*player-specific* input to adjust the volume [associated
with the] *of that individual* player causes [the corre-
sponding independent playback device] *that individual
player* to adjust its volume; and
accept via the user interface [an] *a group-level* input to
adjust a volume associated with the player group,
wherein the *group-level* input to adjust the volume asso-
ciated with the *player* group causes [the corresponding
independent playback devices] *each of the players* in the
player group to adjust [their volumes] *its respective vol-
ume*.

**10**. The computer readable medium of claim **8**, wherein the
controller is further configured to accept via the user interface
[an] *a group-level* input to mute the volume of the player
group, wherein the *group-level* input to mute *the volume of*
the player group causes *each of* the players [within] *in* the
player group to mute [their] *its respective* volume.

**11**. The computer readable medium of [claim **10**] *claim 8*,
wherein the *group-level* input to [mute] *adjust the volume
associated with* the player group *further* causes [the players in
the player group to adjust their volumes comprises]:
the controller [sending] *to send* an instruction to one of the
players in the player group, the instruction indicating
that the volumes of each of the players in the player
group should be adjusted in scale.

**13**. The computer readable medium of claim **8**, wherein the
controller is further configured to accept via the user interface
[an] *a player-specific* input to mute the volume of [one of the
players within] *an individual player in* the player group,
wherein the *player-specific* input to mute [one of the players
within] *the volume of an individual player in* the player group
causes [the player within the player group] *that individual
player* to mute its volume.

**14**. The computer readable medium of claim **8**, wherein the
controller is further configured to save a configuration asso-
ciated with the player group, wherein the configuration
includes one or more of the following parameters: a) a volume

US 8,588,949 C1

**3**

level for each player in the player group, b) a mute or unmute setting for each player in the player group, and [d)] *c)* an equalization setting for each player in the player group.

15. A method comprising:

displaying a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each player is an independent playback device configured to playback a multimedia output from a multimedia source;

receiving via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source*;

receiving via the user interface [an] *a player-specific* input to adjust a volume [associated with one of the players within] *of an individual player in* the player group, and responsively instructing [the corresponding independent playback device] *that individual player* to adjust its volume; and

receiving via the user interface [an] *a group-level* input to adjust a volume associated with the player group, and responsively instructing [the corresponding indepen-

**4**

dent playback devices] *each of the players* in the player group to adjust *its respective volume*.

17. The method of claim 15, further comprising:

receiving via the user interface [an] *a group-level* input to mute the volume of the player group, and responsively instructing *each of* the players [within] *in* the player group to mute [their] *its respective* volume.

18. The method of claim 15, wherein instructing *each of* the players in the player group to adjust [their volumes] *its respective volume comprises*:

sending an instruction to one of the players in the player group, the instruction indicating that the volumes of each of the players in the player group should be adjusted in scale.

19. The method of claim 15, further comprising receiving an input to *assign a* name *to* the player group, and responsively assigning the name to the player group.

20. The method of claim 15, further comprising receiving via the user interface [an] *a player-specific* input to mute the volume of [one of the players within] *an individual player in* the player group, and responsively instructing [the player within the player group] *that individual player* to mute its volume.

\* \* \* \* \*

# Sonos's Opposition to D&M's Motions *in Limine* Nos. 1-3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 14-1330-RGA |
| v. | ) | |
| | ) | |
| D&M HOLDINGS INC. d/b/a THE | ) | JURY TRIAL DEMANDED |
| D+M GROUP, D&M HOLDINGS U.S. | ) | |
| INC., and DENON ELECTRONICS | ) | |
| (USA), LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## SONOS, INC.'S OPPOSITION TO DEFENDANTS' MOTIONS *IN LIMINE*

OF COUNSEL:
George I. Lee
Sean M. Sullivan
Rory P. Shea
J. Dan Smith
Michael P. Boyea
LEE SULLIVAN SHEA & SMITH LLP
224 N Desplaines St, Suite 250
Chicago, IL 60661
(312) 754-0002

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

Dated: November 9, 2017

*Attorneys for Plaintiff Sonos, Inc.*

## I.     SONOS'S OPPOSITION TO D&M'S MOTION *IN LIMINE* #1

D&M again asks the Court to preclude Sonos from introducing evidence of D&M's

pervasive and widespread copying, contending that copying evidence must be specifically tied to

the claimed features of the Asserted Patents, and that all other evidence of copying (*e.g.*, copying

of Sonos's brand name, marketing, unasserted and unelected patents, etc.) is irrelevant and

should be excluded from trial.  As explained below, D&M's motion should be denied.

As an initial matter, the Court has already addressed whether Sonos may present copying

evidence to the jury.  In its order on D&M's *Daubert* motion, the Court explained that, not only

is it proper for the jury to hear evidence of D&M's copying, it is expected.  D.I. 427, pp. 27-29

("Sonos may, of course, still present evidence of copying to the jury," including, "for example,

[evidence] about the similarities between the names 'HEOS' and 'Sonos' and between products

lines, such as the 'PlAY:5' and the 'HEOS 5'," and "the jury . . . is fully competent to evaluate

the evidence and draw its own conclusion about whether D&M copied Sonos's technology and

products.").  D&M's arguments to the contrary lack merit.

Indeed, evidence of copying, including copying beyond the claimed features of the

Asserted Patents, is relevant to at least the subjective elements of willful infringement and

inducement.  *See*, *e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Intl., Inc.*, 843 F.3d

1315, 1333 (Fed. Cir. 2016) (finding evidence that defendant "fostered a corporate culture of

copying" and "competed with [patentee] by reverse engineering and copying of [patentee's]

products" to be relevant to inducement); *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*,

No. 09-290, 2012 WL 5451475, *2-3 (W.D. Penn. Nov. 7, 2012) (denying motion to exclude

copying evidence "beyond the specific patents-in-suit" because such evidence is "relevant to the

issue of willfulness" and "induced infringement"); *Parker-Hannifin Corp. v. Wix Filtration

Corp.*,  Nos. 07-1374, 07-1375,  2011 WL 976559, *10 (N.D. Ohio Mar. 17, 2011) (rejecting

defendant's argument that copying evidence related to "elements . . . not covered in the [asserted] patent," such as "the size and geometry of [patentee's product]," was not relevant to willfulness, and instead finding that "a jury could have used all of the aforementioned evidence . . . to reasonably infer that [defendant] copied [patentee's product]").[1]

Of particular relevance to the facts here is the *Carnegie* decision.  Like D&M, the defendant in *Carnegie* attempted to exclude evidence of copying from the jury on the basis that "any evidence of 'copying' or references to 'Kavcic' beyond the [asserted] patents are irrelevant to infringement and the issue of non-obviousness because such evidence is not tied to any specific claims of the [asserted] Patents."  2012 WL 5451475 at *1.  In response, the patentee asserted that such evidence is "tied to many of their arguments on infringement, inducement, non-obviousness and especially willfulness."  *Id*. at *2.  The court agreed with the patentee and denied the defendant's motion to exclude.  *Id*. at *3-4.  Specifically, the court stated that:

> The Court agrees with [patentee] that ***evidence regarding the "copying" story and references to "Kavcic" beyond the specific patents-in-suit are relevant to the issue of willfulness*** since such evidence has the tendency to make the existence of willfulness "more probable than it would be without such evidence".

*Id*. at *3 (quoting FED. R. EVID. 401) (emphasis added).  Further, the *Carnegie* court found that such copying evidence is also admissible as relevant to "induced infringement" and specifically to "determining the subjective beliefs of Defendants in regards to willful blindness."  *Id*. at *2.

For at least the reasons set forth in *Carnegie*, the Court should reject D&M's argument that copying evidence "beyond the specific patents-in-suit" is irrelevant and deny its motion.[2]

---

[1] *See also Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) (affirming jury finding of inducement based in part on evidence that defendant "deci[ded] to copy all but the cosmetic features of [patentee's product]").

[2] The two cases that D&M cites for support are inapposite here. In *AquaTex*, the Federal Circuit held that statements on the patentee's website were not sufficient to prove infringement under the doctrine of equivalents. 479 F.3d at 1328. The website evidence was not related to copying, let

While D&M appears to acknowledge that evidence of copying is relevant to willful infringement, D&M argues that such evidence should only be considered by "the Court in determining whether to exercise its discretion to enhance damages *after* a finding of willfulness." Defs.' Mot. Lim. No. 1 at pp. 3-4 (emphasis in original).  To support this assertion, D&M cites *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229 (Fed. Cir. 2017).  However, *Georgetown* does not stand for the proposition that copying evidence relevant to willfulness can only be presented to the Court (not the jury) after trial.  To the contrary, in finding that "[s]ubstantial evidence supports the jury's [willful infringement] finding," the Federal Circuit in *Georgetown* acknowledged that "***[t]he jury heard*** . . . 'circumstantial evidence that [defendant] copied [patentee's] technology." *Id*. at 1245 (emphasis added).  At most, *Georgetown* stands for the proposition that evidence of willfulness (including copying) goes to the jury[3] and then the court can exercise its discretion using the *Read* factors to determine whether such willful infringement warrants enhanced damages.  *Id*. at 1244-45.[4]

Accordingly, the Court should deny D&M's Motion *in Limine* # 1.

---

alone copying in the context of willfulness or inducement. In *Orthoarm*, while the district court excluded a demonstrative of the patentee's commercial embodiment despite the assertion that it was relevant to willfulness, the court recognized that "courts did not abuse their discretion by allowing a commercial embodiment to be used as a demonstrative device during opening statements or admitted into evidence as relevant to a charge of willful infringement and copying." 682 F. Supp. 2d at 981.

[3] *See, e.g.*, *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004) ("Determination of willfulness is made on consideration of the totality of the circumstances," and may include contributions of several factors, such as those compiled in *Read*, which are "evaluated and weighed by the trier of fact"); *Tenneco Auto. Operating Co. Inc. v. Visteon Corp.*, 375 F. Supp. 2d 360, 366 n.4 (D. Del. 2005) ("Although *Read Corp.* presented these factors as part of its analysis on enhancing damages, the Federal Circuit subsequently adopted these factors for determining willfulness.").

[4] Notably, *Read* factor (1) is "whether the infringer deliberately copied the ideas or design of another," which "encompass[es] . . . copying the commercial embodiment, not merely the elements of a patent claim."  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 n.7 (Fed. Cir. 1992).

## II.    SONOS'S OPPOSITION TO D&M'S MOTION *IN LIMINE* #2

D&M's Motion *in Limine* # 2 appears to confuse/conflate two very different issues:

(1) whether evidence that D&M copied Sonos before the Asserted Patents issued is relevant to

D&M's willful infringement of these patents and (2) whether D&M can be liable for willful

infringement of the Asserted Patents before they issued.[5]

With respect to (1), the Federal Circuit and other courts (including the District of

Delaware) have consistently held that an accused infringer's pre-issuance conduct, including

copying of a patentee, is relevant to willful infringement.  *See, e.g.*, *Minn. Min. and Mfg. Co. v.*

*Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992) (affirming finding

of willful infringement and noting that "although willfulness is generally based on conduct that

occurred after a patent issued, ***pre-patent*** conduct may also be used to support a finding of

willfulness.") (emphasis added); *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978-79 (Fed. Cir.

1986) (affirming finding of willful infringement and rejecting infringers argument that "the

allegedly improper copying took place *before* the patent was issued and therefore cannot be

considered") (emphasis in original); *Milgo Elec. Corp. v. United Bus. Commc's, Inc.*, 623 F.2d

645, 665-66 (10th Cir. 1980) (affirming finding of willful infringement and rejecting infringers

argument "that any copying endeavors that occurred ***prior*** to the date of issuance of the patents

cannot support a finding of willful infringement") (emphasis added); *Idenix Pharm. LLC v.*

*Gilead Sciences, Inc.*, Nos. 13-1987-LPS, 14-109-LPS, 14-846-LPS, 2016 WL 7380530, *1 (D.

Del. Dec. 4, 2016) (overruling accused infringers objection to evidence of pre-issuance copying

and stating that "[n]or is the Court persuaded that the law absolutely precludes ***pre-patent***

---

[5] Notably, D&M incorrectly suggests that the '949 Patent issued after this lawsuit was filed. Defs.' Mot. Lim. No. 2 at p. 5.  However, the '949 Patent issued on November 19, 2013, almost a year before Sonos filed this action, and Sonos is asserting willful infringement for any infringement after that date.

4

conduct from being probative of willfulness") (emphasis added); *Chimie v. PPG Indus., Inc.*, 218

F.R.D. 416, 422 (D. Del. 2003) ("Where there is particularly egregious behavior showing a party

intent on misappropriating a competitor's proprietary technology, courts have been willing to

consider that behavior as evidence of willfulness, even if some of the offending acts occurred

***before*** a patent issued.") (emphasis added).[6]

      With respect to (2), Sonos is not claiming that D&M is liable for willful infringement of

the asserted patents before they issued.  Instead, and contrary to D&M's assertion, Sonos

properly contends that evidence of pre-issuance copying is relevant to the issue of post-issuance

willful infringement.  Defs.' Mot. Lim. No. 2 at pp. 5-6.  In fact, in *Gustafson*, cited by D&M,

the Federal Circuit clearly stated that "[w]hether an act is 'willful' is by definition a question of

the actor's intent, the answer to which must be inferred from ***all*** the circumstances."  *Gustafson,*

*Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510-11 (Fed. Cir. 1990) (emphasis added).

The *Gustafson* court also pointed to numerous Federal Circuit decisions sustaining findings of

willful infringement where the infringer began manufacturing infringing products "***before***

issuance" of the asserted patent.  *Id.* at 10 (citing *Shiley, Inc. v. Bentley Laboratories, Inc.*, 794

---

[6] *See also Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 481-82 (Fed. Cir. 1985) (affirming finding of willful infringement based in part on pre-issuance evidence that infringer copied/based its design on patentee's system); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 12-00630, 2017 WL 2720220, *9, 12 (N.D. Cal. June 23, 2017) (affirming finding of willful infringement and noting that while "[t]he initial copying of the slide-to-unlock feature before the instant suit was filed [and before the issuance of the asserted patent] . . . cannot alone support a willfulness finding[,] . . . [t]he continued sale of a copied product supports an inference that Samsung's infringement was willful."); *Philippi-Hagenbuch, Inc. v. Western Tech. Servs. Int'l, Inc.*, No. 12-1099, 2013 WL 2419934, *2-3 (C.D. Ill. June 3, 2012) (agreeing with patentee "that copying and using the inventions before the Patents in Suit were issued" is relevant to willful infringement); *X-Tra Light MFG Inc. v. Acuity Brands, Inc.*, No. 04-1413, 2007 WL 7117888, * (S. D. Tex. Feb. 13, 2007) (denying "motion to exclude evidence of copying prior to patent issuance" because "[c]opying is relevant to the willfulness determination, and thus X–Tra Light will not be precluded from presenting evidence at trial that Acuity allegedly copied its design ***prior*** to patent issuance.") (emphasis added).

F.2d 1561, 1568 (Fed. Cir. 1986); *Pac. Furniture Mfg. Co. v. Preview Furniture Corp.*, 800 F.2d

1111, 1114-15 n. 9 (Fed. Cir. 1986); *Kaufman*, 807 F.2d at 979).

D&M's reliance on *W.S. Molnar Co. v. IKG Indus., a Div. of Harsco Corp.*, Nos. Civ. A.

95-1352, 95-1364, 1996 WL 128262, *1 (Fed.Cir. Mar. 21, 1996) (unpublished) is also

misplaced.  Indeed, contrary to D&M's suggestion, in *Molnar*, the Federal Circuit did not

address the jury's finding of willful infringement where "most of the evidence of copying

involved ***pre-issuance*** activity."  82 F.3d at *1 (emphasis added).  Instead, the issue on cross-

appeal in *Molnar* was merely whether the district court abused its discretion in denying the

patentee enhanced damages and attorney fees.  *Id*. at *1-2.[7]

Accordingly, to the extent that D&M is asking the Court to exclude pre-issuance

evidence of copying (or argument related thereto) as "irrelevant" to the issue of willful

infringement, Sonos respectfully requests that the Court deny D&M's Motion *in Limine* # 2.

---

[7] D&M also cites *Am. Original Corp. v. Jenkins Food Corp.*, 774 F.2d 459 (Fed. Circ. 1985) and
*Emory Univ. v. Glaxo Wellcome Inc.*, No. 1:96-CV-1868-GET, 1997 WL 854942 (N.D. Ga. Dec.
16, 1997).  However, D&M fails to recognize that the statements it relies on from these cases are
based on *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (*see Am.
Original*, 774 F.2d at 465; *Emory*, 1997 WL 854942 at *3), and the Federal Circuit in *Gustafson*
explained that "*State Industries* did not lay down a *per se* rule that willful infringement could
never be found when manufacture began ***before*** issuance of a patent" (*see Gustafson*, 897 F.2d at
510 (emphasis added)).

## III.    SONOS'S OPPOSITION TO D&M'S MOTION *IN LIMINE* #3

As an initial matter, D&M's motion in *limine* #3 is clearly a dispositive motion on

D&M's affirmative defense of absolute intervening rights in disguise, which is improper.  Courts

have consistently found that a motion in *limine* is not the proper vehicle to resolve a dispositive

issue, particularly in a situation like this where Sonos would be deprived of a full opportunity to

present evidence showing that the claims of the '949 Patent were not substantively changed.  *See*

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1378 (Fed. Cir. 2012).[8]

Nevertheless, to briefly address the merits of D&M's defense, it is well-established that

reexamination amendments "do not necessarily compel a conclusion that the scope of the claims

has been substantively changed." *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313,

1322-25 (Fed. Cir. 2016) (cited in D.I. 427).  Rather, to determine whether a substantive change

has been made, the intrinsic evidence must be analyzed and the claims must be interpreted under

the *Philips* standard, ***not*** the broadest reasonable interpretation standard as in reexamination.  *Id*.

Here, the added claim language did not substantively change the claims – a proper

*Philips* analysis shows that the language "for synchronized playback of a multimedia output

from the same multimedia source" only makes express what the term "player group" in the '949

Patent already meant.  The '949 Patent is directed to a networked audio system of "independent

playback devices" or "players" (i.e., audio speakers).  To play the same audio in synchrony, a

number of players can be dynamically "linked" or ***"grouped"*** together.  *See, e.g.,* '949 Patent, at

3:40-45, 6:56-60, 7:46-49, 8:1-8, 9:55-64, 10:17-29.  The '949 Patent also teaches that the

---

[8] D&M argues that the issue is "ripe for the Court's decision" and was "previously briefed in the
context of Sonos's Motions for Summary Judgment."  *Infra* at p. 7.  Sonos's Motion, however,
was directed to whether D&M forfeited its right to present its intervening rights defense – not
whether D&M had met its burden of proof on this defense.  Thus, the merits of D&M's
intervening rights defense were only tangential and certainly not fully briefed.  Further, given
that intervening rights only impacts damages, it need not be resolved as part of pretrial motions.

volume of the players in the group can be controlled individually or collectively, but each of the

players in the group necessarily plays back the same audio content in synchrony.  *Id*.

The '949 Patent repeatedly and consistently discloses that the very purpose of ***grouped***

players is "for synchronized playback of a multimedia output from the same multimedia source":

- "[***P***]*laying* and controlling **the audio source synchronously if the players are grouped together** . . ."  '949 Patent, at 3:40-45 (emphasis added).
- "[***G***]*rouping* a number of selected zone players into a ***zone group*** and ***synchronizing*** the zone players for ***one audio source***."  '949 Patent, at 7:46-49 (emphasis added).
- "[A] ***zone group*** including at least two zone players," which "can cause other zone players in the ***group*** to be ***synchronized*** so that all the zone players in the ***group*** **playback an *identical audio source*** or a list of identical audio sources in a ***timely synchronized manner***."  *Id*. at 8:1-8 (emphasis added).
- "[L]ink players in some rooms together to form a ***group*** so that players in these rooms are ***playing the same media in a synchronized fashion***, the user may activate the ***grouping*** function by activating 'link zones' 332 that leads to a user interface 340 as shown in FIG. 3D."  *Id*. at 9:55-59 (emphasis added).
- "[A]s soon as a second zone player joins the ***group***, the second zone player starts to be ***synchronized*** with the one already in the ***group*** and thus to play 'the Beatles' in this case. . . . [T]he user now can switch the ***group of players*** to any other type of media or a different piece of music and ***all of the zone players in the group will play the selected media at the same time***."  *Id*. at 10:17-29 (emphasis added).

This repeated and consistent disclosure in the '949 Patent definitively establishes that

"player group" in the original claims was ***already limited*** to a group of players configured "for

synchronized playback of a multimedia output from the same multimedia source."  *See, e.g.,*

*UltimatePointer, L.L.C. v. Nintendo Co., Ltd.*, 816 F.3d 816, 823-24 (Fed. Cir. 2016)*; In re*

*Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149-50 (Fed. Cir. 2012); *ICU Med., Inc. v. Alaris*

*Med. Sys., Inc.*, 558 F.3d 1368, 1374-75 (Fed. Cir. 2009).[9]

In fact, a "player group" in the context of the '949 Patent cannot mean anything else – it

---

[9] In addition, D&M's argument that the amended claims now require players to actually be "playing back . . . multimedia" is not correct.  As with the original claims, the amended claims only require that the players in the "player group" be configured "***for*** synchronized playback," not that the players actually (i.e., presently) be playing back audio in synchrony.

is a group of players configured for synchronized playback of the same audio source.

Thus, Sonos's addition of this language during reexamination merely made express what was already inherent in the claims, which is not a "substantive change" to the scope of the claims. *See, e.g., Convolve*, 812 F.3d 1322-25; *Tennant Co. v. Hako Minuteman, Inc.*, 878 F.2d 1413, 1417 (Fed. Cir. 1989); *Henrob Ltd. v. Bollhoff Systemtechnick GMBH & Co.*, No. 05-73214, 2009 WL 3188572, at *13 (E.D. Mich. Sept. 29, 2009).

Lastly, even if there had been a substantive change to the '949 Patent claims, D&M's absolute intervening rights defense does not apply to asserted claim 16 of the '949 Patent, which is a ***method*** claim.  Indeed, as this Court recently confirmed, there is a "distinction between process claims and product claims with regarding to absolute intervening rights."  D.I. 427 at p. 6.  This Court went on to find that absolute intervening rights "must extend not only to products that are asserted to infringe a modified product claim, but also to ***processes that were used to make those specific products***," because otherwise "the statutory protection for particular products made prior to . . . reexamination" would be undermined.  *Id*. at p. 7 (emphasis added).

However, asserted method claim 16 of the '949 patent does <u>not</u> recite a process ***used to make*** products.  To the contrary, asserted method claim 16 of '949 patent recites a ***method for controlling audio playback devices***, which falls outside of both the statutory language of 35 U.S.C. § 252 governing absolute intervening rights and the Court's recent ruling.  *See NetAirus Techs., LLC v. Apple, Inc.*, No. 10-3257, 2013 WL 3089061, at *2, 4, 6 (C.D. Cal. May 23, 2013) (absolute intervening rights did not apply to claims reciting method for handset communication).  Only ***equitable*** intervening rights could apply to this process claim, and D&M has explicitly chosen not to assert such rights.  D.I. 427.

For at least these reasons, Sonos requests that D&M's motion *in limine* #3 be denied.

9

# D&M's Replies in Support of its Motions *in Limine* Nos. 1-3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SONOS, INC. | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. 14-1330 (RGA) |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| D&M HOLDINGS INC. d/b/a THE | § | |
| D+M GROUP, D&M HOLDINGS U.S. | § | |
| INC., and DENON ELECTRONICS | § | |
| (USA), LLC, | § | |
| | § | |
| Defendants. | § | |

### DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION IN LIMINE

TO THE HONORABLE COURT:

Pursuant to Federal Rule of Evidence 103(c), Defendants D&M Holdings, Inc., d/b/a The D+M Group, D&M Holdings U.S. Inc.  and Denon Electronics (USA), LLC, ("Defendants" or "D&M") file this Reply in Support of its Motions in Limine and respectfully requests that the court exclude from use at trial, for any purpose, argument, evidence, testimony or suggestion of the following matters:

**DEFENDANTS' MOTION IN LIMINE**        **Page 1**

## I.      DEFENDANTS' MOTION IN LIMINE # 1

Sonos argues, incorrectly, that the Court already decided this motion when it granted

D&M's *Daubert* motion to preclude Sonos's experts' "copying" opinions.  Sonos Resp. at 1. The

Court has never considered whether Sonos may introduce evidence or argue that a comparison

between the parties' branding, websites and product appearance is admissible under Rules 402

and 403.  To be sure, the HEOS and SONOS brands and products will be present at trial and the

jury may draw its own conclusions from that evidence.  Sonos should not, however, be permitted

to argue that websites, fonts, and side-by-side comparisons of physical appearances are relevant

to alleged willful infringement of utility patents relating to group volume control and

synchronization.  Rather than focusing on the technical issues relevant to Sonos's infringement

case, Sonos appears resolved to turn this trial into a sideshow and attempt to inflame the jury

through purported "copying" evidence that has nothing whatsoever to do with the asserted

claims.  This type of evidence should be excluded under Rule 403 because it carries a great risk

of causing D&M "unfair prejudice," "confusion of issues," and "misleading the jury."

None of Sonos's cases endorse comparisons of physical appearance, marketing, branding

or websites to show willfulness.[1]  *Fairchild* holds that it was proper to allow evidence regarding

a "corporate culture of copying" and "reverse engineering."[2]  Similarly, *Carnegie*, merely denies

a blanket request to exclude all copying evidence.[3]  *Georgetown Rail Equipment*[4] involved

---

[1] *Parker-Hannifin Corp. v. Wix Filtration Corp.*, is also inapposite because the "size and geometry" of Defendants' filter product was directly tied to the patented apparatus, which the physical specifications of a filter. Nos. 07-1375, 2011 WL 976559, *10 (N.D. Ohio Mar. 17, 2011); U.S. Pat. No. 5643446.

[2] *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1333 (Fed. Cir. 2016)

[3] *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, No. 09-290, 2012 WL 5451475, *2-3 (W.D. Penn. Nov. 7, 2012).

[4] *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 (Fed. Cir. 2017).

**DEFENDANTS' MOTION IN LIMINE**        **Page 2**

evidence that a Defendant copied "*technology*," and not marketing material, branding or physical appearance.  Defendants' motion should be granted.

## II.   DEFENDANTS' MOTION IN LIMINE # 2[5]

Admitting that it cannot allege willful infringement before the patent claims issued (Sonos Resp. at 5), Sonos instead argues that  D&M willfully infringed the '258 and '949 Patents by continuing to sell its products post-issuance during this lawsuit.  Under these circumstances, however, pre-issuance conduct is irrelevant to willfulness as a matter of law.

The Supreme Court recognized in *Halo* that the willfulness inquiry does not include "facts that the defendant neither knew nor had reason to know at the time he acted."  136 S. Ct. 1923, 1933 (2016).  The Federal Circuit has further held that "the scope of claims in patents that do issue [in the future] is something totally unforeseeable."  *State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) (no willfulness where claims were drawn to allegedly infringing product).  D&M's' pre-issue conduct could not possibly infringe the unissued patent claims and D&M had no reason to believe the claims would issue as they did.

Sonos's cases do not address whether Sonos may present willfulness evidence for patent claims that were drafted and prosecuted only (a) after the present lawsuit was filed, and (b) after the accused products had been on sale for more than a year.  In this context, courts have found pre-issue conduct irrelevant.  *MasterObjects, Inc. v. Google, Inc.*, No. C 11-1054 PJH, 2013 WL 12177460, at *1 (N.D. Cal. May 2, 2013) (when patent issued post-suit, "Google's pre-issuance conduct [was] irrelevant to the issue of willful infringement.").[6]  D&M's motion is meritorious.

---

[5] D&M has never stated that the '949 Patent issued prior to this lawsuit, but rather, that the asserted claims of the '949 Patent issued after this lawsuit.

[6] *See also Vasudevan Software, Inc. v. TIBCO Software Inc.*, No. C 11-06638 RS, 2012 WL 1831543, at *3 (N.D. Cal. May 18, 2012) ("The requisite knowledge of the patent allegedly infringed simply cannot be inferred from mere knowledge of other patents, even if somewhat similar."); *c.f. Power Lift, Inc. v. Lang Tools, Inc.*, 774 F.2d 478, 482 (Fed. Cir. 1985)

**DEFENDANTS' MOTION IN LIMINE**          Page 3

## III.  DEFENDANTS' MOTION IN LIMINE #3:

This issue is critical to Sonos's damages and ripe for a pre-trial ruling as a matter of law. Sonos's argument that the term "player groups" (in the original claims) inherently required "synchronization" and "playback from the same multimedia source" (in the reexamined claims) commits a "cardinal sin" by retrospectively reading narrowing limitations from the specification into the original claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319-20 (Fed. Cir. 2005). Further, the Court rejected this argument explaining that "a change which is made [] in response to a prior art rejection is very strong evidence of a substantive change." Oct. 30 Trans. at 24:22-29:20; *see also* D.I. 428 at p. 9.   Sonos's contention that groups of player "can" play "synchronously" also fails to address D&M's citations showing that groups can be formed and preserved independent of synchronous, or any playback.  '949 Patent at 2:28-37; 11:34-36.

Ignoring this Court's ruling (D.I. 428 at 7) and *MonoSol Rx*,[7] Sonos again claims that intervening rights do not apply to method claims.  Sonos also ignores *BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, which explains that absolute intervening rights "provide[] an accused infringer with the absolute right to <u>use or sell a product</u> that was made, used, or purchased before the grant of the reissue patent as long as this activity does not infringe a claim of the reissue patent that was in the original patent." 1 F.3d 1214, 1220–21 (Fed. Cir. 1993) (emphasis added). "This absolute right extends only to anything made, purchased, or used before the grant of the reissue patent.  In other words, it covers <u>products already made</u> at the time of reissue." *Id.* at 1221 (emphasis added).  Defendants' motion should be granted.

---

(distinguishing *State Ind.* because "State reacted by filing a new patent application, claiming an improvement over its previous water heater, with claims drafted to cover the Smith device.")
[7] *MonoSol Rx, LLC v. Biodelivery Scis. Int'l,  Inc.*, No. 10-5695, 2015 WL 5679891, at *17 (D.N.J. Sept. 25, 2015) (holding that method claims were subject to intervening rights); *See also R+L Carriers, Inc. v. Qualcomm, Inc.*, 801 F.3d 1346, 1349-51 (Fed. Cir. 2015); *Univ. of Virginia Patent Found. v. Gen. Elec. Co.,* 755 F. Supp. 2d 709, 735-38 (W.D. Va. 2010).

Respectfully submitted,

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ John M. Jackson
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

OF COUNSEL:

John M. Jackson
Matthew C. Acosta
Blake T. Dietrich
Christopher J. Rourk
Robert P. Latham
JACKSON WALKER L.L.P.
2323 Ross Avenue, Suite 600
Dallas, TX 75201
(214) 953-6000

David Folsom
JACKSON WALKER L.L.P.
6002 Summerfield, Suite B
Texarkana, TX 75503
(903) 255-3250

Wasif Qureshi
JACKSON WALKER LLP
1401 McKinney, Ste. 1900
Houston, Texas 77010
(713) 752-4521
wqureshi@jw.com

*Attorneys for D&M Holdings Inc. d/b/a The D+M Group, D&M Holdings U.S. Inc. and Denon Electronics (USA), LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused copies of the foregoing document to be served on November 14, 2017, upon the following in the manner indicated:

George I. Lee                                                                          *VIA ELECTRONIC MAIL*
Sean M. Sullivan
Rory P. Shea
J. Dan Smith
Michael Boyea
Jae Pak
Cole Richter
LEE SULLIVAN SHEA & SMITH LLP
224 N. Desplaines Street
Suite 250
Chicago, IL 60661
(312) 754-9602

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*/s/ John M. Jackson*
John M. Jackson