IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SONOS, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> D&M HOLDINGS INC. d/b/a THE D+M GROUP, D&M HOLDINGS U.S. INC., and DENON ELECTRONICS (USA), LLC, <br><br> *Defendants*. | Civil Action No. 14-1330-WCB |

## MEMORANDUM OPINION AND ORDER

Before the Court is <u>Defendants' Motion for Judgment on Absolute Intervening Rights with Respect to the '949 Patent</u>, Dkt. No. 463. The motion is granted.

## BACKGROUND

Defendants D&M Holdings Inc., D&M Holdings U.S. Inc., and Denon Electronics (USA), LLC (collectively, "D&M") seek a ruling that D&M is not liable for patent infringement for specific things that D&M made, offered for sale, sold, or used before the issuance of the reexamination certification for plaintiff Sonos, Inc.'s U.S. Patent No. 8,588,949 ("the '949 patent"), on November 5, 2015. D&M invokes what is referred to as the "absolute intervening rights" that are provided by the first sentence of the second paragraph of section 252 of the Patent Act, 35 U.S.C. § 252. That sentence reads as follows:

> A reissued patent shall not abridge or affect the right of any person or that person's successors in business who, prior to the grant of a reissue, made, purchased, offered to sell, or used within the United States, or imported into the United States, anything patented by the reissued patent, to continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold, the specific thing so made, purchased, offered for sale, used, or imported unless the making,

using, offering for sale, or selling of such thing infringes a valid claim of the reissued patent which was in the original patent.

Section 307(b) of the Patent Act, 35 U.S.C. § 307(b), provides that the protections of section 252 apply to reexamined patents as well as reissued patents.[1]

A significant portion of Sonos's damages claim in this case pertains to D&M's alleged infringing activity that took place prior to November 5, 2015, the issuance date of the reexamination certificate for the '949 patent. D&M claims that it enjoys absolute intervening rights under section 252 for all of its activities alleged to infringe both asserted claims of the '949 patent, claims 1 and 16.

The intervening rights issue has been raised twice before in this litigation. First, Sonos filed a motion for a summary judgment seeking a ruling from the Court that D&M could not invoke intervening rights. Dkt. No. 289. In an opinion issued on November 1, 2017, the Court denied Sonos's motion. Dkt. No. 428. Subsequently, D&M filed a motion in limine seeking a ruling from the Court that, because of intervening rights, Sonos should not be allowed to introduce evidence of infringement of the '949 patent attributable to those products that were made, used, purchased, sold, or offered for sale before November 5, 2015. Dkt. No. 438. The Court denied the motion, ruling that the request was not appropriate as a motion in limine because it sought a dispositive ruling with respect to a portion of the claimed relief in this case. Dkt. No. 453. The Court subsequently granted D&M leave to seek a dispositive ruling on that

---

[1] D&M has not asserted the defense of equitable intervening rights, which is embodied in the second sentence of the second paragraph of section 252. See Dkt. No. 343, at 4-5. The statutory provision establishing equitable intervening rights authorizes the court to allow the continued manufacture, use, or sale of additional products covered by the reissued or reexamined patent when the accused infringer made, purchased, or used identical products, or made substantial preparations to make, use, or sell identical products, before the reissue or reexamination date, "under such terms as the court deems equitable for the protection of investments made or business commenced." 35 U.S.C. § 252 (second paragraph, second sentence); see Shockley v. Arcan, Inc., 248 F.3d 1349, 1360-61 (Fed. Cir. 2001).

issue with full briefing. Dkt. No. 455. The parties have now briefed the issue, Dkt. Nos. 463, 472, and the Court is prepared to rule.

## DISCUSSION

By its terms, section 252 makes clear that in order to establish entitlement to absolute intervening rights with regard to the '949 patent, D&M must show that the asserted reexamined claims of that patent were not "in the original patent." Thus, if the claims of the reexamined patent have been changed in substance from the original claims, D&M satisfies that prerequisite for entitlement to intervening rights. D&M must then show that the statutory protection applies to its activities.

The two asserted claims of the '949 patent are claims 1 and 16. Claim 16 depends from independent claim 15. In their original form, the claims provided as follows:

> **1.** A multimedia controller including a processor, the controller configured to:
> provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each layer is an independent playback device configures to playback a multimedia output form a multimedia source;
> accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;
> for each of the plurality of players within the player group, accept via the user interface an input to adjust a volume associated with the player, wherein the input to adjust the volume associated with the player causes the corresponding independent playback device to adjust its volume; and
> accept via the user interface an input to adjust a volume associated with the player group, wherein the input to adjust the volume associated with the group causes the corresponding independent playback devices in the player group to adjust their volumes.
>
> **15.** A method comprising:
> displaying a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each layer is an independent playback device configures to playback a multimedia output form a multimedia source;

receiving via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group;

receiving via the user interface an input to adjust a volume associated with one of the players within the player group, and responsively instructing the corresponding independent playback device within the player group to adjust its volume; and

receiving via the user interface an input to adjust a volume associated with the player group, and responsively instructing the corresponding independent playback devices in the player group to adjust their volumes.

**16.** The method of claim **15**, further comprising:
receiving via the user interface an input to remove one of the plurality of players from the player group, and responsively removing the one of the plurality of players from the player group.

Claim 16 was not amended during the reexamination. Following the reexamination, claims 1 and 15 were rewritten to provide as follows[2]:

**1.** A multimedia controller including a processor, the controller configured to:

provide a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each layer is an independent playback device configures to playback a multimedia output form a multimedia source;

accept via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source*;

for [each of the plurality of players within] *any individual player in* the player group, accept via the user interface [an] *a player-specific* input to adjust a volume [associated with the] *of that individual* player, wherein the *player-specific* input to adjust the volume [associated with the] *of that individual* player causes [the corresponding independent playback device] *that individual player* to adjust its volume; and

accept via the user interface [an] *a group-level* input to adjust a volume associated with the player group, wherein the *group-level* input to adjust the volume associated with the *player* group causes [the corresponding independent playback devices] *each of the players* in the player group to adjust [their volumes] *its respective volume*.

---

[2] Italics indicate additions; text within brackets was removed.

**15.** A method comprising:

displaying a user interface for a player group, wherein the player group includes a plurality of players in a local area network, and wherein each layer is an independent playback device configures to playback a multimedia output form a multimedia source;

receiving via the user interface an input to facilitate formation of the player group, wherein the input to facilitate formation of the player group indicates that at least two of the plurality of players in the local area network are to be included in the player group *for synchronized playback of a multimedia output from the same multimedia source*;

receiving via the user interface [an] *a player-specific* input to adjust a volume [associated with one of the players within] *of an individual player* in the player group, and responsively instructing [the corresponding independent playback device] *that individual player* to adjust its volume; and

receiving via the user interface [an] *a group-level* input to adjust a volume associated with the player group, and responsively instructing [the corresponding independent playback devices] *each of the players* in the player group to adjust [their volumes] *its respective volume*.

### A.

The "absolute intervening rights" provision in section 252 provides that the owner of a patent that survives reexamination "is only entitled to infringement damages for the time period between the date of issuance of the original claims and the date of the reexamined claims if the original and the reexamined claims are substantially identical." Convolve, Inc. v. Compaq Comput. Corp., 812 F.3d 1313, 1322 (Fed. Cir. 2016) (quoting R & L Carriers, Inc. v. Qualcomm, Inc., 801 F.3d 1346, 1351 (Fed. Cir. 2015)). In determining whether the original and reexamined claims are substantially identical, "[i]t is the scope of the claim that must be identical, not that identical words must be used." Id. (quoting Slimfold Mfg. Co. v. Kinkead Indus., Inc., 810 F.2d 1113, 1116 (Fed. Cir. 1987)). Amendments made during reexamination, even those made after a rejection based on prior art, "do not necessarily compel a conclusion that the scope of the claims has been substantively changed," even when the amendments were made "after a rejection based on prior art." Id. Rather, "[t]o determine whether a claim change is substantive it is necessary to analyze the claims of the original and the reexamined patents in

5

light of the particular facts, including the prior art, the prosecution history, other claims, and any other pertinent information." Id. (alteration in original) (quoting Laitram Corp. v. NEC Corp., 952 F.2d 1357, 1362-63 (Fed. Cir. 1991)). The court applies traditional claim construction principles and pays "particular attention to the 'examiner's focus in allowing the claims' after amendment." Id. at 1322-23 (quoting R & L Carriers, Inc., 801 F.3d at 1351).

The parties disagree about whether claims 1 and 16 of the '949 patent were changed in reexamination. The main change made in both claims was the addition, in reexamined claim 1 and claim 16 (through reexamined claim 15), of the words "for synchronized playback of a multimedia output from the same multimedia source."

Sonos's expert, Dr. Almeroth, stated in his report that "[a]fter reviewing the differences between the original and amended claims of the '949 patent, it is my opinion that the amendments made during prosecution of the '949 patent did not substantively change the scope of the claims." Dkt. No. 311, Ex. E-3, at 75 (¶ 205). Instead, he stated, "it is my opinion that these amendments merely clarified the claim language by making explicit what was always implicit in the original claims when such claims were viewed in the context of the intrinsic evidence." Id. He added that in his view it was "clear that 'synchronized playback of a multimedia output from the same multimedia source' was an implicit aspect of a 'player group' as recited in the original claims." Id.

D&M's expert, Dr. Bims, disagreed. He pointed out that in the course of the reexamination, all of the claims of the original patent were rejected as anticipated by U.S. Patent No. 5,761,320 to Farinelli. Dkt. No. 309, Ex. C, at 77 (¶ 246). Sonos did not at that point amend its claims, but argued that Farinelli was not an anticipating reference. Id. at 77-79 (¶¶ 247-49). After the examiner issued a final rejection, however, Sonos amended claims 1 and 15 to add the

6

language "synchronized playback of a multimedia output from the same multimedia source" that has given rise to D&M's claim of intervening rights. Id. at 79-80 (¶¶ 250-54).

As D&M points out, amendments made to overcome a prior art rejection during reexamination are "a highly influential piece of prosecution history," and it is "difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment." Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1348 (Fed. Cir. 1998). Because the evidence shows that the language that was added during reexamination to claims 1 and 15 (and thus to dependent claim 16) was added to overcome a prior art rejection, Sonos bears a heavy burden to show that the claims were not substantively altered.

Sonos attempts to meet that burden by arguing that the proper construction of the term "player group" in original claims 1 and 16 implicitly contained requirements that the player group be "for synchronized playback of a multimedia output from the same multimedia source." Sonos relies on the specification of the '949 patent, which discloses that players in networked multi-room audio systems can be dynamically grouped together so that the players are configured for synchronous playback of audio from the same source.

The problem with Sonos's argument is that nothing in the specification indicates that the capacity for synchronous playback is a necessary limitation of original claims 1 or 16. Although there are numerous references in the specification to synchronous playback, almost all of them are in the context of describing either (1) "one aspect of the present invention," '949 patent, col. 2, ll. 30-35; (2) a preferred embodiment, id., col. 3, ll. 6-15, 28-39; col. 6, ll. 56-58; col. 7, ll. 46-49; col. 8, ll. 1-8; or (3) an example, id., col. 9, ll. 49-59; col. 10 ll. 20-29. Only one passage from the specification among the passages cited by Sonos does not fall into one of

those categories. That passage, found at column 3, lines 40-45, states: "One of the objects, features, and advantages of the present invention is to remotely control a plurality of multimedia players in a multi-zone system, playing and controlling the audio source synchronously if the players are grouped together, or playing and controlling the audio source individually if the players are disassociated with each other." Given the frequency with which the specification describes the synchronous playback capacity as a feature of preferred embodiments, that passage is not sufficient to indicate that original claims 1 and 16, which do not include any reference to synchronous playback, nonetheless implicitly require that capability. The Court therefore concludes that Sonos has not satisfied the heavy burden of showing that, notwithstanding the alteration in the claim language based on the examiner's prior art rejection, the change made to the claims during reexamination had no effect on their scope.

**B.**

Sonos next argues that even if intervening rights are available to D&M with regard to claim 1 of the '949 patent, an apparatus claim, intervening rights are not available with regard to claim 16, a method claim. Sonos points to the difference between the portion of section 252 that creates absolute intervening rights and the portion that creates equitable intervening rights. Only the latter extends intervening rights to "any process patented" by the reexamined patent. Based on that difference in the statutory text, Sonos argues that absolute intervening rights have no application to method claims, such as claim 16 of the '949 patent. See NetAirus Techs., LLC v. Apple, Inc., No. LA CV10-3257, 2013 WL 3089061, at *6 (C.D. Cal. May 23, 2013).

A close reading of the statute makes it clear that the matter is not that simple. The statutory protection offered by absolute intervening rights does not depend on whether the

8

claims at issue are apparatus or method claims. Rather, absolute intervening rights extend to the "specific thing" that that was made, purchased, offered for sale, used, or imported before the issuance of the reissued or reexamined claims. Thus, the distinction between absolute intervening rights and equitable intervening rights is that absolute intervening rights extend only to those "specific thing[s]" in existence before the reissuance or reexamination, while under the doctrine of equitable intervening rights, a court can allow a party to continue to practice a process covered by the reissued or reexamined patent if the statutory conditions for that relief are satisfied. See generally BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1220-21 (Fed. Cir. 1993) (noting the narrow statutory language applicable to absolute intervening rights as compared to the broader language applicable to equitable intervening rights).[3]

As the Court noted in its order dated November 1, 2017, drawing a sharp line between product claims and method claims in determining eligibility for absolute intervening rights could result in defeating the purpose of the statute to provide intervening rights for particular goods made prior to the reissue or reexamination. For example, if particular goods were made by a process that is separately covered by a process claim that was also changed upon reissuance or reexamination, absolute intervening rights would be of no benefit to the accused infringer if the patentee could simply assert a parallel process claim against the process that was used to make the very same products that were intended to be protected by absolute intervening rights. Thus,

---

[3] P.J. Federico, one of the principal authors of the 1952 Patent Act that added section 252 explained that the protection of absolute intervening rights extended only to the things made before the reissue, whereas equitable intervening rights could extend to "the continued practice of a process patented by the reissue" if the court determined that it was equitable to so provide. See P.J. Federico, Commentary on the New Patent Act, 75 J. Pat. & Trademark Off. Soc'y 161, 207-08 (1975 reprint; original 1954); P.J. Federico, Intervening Rights in Patent Reissues, 30 Geo. Wash. L. Rev. 603, 632-33 (1961-62).

to apply the statutory language, it is necessary to focus on the nature of the product or the activity in question so as to determine whether the protection of absolute intervening rights is being extended to "specific thing[s]" in existence at the time of the reexamination.

C.

Applying absolute intervening rights in the context of claim 16 of the '949 patent is rendered somewhat difficult by the fact that the product accused of infringing that claim is in the form of downloaded software. See Dkt. No. 437-1, Ex. J (Sonos's infringement chart). If the accused controller were a physical device sold by D&M that performed all the functions of the D&M controller software, the application of absolute intervening rights would be straightforward. Assuming a substantive change in claim 16, as the Court has found, D&M would be entitled to "continue the use of, to offer to sell, or to sell to others to be used, offered for sale, or sold" the specific controllers that had been "made, purchased, offered for sale, used, [or] imported." 35 U.S.C. § 252. The use or sale of those particular controllers that had already been manufactured would not be subject to infringement liability, even if they were used to practice the method recited in claim 16. Controllers made after the date of the reexamination certificate, however, would be subject to both the apparatus claim 1 and the method claim 16.

The same analysis would apply if the controller software were sold in a tangible package—for example, as a CD with the software loaded onto it. Absolute intervening rights would attach to the particular CDs that were in existence as of the date of the reexamination, but not to any CDs produced thereafter. The CDs that were made prior to the date of the reexamination could be sold, and the purchasers could use them on a device capable of displaying the allegedly infringing user interface without liability for infringement.

Logic requires that the same reasoning be applied to software that is distributed to customers by being downloaded. In that instance, the particular copies of the downloaded software that were distributed before the issuance of the reexamination certificate are the "specific thing[s]" that are protected by absolute intervening rights. Copies made after the reexamination certificate was issued are subject to infringement liability under both claims 1 and 16. For that reason, the Court holds that D&M is not liable for infringement of claims 1 or 16 of the '949 patent based on the download of those copies of its controller application that occurred prior to November 5, 2015, and the subsequent use of those copies. Any copies of the software made thereafter would not be protected by absolute intervening rights and thus would be subject to infringement liability.

The Court therefore directs that the scope of Sonos's infringement claims and its potential relief in the form of damages will be limited by the operation of absolute intervening rights in accordance with the foregoing opinion.

IT IS SO ORDERED.

SIGNED this 7th day of December, 2017.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE